**No. 26-2569**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

AVISTA CORPORATION, *et al.*
*Petitioners,*

*v.*
BONNEVILLE POWER ADMINISTRATION, *et al.*
*Respondents,*

*and*
NORTHWEST REQUIREMENTS UTILITIES, *et al.*,
*Intervenors*

On Petition for Review Under the Northwest Power Act

# RESPONDENTS' ANSWERING BRIEF

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
*Assistant General Counsel*

NEAL M. GSCHWEND
*Attorney*
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208
503-230-3128

SCOTT E. BRADFORD
*United States Attorney*
*District of Oregon*

SEAN E. MARTIN
*Assistant U.S. Attorney*

RICHARD A. GREENE
*Special Asst. U.S. Attorney*
P.O. Box 3621
Portland, OR 97208
503-230-4626

*Attorneys for Respondents*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ vi

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ........ xii

INTRODUCTION........ 1

STATEMENT OF JURISDICTION........ 4

STATEMENT OF THE ISSUES........ 4

STATEMENT PURSUANT TO CIRCUIT RULE 28-2.7........ 5

STATEMENT OF THE CASE........ 5

A. Historical context for the Residential Exchange Program ........ 5

B. The Northwest Power Act and the advent of the REP........ 7

1. Section 5(c) – Energy-neutrality and calculating the REP's "cost benefits." ........ 7

2. Section 7(b)(2) – Protecting COUs' rates from REP costs. ........ 9

C. REP implementation history........ 10

1. REP disputes and this Court's decisions in *PGE* and *GNA*. ........ 10

2. The 2012 REP Settlement and this Court's decision in *APAC*. ........ 11

D. Post-2028 REP planning and the Provider of Choice (Section 5(b)) process to assign Environmental Attributes with physical power. ........ 13

E. The 2026 RPSA contract template and ROD development process........ 14

SUMMARY OF ARGUMENT ........................................................................................ 16

STANDARD OF REVIEW.......................................................................................... 20

ARGUMENT ................................................................................................................. 22

I. CONGRESS ESTABLISHED SECTION 5(c)(1) AS A FINANCIAL ACCOUNTING MECHANISM TO PROVIDE COST BENEFITS, NOT PHYSICAL POWER DELIVERIES .............................. 22

A. The statutory text, contemporaneous agency practice, litigant admissions, and decades of circuit interpretation affirm that Section 5(c)(1) creates a non-physical paper transaction ................................................... 22

1. The plain text of Section 5(c)(1) indicates that "purchase" and "sell" establish a non-physical, paper transaction..............................................................22

2. BPA's "paper transaction" interpretation was contemporaneous with the Act's passage. .....................26

3. The IOUs concede that the plain language of Section 5(c)(1) does not require physical delivery. ......................................................................27

4. Ninth Circuit cases have uniformly read Section 5(c)(1) as a non-physical, paper transaction. ...............29

B. The statutory scheme, context, and legislative purpose reinforce that Section 5(c)(1) was designed solely to generate a "cost benefit" through an energy-neutral paper transaction ............................................................ 32

1. Sections 5(c)(2), 5(c)(3), and the timing provision of Section 5(g), demonstrate that Section 5(c)(1) is a financial mechanism designed solely to calculate monetary "cost benefits" for retail loads.......................................................33

2. Section 5(c)(1) conspicuously omits every hallmark of a mandatory physical power sale present elsewhere in the Act. ....37

3. Section 5(c)(4) restricts contract termination exclusively to adverse economics, omitting operational exit remedies. ....40

4. Section 5(c)(5) authorizes a physical power substitution in explicit contrast to Section 5(c)(1)'s baseline paper exchange. ....41

5. Section 5(c)(6) enforces energy neutrality and insulates the financial construct from physical curtailment. ....44

6. Implementing Section 5(c)(1) as an energy-neutral paper transaction harmonizes the Act and avoids severe conflicts with preference rights and COU eligibility for the REP. ....45

7. BPA's construction faithfully fulfills Congress's core statutory purpose for the REP. ....49

C. Section 5(c)(1) affords no elective right to the IOUs to dictate the transactional form of the REP, and Section 9(b) cannot be invoked to manufacture one. .... 52

1. Section 5(c)(1) confers no unilateral discretion on the IOUs to choose between transactional modes. ....52

2. The statutory architecture and omission of power attributes foreclose an elective physical regime. ....54

3. If Section 5(c)(1) mandated physical sales, Section 9(b) could not convert that mandatory requirement into a discretionary option. ....54

II. SECTION 5(c) DOES NOT ENTITLE THE IOUS TO "NON-COST BENEFITS" ..... 57

A. The plain language of Section 5(c) and controlling precedent establish that the REP benefits are exclusively limited to "cost benefits" ..... 57

B. BPA cannot circumvent statutory limits by relabeling the benefits or monetizing non-cost benefits through the RPSA ..... 59

1. Labeling non-cost benefits "inherent" cannot evade statutory limits. ..... 59

2. Monetizing speculative attributes directly contravenes the Section 7(b)(2) rate ceiling test. ..... 61

C. The broader statutory context confirms that Congress intended the REP to provide only cost benefits. ..... 63

1. The mandatory residential pass-through provisions confirm that the Section 5(c)(1) exchange is exclusively financial and excludes non-cost benefits. ..... 63

2. Rate and funding provisions confirm that the REP operates exclusively as an accounting mechanism for net costs rather than non-cost benefits. ..... 65

3. Elsewhere in the Act, Congress expressly provided for non-cost and capacity benefits, demonstrating that their omission from Section 5(c) was intentional. ..... 66

D. The existing statutory formula already accounts for state environmental mandates by expanding statutory cost benefits. ..... 69

E. BPA's prior settlements and administrative reporting policies do not require conveying environmental attributes as part of the REP ........ 70

F. The IOUs' and Amici's unsubstantiated pleas regarding equity cannot override Congress's exclusive statutory design for the REP ........ 72

CONCLUSION ........ 74

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*,
467 U.S. 380 (1984) ........ passim

*Assoc. of Pub. Agency Customers v. Bonneville Power Admin.*,
733 F.3d 939 (9th Cir. 2013) ........ passim

*Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson*,
807 F.2d 1456 (9th Cir. 1987) ........ 30, 42, 43

*Cent. Elec. Coop. v. Bonneville Power Admin.*,
835 F.2d 199 (9th Cir. 1987) ........ 29, 48, 49

*Cent. Lincoln Peoples' Util. Dist. v. Johnson*,
735 F.2d 1101 (9th Cir. 1984) ........ 7

*Comm. for a Better Arvin v. United States Env't Prot. Agency*,
185 F.4th 957 (9th Cir. 2026) ........ 46

*Confederated Tribes of the Umatilla Indian Rsrv. v. Bonneville Power Admin.*,
342 F.3d 924 (9th Cir. 2003) ........ 21

*CP Nat'l Corp. v. Bonneville Power Admin.*,
928 F.2d 905 (9th Cir. 1991) ........ 29, 30, 31, 50

*Enying Li v. Holder*,
738 F.3d 1160 (9th Cir. 2013) ........ 31

*Golden Nw. Aluminum, Inc. v. BPA*,
501 F.3d 1037 (9th Cir. 2007) ........ 11, 29, 58

*Idaho Conservation League v. Bonneville Power Admin.*,
142 F.4th 636 (9th Cir. 2025) ........ 32

*Idaho Conservation League v. Bonneville Power Admin.*,
83 F.4th 1182 (9th Cir. 2023) ........................ passim

*Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp.*,
387 F.3d 1046, 1051 (9th Cir. 2004) ........................ 23

*Jones v. Hendrix*,
599 U.S. 465 (2023) ........................ 45

*KalshiEX, LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) ........................ 33

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................ 20, 21, 26

*Murphy v. Smith*,
583 U.S. 220, 223 (2018) ........................ 52

*Northwest Environmental Defense Center v. BPA*,
117 F.3d 1520 (9th Cir. 1997) ........................ 43

*Pac. Power & Light Co. v. Bonneville Power Admin.*,
795 F.2d 810 (9th Cir. 1986) ........................ 29

P*acific Northwest Generating Coop. v. BPA,*
580 F.3d 792 (9th Cir. 2009) ........................ 30, 59

*PacifiCorp v. FERC,*
795 F.2d 816 (9th Cir. 1986) ........................ 5, 29, 37, 50

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
501 F.3d 1009 (9th Cir. 2007) ........................ passim

*Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*,
767 F.2d 622 (9th Cir. 1985) ........................ 29

*Pub. Util. Dist. No. 1 of Douglas Cnty. v. Bonneville Power Admin.*,
947 F.2d 386 (9th Cir. 1991) .......... 20, 21

*State v. Su*,
121 F.4th 1 (9th Cir. 2024) .......... 53, 58, 62

*United States v. Alaska*,
151 F.4th 1124 (9th Cir. 2025) .......... 36

*Utility Reform Project v. Bonneville Power Admin.*,
869 F.2d 437 (9th Cir. 1989) .......... 47

*Wash. Utils. & Trans. Comm'n v. FERC*,
26 F.3d 935 (9th Cir. 1994) .......... 29

*West Texas Utilities Co. v. Texas Elec. Serv. Co.*,
470 F.Supp. 798 (N.D. Tex. 1979) .......... 23

*Wheeler v. City of Santa Clara*,
894 F.3d 1046 (9th Cir. 2018) .......... 67

**Statutes**

16 U.S.C. § 832c(a) .......... 5, 6

16 U.S.C. § 832d(b) .......... 47

16 U.S.C. § 839a(18) .......... 64

16 U.S.C. § 839a(4)(B) .......... 66, 67

16 U.S.C. § 839b(c)(10)(B) .......... 53

16 U.S.C. § 839b(e)(1) .......... 66

16 U.S.C. § 839c .......... 24

16 U.S.C. § 839c(a) .......... 8, 46

16 U.S.C. § 839c(b)(1) .......... 14, 38, 49, 54

16 U.S.C. § 839c(b)(3) .......... 53

16 U.S.C. § 839c(b)(4) .......... 39

16 U.S.C. § 839c(c) .......... 1, 4

16 U.S.C. § 839c(c)(1) .......... passim

16 U.S.C. § 839c(c)(2) .......... 1, 8, 33, 34

16 U.S.C. § 839c(c)(3) .......... passim

16 U.S.C. § 839c(c)(4) .......... 40

16 U.S.C. § 839c(c)(5) .......... 39, 41, 42, 60

16 U.S.C. § 839c(c)(6) .......... 44, 45

16 U.S.C. § 839c(c)(7) .......... 8

16 U.S.C. § 839c(d)(1) .......... 39, 54

16 U.S.C. § 839c(d)(1)(B) .......... 38

16 U.S.C. § 839c(f) .......... 39

16 U.S.C. § 839c(g) .......... 33

16 U.S.C. § 839c(g)(1)(C) .......... 34

16 U.S.C. § 839c(g)(4) .......... 34

16 U.S.C. § 839d .......... 24

16 U.S.C. § 839d(a)(2) .......... 43

16 U.S.C. § 839d(b)(2) .......... 53

16 U.S.C. § 839d(d) .......... 53

16 U.S.C. § 839e(a)(1) .......... 9

16 U.S.C. § 839e(b) .......... 47

16 U.S.C. § 839e(b)(2) .......... 61, 63

16 U.S.C. § 839e(b)(2)(C) .......... 9, 63

16 U.S.C. § 839e(b)(2)(E) .......... 62

16 U.S.C. § 839e(b)(3)(B) .......... 65

16 U.S.C. § 839e(c)(1)(A) .......... 9, 65

16 U.S.C. § 839e(c)(3) .......... 68

16 U.S.C. § 839f(b) .......... 37, 55

16 U.S.C. § 839f(e)(1)(B) .......... 4

16 U.S.C. § 839f(e)(2) .......... 20

16 U.S.C. § 839f(e)(5) .......... 4

16 U.S.C. § 839g(a)(1) .......... 38, 64

16 U.S.C. § 839g(c) .......... 46

16 U.S.C. §§ 832–832*l* .......... 5

5 U.S.C. § 706 .......... 20

5 U.S.C. § 706(2)(A) .......... 20

**Other Authorities**

126 Cong. Rec. 28,550 (Sept. 30, 1980) .................... 51

51 Fed. Reg. 42,902, 42,905 (Dec. 1, 1986) .................... 43

FERC Order No. 400-A, 30 FERC ¶ 61,108 (1985) .................... 25, 30

H.R. Rep. No. 96-976, pt. 1 (1980) .................... passim

H.R. Rep. No. 96-976, pt. 2 (1980) .................... 34

Merriam-Webster's Dictionary (12 ed. 2026) .................... 23

S. Rep. No. 96-272 (1979) .................... 62

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| Amicus, Amici | Oregon Citizens' Utility Board (CUB), Washington Utilities and Transportation Commission (WUTC), Oregon Public Utilities Commission (OPUC), Washington Public Counsel (PC). |
| aMW | Average-megawatt |
| APA | Administrative Procedure Act |
| ASC | Average system cost of resources |
| BPA | Bonneville Power Administration |
| COUs | Consumer-owned utilities, a.k.a. "preference customers" |
| Council | Northwest Power and Conservation Council |
| DSI | Direct Service Industry |
| ER | Excerpts of Record |
| FY | Fiscal Year |
| FERC | Federal Energy Regulatory Commission |
| IOUs | Investor-owned utilities, consisting of Avista Corporation, Idaho Power Company, NorthWestern Energy, Portland General Electric Company, and Puget Sound Energy, Inc. |
| NWPA or Act | Northwest Power Act |

| | |
|---|---|
| POC | Provider of Choice |
| PF | Priority Firm |
| ROD | Record of Decision |
| REP | Residential Exchange Program |
| REPSIA | Residential Exchange Program Settlement Implementation Agreement |
| REC | Renewable Energy Certificate |
| RPSA | Residential Purchase and Sale Agreement |
| SER | Supplemental Excerpts of Record |

# INTRODUCTION

Section 5(c) of the Northwest Power Act (NWPA or Act), 16 U.S.C. § 839c(c), establishes the Residential Exchange Program (REP), a program that serves the distinct purpose of "provid[ing] rate relief for consumers served by IOUs [investor-owned utilities]." *Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 398 (1984) (*Alcoa*). For over 45 years, that rate relief has come in the form of a bookkeeping transaction where an IOU "sells" power to the Bonneville Power Administration (BPA) at a rate equal to its average system cost of resources (ASC), and in an amount equal to its residential and farm load (around 4,900 aMW). *See* 16 U.S.C. §§ 839c(c)(1), 839c(c)(2); 1-ER-71. BPA buys this power, and simultaneously "sells" the same amount of power to the IOUs at BPA's cost of power, called the priority firm (PF) exchange rate. *Id.*

No actual power moves under this energy-neutral transaction. As described by this Court, "[t]his 'exchange' is a paper transaction[.]" *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1015 (9th Cir. 2007) (*PGE*). Instead, BPA simply pays the utility the net difference between the two sales, under what this Court has called "the traditional section 5 formula:"

**(ASC-PF Exchange Rate) x load = REP benefit**.

*Assoc. of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 956-57 (9th Cir. 2013) (*APAC*). The REP benefits, referred to as "cost benefits" under the Act, are then "passed through directly to such utility's residential loads." 16 U.S.C. § 839c(c)(3).

This financial-only framework—which has been in place since the REP's commencement in 1981—has been the program's cornerstone across multiple contract iterations, delivering over $11 billion in rate relief to regional consumers. 1-ER-35-36. This framework has also operated without controversy. *Id.* While many aspects of the REP have been challenged, at no point during these lengthy legal and administrative battles have the IOUs (or Amici) ever argued that implementing the REP as a "paper" transaction was unlawful or otherwise improper. 1-ER-36.

For the first time in the history of the Act, Petitioners (all of whom are IOUs) and Amici (state commissions and retail rate advocacy groups) challenge BPA's decision to structure the REP as a paper transaction. Br. at 3. The IOUs assert that a "plain text" reading of the statutory language requires physical energy deliveries between the participants in the REP and that BPA's decision to maintain its historical approach of a paper, financial-only exchange violates the statute. *Id.* The IOUs demand that BPA design the contract

implementing the REP (the Residential Purchase and Sale Agreement or RPSA) as a physical purchase and sale. *Id.*

Implementing the REP as a physical exchange with all participating IOUs would require the IOUs and BPA to sell back and forth almost 10,000 aMW of electricity (roughly the output of ten nuclear power plants, 1-ER-35, n.197) on a transmission grid that is already overtaxed and constrained. 1-ER-71. Recognizing that their primary demand borders on the absurd, the IOUs pivot to arguing that a physical exchange is mandatory only upon their request. Br. at 18. They contend the statute empowers them to dictate at their whim whether BPA provides physical delivery or a financial payout, whichever benefits them most. *Id.*

The reason for the IOUs' newfound desire for a physical power exchange is to force BPA—and ultimately BPA's consumer-owned utility (COU) customers—to bear the IOUs' cost of complying with emerging state-created carbon regulations. They call this novel subsidy "non-cost benefits," a term that does not appear in the Act. *Id.* at 19.

The IOUs' strained contention that Congress envisioned the REP as offsetting physical sales—convertible at their discretion into a financial transaction—in order to convey both "cost" and "non-cost benefits," defies the Act's text, context, purpose, as well as this Court's own plain reading, not to

mention nearly fifty years of consistent BPA practice. Similarly, their attempt to expand REP benefits beyond the statutorily defined "cost benefit" to encompass "non-cost benefits" lacks statutory or precedential support. The Court should deny the petition and affirm BPA's decision to maintain the REP as a paper transaction.

## STATEMENT OF JURISDICTION

This Court has original and exclusive jurisdiction to review BPA final determinations regarding the terms of the purchases and sales under Section 5(c) (16 U.S.C. § 839c(c))—the subject of this case. *See* 16 U.S.C. §§ 839f(e)(5), 839f(e)(1)(B).

## STATEMENT OF THE ISSUES

The IOUs seek review of BPA's 2026 Residential Purchase and Sale Agreement Record of Decision (2026 RPSA ROD), which establishes the BPA Administrator's final decisions on the contractual terms for the purchases and sales authorized by Section 5(c) of the NWPA (colloquially known as the Residential Exchange Program or REP). *See* 16 U.S.C. § 839c(c)(1). The 2026 RPSA ROD and the 2026 RPSA contract template set the REP's structure and terms from October 1, 2028, through September 30, 2044. 1-ER-2-138; 2-ER-140-80. The issues on appeal are:

1. Whether BPA's decision to structure the 2026 RPSA as a paper transaction—rather than a physical power sale convertible at will by an IOU to a paper transaction—is consistent with the NWPA.

2. Whether BPA's decision to provide statutory "cost benefits" through the 2026 RPSA—rather than expanding the 2026 RPSA to include alleged "non-cost benefits" such as "environmental attributes"—is consistent with the NWPA.

## STATEMENT PURSUANT TO CIRCUIT RULE 28-2.7

Pertinent statutes are included in addenda at the end of this brief.

## STATEMENT OF THE CASE

### A. Historical context for the Residential Exchange Program.

BPA's role in the region, and the tumultuous circumstances that led to the REP, have been well documented by this Court in its previous cases. *See e.g., APAC,* 733 F.3d at 944-48; *PGE*, 501 F.3d at 1013-17; *PacifiCorp v. FERC,* 795 F.2d 816, 818 (9th Cir. 1986) (*PacifiCorp*).

Briefly, BPA is a federal power-marketing administration created by Congress in 1937, "for the benefit of the general public," to market electric power from the Federal Columbia River Power System. 16 U.S.C. § 832c(a); *see generally* 16 U.S.C. §§ 832-832*l*. BPA sells power from 31 federal

hydroelectric projects and one non-federal nuclear plant. 1-ER-10. BPA sells its power and transmission at cost, with no profit. *Id.*

By law, BPA must give "preference and priority" of power sales from federal projects to public bodies and cooperatives (herein referred to as "consumer-owned utilities," "COUs," or "preference customers"). 16 U.S.C. § 832c(a); 1-ER-10. Any surplus power may then be sold to non-preference customers, including IOUs and direct service industries (DSIs). 1-ER-10. While BPA initially had enough power to serve all customer classes, by the early 1970s, projected demand from COUs threatened to exhaust federal supply. *Id.* Because federal law required BPA to prioritize sales to preference customers, BPA began restricting long-term commitments to non-preference entities, ultimately halting long-term firm power sales to IOUs in 1973. *Id.*

With the loss of BPA power, the IOUs invested in their own higher-cost thermal resources. *Id.* These increased costs led to higher retail rates for consumers in IOU-served areas. *Id.* Significant cost disparities soon emerged between the rates paid by COU end-use consumers and IOU end-use consumers. 1-ER-10-11. This led to litigation and other attempts to expand access to BPA's low-cost power. 1-ER-11. The situation escalated to a point where the Northwest was facing a "regional civil war" over access to low-cost federal power. H.R. Rep. No. 96-976, pt. 1, at 27 (1980).

### B. The Northwest Power Act and the advent of the REP.

To "avoid the prospect of unproductive and endless litigation," *Alcoa*, 467 U.S. at 386, in 1980, Congress passed the NWPA to provide a "comprehensive solution" to the regional power disputes. *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1107 (9th Cir. 1984). A key component of the NWPA is the REP.

The REP was created to resolve the central conflict between COUs and IOUs by creating a mechanism to mitigate the wholesale power price disparity between their consumers. 1-ER-11. Congress did so by providing residential and farm ratepayers of IOUs the economic benefits of low-cost federal power, without violating the preference provisions of existing law, and while also ensuring that COUs were not economically harmed. *See PGE,* 501 F.3d at 1015-16; 1-ER-12. Congress achieved these competing objectives through two primary provisions of the Act: Section 5(c) and Section 7(b)(2).

#### 1. Section 5(c) – Energy-neutrality and calculating the REP's "cost benefits."

In Section 5(c), Congress established an energy-neutral, purchase and sale transaction between BPA and the IOUs.[1] *See* 16 U.S.C. § 839c(c)(1).

---

[1] COUs are also eligible to participate in the REP, *see* 16 U.S.C. § 839c(c)(1) ("Whenever a Pacific Northwest electric utility offers . . .").

Under this "mechanism," *PGE,* 501 F.3d at 1014, an IOU sells power to BPA at its "average system cost of resources" or ASC. *Id.* at 1015; 16 U.S.C. § 839c(c)(7). Simultaneously, BPA "sells" the exact same amount of power back to the IOU at BPA's cost of power, called the PF Exchange Rate. *See* 16 U.S.C. § 839c(c)(1); § 839c(a); 1-ER-35. Because the two sales are equal and offsetting, there is no reduction in BPA's power system, eliminating concerns that preference customers would lose access. 1-ER-50-51.

When fully ramped in, the IOUs' residential load was around 4,500 aMW; to offer to physically sell this amount to BPA, the IOUs would have needed roughly four and a half nuclear power plants of excess power. *See* 16 U.S.C. § 839c(c)(2) (ramping the residential load in from 1980-1985); 1-ER-35-36.

Given the size and magnitude of the sales contemplated in the REP, BPA has always structured it as a "paper" transaction; no physical power has changed hands since the program began in 1981. 1-ER-35-36. BPA has paid the utility the net price difference multiplied by the IOUs' qualifying load—generating what the statute terms the "cost benefits." *See* 16 U.S.C. § 839c(c)(3); *see also* 1-ER-36. This Court defines the paper transaction using the following formula:

**(ASC-PF Exchange Rate) x load = REP benefit**

*APAC,* 733 F.3d at 956 ("traditional section 5 formula"). Under this paper construct, regional residential consumers have received roughly $11 billion in retail rate credits. 1-ER-36.

Implementing the Section 5(c)(1) exchange as a paper transaction has not been controversial. Despite extensive litigation surrounding virtually every aspect of the REP, both in BPA administrative proceedings and before this Court, the IOUs have never—prior to these petitions—challenged BPA's decision to structure the RPSAs in this manner. 1-ER-36 n.205.

**2. Section 7(b)(2) – Protecting COUs' rates from REP costs.**

While Section 5(c) allowed IOUs' retail consumers to receive REP cost benefits without violating COUs' preference rights, Congress' solution also protected COUs from rate increases caused by the REP. *See PGE,* 501 F.3d at 1016. REP benefits are funded solely through BPA power sales. *See* 16 U.S.C. § 839e(a)(1). Initially funded exclusively by rates charged to the DSIs, *see* 16 U.S.C. § 839e(c)(1)(A), REP costs became recoverable through COU rates after 1985. 1-ER-12.

To protect COU rates, Congress established the Section 7(b)(2) rate test, which ensured preference customers' rates would be no higher than if "no REP program existed." *PGE,* 501 F.3d at 1028; *see also* 16 U.S.C. § 839e(b)(2)(C). Crucially for this case, Section 7(b)(2) acts as a hard cap on

BPA's authority to pay REP benefits to IOUs that are sourced from the COUs' PF rate. *See PGE,* 501 F.3d at 1030, 1032 (noting BPA's authority to implement the REP is limited by Section 7(b)(2)). Thus, the Section 5(c) exchange and Section 7(b)(2) rate test function in tandem. *Id.* BPA must account for both when designing the RPSAs that implement the REP. *Id.* at 1032. Importantly, this Court has made clear that BPA cannot use REP contracts to offer value beyond that defined by Congress through Section 5(c) and as limited by Section 7(b)(2). *Id.* at 1030 (noting BPA may enter REP settlement contracts with IOUs "only on terms that will protect the position of its preference customers, consistent with §§ 5(c) and 7(b)").

## C. REP implementation history.

### 1. REP disputes and this Court's decisions in *PGE* and *GNA*.

The REP is a source of long-standing conflict among BPA's customers. 1-ER-15. IOUs and their stakeholders (state commissions and consumer advocacy groups) advocate for maximized REP payments to achieve greater retail rate relief for IOU residential and farm consumers. *Id.* Conversely, COUs and their constituents seek to minimize REP costs recovered in their own power rates and ensure guaranteed statutory protections for their consumers. *Id.*

Following many years of litigation, in 2000, BPA sought to stabilize REP benefit payments to the IOUs through a settlement agreement fashioned from recommendations from regional state commissions rather than the traditional Section 5 formula. 1-ER-15-16; *see PGE,* 501 F.3d at 1020-21. This settlement provided benefits to the IOUs worth roughly triple the amount allowed under the traditional formula. *See PGE,* 501 F.3d at 1022-23.

COUs successfully challenged the settlement (2000 REP Settlement) in *PGE* and in a companion case, *Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.,* 501 F.3d 1037 (9th Cir. 2007) (*GNA*). Significantly, this Court held that BPA "ignored" its obligations under Sections 5(c) and 7(b)(2) because these settlement payments were neither determined based on IOU ASCs nor subject to the Section 7(b)(2) rate test cost protections. *PGE*, 501 F.3d at 1032-33. The Court invalidated the 2000 REP Settlement and issued the first-ever general remand of a BPA power rate. *Id.* at 1037; *GNA*, 501 F.3d at 1053.

**2. The 2012 REP Settlement and this Court's decision in *APAC.***

Following this Court's rulings in *PGE* and *GNA*, BPA initiated multiple proceedings to restart the REP. 1-ER-16.

Extensive litigation contesting virtually every aspect of BPA's answer to the remands ensued. *Id.* While litigation was pending, stakeholders negotiated a comprehensive settlement of the REP covering FY 2012-2028

(2012 REP Settlement). 1-ER-16-17. The 2012 REP Settlement resolved ongoing litigation, provided fixed REP payments to the IOUs until September 2028, and issued refunds to the COUs. 1-ER-17. Following a nine-month evidentiary process, BPA approved the settlement as lawful because it applied a variant of the "traditional Section 5 formula" and the IOUs accepted fewer REP benefits than they were legally entitled to receive. *Id.*

The 2012 REP Settlement also included a minor compromise granting the IOUs 14% of the renewable energy credits (RECs) generated by incremental federal system improvements. 1-ER-97. This negotiated compromise was expressly consented to by the COUs through amendments to their power contracts and carried minimal financial value. *Id.;* SER-67 (describing COUs' agreement to "replace" existing Exhibit H). Most importantly, the 2012 REP Settlement was not "precedential" or of any "evidentiary effect" to "any underlying principle or statutory interpretation in any context." 1-ER-97-98; SER-68.

A single party challenged the 2012 REP Settlement. In *APAC*, this Court upheld the 2012 REP Settlement as lawful. *See* 733 F.3d at 968. The settlement remains operative through September 30, 2028.

### D. Post-2028 REP planning and the Provider of Choice (Section 5(b)) process to assign Environmental Attributes with physical power.

Following *APAC*, a decade of relative stability ensued under the 2012 REP Settlement. In 2022, BPA launched a dual-track strategy to address contracts expiring in 2028, covering both long-term physical firm power sales under Section 5(b) via the "Provider of Choice" (POC) process, and the financial-based REP under Section 5(c) through a separate process. 1-ER-17-18.

Relevant to this case, one issue decided in the POC process was how to address emerging state-specific clean energy and carbon-reporting programs that apply to many of BPA's customers who purchase physical power to serve their load. 1-ER-80-81. In a March 2024 decision, BPA elected as a policy matter to report environmental attributes commensurate with a customer's firm physical power purchases and rate elections. 1-ER-81; SER-41. BPA stated that "state-defined characteristics of the power that customers buy from Bonneville will flow to those customers commensurate with the physical amount of power they buy." SER-35. That determination, which applied to all physical power sales under the Act (*e.g.,* Section 5(b) sales to both COUs and

IOUs[2]), was not challenged and remains BPA's established policy governing the allocation of state-created attributes. 1-ER-80.

In parallel with the POC process, BPA conducted a separate process to prepare for the September 2028 expiration of the 2012 REP Settlement. 1-ER-17. First, BPA facilitated negotiations between COUs and IOUs toward a successor settlement with projections of potential future REP payments. 1-ER-18-19; SER-45-48. Those discussions formally collapsed in May 2025, when the IOUs demanded that BPA offer a new Residential Purchase and Sale Agreement (RPSA) premised on physical power sales that included both the "cost benefits" prescribed by statute, as well as a set of undefined "non-cost attributes." 3-ER-432; 1-ER-20. With settlement options exhausted, BPA moved forward with the traditional REP process, initiating formal proceedings to establish the terms of the 2026 RPSA. 1-ER-20.

## E. The 2026 RPSA contract template and ROD development process.

The 2026 RPSA process ran from September 2025 through March 2026, culminating in the Administrator's 2026 RPSA ROD. 1-ER-21-22. Through this proceeding, BPA established the terms and conditions governing the

---

[2] The IOUs imply that Section 5(b) contracts for physical power are only available to COUs. *See* Br. at 8, 14. That is incorrect. *See* 16 U.S.C. § 839c(b)(1) ("Whenever requested, the Administrator shall offer to sell to each . . . requesting investor-owned utility electric power to meet the firm load[.]")

implementation of the REP for the period covering October 1, 2028, through September 30, 2044. 1-ER-9. In that process, the IOUs argued that Section 5(c) requires the IOUs and BPA to engage in two physical sales of power, which the IOUs could elect to turn into a financial transaction. 1-ER-37. In the IOUs' view, structuring the 2026 RPSA in this manner would entitle them to an open-ended list of what they referred to as "non-cost benefits," including any associated environmental attributes. 1-ER-37. COUs vigorously opposed this request. 1-ER-38.

On March 6, 2026, BPA issued the final 2026 RPSA ROD and final template RPSA, affirming that Section 5(c) operates as a simultaneous, offsetting "paper" transaction with no physical delivery. 1-ER-43-73. BPA determined that the statute's text, context, purpose, and legislative history foreclosed the IOUs' demands for physical power. *Id.* In addition, BPA found that the REP authorizes "cost benefits" only, and that the NWPA does not permit BPA to expand the program to include non-statutory "non-cost benefits," such as environmental attributes sought by the IOUs. 1-ER-78-101. All six IOUs executed the final 2026 RPSA under protest and this petition followed. SER-3-14.

## SUMMARY OF ARGUMENT

For over forty years, the REP has operated under a single, undisputed premise: Section 5(c)(1) creates an energy-neutral, paper transaction designed to calculate and deliver monetary rate relief to regional residential and small-farm consumers. That rate relief occurs by calculating a cost differential—the "traditional section 5 formula," *APAC,* 733 F.3d at 956—between an IOU's cost of power and BPA's cost of power. *See infra* Section I.A. Given this statutory objective, Congress intended that the RPSA be structured as an accounting or paper transaction—not two physical sales—as evidenced by the Act's plain text. *See infra* Section I.A.1.

BPA's interpretation that a paper transaction was intended was contemporaneous with the passage of the Act and confirmed by this Court's own plain reading of the text. *See infra* Section I.A.2-3. The statutory context and the statutory purpose for the REP all reinforce that Congress expected the REP to encompass the totality of the IOUs' load—over 4,500 aMW—within a paper transaction construct for the distinct purpose of generating rate relief for retail consumers as "cost benefits." *See infra* Sections I.B.1, I.B.7. In addition, the usual hallmarks of a physical power sale—the requirement to "meet load," the firmness of the power, and essential operational

prerequisites—are all absent from the statutory text of Section 5(c)(1). *See infra* Section I.B.2.

The IOUs ultimately *agree* that a physical power sale is not *required* by Section 5(c)(1), though through a far more circuitous theory. Like BPA, the IOUs conclude that a physical purchase and sale is not required to generate the "cost benefit" in the REP. Br. at 26. Nevertheless, they assert the REP operates with a statutory presumption of physical delivery—unless the IOUs, in their sole discretion, elect a financial transaction. *Id.* at 26-27. Under their theory, BPA must support whatever mode of operation each utility chooses through BPA's business "facilitative power" under Section 9(b). *Id.* at 41-45.

The IOUs cannot square their newly minted interpretation (conveniently withheld after 45 years of practice and $11 billion in REP payments under a paper construct) with the statutory language or context. Moreover, there is no textual basis for the IOUs' assertion that Section 5(c)(1) somehow grants them unilateral optionality to toggle between physical and financial transactions. *See infra* Section I.C. When Congress intends to confer operational optionality, it does so explicitly. *Id.* Lacking this optionality, the IOUs' interpretation of Section 5(c)(1) proves too much. If Congress truly mandated physical delivery under Section 5(c)(1), BPA could not use its facilitative Section 9(b) authority to circumvent that substantive statutory

obligation and create a bespoke, hybrid scheme. *See infra* Section I.C.3; *see also PGE*, 501 F.3d at 1032. Under the IOUs' reading, physical delivery would become a mandatory prerequisite for all REP participants—disqualifying utilities that lack the physical capability to schedule power to BPA and foreclosing statutory rate relief for millions of residential consumers. *See infra* Section I.C.3.

Recognizing their primary theories fail, the IOUs posit an alternative theory for their case: even if a paper transaction is lawful, they are nonetheless entitled to an undefined host of "non-cost" benefits associated with BPA's power. Br. at 46-47. This argument conflicts with the plain text of the Act. Congress defined the sole benefit available under the REP as the Section 5(c) monetary "cost benefits" generated through offsetting purchases and sales, and constrained by Section 7(b)(2). *See* 16 U.S.C. § 839c(c)(3); *see infra* Section II.A. The concept of "non-cost" benefits is foreign to the text Congress enacted. *Id.* Controlling precedent confirms that BPA cannot expand REP benefits beyond the limits established by Sections 5(c) and 7(b)(2) through clever wording or administrative discretion. *See PGE,* 501 F.3d at 1036-37; *see infra* Section II.B.

Reading the text in context confirms this conclusion. Congress explicitly directed BPA to recover "net costs" of the REP across multiple provisions, yet

created no obligation to account for "non-cost" benefits. *See infra* Sections II.C.1-2. Where Congress intended BPA or the Council to consider other attributes of power—such as "environmental costs and benefits" or capacity value—it did so explicitly. *See infra* Section II.C.3. Furthermore, the "traditional section 5 formula" Congress designed already reflects "cost benefits" for environmental compliance—IOUs' ASC will reflect the cost of compliance and BPA's PF Exchange rate will reflect the value of any attribute-associated premiums. *See infra* Section II.D. The IOUs' contention that BPA recognized "non-cost" benefits via the nonprecedential 2012 REP Settlement compromise is unsupportable, *see infra* Section II.E, and their appeal to general "equity" regarding state carbon policies is backwards and cannot supersede statutory text. *See infra* Section II.F.

Ultimately, the IOUs are attempting to rewrite the 2026 RPSA to "create[] a new residential exchange benefit system" that "does not resemble the REP program created in §§ 5(c) and 7(b)." *PGE*, 501 F.3d at 1037. BPA properly rejected this overreach, and its 2026 RPSA ROD decision should be affirmed.

## STANDARD OF REVIEW

This Court's review is governed by the NWPA's judicial review provision, which incorporates § 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706. *See* 16 U.S.C. § 839f(e)(2). Under the APA, BPA's decision is upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

Courts review matters of statutory interpretation de novo. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386, 391-94 (2024) (*Loper Bright*); *Pub. Util. Dist. No. 1 of Douglas Cnty. v. Bonneville Power Admin*., 947 F.2d 386, 390 (9th Cir. 1991) (*Douglas Cnty*.). In exercising its independent judgment, the judiciary has "often included according due respect to Executive Branch interpretations of federal statutes." *Loper Bright,* 603 U.S. at 385. The "most respectful consideration" has been justified where agency officers were "masters of the subject, who were not unfrequently the draftsmen of the laws they were afterwards called upon to interpret." *Id.* at 386 (internal quotations omitted).

To that end, the Supreme Court concluded that "[BPA's] interpretation [of the NWPA] is to be given great weight" because BPA was "intimately involved in the drafting and consideration" of the NWPA, the Act is "technical and complex," and BPA has "longstanding expertise in the area[.]" *Alcoa,* 467

U.S. at 389-90; *see also Confederated Tribes of the Umatilla Indian Rsrv. v. Bonneville Power Admin*., 342 F.3d 924, 928 (9th Cir. 2003) (noting "BPA's factual and legal expertise" with respect to the NWPA).

The "great weight" given to BPA's interpretation is not binding.[3] *See, e.g.*, *Douglas Cnty*., 947 F.2d at 390 (reviewing BPA's statutory interpretation and stating "[i]n the final analysis, however, it is the obligation of the court to construe the statute."). Rather, it is an example of where the "most respectful consideration" is given. *Loper Bright*, 603 U.S. at 386. That weight is especially warranted where BPA drafts contract terms to harmonize the NWPA's complex scheme, including the REP: "[i]t is the responsibility of the Administrator to manage the complex relationship among these various aspects of the statute, and, absent an express statutory statement requiring particular terms in the contracts, it is appropriate that we give him broad discretion to determine them." *Alcoa*, 467 U.S. at 400.

[3] *Alcoa* was decided before *Chevron* and was grounded in "established administrative law principles." *Alcoa*, 467 U.S. at 389.

# ARGUMENT

## I. CONGRESS ESTABLISHED SECTION 5(c)(1) AS A FINANCIAL ACCOUNTING MECHANISM TO PROVIDE COST BENEFITS, NOT PHYSICAL POWER DELIVERIES.

### A. The statutory text, contemporaneous agency practice, litigant admissions, and decades of circuit interpretation affirm that Section 5(c)(1) creates a non-physical paper transaction.

The IOUs' novel assertion that Section 5(c)(1) confers an entitlement to physical power—or affords utilities a unilateral option to demand physical delivery—collapses under the weight of the statute's plain text, BPA's long-standing and uncontested interpretation, the IOUs' own arguments, and decades of uniform judicial review of the statutory provision.

#### 1. The plain text of Section 5(c)(1) indicates that "purchase" and "sell" establish a non-physical, paper transaction.

Section 5(c)(1) of the NWPA provides as follows:

> [w]henever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

16 U.S.C. § 839c(c)(1).

The statutory verbs governing this provision—"sell" and "acquire by purchase"—all denote a monetary transaction. Congress pointedly avoided

terms that would have unambiguously directed physical deliveries of energy, such as "deliver" or "transmit." The statutory language also makes clear that the amount of "electric power" bought and sold under these two sales are entirely equal. *See id.* ("an equivalent amount of electric power"). The term "equivalent" means "equal in force, amount, or value." Merriam-Webster's Dictionary (12 ed. 2026), [https://www.merriam-webster.com/dictionary/equivalent](https://www.merriam-webster.com/dictionary/equivalent); *see also* 1-ER-40*.* Thus, by design, this reciprocal purchase and sale is "energy-neutral," meaning neither the utility nor BPA ends up with more or less "electric power" than it started with—a point the IOUs concede. Br. at 34, 37; *see also* 1-ER-48.

The subject of the statutory verbs ("sell" and "purchase") is "electric power," a term which sheds light on the nature of the "purchase" and "sale" at issue. *See, e.g.*, *Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp.*, 387 F.3d 1046, 1051 (9th Cir. 2004) ("In analyzing a statutory text, we do not look at its words in isolation."). Electric power is unlike other commodities, in that "the amount of power generated must instantaneously match the amount of power consumed at all times," in order to maintain "load and resource balance." 1-ER-76; *see also W. Texas Utilities Co. v. Texas Elec. Serv. Co.*, 470 F. Supp. 798, 807 (N.D. Tex. 1979) ("Electricity is unique as a commodity because it cannot be seen,

branded, traced, accumulated, stored or confined and is consumed the instant it is produced.”).

To ensure this load and resource balance is maintained, Congress joined the purchase and return sale mandates within a single sentence—a structure unique to the text of Section 5(c)(1)[4]—and expressly conditioned BPA’s sale “in exchange” for the utility’s initial offer. 16 U.S.C. § 839c(c)(1); 1-ER-49-50. Because Section 5(c)(1) does not specify the amount of electric power sold or bought, BPA can ensure an “equivalent” return sale only by executing it simultaneously against the utility’s offer, instantly netting out the power transfer. 1-ER-49-50.

In utility practice, simultaneous, equal, and offsetting “purchase-and-sale” transactions between identical counterparties are considered “bookouts” or “paper” transactions. 1-ER-48. The matching volumes of energy cancel out, requiring no physical delivery, and the parties settle solely on the price differential. *Id.*

---

[4] BPA’s power sale authorities are in Section 5 of the Act, 16 U.S.C. § 839c *et seq.*, while BPA’s acquisition authorities are in Section 6, 16 U.S.C. § 839d *et seq*. Section 5(c)(1) is the only place in the Act where Congress tied both authorities together in a single transaction.

Read naturally against this industry backdrop, Section 5(c)(1) creates a transaction akin to a modern bookout.[5] *Id.* Under this self-balancing paper transaction, the sole product is the price difference between the utility's sale (its ASC) and BPA's return sale (the PF Exchange rate). *See* 16 U.S.C. § 839c(c)(1). These offsetting sales yield a net payment, recognized in *APAC,* 733 F.3d at 956-57, through the following formula:

**(ASC - PF Exchange Rate) x load = REP benefit.**

The 2026 RPSA faithfully implements this formula as a paper transaction. Section 5.1 of the 2026 RPSA provides for the utility's sale of an amount equal to its residential load, Section 5.2 provides for BPA's simultaneous return sale, and Section 5.3 nets the reciprocal transactions to calculate the consumer cost benefit. 2-ER-146. Consistent with the design of Section 5(c)(1), the 2026 RPSA does not condition payments on physical power flows, preserving the paper transaction that, as explained next, has governed every RPSA since enactment.

---

[5] The REP is not a typical commercial bookout because neither side must show they have "actual power to deliver" nor is either party able to deny the other's sale. 1-ER-48, n.298. Thus, it is proper to consider the REP "akin" to a FERC-defined bookout. *Id.* For its part, FERC has long recognized the REP is a "paper transaction," designed exclusively to determine a "subsidy." *See* Order No. 400-A, 30 FERC ¶ 61,108, at P 61,195-96 (Feb. 1, 1985) (FERC Order 400-A).

### 2. BPA's "paper transaction" interpretation was contemporaneous with the Act's passage.

BPA's view that Section 5(c)(1) envisions a paper transaction is in accord with its longstanding interpretation developed contemporaneously with the NWPA's enactment. Under *Loper Bright*, interpretations issued "contemporaneously with the statute at issue" and which have "remained consistent over time" warrant respectful consideration—particularly where agency officials were "masters of the subject" who helped draft the provisions they implemented. 603 U.S. at 386, 394; *see also Alcoa*, 467 U.S. at 389-90.

When adopting the inaugural RPSA in 1981, BPA explicitly designed it as a paper transaction, explaining that "the exchange agreement is not a power supply arrangement, but rather a rate arrangement and puts no constraints on a utility's resource operations." 1-ER-59-60. Consequently, the 1981 RPSAs required the IOUs to deliver invoices rather than physical electrons, 1-ER-60, 1-ER-69; 3-ER-506. Subsequent agreements maintained this construct without even mentioning "delivery" at all. 1-ER-69-70, n.441.

The IOUs claim both that they merely accepted "deemed" delivery while reserving a statutory right to physical power, Br. at 40-41, and that BPA's contrary interpretation is "far from clear" or long-standing, *id.* at 40. These arguments collapse against the record. BPA has consistently treated the REP

as an exclusively paper transaction, concluding in 1981 that federal environmental review was unnecessary because the program involved "an exchange of costs, rather than physical exchange of energy." 1-ER-59-60. Nor does the record support the IOUs' claim that they "waived" physical power deliveries. 1-ER-70 n.442. The IOUs cite nothing in the contemporaneous record reserving such a right—unsurprisingly, as they first advanced their theory for physical power in June 2023. SER-52-59.

Forty years of uninterrupted and undisputed practice administering the REP as an energy-neutral paper transaction—distributing over $11 billion in REP benefits (1-ER-36)—confirms the settled understanding of Section 5(c)(1) as a paper transaction, a premise that, as explained below, the IOUs ultimately share.

**3. The IOUs concede that the plain language of Section 5(c)(1) does not require physical delivery.**

The IOUs concede that Section 5(c)(1) does not *mandate* a physical delivery of power. Throughout their brief, the IOUs admit that the statutory transaction can be—and historically has been—fully satisfied through non-physical accounting bookouts without the transfer of physical electrons. *See* Br. at 18, 20, 21, 25-27, 41 (arguing that utilities may "elect" or "waive"

physical delivery in favor of "a bookout transaction" or "financial transaction[.]").

That concession undermines the IOUs' threshold plain-meaning challenge. The IOUs argue that the Court should view verbs like "purchase," "sell," and "acquire" as they might apply to a transaction for commercial goods, unambiguously compelling the physical movement of a commodity. *Id.* at 21-22. Yet in the same breath, they concede that these identical statutory words comfortably accommodate purely financial, paper settlements. *Id.* at 25-27. Having conceded that Section 5(c)(1) does not *mandate* physical delivery, the IOUs cannot credibly argue that the statute's text forecloses BPA's interpretation.

The IOUs attempt to avoid the consequences of this admission by fabricating an unwritten right of "election"—claiming Section 5(c)(1) affords each utility unilateral discretion to choose between physical delivery and a financial transaction. Br. at 41-43. That extratextual theory finds no support in the plain language and fails as a matter of law. *See infra* Section I.C. At bottom, the IOUs' own admission underscores what the statutory mechanics mandate, namely, that Section 5(c)(1) functions purely as a paper transaction that generates a cost difference, not a directive for physical delivery—an interpretation that this Court's review has repeatedly reinforced.

### 4. Ninth Circuit cases have uniformly read Section 5(c)(1) as a non-physical, paper transaction.

For more than three decades, this Court has consistently recognized what statutory mechanics, agency practice, and until recently, the IOUs themselves acknowledged: Section 5(c)(1) operates as a paper transaction, and does not encompass a physical power transfer mandate.

The consistent and uniform judicial understanding of the REP overwhelmingly characterizes it as a regulatory program that functions through non-physical, offsetting purchases and sales that generate a payment. This Court has characterized the REP as:

- "bookkeeping entries only[,]" *Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 624 (9th Cir. 1985);

- an "accounting transaction," *Pac. Power & Light Co. v. Bonneville Power Admin.*, 795 F.2d 810, 812 (9th Cir. 1986); *CP Nat'l Corp. v. Bonneville Power Admin.*, 928 F.2d 905, 907 (9th Cir. 1991) (*CP Nat'l*);

- a "paper transaction," *PacifiCorp*, 795 F.2d at 818; *PGE*, 501 F.3d at 1015, 1027;

- a "fictional exchange of power" operating as a "subsidy," *Cent. Elec. Coop. v. Bonneville Power Admin.*, 835 F.2d 199, 200 (9th Cir. 1987) (*CEC*); *see also Wash. Utils. & Trans. Comm'n v. FERC*, 26 F.3d 935, 937 (9th Cir. 1994) ("subsidy");

- a "cash rebate," *GNA*, 501 F.3d at 1047; *APAC,* 733 F.3d at 945; *PGE,* 501 F.3d at 1015; and

- a "mechanism for calculating a subsidy, not for establishing a traditional cost of purchased power," *CP Nat'l*, 928 F.2d at 907 (quoting FERC Order 400-A).

In addition, in *Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1461 (9th Cir. 1987) (*CERCD*), this Court plainly understood that physical deliveries of power are unnecessary under Section 5(c)(1), noting that utilities "already have the power they need [under Section 5(c)(1)], and could not benefit from actual purchases of power from BPA even at a low rate [under Section 5(c)(5)]." And, as noted above, in *APAC*, this Court confirmed that the statutory spread in Section 5(c)(1) is captured mathematically by the "traditional section 5 formula" of (ASC-PF Exchange Rate) x load = REP benefit. 733 F.3d at 956-57; *see also Pacific Northwest Generating Coop. v. BPA,* 580 F.3d 792, 819 (9th Cir. 2009) *(PNGC)* (recognizing Section 5(c)(1) as the sole statutory authority for "monetizing energy contracts."). This Court's uniform reading of the plain language of Section 5(c)(1) as a non-physical, "paper transaction," distillable to a financial formula, reinforces the accuracy of BPA's interpretation.

The IOUs dismiss this unbroken judicial consensus as background summaries, asserting it merely described "BPA's past practice[,]" Br. at 39, and did not resolve whether Section 5(c)(1) mandates or permits a physical exchange. Br. at 38-40 & n.10. This argument cannot withstand scrutiny. The

consistent characterizations across this body of case law reflect careful statutory analysis and a deep understanding of the REP, not inadvertent drafting. To that point, the Court routinely independently reviewed the statutory language in reaching these conclusions, *see*, *e.g., APAC,* 733 F.3d at 945-46; *PGE,* 501 F.3d at 1014-15; *CP Nat'l*, 928 F.2d at 907, and does not refer to it as merely "BPA's past practice[ ]."[6] In any event, even if the Court's decades-long understanding of the REP is not binding, it is at the very least "[w]ell-reasoned dicta" which "is the law of the circuit." *Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013).

Moreover, the absence of an earlier direct holding refuting the IOUs' view does not aid their argument. Rather, it reveals that over decades of intensive litigation, no party ever conceived of Section 5(c)(1) as a physical delivery mandate. 1-ER-36 n.205. Either this Court, BPA, and generations of litigants all failed to discern Congress' clear intent, or Section 5(c)(1) remains exactly what BPA's Administrator, Sterling Munro, testified to Congress during

---

[6] The IOUs seize on an isolated phrase in *Alcoa*, 467 U.S. at 399, noting that the REP "essentially requires BPA to trade its cheap power for more expensive power." Br. at 39. But even there, *Alcoa* focused squarely on the financial economics of the exchange, centering on BPA's "ability to finance the exchange program" through DSI sales rather than any physical movement of megawatts. 467 U.S. at 400.

the Act's formation: "merely a bookkeeping exchange." 1-ER-49 n.299; SER-196.

### B. The statutory scheme, context, and legislative purpose reinforce that Section 5(c)(1) was designed solely to generate a "cost benefit" through an energy-neutral paper transaction.

Any doubt regarding the non-physical nature of the transaction envisioned in Section 5(c)(1) is resolved by interpreting its provisions within the broader statutory context and the comprehensive scheme established by Congress.

It is a foundational principle of statutory interpretation that "when interpreting a statutory provision" the Court "consider[s] not only its ordinary meaning, but also its place within the broader statutory scheme of which it is a part." *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1192 (9th Cir. 2023) (*ICL I*). To determine a provision's meaning, the Court does not read isolated words "in a vacuum," but "in their context and with a view to their place in the overall statutory scheme." *Idaho Conservation League v. Bonneville Power Admin.*, 142 F.4th 636, 642 (9th Cir. 2025) (*ICL II*) (citation omitted). Statutory context matters for the Court's determination of ordinary meaning because "[i]gnoring context in textual interpretation can lead to contorted statutory interpretations" and "words are colored by their

surroundings and the backdrop against which they were enacted." *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1112 (9th Cir. 2026) (internal citation omitted).

Here, statutory context confirms that Section 5(c)(1) was designed solely as a financial, paper transaction.

#### 1. Sections 5(c)(2), 5(c)(3), and the timing provision of Section 5(g), demonstrate that Section 5(c)(1) is a financial mechanism designed solely to calculate monetary "cost benefits" for retail loads.

Section 5(c)(1) cannot be read in isolation from its immediate companion provisions, Sections 5(c)(2), 5(c)(3), and, relatedly, Section 5(g). *See* 16 U.S.C. §§ 839c(c)(2), (3), 839c(g). When read together, these provisions make clear that Congress structured the REP around loads so massive, and on a timeline so quick, that physical delivery was impossible, leaving little question the exclusive statutory purpose of Section 5(c)(1) was to maximize monetary "cost benefits," and not exchange physical power.

*First*, Section 5(c)(1) does not specify the volume of power eligible for the REP; that volume is supplied by statutory context, namely, Section 5(c)(2). *See* 16 U.S.C. § 839c(c)(2); 1-ER-58. Under Section 5(c)(2), Congress phased in IOU participation from 50 percent of its residential load in 1980 (roughly 1,800 aMW, equivalent to two nuclear power plants) to up to 100 percent by

1985 (roughly 4,500 aMW, or four and a half nuclear power plants).[7] 16 U.S.C. § 839c(c)(2); 1-ER-58. The sheer magnitude of this load confirms Congress envisioned a paper transaction. Regional IOUs lacked the surplus generation and transmission needed to physically deliver such massive volumes to BPA while still serving retail customers—especially amid the severe regional power deficits that prompted Congress to enact the NWPA in the first place. 1-ER-58-59; *see also* H.R. Rep. No. 96-976, pt. 2, at 31 (1980).

*Second*, Congress presumed that the IOUs would sell power to BPA in the amounts noted above from the program's inception. 1-ER-58. Under Section 5(g), Congress required BPA to offer REP contracts "within nine months" and begin implementation within ten months of enactment. 16 U.S.C. §§ 839c(g)(1)(C), (g)(4); 1-ER-58-60. At the time of the Act, the IOUs were purchasing *no* firm power from BPA, meaning neither BPA nor the IOUs had existing power arrangements or transmission to facilitate these sales. 1-ER-10. Commencing half a dozen new power transactions with IOUs involving thousands of megawatts across six Northwest states within ten months was logistically impossible under the hydrological and transmission realities of the

[7] This phase-in was adopted to "minimize the dramatic rate increase to the Administrator's direct service industries." H.R. Rep. No. 96-976, pt. 1, at 61 (1980).

Columbia River Power System at the time. 1-ER-58-60; 1-ER-71-72. That Congress believed these transactions could commence at these scales within these time limitations, and would begin "on a specified date[,]" (*see* H.R. Rep. No. 96-976, pt. 1, at 64 (1980)), can only make sense if it expected BPA to implement the REP as a paper transaction.[8]

*Third*, Section 5(c)(3) confirms that the sole operational purpose of Section 5(c)(1)'s offsetting transactions is to generate a monetary price differential between a utility's ASC and BPA's PF Exchange rate. Under Section 5(c)(3), "[t]he cost benefits, as specified in contracts with the Administrator, of any purchase and exchange sale referred to in [Section 5(c)(1)] . . . shall be passed through directly to such utility's residential loads." 16 U.S.C. § 839c(c)(3). By defining the product of the Section 5(c)(1) exchange as "cost benefits" that must be "passed through directly" to residential consumers, Congress established that Section 5(c)(1) is an inherently financial mechanism. *See id.*; 1-ER-54-57.

---

[8] BPA does not invoke practical infeasibility to excuse compliance with an established statutory mandate, as suggested by the IOUs. Br. at 43-44. Rather, the operational absurdities and transmission impossibilities that would result from physical delivery under these timelines demonstrate that Congress never intended a physical mandate in the first place.

Read in context, Sections 5(c)(1), 5(c)(2), 5(c)(3), and 5(g) operate in harmony as an integrated financial mechanism. Section 5(c)(1)'s offsetting power sales are sized to the residential load set by Section 5(c)(2), and the resulting price difference—the "cost benefits"—is passed through to consumers under Section 5(c)(3) through retail rates. 16 U.S.C. § 839c(c)(3). 1-ER-54; *see also PGE*, 501 F.3d at 1015 (characterizing the REP as "essentially . . . a cash rebate to the IOUs"); *see also APAC*, 733 F.3d at 956-57 ("the traditional section 5 formula.").

With this statutory scheme in view, Congress's use of the terms "acquire by purchase" and "sell" in Section 5(c)(1) to create a paper-based transaction makes perfect sense because these terms serve the distinct purpose of generating the monetary "cost benefits" of Section 5(c)(3). 1-ER-49. That these terms serve a unique function in Section 5(c)(1) is also unsurprising given that the REP is no standard commercial transaction, but "part and parcel of [a] more traditional regulatory power[]." *PGE*, 501 F.3d at 1030; *see also United States v. Alaska*, 151 F.4th 1124, 1137 (9th Cir. 2025) (noting the presumption of consistent usage "readily yields to context") (cleaned up).

Ultimately, Congress entrusted BPA with designing the contractual mechanisms to implement this scheme ("as specified in contracts with the Administrator"), 16 U.S.C. § 839c(c)(3), relying on the agency's expertise to

manage the statute's "complex relationship[s]," *Alcoa*, 467 U.S. at 400, and directing it to act in a timely, "business-like manner," 16 U.S.C. § 839f(b). Since the Act's inception, BPA has done precisely that—implementing the RPSA as the self-balancing "paper" transaction this Court has long recognized. 1-ER-48, 57; *PGE*, 501 F.3d at 1015; *PacifiCorp*, 795 F.2d at 818 ("In reality, the exchange is a paper transaction.").

For their part, the IOUs have taken full advantage of the paper-based structure BPA adopted at the commencement of the Act by "fully ramp[ing] in their residential loads by 1985 as intended by Congress and have been paid by BPA for their *entire* residential load under the traditional 5(c) formula ever since." 1-ER-61.

#### 2. Section 5(c)(1) conspicuously omits every hallmark of a mandatory physical power sale present elsewhere in the Act.

That Section 5(c)(1) is a paper construct is further reinforced by contextual evidence—namely, the conspicuous absence, in Section 5(c)(1), of operational terms that Congress used in *other* provisions of the NWPA that expressly deal with physical sales.

*First*, the IOUs point to Section 5(b) as proof that "sell" always denotes physical delivery. Br. at 21-22. BPA agrees that Section 5(b) involves physical sales. However, in Section 5(b), Congress explicitly mandated a physical,

operational objective for the power sold: the Administrator must offer to sell power "to meet the firm power load" of requesting utilities. 16 U.S.C. § 839c(b)(1). In contrast, Section 5(c)(1) conspicuously omits any mention of "meeting" a firm load.[9] 16 U.S.C. § 839c(c)(1).

*Second*, Section 5(c)(1) omits any specification regarding power firmness. A key component of a physical power sale under the Act is the firmness of the power sold. *See Alcoa*, 467 U.S. at 383 (discussing firm and nonfirm power). In every instance where the NWPA requires a physical power sale, these operational features are present. *See* 16 U.S.C. § 839c(b)(1) ("to meet the firm power load"); *see also* 16 U.S.C. § 839c(d)(1)(B) (requiring BPA to sell "industrial firm power" to DSIs). Yet, in Section 5(c)(1), Congress makes no mention of the firmness of the power sold by or to BPA. *See ICL I*, 83 F.4th at 1194 (noting Congress is presumed to act intentionally when it includes language in one part of a statute but omits it in another).

---

[9] Instead, Congress directed that Section 5(c)(1) sales be for "resale" to residential users, which is a ratemaking term of art. Appearing only here in the Act, "resale" is a ratemaking concept that ensures transactional savings pass directly through to residential consumers without utility markup. 1-ER-54-55. Congress made this pass-through explicit in Section 5(c)(3) by defining these transfers as "cost benefits," and reinforced it in Section 10(a)(1) by directing state regulators to guarantee an exact economic pass-through. *See* 16 U.S.C. §§ 839c(c)(3), 839g(a)(1); *see also* 1-ER-55 n.334.

*Third*, Section 5(c)(1) entirely omits technical standards of service and operational prerequisites required for other mandatory physical power sales. Sales of firm power under Section 5(b) are expressly conditioned on customers meeting "the Administrator's standards for service in effect on December 5, 1980, or as subsequently revised." 16 U.S.C. § 839c(b)(4); 1-ER-65. Under these standards, a utility must establish physical readiness for high-voltage transmission, including metering, scheduling, billing, facility maintenance, creditworthiness, and technical grid interconnection. 1-ER-65-66. If a utility fails to satisfy these requirements, BPA may refuse to sell them power. *See* H.R. Rep. No. 96-976, pt. 1, at 60 (1980). Section 5(c)(1) omits these physical technical requirements in their entirety, allowing utilities to participate in the REP with over 4,500 aMW without any operational restrictions.[10]

[10] The IOUs and Amici dismiss Section 5(b)(4) by claiming other sales omit these conditions (Br. at 37; WUTC Amicus Br. at 19). That comparison is inapposite. The provisions they cite govern either discretionary sales (§§ 5(c)(5), 16 U.S.C. § 839c(c)(5), 5(f), 16 U.S.C. § 839c(f)) or pre-existing contractual arrangements (§ 5(d)(1), 16 U.S.C. § 839c(d)(1)). For new, mandatory sales like Section 5(b), operational standards were functionally essential to ensure feasible delivery. 1-ER-65-66.

In sum, the statutory contrast is decisive. Where the NWPA mandates physical power deliveries, Congress consistently included explicit operational prerequisites—firm load requirements, power firmness classifications, and technical standards for service. Congress's complete omission of these physical hallmarks from Section 5(c)(1) confirms that the exchange is not an operational power sale, but a financial paper transaction designed solely to yield statutory cost benefits.

### 3. Section 5(c)(4) restricts contract termination exclusively to adverse economics, omitting operational exit remedies.

The primacy of "cost benefits" and the lack of any physical delivery requirement in the Section 5(c)(1) exchange are underscored by the sole statutory exit mechanism. Under Section 5(c)(4), a utility may terminate its RPSA contract if the supplemental rate charge under Section 7(b)(3) applies and BPA's rate exceeds the utility's ASC. 16 U.S.C. § 839c(c)(4); 1-ER-57. In simple terms, if BPA's PF Exchange rate exceeds the IOU's ASC under the "traditional section 5 formula," the utility does not pay BPA but has a statutory right to leave the exchange.

The IOUs assert that this provision "sheds no light" on whether physical exchange was contemplated, arguing that Congress merely wanted to ensure rate relief and that BPA's contract provides additional reasons for

termination. Br. at 36-37 (*citing* 2-ER-153-54). The IOUs miss the point. The statutory exit criteria omit any reference to physical constraints, transmission bottlenecks, or generation disruptions. Had Congress intended physical delivery to be an operational reality rather than an accounting measure of cost benefits, it would have provided statutory exit rights for physical contingencies. 1-ER-57. By tying the sole statutory exit strictly to an unfavorable price difference, Congress confirmed that the exchange begins, operates, and ends purely as a financial mechanism.

#### 4. Section 5(c)(5) authorizes a physical power substitution in explicit contrast to Section 5(c)(1)'s baseline paper exchange.

Section 5(c)(5) provides further contextual support that the Section 5(c)(1) exchange is financial, by creating a discretionary alternative that permits BPA to substitute an actual third-party resource acquisition in place of the energy-neutral exchange:

> Subject to the provisions of sections [4] and [6] of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility.

16 U.S.C. § 839c(c)(5).

The IOUs argue that Section 5(c)(5) proves Section 5(c)(1) is physical. Invoking the canon against surplusage, the IOUs argue that if Section 5(c)(1) is a paper transaction, Section 5(c)(5) would be rendered superfluous because "[o]ne does not need to 'replace' power that one never really sold in the first place—much less replace it with physical power." Br. at 24-25.

The IOUs' surplusage argument collapses because it fundamentally misunderstands the mechanics of Section 5(c)(5). Section 5(c)(5) allows BPA, when economically advantageous to BPA, to step outside that paper construct: "in lieu of purchasing" the offered power under Section 5(c)(1), BPA may acquire physical power from "other sources" to "replace" the power it would otherwise sell on paper. 16 U.S.C. § 839c(c)(5); 1-ER-74. In simple terms, Section 5(c)(5) describes a transaction where BPA "substitute[s]" physical power for the Section 5(c)(1) paper transaction. *See CERCD*, 807 F.2d at 1461 ("Section 5(c)(5) provides that BPA 'may' substitute in-lieu sales for exchanges"); *see also APAC*, 733 F.3d at 960-61 (noting that "in-lieu transactions . . . involve the actual sale of power, rather than paper transactions").

Because Section 5(c)(5) involves real physical power, it is explicitly subject to the Act's Section 4 resource planning (16 U.S.C. § 839b *et seq.*) and Section 6 acquisition procedures (16 U.S.C. § 839d *et seq.*). In contrast, these

features are entirely absent from the non-physical Section 5(c)(1) exchange. *See* 16 U.S.C. § 839d(a)(2) (exempting Section 5(c)(1) from Section 6); 1-ER-75-77; *see also CERCD*, 807 F.2d at 1462 (noting that "acquisitions of 'in-lieu' power, not residential exchanges, are subject to the provisions of sections [4] and [6]").[11]

Section 5(c)(5) is discretionary ("may acquire") precisely because physical constraints and market realities govern whether an *in-lieu* transaction is feasible. 1-ER-76. By omitting those physical contingencies and making the sale mandatory under Section 5(c)(1), Congress confirmed that the baseline exchange remains an accounting mechanism rather than a physical transfer. *See ICL I,* 83 F.4th at 1194.

[11] The IOUs also cite BPA's Section 6(c) policy (51 Fed. Reg. 42,902, 42,905 (Dec. 1, 1986)) and *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1535 (9th Cir. 1997), to argue that exchanges are generally exempt from Section 6 review because they do not burden the region with costly infrastructure. Br. at 36. The IOUs' argument proves BPA's point. The Section 5(c)(1) exchange was not expected to infringe on either BPA's or the IOUs' physical systems, allowing Congress to reasonably exclude the REP transaction from the Act's robust resource acquisition and planning requirements.

### 5. Section 5(c)(6) enforces energy neutrality and insulates the financial construct from physical curtailment.

Section 5(c)(6) provides that exchange sales "shall not be restricted below the amounts of electric power acquired by the Administrator from, or on behalf of, such utility pursuant to this subsection." 16 U.S.C. § 839c(c)(6).

The IOUs and Amici contend that Section 5(c)(6) is a physical scarcity rule, citing legislative history and describing its application "in the event of insufficiency." Br. at 25; *see also* WUTC Amicus Br. at 17. The IOUs argue that an anti-restriction provision makes sense only in a physical delivery regime and is difficult to explain as part of an accounting exercise. Br. at 25 & n.7. The IOUs misunderstand the Act. Section 5(c)(6) serves a vital dual structural function confirming the non-physical nature of the baseline paper transaction of Section 5(c)(1).

*First*, Section 5(c)(6) ensures that BPA's physical system constraints do not alter the baseline Section 5(c)(1) paper transaction. Because offsetting transactions balance on paper, the statutory "cost benefit" provided by Section 5(c)(1) operates independent of BPA's physical system. 1-ER-63-64. Section 5(c)(6) explicitly reinforces this structure by mandating that exchange sales not be "restricted below" amounts purchased, ensuring physical limitations on BPA's system—whether droughts, power shortages, or

transmission outages—cannot curtail an IOU's financial exchange participation. 16 U.S.C. § 839c(c)(6); *see also* 1-ER-63. As the House Report cited by the IOUs confirms, the financial exchange "would continue during period[s] of declared [power] insufficiency." H.R. Rep. No. 96-976, pt. 1, at 61 (1980).

*Second*, Section 5(c)(6) shields real physical power acquired "on behalf of" a utility under Section 5(c)(5), ensuring BPA cannot divert third-party physical replacement megawatts to preference customers during an insufficiency. 1-ER-64. Far from mandating physical deliveries, Section 5(c)(6) insulates the REP's financial benefits from physical grid curtailment, further confirming its non-physical nature.

**6. Implementing Section 5(c)(1) as an energy-neutral paper transaction harmonizes the Act and avoids severe conflicts with preference rights and COU eligibility for the REP.**

Apart from being consistent with the text, context, and statutory scheme, implementing Section 5(c)(1) as a paper transaction also avoids creating irreconcilable conflicts with other provisions of the Act. A basic principle of statutory interpretation requires that the Court construe a statute's provisions in "harmony" and "not set them at cross-purposes" with each other. *Jones v. Hendrix*, 599 U.S. 465, 478 (2023) (cleaned up); *Comm. for a Better Arvin v. United States Env't Prot. Agency*, 185 F.4th 957, 966 (9th Cir.

2026) ("[W]e must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation omitted). Reading Section 5(c)(1) as mandating physical deliveries would create severe conflicts across the broader statutory scheme of the Act.

*First*, a physical exchange under Section 5(c)(1) would undermine the statutory guarantees of preference to federal power owed to COUs. Congress enacted Sections 5(a) and 10(c) of the Act specifically to reaffirm COUs' historical preference rights. *See* 16 U.S.C. § 839c(a) (mandating that all sales remain "subject at all times to the preference and priority provisions of the Bonneville Project Act"); *id.* § 839g(c) (preserving preexisting preference and priority laws); 1-ER-50-51. Given the size of the sales under Section 5(c)(1), operational failures or counterparty non-delivery could destabilize physical exchange balances and compromise federal supplies dedicated to preference customers. 1-ER-52 n.316. By contrast, an energy-neutral paper transaction fulfills the mandates of Sections 5(a) and 10(c) because reciprocal sales remain perfectly balanced and never infringe on federal power deliveries to COUs. 1-ER-52.

The IOUs dispute that these preference issues exist and rely heavily on *Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437 (9th Cir. 1989), to argue that physical power exchanges protect preference rights and are contemplated by the Act. Br. at 22, 35, 44. Their argument is flawed. *Utility Reform Project* involved BPA's discretionary power exchange authority under Section 5(b) of the 1937 Bonneville Project Act, 16 U.S.C. § 832d(b), not the mandatory purchase-and-sale obligations of Section 5(c)(1) of the NWPA. In discretionary exchanges, BPA can tailor terms to its system limits and incorporate dynamic balancing or equalization mechanisms to offset operational variances and delivery disruptions, which BPA did in the exchange discussed in *Utility Reform Project*. *See* 869 F.2d at 444.

Here, however, BPA lacks authority to develop those equalization measures and is required to deliver the "equivalent" (*i.e.,* same) amount of power back at a statutorily defined power price. *See* 16 U.S.C. § 839c(c)(1); 16 U.S.C. § 839e(b)(1)-(2) (describing BPA's rates). Maintaining preference as required by Sections 5(a) and 10(c) in the mandatory Section 5(c)(1) exchange can only occur if the transactions are strictly offsetting and avoid net draws on the federal system—a principle the court in *Utility Reform Project* affirmed. *See* 869 F.2d at 444. Lacking the tools to equalize physical power exchanges as described in *Utility Reform Project*, the REP protects preference

precisely because transactions remain energy-neutral and self-balancing on paper.

*Second,* under the IOUs' reading of Section 5(c)(1), COUs would effectively be barred from participating in the REP. Section 5(c)(1) unambiguously applies to "a Pacific Northwest electric utility"—a statutory category encompassing COUs, which have historically participated in the program at an ASC reflecting an average of their BPA power purchases commingled with their own resource costs. 16 U.S.C. § 839c(c)(1); *see also CEC*, 835 F.2d at 200, n.1 ("the broad language of the statute allows other utilities such as [a COU] to apply for subsidies as well."). Assuming Congress intended a physical energy exchange under Section 5(c)(1) attributes an absurd premise: that BPA and COUs are trapped in an endless loop where BPA sells power to a COU under Section 5(b), the COU resells it back under Section 5(c)(1), and BPA immediately returns it in an "exchange" sale. 1-ER-67-68. Operationally, BPA dispatchers would not configure the complex, multifaceted hydrological system to engage in such a nonsensical loop, 1-ER-67, n.413, which leaves financial implementation of the REP as the only workable method for COU participation.

The IOUs attempt to discount this conflict by claiming that the statute does not entitle COUs to participate simultaneously in Section 5(b) sales and

Section 5(c) exchanges, and further argue that any conflict is purely hypothetical because COUs waived REP rights in their 2028-2044 POC contracts. Br. at 37-38. The IOUs misstate the law. Both Section 5(b) and Section 5(c) are statutory entitlements triggered upon utility request (COU or IOU); neither conditions eligibility on forfeiting the other. *See* 16 U.S.C. § 839c(b)(1) ("[w]henever requested"); § 839c(c)(1) ("[w]henever a [utility] offers"); *see also CEC*, 835 F.2d at 200. That COUs have agreed to a temporary contract waiver of this right does not alter the statute's permanent design. Section 5(c)(1) is statutorily available to both IOUs and COUs, and Congress must have assumed that simultaneous participation under both Sections 5(b) and 5(c) was possible. 1-ER-67-68. BPA's long-standing interpretation of Section 5(c)(1) as a paper transaction permits dual participation; the IOUs' newfound view of the law does not.

**7. BPA's construction faithfully fulfills Congress's core statutory purpose for the REP.**

BPA's construction of Section 5(c)(1) as an energy-neutral paper transaction also faithfully implements the core statutory purpose of the REP—mitigating historical rate disparities between COUs and IOUs without compromising preference rights to federal power. *See* H.R. Rep. No. 96-976, pt. 1, at 27, 60 (1980); *Alcoa*, 467 U.S. at 398 ("The exchange program is

designed to provide rate relief for consumers served by IOUs"); *CP Nat'l*, 928 F.2d at 907 ("Congress aimed with this exchange program to eliminate the disparity that developed between the rates paid by residential . . . IOUs and . . . publicly owned utilities. . . ."); *PacifiCorp,* 795 F.2d at 818 (noting the REP "is designed to eliminate the disparity that developed between the rates paid by residential customers of the IOUs and the lower rates paid by residential customers of publicly owned utilities.")

Implementing the Section 5(c)(1) exchange as a paper transaction ensures the rate mitigation purpose is accomplished by providing the *maximum* amount of rate relief to IOU consumers, all the while not impinging on the COUs' preference rights to federal power. Conditioning participation on physical transmission and generation constraints would shrink eligible load, ultimately constraining the "cost benefits" produced by the program and artificially limiting the financial payments to the physical capabilities of the utility's system. 1-ER-56 (noting a "physical requirement . . . would be adding limitation to the REP not expressly required by Congress."). A paper transaction ensures that every megawatt of the IOUs' residential load (currently around 4,900 aMW, 1-ER-71) is included in the REP benefit calculation, resulting in the maximum amount of rate credits to its consumers, while not imposing any physical obligations on BPA's system.

Legislative history confirms that the REP was never intended to be implemented with BPA's physical power. During Congressional hearings, then-Administrator Sterling Munro explained that Section 5(c)(1) would operate as "merely a bookkeeping exchange." 1-ER-49 n.299; SER-196. Key legislators reaffirmed this understanding immediately prior to passage of the Act. *See* 126 Cong. Rec. 28,550 (Sept. 30, 1980) (statement of Rep. Al Swift) (confirming there are "no net BPA power sales to investor-owned utilities . . . the power these utilities receive is the power they supply to BPA themselves").

Whereas BPA's interpretation directly accords with the rate-mitigating purposes of the REP, the IOUs' demand for physical deliveries and associated "non-cost" benefits relies on an unwritten, non-statutory "equitable" purpose. Br. at 7, 18, 19, 27, 43. Congress did not design the REP to confer physical access to BPA system generation or to create broad operational parity with preference customers across state regulatory regimes. To that point, the statute nowhere mentions supplying physical "BPA system power" under Section 5(c)(1) as asserted by the IOUs. Br. at 1, 7, 18.

Ultimately, Congress designed the REP for the narrow purpose of providing monetary "cost benefits" to reduce retail bills of residential and farm loads of a utility. 16 U.S.C. § 839c(c)(3); *Alcoa*, 467 U.S. at 398.

Implementing Section 5(c)(1) as a paper transaction faithfully meets that targeted purpose.

### C. Section 5(c)(1) affords no elective right to the IOUs to dictate the transactional form of the REP, and Section 9(b) cannot be invoked to manufacture one.

Recognizing the flaws in their primary interpretation, the IOUs advance a novel hybrid theory asserting that Section 5(c)(1) presumes physical delivery, Br. at 21-25, yet each utility retains a unilateral right to choose physical delivery or a financial bookout that BPA must accommodate under Section 9(b). Br. at 18, 25-27, 41-45. This concession that the statute accommodates a paper transaction fatally undermines the IOUs' own primary interpretation. Unable to reconcile that contradiction, the IOUs fabricate a unilateral election from whole cloth, without statutory or structural support in the Act.

#### 1. Section 5(c)(1) confers no unilateral discretion on the IOUs to choose between transactional modes.

Section 5(c)(1) neither contemplates multiple transaction modes nor permits utilities to choose among them. *See* 16 U.S.C. § 839c(c)(1). Although the IOUs argue that the statute places the initiating choice in their hands, Br. at 26, that choice extends only to whether to offer power for sale, not how the transaction is executed. The IOUs cite *Murphy v. Smith*, 583 U.S. 220, 223

(2018), for the proposition that "shall" creates a mandatory duty. Br. at 26. BPA agrees: "shall" creates a mandatory duty to execute the single statutory exchange Congress designed—it does not create a menu of optionality.

When Congress intended to grant discretion or optionality in the Act, it did so explicitly. Section 5(c)(4), for instance, provides that a utility may terminate an uneconomic exchange agreement. *See also* 16 U.S.C. §§ 839b(c)(10)(B), 839d(b)(2) (using "may"); *id.* §§ 839c(b)(3), 839d(d) (using "is [ ]authorized"). The absence of comparable discretionary language in Section 5(c)(1) forecloses any implied right of election. Congressional silence cannot confer a unilateral right to invent extratextual transaction modes and compel BPA to execute them. *See State v. Su*, 121 F.4th 1, 13 (9th Cir. 2024) (*Su*) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.") (cleaned up).

Similarly, the IOUs place undue weight on the phrase "such power." Br. at 26. Grammatically, the term functions merely as a reference to the antecedent noun phrase "electric power" across the intervening pricing clause. *See* 16 U.S.C. § 839c(c)(1). It denotes nothing more than BPA purchasing the power the utility offers—the volume of which is not defined in Section 5(c)(1), but in Section 5(c)(2). *See supra* Section I.B.1. Nothing in this

language grants the IOUs discretion to alternate between physical delivery and a paper exchange.

### 2. The statutory architecture and omission of power attributes foreclose an elective physical regime.

The statutory scheme also directly contradicts inventing an elective physical regime. The character of physical power sold by BPA is an essential element of every mandatory sale under the Act. *See* 16 U.S.C. § 839c(b)(1) ("firm power"); *id.* § 839c(d)(1) ("industrial firm power"). However, Section 5(c)(1) nowhere specifies whether the power a utility "elects" to sell must be firm or non-firm. Granting IOUs unilateral discretion to choose the physical form and the quality of power under Section 5(c)(1) would be an unprecedented departure under the Act, conferring flexibility denied to every other BPA customer. *See Alcoa*, 467 U.S. at 383-84 (discussing the importance of "firm" and "nonfirm power."). Congress' omission of physical power characteristics confirms that no physical delivery—and therefore no utility election—was ever intended. *See ICL I*, 83 F.4th at 1194.

### 3. If Section 5(c)(1) mandated physical sales, Section 9(b) could not convert that mandatory requirement into a discretionary option.

The IOUs cannot invoke Section 9(b) to salvage their unworkable theory. Br. at 41-43. Section 9(b) directs BPA to administer the Act in a

"sound and business-like manner." 16 U.S.C. § 839f(b). This provision confers only "'facilitative power' rather than a 'substantive power,'" 1-ER-41, and cannot be used to "provide power under the REP program on whatever terms—whether good business or not—that BPA likes." *PGE*, 501 F.3d at 1030.

If Section 5(c)(1) genuinely mandated physical transfers, BPA would be legally obligated to enforce it uniformly across all participants. Section 9(b) could not authorize BPA to transform a statutory physical mandate into a financial paper transaction for select utilities, treating Section 5(c) as an à la carte menu where each IOU can claim physical electrons when advantageous and retreat to financial bookouts when convenient. *See id.*; 1-ER-42.

The IOUs' theory that they may "waive" physical delivery if required fails as a matter of law. Br. at 18, 27. While *APAC* recognized that IOUs could compromise statutory claims in the context of a comprehensive, multi-party settlement, *see* 733 F.3d at 957, individual utilities cannot unilaterally "waive" mandatory statutory provisions. If Section 5(c)(1) mandates physical delivery, Congress must have intended to limit participation in the REP to utilities capable of physically transferring power to BPA "along with the attendant limitations of that approach." 1-ER-42. In such case, implying an elective waiver improperly presumes "greater flexibility in designing a REP

program than Congress was willing to give[.]" *PGE*, 501 F.3d at 1036. Although mandatory physical delivery would "effectively dismantle the REP," 1-ER-73, the IOUs cannot manufacture a waiver to escape the harsh consequences of their own statutory reading. Under the IOUs' reading, physical delivery would become a mandatory prerequisite for all REP participants—disqualifying utilities that lack the physical capability to schedule power to BPA and foreclosing statutory rate relief for millions of residential consumers. 1-ER-71-72.

The Court, however, need not go down this path. BPA's long-standing interpretation avoids these statutory contortions by adhering to the Act's text, structure, and purpose. It faithfully implements the "traditional section 5 formula" as an economic paper transaction consistent with nearly fifty years of unbroken practice, ensuring all participants receive the statutory "cost benefits" Congress intended without artificial physical constraints or inventing non-existent flexibilities.

## II. SECTION 5(c) DOES NOT ENTITLE THE IOUS TO "NON-COST BENEFITS."

Anticipating the failure of their primary interpretation, the IOUs offer an alternative argument that even under a paper exchange pursuant to Section 5(c)(1), "no statutory basis exists for refusing to convey environmental attributes and other non-cost benefits through the REP." Br. at 46. They argue these attributes are not "additional" benefits, but "inherent characteristics of BPA system power." *Id.*

Their contention is unsupportable. Section 5(c) expressly restricts REP value to monetary "cost benefits." 16 U.S.C. § 839c(c)(3). The idea of "non-cost benefits" is antithetical to this; it is an invention of the IOUs and has no basis in the statute.

### A. The plain language of Section 5(c) and controlling precedent establish that the REP benefits are exclusively limited to "cost benefits."

The plain text of the NWPA forecloses BPA from expanding the REP to encompass undefined "non-cost benefits."[12] The term "non-cost benefit" appears nowhere in the statute. 1-ER-83-84. Conversely, Congress used the term "cost benefit"—measured by the differential between a utility's ASC and

---

[12] The IOUs' alleged "non-cost benefits" include "environmental attributes," but their definition is not so limited; it encompasses an open-ended list of benefits allegedly "inherent" in BPA system power. Br. at 14 n.4.

BPA's PF Exchange rate—to define the exclusive REP benefit. *See* 16 U.S.C. § 839c(c)(3); 1-ER-83-84. The Act recognizes no other category of REP benefit and there is no basis to imply one. *See Su,* 121 F.4th at 13.

Controlling precedent confirms this limitation. In *APAC*, 733 F.3d at 956-57, this Court reaffirmed that the "traditional section 5 formula" governs the "*maximum*" amount of REP benefits permitted under the Act. *See also id.* at 945-946 (describing how the "REP benefit" is calculated). Nothing in Section 5(c) or *APAC* sanctions the inclusion of qualitative non-cost benefits, unrelated to this formula, through the REP.

Nor can BPA invent extra-statutory benefits under the guise of general contract administration. 1-ER-86-87. In *PGE*, this Court invalidated a settlement that conferred extra-statutory value on IOUs by factoring in litigation risks and market fluctuations rather than adhering strictly to the differential between ASCs and BPA's PF Exchange rate. *See* 501 F.3d at 1021-22. The Court emphasized that "whenever BPA engages in a purchase and exchange of power . . . BPA acts pursuant to its § 5(c) authority, and is thus subject to the Congressionally imposed limitations on that authority as expressed in § 5(c) and § 7(b)." *Id.* at 1032; *see also GNA,* 501 F.3d at 1045. The IOUs now urge BPA to repeat its error in *PGE* by discovering implied

benefits beyond the statutory maximum and contractually conferring them through the 2026 RPSA. Br. at 52-53. BPA properly rejected that request.

## B. BPA cannot circumvent statutory limits by relabeling the benefits or monetizing non-cost benefits through the RPSA.

To bypass the statutory bounds, the IOUs offer two conflicting theories. First, they argue that environmental attributes and other "non-cost benefits" are "inherent" aspects of physical power and therefore are not "additional" benefits that must comply with Section 7(b)(2). Br. at 19, 46, 51, 53. Second, they argue that BPA can monetize these attributes into an additive "cost benefit" routed through the Section 7(b)(2) rate ceiling test. Br. at 54-55. Both theories misapprehend the statutory mechanics and invite the administrative overreach rejected in *PGE*.

### 1. Labeling non-cost benefits "inherent" cannot evade statutory limits.

The IOUs first contend "environmental attributes are not additional benefits . . . they are inherent characteristics of BPA system power[.]" Br. at 46; *see also id.* at 53. Under their theory, the transfer of this "inherent" characteristic would bypass the limits of Section 5(c) and Section 7(b)(2). BPA properly rejected this approach.

BPA "cannot expand its mandate solely through creative use of nomenclature." *PNGC,* 580 F.3d at 823. This Court's binding precedent

squarely forecloses BPA from conferring value in connection with the exchange by evading the strictures of Sections 5(c) and 7(b)(2) through relabeling. *See PGE*, 501 F.3d at 1032 ("BPA is not excused from § 5(c) by calling its actions here a § 2(f) 'settlement.' Sections 5(c) and, by extension, 7(b) are triggered[.]"). The Act provides no path for the IOUs to receive REP-related value free from the statutory protections in Sections 5(c) and 7(b)(2) that safeguard COUs. 1-ER-86-90.

The IOUs attempt to counter this statutory intent by pointing to Section 5(c)(5) *in-lieu* sales, arguing that because BPA conveys environmental attributes in that context, Section 7(b)(2) poses no barrier to doing so under Section 5(c)(1). Br. at 54. This argument ignores the distinct nature of an *in-lieu* transaction. Because the power for an *in-lieu* sale originates from "other sources," 16 U.S.C. § 839c(c)(5), BPA merely passes through whatever attributes accompany the third-party source power pursuant to BPA's POC Policy. 1-ER-115. In doing so, BPA conveys no incremental value of its own but "the environmental attributes associated with the physical power" the utility is purchasing from BPA under Section 5(c)(5), meaning Section 7(b)(2)'s cost protections are not implicated. *Id.*

### 2. Monetizing speculative attributes directly contravenes the Section 7(b)(2) rate ceiling test.

Recognizing that all REP-derived value must satisfy Section 7(b)(2), the IOUs fall back on an alternative, arguing that BPA can invent a monetary valuation for non-cost attributes and inject that artificial figure into the Section 7(b)(2) rate ceiling test. *See* Br. at 54-55. This approach misunderstands both the purpose and mechanics of the rate test.

*First,* the purpose of the Section 7(b)(2) rate test is to ensure "that BPA cannot charge preference customers higher rates than BPA would charge in the absence of the REP." *PGE*, 501 F.3d at 1015. BPA performs this test by comparing power rates that include REP costs against a hypothetical rate that excludes them, alongside specified statutory assumptions. *See* 16 U.S.C. § 839e(b)(2)(A)-(E); 1-ER-86.

*Second*, the mechanics of Section 7(b)(2) demonstrate that it is not an open-ended ledger into which BPA may insert speculative, extra-statutory benefits. Rather, it is an objective calculation engineered exclusively to evaluate and protect against "power costs" generated by the traditional Section 5(c) formula. *See* 16 U.S.C. § 839e(b)(2); 1-ER-87-88; *see also APAC*, 733 F.3d at 956-57 (explaining that the statutory formula defines the "maximum REP benefit"). Congress explicitly limited the Section 7(b)(2) rate

test to objective metrics requiring only "minor estimating." S. Rep. No. 96-272, at 61 (1979). When Congress intended BPA to hypothesize about unliquidated benefits in the rate test, it did so expressly, such as mandating assumptions regarding "quantifiable monetary savings" in Section 7(b)(2)(E). 16 U.S.C. § 839e(b)(2)(E). Because Congress did not mention non-cost benefits in the Section 7(b)(2) rate test, it must be presumed that Congress never intended such benefits to be part of the Section 5(c)(1) exchange to begin with. *Su*, 121 F.4th at 13.

The IOUs point to the forecast modeling sustained in *APAC* to argue BPA can handle such estimations. *See* Br. at 55. That comparison fails. The methodology BPA applied in *APAC* used a mathematical variation of the "traditional section 5 formula" that was based entirely on the standard power cost components of the REP, specifically ASCs, the PF Exchange rate, and utility loads. *See* 733 F.3d at 966. Here, the IOUs urge BPA to invent values for what their avoided state carbon compliance costs might be, despite each IOU having different carbon footprints and being subject to different state requirements. *See* Br. at 54. Any such appraisal would be highly speculative, particularly where dynamic state programs are allowing multiple methods of compliance. 1-ER-80-81; *see also* Br. at 12-13 (describing different compliance regimes).

*Third*, even if BPA could quantify an IOU's avoided compliance costs as a "cost benefit" under the Section 7(b)(2) rate test, doing so would impermissibly crowd out statutory "cost benefits" owed to other IOUs under the "traditional section 5 formula." Because Section 5(c) value is excluded from COU rates during the rate test, *see* 16 U.S.C. § 839e(b)(2)(C), and the Section 7(b)(2) rate ceiling is a hard cap on these payments, *see PGE*, 501 F.3d at 1015, imputing a value for "non-cost" benefits does not *expand* the total REP benefits allowed. Instead, it will *reduce* actual REP payments to other qualifying IOUs to allow through these "non-cost" REP benefits. Nothing in the Act's text or context suggests Congress intended unstated "non-cost benefits" to displace express statutory "cost benefits."

**C. The broader statutory context confirms that Congress intended the REP to provide only cost benefits.**

Three structural features of the NWPA confirm that Congress intended the REP to deliver only "cost benefits" and not "non-cost benefits."

**1. The mandatory residential pass-through provisions confirm that the Section 5(c)(1) exchange is exclusively financial and excludes non-cost benefits.**

First, the statutory scheme mandates that REP benefits flow exclusively to residential and farm consumers through a strict, federally supervised pass-through financial mechanism. *See* 16 U.S.C. § 839c(c)(3); 1-ER-84-85. Section

5(c)(3) is clear that the *only* benefit provided by Section 5(c)(1) is a "cost benefit[]" and that benefit must be distributed to "residential load." 16 U.S.C. § 839c(c)(3). By limiting "residential load" strictly to "usual residential, apartment, seasonal dwelling and farm electrical loads," Congress foreclosed utilities from diverting REP value to commercial or industrial users or retaining it for shareholders. 16 U.S.C. § 839a(18). Congress also preempted state utility ratemaking in Section 10(a)(1) to ensure compliance with Section 5(c)(3). *See* 16 U.S.C. § 839g(a)(1) (preserving state authority to set retail rates "except as provided by section [5](c)(3)"); 1-ER-55.

The IOUs' effort to expand the REP to include "non-cost benefits" would dismantle this statutory framework. Because Section 5(c)(3)'s mandatory pass-through and Section 10(a)(1)'s preemption apply strictly to "cost benefits," any purported "non-cost benefit" would escape statutory distribution mandates entirely. 1-ER-84. Unconstrained by federal law, utilities could freely capture this value for corporate gain or allocate it to ineligible loads—an outcome antithetical to the Act and its legislative history.[13] *Id.* Even Amicus recognizes the problem with this broad approach,

[13] Attempting to cure this defect during the RPSA process, the IOUs proposed voluntarily passing these benefits through to their residential customers. *See* 1-ER-84-85. The very need for such an *ad hoc* workaround underscores the underlying error. *Id.*

and suggests the Court "clarify" that any resulting environmental benefits only go to residential consumers. CUB Amicus Br. at 10. As BPA concluded, "nothing in the [NWPA] or its extensive legislative history even remotely suggests this outcome was intended or acceptable," yet that remains the unavoidable legal consequence of the IOUs' interpretation. 1-ER-84.

### 2. Rate and funding provisions confirm that the REP operates exclusively as an accounting mechanism for net costs rather than non-cost benefits.

Adjacent rate provisions reinforce that the REP was intended to generate a "cost benefit" and nothing more.

Under Section 7(b)(3)(B), Congress barred BPA from incorporating into COU rates any costs or benefits arising from "an overrecovery or underrecovery of the net costs incurred by the Administrator under section [5(c)]." 16 U.S.C. § 839e(b)(3)(B). Through this provision, Congress presumed that the Section 5(c)(1) exchange was limited to a set of "net costs" and left no opening for other "non-cost" benefits to impact this provision. 1-ER-85.

Similarly, Section 7(c)(1)(A) required DSI customers to fund the entire "net cost" of the Section 5(c)(1) exchange during the Act's first five years. 16 U.S.C. § 839e(c)(1)(A). As the Supreme Court recognized in *Alcoa*, DSI sales and the exchange program are "integrally related" because Congress directed

the DSIs to "finance the exchange program." 467 U.S. at 400. This statutory financing structure confirms that both Congress and the Court viewed the exchange purely as a monetary transaction governed by "net cost," leaving no room for unpriced non-cost attributes. 1-ER-85-86.

The IOUs have no response to these contextual arguments, lumping them with the "pass along" provision of Section 5(c)(3). Br. at 51. In reality, these contextual points confirm that Congress designed the entire statutory architecture around quantifiable costs, leaving no statutory authority for BPA to convey non-cost attributes through the REP.

### 3. Elsewhere in the Act, Congress expressly provided for non-cost and capacity benefits, demonstrating that their omission from Section 5(c) was intentional.

When Congress intended BPA to consider non-cost values, such as the environmental "costs and benefits" of particular resources, or operational benefits, such as capacity benefits, it provided express statutory provisions to do so. 1-ER-92-94. Congress chose not to include any such terms in Section 5(c), and settled principles of statutory interpretation forbid implying them. *See ICL I,* 83 F.4th at 1194.

Congress explicitly addressed environmental "costs and benefits" when defining "system cost" for purposes of determining "cost effective" resources for the Regional Power Plan under Section 4(e)(1). 16 U.S.C. § 839a(4)(B); *see*

*also* § 839b(e)(1). Section 3(4)(B) defines "system cost" to include "such quantifiable environmental costs and benefits as the Administrator determines, on the basis of a methodology developed by the Council as part of the plan . . . [that] are directly attributable to such measure or resource." 16 U.S.C. § 839a(4)(B).

This language confirms two critical points. First, unlike in Section 5(c)(1), in Section 3(4)(B) Congress recognized that regional resources could possess certain "environmental costs and benefits" capable of valuation. *Id*. Second, rather than granting BPA unbridled discretion to assess those benefits, Congress strictly conditioned their use by requiring that they be "quantifiable" and informed by an established Council methodology. *Id.*

By contrast, Section 5(c) contains no reference to environmental costs or benefits, much less to the broader concept of "attributes" that the IOUs infer. It defies logic that Congress would enact detailed constraints and methodological requirements for environmental benefits in Section 3(4)(B), yet silently authorize BPA to distribute those same attributes without statutory criteria or procedural checks under Section 5(c). *See Wheeler v. City of Santa Clara,* 894 F.3d 1046, 1054 (9th Cir. 2018) (noting presumption that when a statute designates certain persons, things or manners of operation, all omissions should be understood as exclusions). Had Congress intended for

the Section 5(c) exchange to convey environmental "costs or benefits" of the Federal system, it would have mandated their accounting as it did elsewhere in the Act.

The same statutory contrast disproves the IOUs' demand for "capacity" or other "non-cost" benefits. Br. at 14 n.4. When Congress wanted BPA to account for capacity value in power transactions, it gave specific statutory instructions. Under Section 7(c)(3), Congress directed the Administrator to credit DSI rates "to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers." 16 U.S.C. § 839e(c)(3). Congress tethered that capacity benefit to an identifiable operational mechanism—reserves generated through curtailment rights—and subjected that valuation to public review through Section 7(i) rate proceedings. 1-ER-94.

Congress provided no corresponding mechanism or valuation criteria for capacity under Section 5(c). The omission of capacity or operational benefits from Section 5(c) demonstrates that Congress never intended for the REP to encompass them.

### D. The existing statutory formula already accounts for state environmental mandates by expanding statutory cost benefits.

While the IOUs emphasize the regulatory burdens of state decarbonization mandates, Br. at 12, 57, they ignore that the financial nature of the REP already accounts for these regulatory pressures through monetary cost relief. 1-ER-90. Specifically, an IOU's ASC already includes its environmental compliance expenses, meaning that as an IOU spends more to satisfy state mandates, its ASC increases and produces a correspondingly larger REP payment. *Id.* As BPA explained, "the costs the IOUs incur to meet their compliance and other goals imposed by state legislature[s] will be included in their ASC." 1-ER-91.

Likewise, any economic value the market places on BPA's low-carbon hydropower flows back through the PF Exchange rate. *Id.* When BPA sells physical surplus power on the open market, BPA may receive a premium for this power because of the associated environmental attributes. *Id.* These increased revenues apply as credits against BPA's overall revenue requirements, reducing its rates across the board, including the PF Exchange rate. *Id.* The lower the PF Exchange rate, the larger the spread against the IOUs' ASCs and the greater the potential REP benefit.

Although the IOUs dismiss this result as "delayed and indirect," it is the statutory remedy Congress enacted. Br. at 59. The "traditional section 5 formula" accomplishes the economic sharing envisioned by the Act without requiring BPA to imply non-statutory benefits outside the law.

**E. BPA's prior settlements and administrative reporting policies do not require conveying environmental attributes as part of the REP.**

The IOUs argue that BPA recognized the transfer of environmental attributes through the REP in the 2012 REP Settlement and in policy decisions reporting environmental attributes for Section 5(b) sales, and arbitrarily departed from those positions in the 2026 RPSA ROD. Br. at 48-49. This argument mischaracterizes the record on both counts.

*First*, the 2012 REP Settlement was a negotiated compromise among the IOUs, COUs, and BPA, in which the COUs expressly consented to transfer a limited category of RECs and modified their power contracts accordingly. 1-ER-97; SER-67. The 2012 REP Settlement clearly states its terms carry no "precedential" value or "evidentiary effect" regarding any "statutory interpretation" or "underlying principle," nor did it constitute agreement to any methodology outside the settlement's execution. 1-ER-97-98; SER-68. The IOUs cannot rely on that non-precedential settlement to establish a statutory baseline here.

*Second*, the IOUs are mistaken in asserting that BPA's policy decision to report power characteristics for physical sales under Section 5(b) and Section 5(c)(5) *in-lieu* transactions conflicts with its decision to exclude those attributes from the paper-based Section 5(c)(1) exchange. Br. at 49. As discussed earlier, in its March 2024 POC Policy, BPA decided as a matter of policy to convey environmental attributes commensurate with firm physical power purchases. 1-ER-81-82; SER-41, SER-35. This policy uniformly applies across all firm physical power sales. When a utility purchases firm physical power from BPA to serve its loads, BPA allows any associated state-created environmental attributes to flow with that power. SER-35.

BPA's POC policy framework confirms the reasonableness of the 2026 RPSA ROD. 1-ER-94-95. Where physical power actually flows to meet a customer's load, as under Section 5(b) or Section 5(c)(5), BPA may reasonably report the associated generation attributes. *Id.*; SER-35. Because the Section 5(c)(1) exchange involves no physical power deliveries and serves no load, BPA reasonably determined that federal system environmental attributes are not conveyed. 1-ER-95. The IOUs did not challenge BPA's final decision in the March 2024 policy ROD to report environmental attributes commensurate with physical power deliveries, and cannot do so now. 1-ER-82.

### F. The IOUs' and Amici's unsubstantiated pleas regarding equity cannot override Congress's exclusive statutory design for the REP.

The IOUs' brief concludes with a broad policy plea, claiming that restricting the REP to "cost benefits" conflicts with the Act's equitable access goals and frustrates Congressional intent to create a "level playing field with COUs." Br. at 56-57. Citing state clean-energy regimes, the IOUs insist that excluding environmental attributes harms their customers and renders BPA's distinction between cost and non-cost benefits "arbitrary and contrary to law." Br. at 59. The IOUs and Amici also invoke general arguments for equity throughout their briefs. *See*, *e.g.,* Br. at 46, 57; *see also*, *e.g.,* WUTC Amicus Br. at 23; CUB Amicus Br. at 6-7.

These policy objections cannot override the statute. Congress resolved the historical retail rate disparities between COU and IOU consumers not by granting IOUs open-ended rights to federal power or its "non-cost" attributes, but by enacting the specific, energy-neutral Section 5(c)(1) exchange, designed to provide "cost benefits," per Section 5(c)(3), and subject to the limitations of Section 7(b)(2). BPA possesses no authority to expand or augment the REP beyond its statutory limits to achieve a broader, non-statutory concept of regional "equity."

Almost two decades ago, this Court rejected a similar bid to expand the REP, holding that "Congress ordained one system," and while it may be "unfortunate that some customer classes" receive fewer benefits, "BPA cannot unilaterally change the law." *PGE*, 501 F.3d at 1036. By demanding BPA incorporate undefined "non-cost benefits" into the 2026 RPSA, the IOUs and Amici seek precisely what *PGE* foreclosed: creating an unauthorized "new residential exchange benefit system." *Id.* at 1037.

To the extent state-mandated carbon policies increase a utility's costs of power, the Act provides a statutory response through increased "cost benefits." Beyond that express statutory feature, the IOUs' remedy for alleviating their costs of complying with state regulatory requirements lies in revising state policy—not reinterpreting a decades-old statute designed to address a distinct economic problem. *See Alcoa*, 467 U.S. at 398 ("The exchange program is designed to provide rate relief for consumers served by IOUs.")

BPA's decision to exclude these non-statutory factors from the 2026 RPSA is consistent with the Act and this Court's binding precedent, and should be upheld.

## CONCLUSION

The petition for review should be denied.

DATE: November 6, 2026

Respectfully submitted,

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
*Assistant General Counsel*

NEAL M. GSCHWEND
*Attorney*

Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208
503-230-3128

SCOTT E. BRADFORD
*United States Attorney*
*District of Oregon*

SEAN E. MARTIN
*Assistant U.S. Attorney*

RICHARD A. GREENE
*Special Asst. U.S. Attorney*
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208
503-230-4626

*Attorneys for Respondents*

*/s/ Richard A. Greene*
RICHARD A. GREENE
Special Asst. U.S. Attorney
Attorney for Respondents

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(5) and (6), and Ninth Circuit Rule 32-1, the attached Answering Brief of Respondent Bonneville Power Administration is proportionally spaced, has a typeface of 14 points or more, and contains 15,085 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

Dated this 6th day of November, 2026.

*/s/ Richard A. Greene*
RICHARD A. GREENE
Special Asst. U.S. Attorney
Attorney for Respondent

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-2569

I am the attorney or self-represented party.

**This brief contains** 15,085 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ● complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ■ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ____.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Richard A. Greene **Date** November 6, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# ADDENDUM

## Addendum

Pacific Northwest Electric Power Planning and Conservation Act,
16 U.S.C. § 839 *et seq*. .......... A-1

H.R. Rep. No. 96-976, pt. I, 96th Cong., 2d Sess, 1980 (excerpt),
pages 1-2, 23-27, 59-64.......... A-63

H.R. Rep. No. 96-976, pt. II, 96th Cong., 2d Sess, 1980 (excerpt),
pages 1, 26-32 .......... A-71

# Pacific Northwest Electric Power Planning and Conservation Act

**16 United States Code** Chapter 12H (2006).
Act of Dec. 5, 1980, 94 Stat. 2697.
Public Law No. 96-501, S. 885.

Purposes

**839. Congressional declaration of purpose**
The purposes of this chapter, together with the provisions of other laws applicable to the Federal Columbia River Power System, are all intended to be construed in a consistent manner. Such purposes are also intended to be construed in a manner consistent with applicable environmental laws. Such purposes are:

**839(1)**. to encourage, through the unique opportunity provided by the Federal Columbia River Power System—

**839(1)(A)**. Conservation and efficiency in the use of electric power, and
[Pacific Northwest Electric Power Planning and Conservation Act, (Northwest Power Act), §2(1)(A), Dec. 5, 1980, 94 Stat. 2697.]

**839(1)(B)**. the development of renewable resources within the Pacific Northwest;
[Northwest Power Act, §2(1)(B), 94 Stat. 2697.]

**839(2)**. to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply;
[Northwest Power Act, §2(2), 94 Stat. 2697.]

**839(3)**. to provide for the participation and consultation of the Pacific Northwest States, local governments, consumers, customers, users of the Columbia River System (including Federal and State fish and wildlife agencies and appropriate Indian tribes), and the public at large within the region in—

**839(3)(A)**. the development of regional plans and programs related to energy conservation, renewable resources, other resources, and protecting, mitigating, and enhancing fish and wildlife resources.
[Northwest Power Act, §2(3)(A), 94 Stat. 2697.]

**839(3)(B)**. facilitating the orderly planning of the region's power system, and
[Northwest Power Act, §2(3)(B), 94 Stat. 2698.]

**839(3)(C)**. providing environmental quality;
[Northwest Power Act, §2(3)(C), 94 Stat. 2698.]

**839(4)**. to provide that the customers of the Bonneville Power Administration and their consumers continue to pay all costs necessary to produce, transmit, and conserve resources to meet the region's electric power requirements,

including the amortization on a current basis of the Federal investment in the Federal Columbia River Power System;
[Northwest Power Act, §2(4), 94 Stat. 2698.]

**839(5)**. to insure, subject to the provisions of this chapter—

**839(5)(A)**. that the authorities and responsibilities of State and local governments, electric utility systems, water management agencies, and other non-Federal entities for the regulation, planning, conservation, supply, distribution, and use of electric power shall be construed to be maintained, and
[Northwest Power Act, §2(5)(A), 94 Stat. 2698.]

**839(5)(B)**. that Congress intends that this chapter not be construed to limit or restrict the ability of customers to take actions in accordance with other applicable provisions of Federal or State law, including, but not limited to, actions to plan, develop, and operate resources and to achieve conservation, without regard to this chapter; and
[Northwest Power Act, §2(5)(B), 94 Stat. 2698.]

**839(6)**. to protect, mitigate and enhance the fish and wildlife, including related spawning grounds and habitat, of the Columbia River and its tributaries, particularly anadromous fish which are of significant importance to the social and economic well-being of the Pacific Northwest and the Nation and which are dependent on suitable environmental conditions substantially obtainable from the management and operation of Federal Columbia River Power System and other power generating facilities on the Columbia River and its tributaries.
[Northwest Power Act, §2(6), 94 Stat. 2698.]

**839a. Definitions**
As used in this chapter, the term—

**839a(1)**. "Acquire" and "acquisition" shall not be construed as authorizing the Administrator to construct, or have ownership of, under this chapter or any other law, any electric generating facility.
[Northwest Power Act, §3(1), 94 Stat. 2698.]

**839a(2)**. "Administrator" means the Administrator of the Bonneville Power Administration.
[Northwest Power Act, §3(2), 94 Stat. 2698.]

**839a(3)**. "Conservation" means any reduction in electric power consumption as a result of increases in the efficiency of energy use, production, or distribution.
[Northwest Power Act, §3(3), 94 Stat. 2698.]

Cost-effective

**839a(4)(A)**. "Cost-effective", when applied to any measure or resource referred to in this chapter, means that such measure or resource must be forecast—

Reliable

**839a(4)(A)(i)**. to be reliable and available within the time it is needed, and
[Northwest Power Act, §3(4)(A)(i), 94 Stat. 2698.]

Meet or reduce electric power demand

**839a(4)(A)(ii)**. to meet or reduce the electric power demand, as determined by the Council or the Administrator, as appropriate, of the consumers of the customers at an estimated incremental system cost no greater than that of the least-cost similarly reliable and available alternative measure or resource, or any combination thereof.
[Northwest Power Act, §3(4)(A)(ii), 94 Stat. 2698.]

System cost

**839a(4)(B)**. For purposes of this paragraph, the term "system cost" means an estimate of all direct costs of a measure or resource over its effective life, including, if applicable, the cost of distribution and transmission to the consumer and, among other factors, waste disposal costs, end-of-cycle costs, and fuel costs (including projected increases), and such quantifiable environmental costs and benefits as the Administrator determines, on the basis of a methodology developed by the Council as part of the plan, or in the absence of the plan by the Administrator, are directly attributable to such measure or resource.
[Northwest Power Act, §3(4)(B), 94 Stat. 2698-9.]

**839a(4)(C)**. In determining the amount of power that a conservation measure or other resource may be expected to save or to produce, the Council or the Administrator, as the case may be, shall take into account projected realization factors and plant factors, including appropriate historical experience with similar measures or resources.
[Northwest Power Act, §3(4)(C), 94 Stat. 2699.]

Conservation favored

**839a(4)(D)**. For purposes of this paragraph, the "estimated incremental system cost" of any conservation measure or resource shall not be treated as greater than that of any non-conservation measure or resource unless the incremental system cost of such conservation measure or resource is in excess of 110 per centum of the incremental system cost of the nonconservation measure or resource.
[Northwest Power Act, §3(4)(D), 94 Stat. 2699.]

**839a(5)**. "Consumer" means any end user of electric power.
[Northwest Power Act, §3(5), 94 Stat. 2699.]

**839a(6)**. "Council" means, unless otherwise specifically provided, the members appointed to the Pacific Northwest Electric Power and Conservation Planning Council established pursuant to section 839b of this title.
[Northwest Power Act, §3(6), 94 Stat. 2699.]

## Pacific NW Power Act (continued)

**839a(7)**. "Customer" means anyone who contracts for the purchase of power from the Administrator pursuant to this chapter.
[Northwest Power Act, §3(7), 94 Stat. 2699.]

**839a(8)**. "Direct service industrial customer" means an industrial customer that contracts for the purchase of power from the Administrator for direct consumption.
[Northwest Power Act, §3(8), 94 Stat. 2699.]

**839a(9)**. "Electric power" means electric peaking capacity, or electric energy, or both.
[Northwest Power Act, §3(9), 94 Stat. 2699.]

**839a(10)**. "Federal base system resources" means—

**839a(10)(A)**. the Federal Columbia River Power System hydroelectric projects;
[Northwest Power Act, §3(10)(A), 94 Stat. 2699.]

**839a(10)(B)**. resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and
[Northwest Power Act, §3(10)(B), 94 Stat. 2699.]

**839a(10)(C)**. resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.
[Northwest Power Act, §3(10)(C), 94 Stat. 2699.]

**839a(11)**. "Indian tribe" means any Indian tribe or band which is located in whole or in part in the region and which has a governing body which is recognized by the Secretary of the Interior.
[Northwest Power Act, §3(11), 94 Stat. 2699.]

**839a(12)**. "Major resource" means any resource that— Major resource

**839a(12)(A)**. has a planned capability greater than fifty average megawatts, and
[Northwest Power Act, §3(12)(A), 94 Stat. 2699.]

**839a(12)(B)**. if acquired by the Administrator, is acquired for a period of more than five years.
[Northwest Power Act, §3(12)(B), 94 Stat. 2699.]

**839a(12) [cont.]**. Such term does not include any resource acquired pursuant to section 838i(b)(6) of this title.
[Northwest Power Act, §3(12), 94 Stat. 2699.]

**839a(13)**. "New large single load" means any load associated with a new facility, an existing facility, or an expansion of an existing facility—

**839a(13)(A)**. which is not contracted for, or committed to, as determined by the Administrator, by a public body, cooperative, investor-owned utility, or Federal agency customer prior to September 1, 1979, and
[Northwest Power Act, §3(13)(A), 94 Stat. 2699-2700.]

**839a(13)(B)**. which will result in an increase in power requirements of such customer of ten average megawatts or more in any consecutive twelve-month period.
[Northwest Power Act, §3(13)(B), 94 Stat. 2700.]

Region

**839a(14)**. "Pacific Northwest", "region", or "regional" means—

**839a(14)(A)**. the area consisting of the States of Oregon, Washington, and Idaho, the portion of the State of Montana west of the Continental Divide, and such portions of the States of Nevada, Utah, and Wyoming as are within the Columbia River drainage basin; and
[Northwest Power Act, §3(14)(A), 94 Stat. 2700.]

**839a(14)(B)**. any contiguous areas, not in excess of seventy-five air miles from the area referred to in subparagraph (A), which are a part of the service area of a rural electric cooperative customer served by the Administrator on December 5, 1980, which has a distribution system from which it serves both within and without such region.
[Northwest Power Act, §3(14)(B), 94 Stat. 2700.]

**839a(15)**. "Plan" means the Regional Electric Power and Conservation plan (including any amendments thereto) adopted pursuant to this chapter and such plan shall apply to actions of the Administrator as specified in this chapter.
[Northwest Power Act, §3(15), 94 Stat. 2700.]

**839a(16)**. "Renewable resource" means a resource which utilizes solar, wind, hydro, geothermal, biomass, or similar sources of energy and which either is used for electric power generation or will reduce the electric power requirements of a consumer, including by direct application.
[Northwest Power Act, §3(16), 94 Stat. 2700.]

**839a(17)**. "Reserves" means the electric power needed to avert particular planning or operating shortages for the benefit of firm power customers of the Administrator and available to the Administrator (A) from resources or (B) from rights to interrupt, curtail, or otherwise withdraw, as provided by specific contract provisions, portions of the electric power supplied to customers.
[Northwest Power Act, §3(17), 94 Stat. 2700.]

**839a(18)**. "Residential use" or "residential load" means all usual residential, apartment, seasonal dwelling and farm electrical loads or uses, but only the first four hundred horsepower during any monthly billing period of farm irrigation and pumping for any farm.
[Northwest Power Act, §3(18), 94 Stat. 2700.]

**839a(19)**. "Resource" means—

**839a(19)(A)**. electric power, including the actual or planned electric power capability of generating facilities, or
[Northwest Power Act, §3(19)(A), 94 Stat. 2700.]

**839a(19)(B)**. actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure.
[Northwest Power Act, §3(19)(B), 94 Stat. 2700.]

**839a(20)**. "Secretary" means the Secretary of Energy.
[Northwest Power Act, §3(20), 94 Stat. 2700.]

**839b. Regional planning and participation**

**839b(a). Pacific Northwest Electric Power and Conservation Planning Council; establishment and operation as regional agency**

Establishment of Pacific Northwest Electric Power and Conservation Planning Council

**839b(a)(1)**. The purposes of this section are to provide for the prompt establishment and effective operation of the Pacific Northwest Electric Power and Conservation Planning Council, to further the purposes of this chapter by the Council promptly preparing and adopting (A) a regional conservation and electric power plan and (B) a program to protect, mitigate, and enhance fish and wildlife, and to otherwise expeditiously and effectively carry out the Council's responsibilities and functions under this chapter.
[Northwest Power Act, §4(a)(1), 94 Stat. 2700.]

**839b(a)(2)**. To achieve such purposes and facilitate cooperation among the States of Idaho, Montana, Oregon, and Washington, and with the Bonneville Power Administration, the consent of Congress is given for an agreement described in this paragraph and not in conflict with this chapter, pursuant to which—

**839b(a)(2)(A)**. there shall be established a regional agency known as the "Pacific Northwest Electric Power and Conservation Planning Council" which (i) shall have its offices in the Pacific Northwest, (ii) shall carry out its functions and responsibilities in accordance with the provisions of this chapter, (iii) shall continue in force and effect in accordance with the provisions of this chapter, and (iv) except as otherwise provided in this chapter, shall not be considered an agency or instrumentality of the United States for the purpose of any Federal law; and
[Northwest Power Act, §4(a)(2)(A), 94 Stat. 2701.]

**839b(a)(2)(B)**. two persons from each State may be appointed, subject to the applicable laws of each such State, to undertake the functions and duties of members of the Council.
[Northwest Power Act, §4(a)(2)(B), 94 Stat. 2701.]

Member appointment

**839b(a)(2)**. The State may fill any vacancy occurring prior to the expiration of the term of any member. The appointment of six initial members, subject to applicable State law, by June 30, 1981, by at least three of such States shall constitute an agreement by the States establishing the Council and such agreement is hereby consented to by the Congress. Upon request of the Governors of two of the States, the Secretary shall extend the June 30, 1981, date for six additional months to provide more time for the States to make such appointments.

[Northwest Power Act, §4(a)(2), 94 Stat. 2701.]

Term

Compensation

**839b(a)(3)**. Except as otherwise provided by State law, each member appointed to the Council shall serve for a term of three years, except that, with respect to members initially appointed, each Governor shall designate one member to serve a term of two years and one member to serve a term of three years. The members of the Council shall select from among themselves a chairman. The members and officers and employees of the Council shall not be deemed to be officers or employees of the United States for any purpose. The Council shall appoint, fix compensation, and assign and delegate duties to such executive and additional personnel as the Council deems necessary to fulfill its functions under this chapter, taking into account such information and analyses as are, or are likely to be, available from other sources pursuant to provisions of this chapter. The compensation of the members shall be fixed by State law. The compensation of the members and officers shall not exceed the rate prescribed for Federal officers and positions at step 1 of level GS-18 of the General Schedule.

[Northwest Power Act, §4(a)(3), 94 Stat. 2701.]

**839b(a)(4)**. For the purpose of providing a uniform system of laws, in addition to this chapter, applicable to the Council relating to the making of contracts, conflicts-of-interest, financial disclosure, open meetings of the Council, advisory committees, disclosure of information, judicial review of Council functions and actions under this chapter, and related matters, the Federal laws applicable to such matters in the case of the Bonneville Power Administration shall apply to the Council to the extent appropriate, except that with respect to open meetings, the Federal laws applicable to open meetings in the case of the Federal Energy Regulatory Commission shall apply to the Council to the extent appropriate. In applying the Federal laws applicable to financial disclosure under the preceding sentence, such laws shall be applied to members of the Council without regard to the duration of their service on the Council or the amount of compensation received for such service. No contract, obligation, or other action of the Council shall be construed as an obligation of the United States or an obligation secured by the full faith and credit of the United States. For the purpose of judicial review of any action of the Council or challenging any provision of this chapter relating to functions and responsibilities of the Council, notwithstanding any other provision of law, the courts of the United States shall have exclusive jurisdiction of any such review.

[Northwest Power Act, §4(a)(4), 94 Stat. 2701-2.]

**839b(b). Alternative establishment of Council as Federal agency**

**839b(b)(1)**. If the Council is not established and its members are not timely appointed in accordance with subsection (a) of this section, or if, at any time after such Council is established and its members are appointed in accordance with subsection (a)—

**839b(b)(1)(A)**. any provision of this chapter relating to the establishment of the Council or to any substantial function or responsibility of the Council (including any function or responsibility under subsection (d) or (h) of this section or under section 839d(c) of this title) is held to be unlawful by a final determination of any Federal court, or
[Northwest Power Act, §4(b)(1)(A), 94 Stat. 2702.]

**839b(b)(1)(B)**. the plan or any program adopted by such Council under this section is held by a final determination of such a court to be ineffective by reason of subsection (a)(2)(B) of this section,
[Northwest Power Act, §4(b)(1)(B), 94 Stat. 2702.]

**839b(b)(1) [cont.]**. the Secretary shall establish the Council pursuant to this subsection as a Federal agency. The Secretary shall promptly publish a notice thereof in the Federal Register and notify the Governors of each of the States referred to in subsection (a) of this section.
[Northwest Power Act, §4(b)(1), 94 Stat. 2702.]

**839b(b)(2)**. As soon as practicable, but not more than thirty days after the publication of the notice referred to in paragraph (1) of this subsection, and thereafter within forty-five days after a vacancy occurs, the Governors of the States of Washington, Oregon, Idaho, and Montana may each (under applicable State laws, if any) provide to the Secretary a list of nominations from such State for each of the State's positions to be selected for such Council. The Secretary may extend this time an additional thirty days. The list shall include at least two persons for each such position. The list shall include such information about such nominees as the Secretary may request. The Secretary shall appoint the Council members from each Governor's list of nominations for each State's positions, except that the Secretary may decline to appoint for any reason any of a Governor's nominees for a position and shall so notify the Governor. The Governor may thereafter make successive nominations within forty-five days of receipt of such notice until nominees acceptable to the Secretary are appointed for each position. In the event the Governor of any such State fails to make the required nominations for any State position on such Council within the time specified for such nominations, the Secretary shall select from such State and appoint the Council member or members for such position. The members of the Council shall select from among themselves one member of the Council as Chairman.
[Northwest Power Act, §4(b)(2), 94 Stat. 2702.]

**839b(b)(3)**. The members of the Council established by this subsection who are not employed by the United States or a State shall receive compensation

at a rate equal to the rate prescribed for offices and positions at level GS-18 of the General Schedule for each day such members are engaged in the actual performance of duties as members of such Council, except that no such member may be paid more in any calendar year than an officer or employee at step 1 of level GS-18 is paid during such year. Members of such Council shall be considered officers or employees of the United States for purposes of title II of the Ethics in Government Act of 1978 (5 U.S.C. app.) and shall also be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in Government service are allowed expenses under section 5703 of title 5. Such Council may appoint, and assign duties to, an executive director who shall serve at the pleasure of such Council and who shall be compensated at the rate established for GS-18 of the General Schedule. The executive director shall exercise the powers and duties delegated to such director by such Council, including the power to appoint and fix compensation of additional personnel in accordance with applicable Federal law to carry out the functions and responsibilities of such Council.

[Northwest Power Act, §4(b)(3), 94 Stat. 2702-3.]

**839b(b)(4)**. When a Council is established under this subsection after a Council was established pursuant to subsection (a) of this section, the Secretary shall provide, to the greatest extent feasible, for the transfer to the Council established by this subsection of all funds, books, papers, documents, equipment, and other matters in order to facilitate the Council's capability to achieve the requirements of subsections (d) and (h) of this section. In order to carry out its functions and responsibilities under this chapter expeditiously, the Council shall take into consideration any actions of the Council under subsection (a) and may review, modify, or confirm such actions without further proceedings.

[Northwest Power Act, §4(b)(4), 94 Stat. 2703.]

**839b(b)(5)(A)**. At any time beginning one year after the plan referred to in such subsection (d) of this section and the program referred to in such subsection (h) of this section are both finally adopted in accordance with this chapter, the Council established pursuant to this subsection shall be terminated by the Secretary 90 days after the Governors of three of the States referred to in this subsection jointly provide for any reason to the Secretary a written request for such termination. Except as provided in subparagraph (B), upon such termination all functions and responsibilities of the Council under this chapter shall also terminate.

[Northwest Power Act, §4(b)(5)(A), 94 Stat. 2703.]

**839b(b)(5)(B)**. Upon such termination of the Council, the functions and responsibilities of the Council set forth in subsection (h) of this section shall be transferred to, and continue to be funded and carried out, jointly, by the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service, in the same manner and to the same extent as required by such subsection and in cooperation with the Federal and the region's State fish and wildlife agencies and Indian tribes referred

to in subsection (h) of this section and the Secretary shall provide for the transfer to them of all records, books, documents, funds, and personnel of such Council that relate to subsection (h) matters. In order to carry out such functions and responsibilities expeditiously, the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service shall take into consideration any actions of the Council under this subsection, and may review, modify, or confirm such actions without further proceedings. In the event the Council is terminated pursuant to this paragraph, whenever any action of the Administrator requires any approval or other action by the Council, the Administrator may take such action without such approval or action, except that the Administrator may not implement any proposal to acquire a major generating resource or to grant billing credits involving a major generating resource until the expenditure of funds for that purpose is specifically authorized by Act of Congress enacted after such termination.
[Northwest Power Act, §4(b)(5)(B), 94 Stat. 2703.]

**839b(c). Organization and operation of Council**

**839b(c)(1)**. The provisions of this subsection shall, except as specifically provided in this subsection, apply to the Council established pursuant to either subsection (a) or (b) of this section.
[Northwest Power Act, §4(c)(1), 94 Stat. 2703.]

**839b(c)(2)**. A majority of the members of the Council shall constitute a quorum. Except as otherwise provided specifically in this chapter, all actions and decisions of the Council shall be by majority vote of the members present and voting. The plan or any part thereof and any amendment thereto shall not be approved unless such plan or amendment receives the votes of—

**839b(c)(2)(A)**. a majority of the members appointed to the Council, including the vote of at least one member from each State with members on the Council; or Quorum
[Northwest Power Act, §4(c)(2)(A), 94 Stat. 2704.]

**839b(c)(2)(B)**. at least six members of the Council.
[Northwest Power Act, §4(c)(2)(B), 94 Stat. 2704.]

**839b(c)(3)**. The Council shall meet at the call of the Chairman or upon the request of any three members of the Council. If any member of the Council disagrees with respect to any matter transmitted to any Federal or State official or any other person or wishes to express additional views concerning such matter, such member may submit a statement to accompany such matter setting forth the reasons for such disagreement or views.
[Northwest Power Act, §4(c)(3), 94 Stat. 2704.]

**839b(c)(4)**. The Council shall determine its organization and prescribe its practices and procedures for carrying out its functions and responsibilities under this chapter. The Council shall make available to the public a statement of its organization, practices, and procedures, and make available to the

public its annual work program budget at the time the President submits his annual budget to Congress.
[Northwest Power Act, §4(c)(4), 94 Stat. 2704.]

**839b(c)(5)**. Upon request of the Council established pursuant to subsection (b) of this section, the head of any Federal agency is authorized to detail or assign to the Council, on a reimbursable basis, any of the personnel of such agency to assist the Council in the performance of its functions under this chapter.
[Northwest Power Act, §4(c)(5), 94 Stat. 2704.]

**839b(c)(6)**. At the Council's request, the Administrator of the General Services Administration shall furnish the Council established pursuant to subsection (b) of this section with such offices, equipment, supplies, and services in the same manner and to the same extent as such Administrator is authorized to furnish to any other Federal agency or instrumentality such offices, supplies, equipment, and services.
[Northwest Power Act, §4(c)(6), 94 Stat. 2704.]

Report to Congress

**839b(c)(7)**. Upon the request of the Congress or any committee thereof, the Council shall promptly provide to the Congress, or to such committee, any record, report, document, material, and other information which is in the possession of the Council.
[Northwest Power Act, §4(c)(7), 94 Stat. 2704.]

**839b(c)(8)**. To obtain such information and advice as the Council determines to be necessary or appropriate to carry out its functions and responsibilities pursuant to this chapter, the Council shall, to the greatest extent practicable, solicit engineering, economic, social, environmental, and other technical studies from customers of the Administrator and from other bodies or organizations in the region with particular expertise.
[Northwest Power Act, §4(c)(8), 94 Stat. 2704.]

**839b(c)(9)**. The Administrator and other Federal agencies, to the extent authorized by other provisions of law, shall furnish the Council all information requested by the Council as necessary for performance of its functions, subject to such requirements of law concerning trade secrets and proprietary data as may be applicable.
[Northwest Power Act, §4(c)(9), 94 Stat. 2704.]

**839b(c)(10)(A)**. At the request of the Council, the Administrator shall pay from funds available to the Administrator the compensation and other expenses of the Council as are authorized by this chapter, including the reimbursement of those States with members on the Council for services and personnel to assist in preparing a plan pursuant to subsection (d) of this section and a program pursuant to subsection (h) of this section, as the Council determines are necessary or appropriate for the performance of its functions and responsibilities. Such payments shall be included by the Administrator in his annual budgets submitted to Congress pursuant to the Federal Columbia

River Transmission System Act [16 U.S.C. 838 et seq.] and shall be subject to the requirements of that Act, including the audit requirements of section 11(d) of such Act [16 U.S.C. 838i(d)]. The records, reports, and other documents of the Council shall be available to the Comptroller General for review in connection with such audit or other review and examination by the Comptroller General pursuant to other provisions of law applicable to the Comptroller General. Funds provided by the Administrator for such payments shall not exceed annually an amount equal to 0.02 mill. multiplied by the kilowatthours of firm power forecast to be sold by the Administrator during the year to be funded. In order to assist the Council's initial organization, the Administrator after Dec. 5 1980, shall promptly prepare and propose an amended annual budget to expedite payment for Council activities.
[Northwest Power Act, §4(c)(10)(A), 94 Stat. 2704-5.]

**839b(c)(10)(B)**. Notwithstanding the limitation contained in the fourth sentence of subparagraph (A) of this paragraph, upon an annual showing by the Council that such limitation will not permit the Council to carry out its functions and responsibilities under this chapter the Administrator may raise such limit up to any amount not in excess of 0.10 mill. multiplied by the kilowatt hours of firm power forecast to be sold by the Administrator during the year to be funded.
[Northwest Power Act, §4(c)(10)(B), 94 Stat. 2705.]

**839b(c)(11)**. The Council shall establish a voluntary scientific and statistical advisory committee to assist in the development, collection, and evaluation of such statistical, biological, economic, social, environmental, and other scientific information as is relevant to the Council's development and amendment of a regional conservation and electric power plan.
[Northwest Power Act, §4(c)(11), 94 Stat. 2705.]

**839b(c)(12)**. The Council may establish such other voluntary advisory committees as it determines are necessary or appropriate to assist it in carrying out its functions and responsibilities under this chapter.
[Northwest Power Act, §4(c)(12), 94 Stat. 2705.]

**839b(c)(13)**. The Council shall ensure that the membership for any advisory committee established or formed pursuant to this section shall, to the extent feasible, include representatives of, and seek the advice of, the Federal, and the various regional, State, local, and Indian Tribal Governments, consumer groups, and customers.
[Northwest Power Act, §4(c)(13), 94 Stat. 2705.]

**839b(d). Regional conservation and electric power plan**

Electric power plan to administrator

**839b(d)(1)**. Within two years after the Council is established and the members are appointed pursuant to subsection (a) or (b) of this section, the Council shall prepare, adopt, and promptly transmit to the Administrator a regional conservation and electric power plan. The adopted plan, or any portion thereof, may be amended from time to time, and shall be reviewed

by the Council not less frequently than once every five years. Prior to such adoption, public hearings shall be held in each Council member's State on the plan or substantial, nontechnical amendments to the plan proposed by the Council for adoption. A public hearing shall also be held in any other State of the region on the plan or amendments thereto, if the Council determines that the plan or amendments would likely have a substantial impact on that State in terms of major resources which may be developed in that State and which the Administrator may seek to acquire. Action of the Council under this subsection concerning such hearings shall be subject to section 553 of title 5, and such procedure as the Council shall adopt.
[Northwest Power Act, §4(d)(1), 94 Stat. 2705.]

**839b(d)(2)**. Following adoption of the plan and any amendment thereto, all actions of the Administrator pursuant to section 839d of this title shall be consistent with the plan and any amendment thereto, except as otherwise specifically provided in this chapter.
[Northwest Power Act, §4(d)(2), 94 Stat. 2705.]

**839b(e). Plan priorities and requisite features; studies**

Plan priority

**839b(e)(1)**. The plan shall, as provided in this paragraph, give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources.
[Northwest Power Act, §4(e)(1), 94 Stat. 2705.]

Conservation measures

**839b(e)(2)**. The plan shall set forth a general scheme for implementing conservation measures and developing resources pursuant to section 839d of this title to reduce or meet the Administrator's obligations with due consideration by the Council for (A) environmental quality, (B) compatibility with the existing regional power system, (C) protection, mitigation, and enhancement of fish and wildlife and related spawning grounds and habitat, including sufficient quantities and qualities of flows for successful migration, survival, and propagation of anadromous fish, and (D) other criteria which may be set forth in the plan.
[Northwest Power Act, §4(e)(2), 94 Stat. 2706.]

**839b(e)(3)**. To accomplish the priorities established by this subsection, the plan shall include the following elements which shall be set forth in such detail as the Council determines to be appropriate:

**839b(e)(3)(A)**. an energy conservation program to be implemented under this chapter, including, but not limited to, model conservation standards;
[Northwest Power Act, §4(e)(3)(A), 94 Stat. 2706.]

**839b(e)(3)(B)**. recommendation for research and development;
[Northwest Power Act, §4(e)(3)(B), 94 Stat. 2706.]

**839b(e)(3)(C)**. a methodology for determining quantifiable environmental costs and benefits under section 839a(4) of this title;
[Northwest Power Act, §4(e)(3)(C), 94 Stat. 2706.]

**839b(e)(3)(D)**. a demand forecast of at least twenty years (developed in consultation with the Administrator, the customers, the States, including State agencies with ratemaking authority over electric utilities, and the public, in such manner as the Council deems appropriate) and a forecast of power resources estimated by the Council to be required to meet the Administrator's obligations and the portion of such obligations the Council determines can be met by resources in each of the priority categories referred to in paragraph (1) of this subsection which forecast (i) shall include regional reliability and reserve requirements, (ii) shall take into account the effect, if any, of the requirements of subsection (h) of this section on the availability of resources to the Administrator, and (iii) shall include the approximate amounts of power the Council recommends should be acquired by the Administrator on a long-term basis and may include, to the extent practicable, an estimate of the types of resources from which such power should be acquired;
[Northwest Power Act, §4(e)(3)(D), 94 Stat. 2706.]

Twenty-year demand forecast

**839b(e)(3)(E)**. an analysis of reserve and reliability requirements and cost-effective methods of providing reserves designed to insure adequate electric power at the lowest probable cost;
[Northwest Power Act, §4(e)(3)(E), 94 Stat. 2706.]

**839b(e)(3)(F)**. the program adopted pursuant to subsection (h); of this section and
[Northwest Power Act, §4(e)(3)(F), 94 Stat. 2706.]

**839b(e)(3)(G)**. if the Council recommends surcharges pursuant to subsection (f) of this section, a methodology for calculating such surcharges.
[Northwest Power Act, §4(e)(3)(G), 94 Stat. 2706.]

**839b(e)(4)**. The Council, taking into consideration the requirement that it devote its principal efforts to carrying out its responsibilities under subsections (d) and (h) of this section, shall undertake studies of conservation measures reasonably available to direct service industrial customers and other major consumers of electric power within the region and make an analysis of the estimated reduction in energy use which would result from the implementation of such measures as rapidly as possible, consistent with sound business practices. The Council shall consult with such customers and consumers in the conduct of such studies.
[Northwest Power Act, §4(e)(4), 94 Stat. 2706.]

**839b(f). Model conservation standards; surcharges**

**839b(f)(1)**. Model conservation standards to be included in the plan shall include, but not be limited to, standards applicable to (A) new and existing structures, (B) utility, customer, and governmental conservation

Model conservation standards

programs, and (C) other consumer actions for achieving conservation. Model conservation standards shall reflect geographic and climatic differences within the region and other appropriate considerations, and shall be designed to produce all power savings that are cost-effective for the region and economically feasible for consumers, taking into account financial assistance made available to consumers under section 839d(a) of this title. These model conservation standards shall be adopted by the Council and included in the plan after consultation, in such manner as the Council deems appropriate, with the Administrator, States, and political subdivisions, customers of the Administrator, and the public.

[Northwest Power Act, §4(f)(1), 94 Stat. 2706-7.]

**839b(f)(2)**. The Council by a majority vote of the members of the Council is authorized to recommend the Administrator a surcharge and the Administrator may thereafter impose such a surcharge, in accordance with the methodology provided in the plan, on customers for those portions of their loads within the region that are within States or political subdivisions which have not, or on the Administrator's customers which have not, implemented conservation measures that achieve energy savings which the Administrator determines are comparable to those which would be obtained under such standards. Such surcharges shall be established to recover such additional costs as the Administrator determines will be incurred because such projected energy savings attributable to such conservation measures have not been achieved, but in no case may such surcharges be less than 10 per centum or more than 50 per centum of the Administrator's applicable rates for such load or portion thereof.

[Northwest Power Act, §4(f)(2), 94 Stat. 2707.]

**839b(g). Public information; consultation; contracts and technical assistance**

**839b(g)(1)**. To insure widespread public involvement in the formulation of regional power policies, the Council and Administrator shall maintain comprehensive programs to—

**839b(g)(1)(A)**. inform the Pacific Northwest public of major regional power issues,

[Northwest Power Act, §4(g)(1)(A), 94 Stat. 2707.]

**839b(g)(1)(B)**. obtain public views concerning major regional power issues, and

[Northwest Power Act, §4(g)(1)(B), 94 Stat. 2707.]

**839b(g)(1)(C)**. secure advice and consultation from the Administrator's customers and others.

[Northwest Power Act, §4(g)(1)(C), 94 Stat. 2707.]

**839b(g)(2)**. In carrying out the provisions of this section, the Council and the Administrator shall—

**839b(g)(2)(A)**. consult with the Administrator's customers;
[Northwest Power Act, §4(g)(2)(A), 94 Stat. 2707.]

**839b(g)(2)(B)**. include the comments of such customers in the record of the Council's proceedings; and
[Northwest Power Act, §4(g)(2)(B), 94 Stat. 2707.]

**839b(g)(2)(C)**. recognize and not abridge the authorities of State and local governments, electric utility systems, and other non-Federal entities responsible to the people of the Pacific Northwest for the planning, conservation, supply, distribution, and use of electric power and the operation of electric generating facilities.
[Northwest Power Act, §4(g)(2)(C), 94 Stat. 2707.]

Plan preparation

**839b(g)(3)**. In the preparation, adoption, and implementation of the plan, the Council and the Administrator shall encourage the cooperation, participation, and assistance of appropriate Federal agencies, State entities, State political subdivisions, and Indian tribes. The Council and the Administrator are authorized to contract, in accordance with applicable law, with such agencies, entities, tribes, and subdivisions individually, in groups, or through associations thereof to (A) investigate possible measures to be included in the plan, (B) provide public involvement and information regarding a proposed plan or amendment thereto, and (C) provide services which will assist in the implementation of the plan. In order to assist in the implementation of the plan, particularly conservation, renewable resource, and fish and wildlife activities, the Administrator, when requested and subject to available funds, may provide technical assistance in establishing conservation, renewable resource, and fish and wildlife objectives by individual States or subdivisions thereof or Indian tribes. Such objectives, if adopted by a State or subdivision thereof or Indian tribes, may be submitted to the Council and the Administrator for review, and upon approval by the Council, may be incorporated as part of the plan.
[Northwest Power Act, §4(g)(3), 94 Stat. 2707-8.]

Fish and wildlife program

**839b(h). Fish and wildlife**

**839b(h)(1)(A)**. The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries. Because of the unique history, problems, and opportunities presented by the development and operation of hydroelectric facilities on the Columbia River and its tributaries, the program, to the greatest extent possible, shall be designed to deal with that river and its tributaries as a system.
[Northwest Power Act, §4(h)(1)(A), 94 Stat. 2708.]

**839b(h)(1)(B)**. This subsection shall be applicable solely to fish and wildlife, including related spawning grounds and habitat, located on the Columbia River and its tributaries. Nothing in this subsection shall alter, modify, or

affect in any way the laws applicable to rivers or river systems, including electric power facilities related thereto, other than the Columbia River and its tributaries, or affect the rights and obligations of any agency, entity, or person under such laws.
[Northwest Power Act, §4(h)(1)(B), 94 Stat. 2708.]

**839b(h)(2)**. The Council shall request, in writing, promptly after the Council is established under either subsection (a) or (b) of this section and prior to the development or review of the plan, or any major revision thereto, from the Federal and the region's State fish and wildlife agencies and from the region's appropriate Indian tribes, recommendations for—

**839b(h)(2)(A)**. measures which can be expected to be implemented by the Administrator, using authorities under this chapter and other laws, and other Federal agencies to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by the development and operation of any hydroelectric project on the Columbia River and its tributaries;
[Northwest Power Act, §4(h)(2)(A), 94 Stat. 2708.]

**839b(h)(2)(B)**. establishing objectives for the development and operation of such projects on the Columbia River and its tributaries in a manner designed to protect, mitigate, and enhance fish and wildlife; and
[Northwest Power Act, §4(h)(2)(B), 94 Stat. 2708.]

**839b(h)(2)(C)**. fish and wildlife management coordination and research and development (including funding) which, among other things, will assist protection, mitigation, and enhancement of anadromous fish at, and between, the region's hydroelectric dams.
[Northwest Power Act, §4(h)(2)(C), 94 Stat. 2708.]

**839b(h)(3)**. Such agencies and tribes shall have 90 days to respond to such request, unless the Council extends the time for making such recommendations. The Federal and the region's water management agencies, and the region's electric power producing agencies, customers, and public may submit recommendations of the type referred to in paragraph (2) of this subsection. All recommendations shall be accompanied by detailed information and data in support of the recommendations.
[Northwest Power Act, §4(h)(3), 94 Stat. 2708.]

Notice

**839b(h)(4)(A)**. The Council shall give notice of all recommendations and shall make the recommendations and supporting documents available to the Administrator, to the Federal and the region's, State fish and wildlife agencies, to the appropriate Indian tribes, to Federal agencies responsible for managing, operating, or regulating hydroelectric facilities located on the Columbia River or its tributaries, and to any customer or other electric utility which owns or operates any such facility. Notice shall also be given to the public. Copies of such recommendations and supporting documents shall be

made available for review at the offices of the Council and shall be available for reproduction at reasonable cost.
[Northwest Power Act, §4(h)(4)(A), 94 Stat. 2708.]

**839b(h)(4)(B).** The Council shall provide for public participation and comment regarding the recommendations and supporting documents, including an opportunity for written and oral comments, within such reasonable time as the Council deems appropriate. Comments
[Northwest Power Act, §4(h)(4)(B), 94 Stat. 2709.]

**839b(h)(5).** The Council shall develop a program on the basis of such recommendations, supporting documents, and views and information obtained through public comment and participation, and consultation with the agencies, tribes, and customers referred to in subparagraph (A) of paragraph (4). The program shall consist of measures to protect, mitigate, and enhance fish and wildlife affected by the development, operation, and management of such facilities while assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply. Enhancement measures shall be included in the program to the extent such measures are designed to achieve improved protection and mitigation. Protect and enhance
[Northwest Power Act, §4(h)(5), 94 Stat. 2709.]

**839b(h)(6).** The Council shall include in the program measures which it determines, on the basis set forth in paragraph (5), will— Measures

**839b(h)(6)(A).** complement the existing and future activities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes;
[Northwest Power Act, §4(h)(6)(A), 94 Stat. 2709.]

**839b(h)(6)(B).** be based on, and supported by, the best available scientific knowledge;
[Northwest Power Act, §4(h)(6)(B), 94 Stat. 2709.]

**839b(h)(6)(C).** utilize, where equally effective alternative means of achieving the same sound biological objective exist, the alternative with the minimum economic cost;
[Northwest Power Act, §4(h)(6)(C), 94 Stat. 2709.]

**839b(h)(6)(D).** be consistent with the legal rights of appropriate Indian tribes in the region; and
[Northwest Power Act, §4(h)(6)(D), 94 Stat. 2709.]

**839b(h)(6)(E).** in the case of anadromous fish—

**839b(h)(6)(E)(i).** provide for improved survival of such fish at hydroelectric facilities located on the Columbia River system; and
[Northwest Power Act, §4(h)(6)(E)(i), 94 Stat. 2709.]

**839b(h)(6)(E)(ii)**. provide flows of sufficient quality and quantity between such facilities to improve production, migration, and survival of such fish as necessary to meet sound biological objectives.
[Northwest Power Act, §4(h)(6)(E)(ii), 94 Stat. 2709.]

Recommendations

**839b(h)(7)**. The Council shall determine whether each recommendation received is consistent with the purposes of this chapter. In the event such recommendations are inconsistent with each other, the Council, in consultation with appropriate entities, shall resolve such inconsistency in the program giving due weight to the recommendations, expertise, and legal rights and responsibilities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes. If the Council does not adopt any recommendation of the fish and wildlife agencies and Indian tribes as part of the program or any other recommendation, it shall explain in writing, as part of the program, the basis for its finding that the adoption of such recommendation would be—

**839b(h)(7)(A)**. inconsistent with paragraph (5) of this subsection;
[Northwest Power Act, §4(h)(7)(A), 94 Stat. 2709.]

**839b(h)(7)(B)**. inconsistent with paragraph (6) of this subsection; or
[Northwest Power Act, §4(h)(7)(B), 94 Stat. 2709.]

**839b(h)(7)(C)**. less effective than the adopted recommendations for the protection, mitigation, and enhancement of fish and wildlife.
[Northwest Power Act, §4(h)(7)(C), 94 Stat. 2709.]

Principles

**839b(h)(8)**. The Council shall consider, in developing and adopting a program pursuant to this subsection, the following principles:

**839b(h)(8)(A)**. Enhancement measures may be used, in appropriate circumstances, as a means of achieving offsite protection and mitigation with respect to compensation for losses arising from the development and operation of the hydroelectric facilities of the Columbia River and its tributaries as a system.
[Northwest Power Act, §4(h)(8)(A), 94 Stat. 2709.]

**839b(h)(8)(B)**. Consumers of electric power shall bear the cost of measures designed to deal with adverse impacts caused by the development and operation of electric power facilities and programs only.
[Northwest Power Act, §4(h)(8)(B), 94 Stat. 2710.]

**839b(h)(8)(C)**. To the extent the program provides for coordination of its measures with additional measures (including additional enhancement measures to deal with impacts caused by factors other than the development and operation of electric power facilities and programs), such additional measures are to be implemented in accordance with agreements among

the appropriate parties providing for the administration and funding of such additional measures.
[Northwest Power Act, §4(h)(8)(C), 94 Stat. 2710.]

**839b(h)(8)(D)**. Monetary costs and electric power losses resulting from the implementation of the program shall be allocated by the Administrator consistent with individual project impacts and system wide objectives of this subsection.
[Northwest Power Act, §4(h)(8)(D), 94 Stat. 2710.]

**839b(h)(9)**. The Council shall adopt such program or amendments thereto within one year after the time provided for receipt of the recommendations. Such program shall also be included in the plan adopted by the Council under subsection (d) of this section.
[Northwest Power Act, §4(h)(9), 94 Stat. 2710.]

**839b(h)(10)(A)**. The Administrator shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of this chapter. Expenditures of the Administrator pursuant to this paragraph shall be in addition to, not in lieu of, other expenditures authorized or required from other entities under other agreements or provisions of law.
[Northwest Power Act, §4(h)(10)(A), 94 Stat. 2710.]

Expenditures

**839b(h)(10)(B)**. The Administrator may make expenditures from such fund which shall be included in the annual or supplementary budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.]. Any amounts included in such budget for the construction of capital facilities with an estimated life of greater than 15 years and an estimated cost of at least $1,000,000 shall be funded in the same manner and in accordance with the same procedures as major transmission facilities under the Federal Columbia River Transmission System Act.
[Northwest Power Act, §4(h)(10)(B), 94 Stat. 2710.]

**839b(h)(10)(C)**. The amounts expended by the Administrator for each activity pursuant to this subsection shall be allocated as appropriate by the Administrator, in consultation with the Corps of Engineers and the Water and Power Resources Service, among the various hydroelectric projects of the Federal Columbia River Power System. Amounts so allocated shall be allocated to the various project purposes in accordance with existing accounting procedures for the Federal Columbia River Power System.
[Northwest Power Act, §4(h)(10)(C), 94 Stat. 2710.]

Scientific Review Panel

**839b(h)(10)(D)(i)**. The Northwest Power Planning Council (Council) shall appoint an Independent Scientific Review Panel (Panel), which shall be comprised of eleven members, to review projects proposed to be funded through that portion of Bonneville Power Administration's (BPA) annual fish and wildlife budget that implements the Council's fish and wildlife program. Members shall be appointed from a list of no fewer than 20 scientists submitted by the National Academy of Sciences (Academy), provided that Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Panel. The Academy shall provide such nominations within 90 days of the date of this enactment, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(i), September 30, 1996, 110 Stat. 3005.]

Peer Review Groups

**839b(h)(10)(D)(ii)**. The Council shall establish Scientific Peer Review Groups (Peer review Groups), which shall be comprised of the appropriate number of scientists, from a list submitted by the Academy to assist the Panel in making its recommendations to the Council for projects to be funded through BPA's annual fish and wildlife budget, provided that the Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Peer Review Groups. The Academy shall provide such nominations within 90 days of the date of this enactment, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(ii), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(iii)**. Panel and Peer Review Group members may be compensated and shall be considered subject to the conflict of interest standards that apply to scientists performing comparable work for the National Academy of Sciences; provided that a Panel or Peer Review Group member with a direct or indirect financial interest in a project, or projects, shall recuse himself or herself from review of, or recommendations associated with, such project or projects. All expenses of the Panel and the Peer Review Groups shall be paid by BPA as provided for under paragraph (vii). Neither the Panel nor the Peer Review Groups shall be deemed advisory committees within the meaning of the Federal Advisory Committee Act.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(iii), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(iv)**. The Peer Review Groups, in conjunction with the Panel, shall review projects proposed to be funded through BPA's annual fish and wildlife budget and make recommendations on matters related to such projects to the Council no later than June 15 of each year. If the recommendations are not received by the Council by this date, the Council may proceed to make final recommendations on funding to BPA, relying on the best information available. The Panel and Peer Review Groups shall review a sufficient number of projects to adequately ensure that the list of prioritized projects recommended is consistent with the Council's program. Project recommendations shall be based on a determination that projects: are based on sound scientific principles; benefit fish and wildlife; and have a clearly defined objective and outcome with provisions for monitoring and evaluation of results. The Panel, with assistance from the Peer Review Groups, shall review, on an annual basis, the results of prior year expenditures based upon these criteria and submit its findings to the Council for review.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(iv), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(v)**. Upon completion of the review of projects to be funded through BPA's annual fish and wildlife budget, the Peer Review Groups shall submit its findings to the Panel. The Panel shall analyze the information submitted by the Peer Review Groups and submit recommendations on project priorities to the Council. The Council shall make the Panel's findings available to the public and subject to public comment.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, §512(4)(h)(10)(D)(v), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(vi).** The Council shall fully consider the recommendations of the Panel when making its final recommendations of projects to be funded through BPA's annual fish and wildlife budget, and if the Council does not incorporate a recommendation of the Panel, the Council shall explain in writing its reasons for not accepting Panel recommendations. In making its recommendations to BPA, the Council shall consider the impact of ocean conditions on fish and wildlife populations and shall determine whether the projects employ cost-effective measures to achieve program objectives. The Council, after consideration of the recommendations of the Panel and other appropriate entities, shall be responsible for making the final recommendations of projects to be funded through BPA's annual fish and wildlife budget.

Council consideration of Panel recommendations

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(vi), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(vii)**. Cost limitation. The annual cost of this provision shall not exceed $500,000 in 1997 dollars.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(vii), September 30, 1996, 110 Stat. 3005; Pub.L. 106-60, § 610, Sept. 29, 1999, 113 Stat. 502.]

**839b(h)(11)(A)**. The Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall—

Managing, operating and regulating facilities

**839b(h)(11)(A)(i)**. exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;
[Northwest Power Act, §4(h)(11)(A)(i), 94 Stat. 2710.]

**839b(h)(11)(A)(ii)**. exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.
[Northwest Power Act, §4(h)(11)(A)(ii), 94 Stat. 2711.]

Consultation between agencies

**839b(h)(11)(B)**. The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.
[Northwest Power Act, §4(h)(11)(A), 94 Stat. 2711.]

Report to congressional committee

**839b(h)(12)(A)**. Beginning on October 1 of the first fiscal year after all members to the Council are appointed initially, the Council shall submit annually a detailed report to the Committee on Energy and Natural Resources of the Senate and to the Committees on Energy and Commerce and on Interior and Insular Affairs of the House of Representatives. The report shall describe the actions taken and to be taken by the Council under this chapter, including this subsection, the effectiveness of the fish and wildlife program, and potential revisions or modifications to the program to be included in the plan when adopted. At least ninety days prior to its submission of such report, the Council shall make available to such fish and wildlife agencies, and tribes, the Administrator and the customers a draft of such report. The Council shall establish procedures for timely comments thereon. The Council shall include as an appendix to such report such comments or a summary thereof.
[Northwest Power Act, §4(h)(12)(A), 94 Stat. 2711, H. Res. 549, March 25, 1980.]

**839b(h)(12)(B)**. The Administrator shall keep such committees fully and currently informed of the actions taken and to be taken by the Administrator under this chapter, including this subsection.
[Northwest Power Act, §4(h)(12)(B), 94 Stat. 2711.]

**839b(i). Review**

Council review

The Council may from time to time review the actions of the Administrator pursuant to this section and section 839d of this title to determine whether such actions are consistent with the plan and programs, the extent to which the plan and programs is being implemented, and to assist the Council in preparing amendments to the plan and programs.
[Northwest Power Act, §4(i), 94 Stat. 2711.]

**839b(j). Requests by Council for action**

Council requests

**839b(j)(1)**. The Council may request the Administrator to take an action under section 839d of this title to carry out the Administrator's responsibilities under the plan.
[Northwest Power Act, §4(j)(1), 94 Stat. 2711.]

**839b(j)(2)**. To the greatest extent practicable within ninety days after the Council's request, the Administrator shall respond to the Council in writing specifying—

**839b(j)(2)(A)**. the means by which the Administrator will undertake the action or any modification thereof requested by the Council, or
[Northwest Power Act, §4(j)(2)(A), 94 Stat. 2711.]

**839b(j)(2)(B)**. the reasons why such action would not be consistent with the plan, or with the Administrator's legal obligations under this chapter, or other provisions of law, which the Administrator shall specifically identify.
[Northwest Power Act, §4(j)(2)(B), 94 Stat. 2711.]

**839b(j)(3)**. If the Administrator determines not to undertake the requested action, the Council, within sixty days after notice of the Administrator's determination, may request the Administrator to hold an informal hearing and make a final decision.
[Northwest Power Act, §4(j)(3), 94 Stat. 2711.]

**839b(k). Review and analysis of five-year period of Council activities**

**839b(k)(1)**. Not later than October 1, 1987, or six years after the Council is established under this chapter, whichever is later, the Council shall complete a thorough analysis of conservation measures and conservation resources implemented pursuant to this chapter during the five-year period beginning on the date the Council is established under this chapter to determine if such measures or resources:

**839b(k)(1)(A)**. have resulted or are likely to result in costs to consumers in the region greater than the costs of additional generating resources or additional fuel which the Council determines would be necessary in the absence of such measures or resources;
[Northwest Power Act, §4(k)(1)(A), 94 Stat. 2711-2.]

**839b(k)(1)(B)**. have not been or are likely not to be generally equitable to all consumers in the region; or
[Northwest Power Act, §4(k)(1)(B), 94 Stat. 2712.]

**839b(k)(1)(C)**. have impaired or are likely to impair the ability of the Administrator to carry out his obligations under this chapter and other laws, consistent with sound business practices.
[Northwest Power Act, §4(k)(1)(C), 94 Stat. 2712.]

**839b(k)(2)**. The Administrator may determine that section 839a(4)(D) of this title shall not apply to any proposed conservation measure or resource if the Administrator finds after receipt of such analysis from the Council that such measure or resource would have any result or effect described in subparagraph (A), (B) or (C) of paragraph (1).
[Northwest Power Act, §4(k)(2), 94 Stat. 2712. as amended Pub.L. 106-60, § 610, Sept. 29, 1999, 113 Stat. 502.]

Sale of power

**839c. Sale of power**

**839c(a). Preferences and priorities**

Preferences and priorities

All power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. 832c and 832d]. Such sales shall be at rates established pursuant to section 839e of this title.
[Northwest Power Act, §5(a), 94 Stat. 2712.]

**839c(b). Sales to public bodies, cooperatives, and Federal agency customers**

Sales to preference customers and investor-owned utilities

**839c(b)(1)**. Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds—

**839c(b)(1)(A)**. the capability of such entity's firm peaking and energy resources used in the year prior to December 5, 1980, to serve its firm load in the region, and
[Northwest Power Act, §5(b)(1)(A), 94 Stat. 2712.]

**839c(b)(1)(B)**. such other resources as such entity determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region.
[Northwest Power Act, §5(b)(1)(B), 94 Stat. 2712.]

User of firm load resources

**839c(b)(1)[cont.]**. In determining the resources which are used to serve a firm load, for purposes of subparagraphs (A) and (B), any resources used to serve a firm load under such subparagraphs shall be treated as continuing

## Pacific NW Power Act (continued)

to be so used, unless such use is discontinued with the consent of the Administrator, or unless such use is discontinued because of obsolescence, retirement, loss of resource, or loss of contract rights.
[Northwest Power Act, §5(b)(1), 94 Stat. 2712.]

**839c(b)(2)**. Contracts with investor-owned utilities shall provide that the Administrator may reduce his obligations under such contracts in accordance with section 5(a) of the Bonneville Project Act of 1937 [16 U.S.C. 832d(a)].
[Northwest Power Act, §5(b)(2), 94 Stat. 2712.]

Sales to federal agencies

**839c(b)(3)**. In addition to his authorities to sell electric power under paragraph (1), the Administrator is also authorized to sell electric power to Federal agencies in the region.
[Northwest Power Act, §5(b)(3), 94 Stat. 2712.]

**839c(b)(4)**. Sales under this subsection shall be made only if the public body, cooperative, Federal agency or investor-owned utility complies with the Administrator's standards for service in effect on December 5, 1980, or as subsequently revised.
[Northwest Power Act, §5(b)(4), 94 Stat. 2712.]

Restrictions

**839c(b)(5)**. The Administrator shall include in contracts executed in accordance with this subsection provisions that enable the Administrator to restrict his contractual obligations to meet the loads referred to in this subsection in the future if the Administrator determines, after a reasonable period of experience under this chapter, that the Administrator cannot be assured on a planning basis of acquiring sufficient resources to meet such loads during a specified period of insufficiency. Any such contract with a public body, cooperative, or Federal agency shall specify a reasonable minimum period between a notice of restriction and the earliest date such restriction may be imposed.
[Northwest Power Act, §5(b)(5), 94 Stat. 2712-3.]

Contract requirements

**839c(b)(6)**. Contracts executed in accordance with this subsection with public body, cooperative, and Federal agency customers shall—

**839c(b)(6)(A)**. provide that the restriction referred to in paragraph (5) shall not be applicable to any such customers until the operating year in which the total of such customers' firm loads to be served by the Administrator equals or exceeds the firm capability of the Federal base system resources;
[Northwest Power Act, §5(b)(6)(A), 94 Stat. 2713.]

**839c(b)(6)(B)**. not permit restrictions which would reduce the total contractual entitlement of such customers to an amount less than the firm capability of the Federal base system resources; and
[Northwest Power Act, §5(b)(6)(B), 94 Stat. 2713.]

**839c(b)(6)(C)**. contain a formula for determining annually, on a uniform basis, each such customer's contractual entitlement to firm power during such

a period of restriction, which formula shall not consider customer resources other than those the customer has determined, as of December 5, 1980, to be used to serve its own firm loads.
[Northwest Power Act, §5(b)(6)(C), 94 Stat. 2713.]

**839c(b)(6)[cont.]**. The formula referred to in subparagraph (C) shall obligate the Administrator to provide on an annual basis only firm power needed to serve the portion of such customer's firm load in excess of the capability of such customer's own firm resources determined by such customer under paragraph (1) of this subsection to be used to serve its firm load.
[Northwest Power Act, §5(b)(6), 94 Stat. 2713.]

**839c(b)(7)**. Required sale—

**839c(b)(7) (A)**. Definition of a Joint Operating Entity—In this section, the term 'joint operating entity' means an entity that is lawfully organized under State law as a public body or cooperative prior to the date of enactment of this paragraph, and is formed by and whose members or participants are two or more public bodies or cooperatives, each of which was a customer of the Bonneville Power Administration on or before January 1, 1999.

**839c(b)(7) (B)**. Sale—Pursuant to paragraph (1), the Administrator shall sell, at wholesale to a joint operating entity, electric power solely for the purpose of meeting the regional firm power consumer loads of regional public bodies and cooperatives that are members of or participants in the joint operating entity.

**839c(b)(7) (C)**. No Resale—A public body or cooperative to which a joint operating entity sells electric power under subparagraph (B) shall not resell that power except to retail customers of the public body or cooperative or to another regional member or participant of the same joint operating entity, or except as otherwise permitted by law.
[As amended Pub. L. 106-273 (2000), § 1, Sept. 22, 2000, 114 Stat. 802.]

Purchase and exchange sales

**839c(c). Purchase and exchange sales**

**839c(c)(1)**. Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.
[Northwest Power Act, §5(c)(1), 94 Stat. 2713.]

**839c(c)(2)**. The purchase and exchange sale referred to in paragraph (1) of this subsection with any electric utility shall be limited to an amount not in excess of 50 per centum of such utility's Regional residential load in the year beginning July 1, 1980, such 50 per centum limit increasing in equal

annual increments to 100 per centum of such load in the year beginning July 1, 1985, and each year thereafter.
[Northwest Power Act, §5(c)(2), 94 Stat. 2713.]

**839c(c)(3)**. The cost benefits, as specified in contracts with the Administrator, of any purchase and exchange sale referred to in paragraph (1) of this subsection which are attributable to any electric utility's residential load within a State shall be passed through directly to such utility's residential loads within such State, except that a State which lies partially within and partially without the region may require that such cost benefits be distributed among all of the utility's residential loads in that State.
[Northwest Power Act, §5(c)(3), 94 Stat. 2713.]

Termination

**839c(c)(4)**. An electric utility may terminate, upon reasonable terms and conditions agreed to by the Administrator and such utility prior to such termination, its purchase and sale under this subsection if the supplemental rate charge provided for in section 839e(b)(3) of this title is applied and the cost of electric power sold to such utility under this subsection exceeds, after application of such rate charge, the average system cost of power sold by such utility to the Administrator under this subsection.
[Northwest Power Act, §5(c)(4), 94 Stat. 2713.]

In lieu acquisition

**839c(c)(5)**. Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility.
[Northwest Power Act, §5(c)(5), 94 Stat. 2714.]

**839c(c)(6)**. Exchange sales to a utility pursuant to this subsection shall not be restricted below the amounts of electric power acquired by the Administrator from, or on behalf of, such utility pursuant to this subsection.
[Northwest Power Act, §5(c)(6), 94 Stat. 2714.]

Average system cost

**839c(c)(7)**. The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include—

**839c(c)(7)(A)**. the cost of additional resources in an amount sufficient to serve any new large single load of the utility;
[Northwest Power Act, §5(c)(7)(A), 94 Stat. 2714.]

**839c(c)(7)(B)**. the cost of additional resources in an amount sufficient to meet any additional load outside the region occurring after December 5, 1980; and

[Northwest Power Act, §5(c)(7)(B), 94 Stat. 2714.]

**839c(c)(7)(C)**. any costs of any generating facility which is terminated prior to initial commercial operation.

[Northwest Power Act, §5(c)(7)(C), 94 Stat. 2714.]

**839c(d). Sales to existing direct service industrial customers**

DSIs, reserves

**839c(d)(1)(A)**. The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.

[Northwest Power Act, §5(d)(1)(A), 94 Stat. 2714.]

**839c(d)(1)(B)**. After December 5, 1980, the Administrator shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."

[Northwest Power Act, §5(d)(1)(B), 94 Stat. 2714.]

**839c(d)(2)**. The Administrator shall not sell electric power, including reserves, directly to new direct service industrial customers.

[Northwest Power Act, §5(d)(2), 94 Stat. 2714.]

**839c(d)(3)**. The Administrator shall not sell amounts of electric power, including reserves, to existing direct service industrial customers in excess of the amount permitted under paragraph (1) unless the Administrator determines, after a plan has been adopted pursuant to section 839b of this title, that such proposed sale is consistent with the plan and that—

**839c(d)(3)(A)**. additional power system reserves are required for the region's firm loads,

[Northwest Power Act, §5(d)(3)(A), 94 Stat. 2714.]

**839c(d)(3)(B)**. the proposed sale would provide a cost-effective method of supplying such reserves,

[Northwest Power Act, §5(d)(3)(B), 94 Stat. 2714.]

**839c(d)(3)(C)**. such loads or loads of similar character cannot provide equivalent operating or planning benefits to the region if served by an electric utility under contractual arrangements providing reserves, and

[Northwest Power Act, §5(d)(3)(C), 94 Stat. 2714.]

**839c(d)(3)(D)**. the Administrator has or can acquire sufficient electric power to serve such loads, and

[Northwest Power Act, §5(d)(3)(D), 94 Stat. 2714.]

**839c(d)(3) [cont.]**. unless the Council has determined such sale is consistent with the plan. After such determination by the Administrator and by the Council, the Administrator is authorized to offer to existing direct service industrial customers power in such amounts in excess of the amount permitted under paragraph (1) of this subsection as the Administrator determines to be necessary to provide additional power system reserves to meet the region's firm loads.

[Northwest Power Act, §5(d)(3), 94 Stat. 2714-5.]

**839c(d)(4)(A)**. As used in this section, the term "existing direct service industrial customer" means any direct service industrial customer of the Administrator which has a contract for the purchase of electric power from the Administrator on December 5, 1980.

[Northwest Power Act, §5(d)(4)(A), 94 Stat. 2715.]

**839c(d)(4)(B)**. The term "new direct service industrial customer" means any industrial entity other than an existing direct service industrial customer.

[Northwest Power Act, §5(d)(4)(B), 94 Stat. 2715.]

New contracts

**839c(d)(4)(C)(i)**. Where a new contract is offered in accordance with subsection (g) of this section to any existing direct service industrial customer which has not received electric power prior to December 5, 1980, from the Administrator pursuant to a contract with the Administrator existing on December 5, 1980, electric power delivered under such new contract shall be conditioned on the Administrator reasonably acquiring, in accordance with this chapter and within such estimated period of time (as specified in the contract) as he deems reasonable, sufficient resources to meet, on a planning basis, the load requirement of such customer. Such contract shall also provide that the obligation of the Administrator to acquire such resources to meet such load requirement shall, except as provided in clause (ii) of this subparagraph, apply only to such customer and shall not be sold or exchanged by such customer to any other person.

[Northwest Power Act, §5(d)(4)(C)(i), 94 Stat. 2715.]

Contract rights

**839c(d)(4)(C)(ii)**. Rights under a contract described in clause (i) of this subparagraph may be transferred by an existing direct service industrial customer referred to in clause (i) to a successor in interest in connection with a reorganization or other transfer of all major assets of such customer. Following such a transfer, such successor in interest (or any other subsequent successor in interest) may also transfer rights under such a contract only in connection with a reorganization or other transfer of all assets of such successor in interest.

[Northwest Power Act, §5(d)(4)(C)(ii), 94 Stat. 2715.]

**839c(d)(4)(C)(iii)**. The limitations of clause (i) of this subparagraph shall not apply to any customer referred to in clause (i) whenever the Administrator determines that such customer is receiving electric power pursuant to a contract referred to in such clause (ii).
[Northwest Power Act, §5(d)(4)(C)(iii), 94 Stat. 2715.]

**839c(e). Contractual entitlements to firm power**

Firm power entitlement

**839c(e)(1)**. The contractual entitlement to firm power of any customer from whom, or on whose behalf, the Administrator has acquired electric power pursuant to section 839d of this title may not be restricted below the amount of electric power so acquired from, or on behalf of, such customer. If in any year such customer's requirements are less than such entitlement, any excess of such entitlement shall be first made available to increase the entitlement of other customers of the same class before being available for the entitlement of other customers. For purposes of this paragraph, the following entities shall each constitute a class:

**839c(e)(1)(A)**. public bodies and cooperatives;
[Northwest Power Act, §5(e)(1)(A), 94 Stat. 2715.]

**839c(e)(1)(B)**. Federal agencies;
[Northwest Power Act, §5(e)(1)(B), 94 Stat. 2715.]

**839c(e)(1)(C)**. direct service industrial; and
[Northwest Power Act, §5(e)(1)(C), 94 Stat. 2715.]

**839c(e)(1)(D)**. investor owned utilities.
[Northwest Power Act, §5(e)(1)(D), 94 Stat. 2715.]

**839c(e)(2)**. Any contractual entitlement to firm power which is based on electric power acquired from, or on behalf of, a customer pursuant to section 839d of this title shall be in addition to any other contractual entitlement to firm power not subject to restriction that such customer may have under this section. For the purposes of this subsection, references to amounts of power acquired by the Administrator pursuant to section 839d of this title shall be deemed to mean the amounts specified in the resource acquisition contracts exclusive of any amounts recognized in such contracts as replacement for Federal base system resources.
[Northwest Power Act, §5(e)(2), 94 Stat. 2715-6.]

**839c(e)(3)**. The Administrator shall, consistent with the provisions of this chapter, insure that any restrictions upon any particular customer class made pursuant to this subsection and subsection (b) of this section are distributed equitably throughout the region.
[Northwest Power Act, §5(e)(3), 94 Stat. 2716.]

**839c(f). Surplus power**

Surplus power

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), and the Act of August 31, 1964 (16 U.S.C. 837-837h).
[Northwest Power Act, §5(f), 94 Stat. 2716.]

**839c(g). Long-term contracts**

Administrator shall offer contracts

**839c(g)(1)**. As soon as practicable within 9 months after December 5, 1980, the Administrator shall commence necessary negotiations for, and offer, initial long-term contracts (within the limitations of the third sentence of section 5(a) of the Bonneville Project Act [16 U.S.C. 832(a)]) simultaneously to—

**839c(g)(1)(A)**. existing public body and cooperative customers and investor-owned utility customers under subsection (b) of this section;
[Northwest Power Act, §5(g)(1)(A), 94 Stat. 2716.]

**839c(g)(1)(B)**. Federal agency customers under subsection (b) of this section;
[Northwest Power Act, §5(g)(1)(B), 94 Stat. 2716.]

**839c(g)(1)(C)**. electric utility customers under subsection (c) of this section; and
[Northwest Power Act, §5(g)(1)(C), 94 Stat. 2716.]

**839c(g)(1)(D)**. direct service industrial customers under subsection (d)(1) of this section.
[Northwest Power Act, §5(g)(1)(D), 94 Stat. 2716.]

One year to accept

**839c(g)(2)**. Each customer offered a contract pursuant to this subsection shall have one year from the date of such offer to accept such contract. Such contract shall be effective as provided in this subsection.
[Northwest Power Act, §5(g)(2), 94 Stat. 2716.]

Effective date of contracts

**839c(g)(3)**. An initial contract with a public body, cooperative or investor-owned electric utility customer or a Federal agency customer pursuant to subsection (b) of this section shall be effective on the date executed by such customer, unless another effective date is otherwise agreed to by the Administrator and the customer.
[Northwest Power Act, §5(g)(3), 94 Stat. 2716.]

**839c(g)(4)**. An initial contract with an electric utility customer pursuant to subsection (c) of this section shall be effective on the date executed by

such customer, but no earlier than the first day of the tenth month after December 5, 1980.

[Northwest Power Act, §5(g)(4), 94 Stat. 2716.]

**839c(g)(5)**. An initial contract with a direct service industrial customer pursuant to subsection (d)(1) of this section, shall be effective on the date agreed upon by the Administrator and such customer, but no later than the first day of the tenth month after December 5, 1980. When such contract is executed, it may for rate purposes be given retroactive effect to such first day.

[Northwest Power Act, §5(g)(5), 94 Stat. 2716.]

Periods of insufficiency

**839c(g)(6)**. Initial contracts offered public body, cooperative and Federal agency customers in accordance with this subsection shall provide that during a period of insufficiency declared in accordance with subsection (b) of this section each customer's contractual entitlement shall, to the extent of its requirements on the Administrator, be no less than the amount of firm power received from the Administrator in the year immediately preceding the period of insufficiency.

[Northwest Power Act, §5(g)(6), 94 Stat. 2716.]

Sufficient resources

**839c(g)(7)**. The Administrator shall be deemed to have sufficient resources for the purpose of entering into the initial contracts specified in paragraph (1)(A) through (D).

[Northwest Power Act, §5(g)(7), 94 Stat. 2716.]

**839d. Conservation and resource acquisition**

**839d(a). Conservation measures; resources**

Conservation

**839d(a)(1)**. The Administrator shall acquire such resources through conservation, implement all such conservation measures, and acquire such renewable resources which are installed by a residential or small commercial consumer to reduce load, as the Administrator determines are consistent with the plan, or if no plan is in effect with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title and, in the case of major resources, in accordance with subsection (c) of this section. Such conservation measures and such resources may include, but are not limited to—

**839d(a)(1)(A)**. loans and grants to consumers for insulation or weatherization, increased system efficiency, and waste energy recovery by direct application,

[Northwest Power Act, §6(a)(1)(A), 94 Stat. 2717.]

**839d(a)(1)(B)**. technical and financial assistance to, and other cooperation with, the Administrator's customer and governmental authorities to encourage maximum cost-effective voluntary conservation and the attainment of

any cost-effective conservation objectives adopted by individual States or subdivisions thereof,
[Northwest Power Act, §6(a)(1)(B), 94 Stat. 2717.]

**839d(a)(1)(C)**. aiding the Administrator's customers and governmental authorities in implementing model conservation standards adopted pursuant to section 839b(f) of this title, and
[Northwest Power Act, §6(a)(1)(C), 94 Stat. 2717.]

**839d(a)(1)(D)**. conducting demonstration projects to determine the cost effectiveness of conservation measures and direct application of renewable energy resources.
[Northwest Power Act, §6(a)(1)(D), 94 Stat. 2717.]

**839d(a)(2)**. In addition to acquiring electric power pursuant to section 839c(c) of this title, or on a short-term basis pursuant to section 11(b)(6)(i) of the Federal Columbia River Transmission System Act [16 U.S.C. 838i(b)(6)(i)], the Administrator shall acquire, in accordance with this section, sufficient resources—

**839d(a)(2)(A)**. to meet his contractual obligations that remain after taking into account planned savings from measures provided for in paragraph (1) of this subsection, and
[Northwest Power Act, §6(a)(2)(A), 94 Stat. 2717.]

**839d(a)(2)(B)**. to assist in meeting the requirements of section 839b(h) of this title.
[Northwest Power Act, §6(a)(2)(B), 94 Stat. 2717.]

**839d(a)(2) [cont.]**. The Administrator shall acquire such resources without considering restrictions which may apply pursuant to section 839c(b) of this title.
[Northwest Power Act, §6(a)(2), 94 Stat. 2717.]

**839d(b). Acquisition of resources**

**839d(b)(1)**. Except as specifically provided in this section, acquisition of resources under this chapter shall be consistent with the plan, as determined by the Administrator.
[Northwest Power Act, §6(b)(1), 94 Stat. 2717.]

Acquisition of resources

**839d(b)(2)**. The Administrator may acquire resources (other than major resources) under this chapter which are not consistent with the plan, but which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(2), 94 Stat. 2717.]

**839d(b)(3)**. If no plan is in effect, the Administrator may acquire resources under this chapter which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(3), 94 Stat. 2717.]

**839d(b)(4)**. The Administrator shall acquire any non-Federal resources to replace Federal base system resources only in accordance with the provisions of this section. The Administrator shall include in the contracts for the acquisition of any such non-Federal replacement resources provisions which will enable him to ensure that such non-Federal replacement resources are developed and operated in a manner consistent with the considerations specified in section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(4), 94 Stat. 2717.]

**839d(b)(5)**. Notwithstanding any acquisition of resources pursuant to this section, the Administrator shall not reduce his efforts to achieve conservation and to acquire renewable resources installed by a residential or small commercial consumer to reduce load, pursuant to subsection (a)(1) of this section.
[Northwest Power Act, §6(b)(5), 94 Stat. 2717-8.]

Procedure for acquiring major resources

**839d(c). Procedure for acquiring major resources, implementing conservation measures, paying or reimbursing investigation and preconstruction expenses, or granting billing credits**

Proposals

**839d(c)(1)**. For each proposal under subsection (a), (b), (f), (h) or (l) of this section to acquire a major resource, to implement a conservation measure which will conserve an amount of electric power equivalent to that of a major resource, to pay or reimburse investigation and preconstruction expenses of the sponsors of a major resource, or to grant billing credits or services involving a major resource, the Administrator shall—

Notice

**839d(c)(1)(A)**. publish notice of the proposed action in the Federal Register and provide a copy of such notice to the Council, the Governor of each State in which facilities would be constructed or a conservation measure implemented, and the Administrator's customers;
[Northwest Power Act, §6(c)(1)(A), 94 Stat. 2718.]

Hearing

**839d(c)(1)(B)**. not less than sixty days following publication of such notice, conduct one or more public hearings, presided over by a hearing officer, at which testimony and evidence shall be received, with opportunity for such rebuttal and cross-examination as the hearing officer deems appropriate in the development of an adequate hearing record;
[Northwest Power Act, §6(c)(1)(B), 94 Stat. 2718.]

Record

**839d(c)(1)(C)**. develop a record to assist in evaluating the proposal which shall include the transcript of the public hearings, together with exhibits, and

such other materials and information as may have been submitted to, or developed by, the Administrator; and
[Northwest Power Act, §6(c)(1)(C), 94 Stat. 2718.]

**839d(c)(1)(D)**. following completion of such hearings, promptly provide to the Council and make public a written decision that includes, in addition to a determination respecting the requirements of subsection (a), (b), (f), (h), (l), or (m) of this section, as appropriate—

Written decision

**839d(c)(1)(D)(i)**. if a plan is in effect, a finding that the proposal is either consistent or inconsistent with the plan or, notwithstanding its inconsistency with the plan, a finding that it is needed to meet the Administrator's obligations under this chapter, or
[Northwest Power Act, §6(c)(1)(D)(i), 94 Stat. 2718.]

**839d(c)(1)(D)(ii)**. if no plan is in effect, a finding that the proposal is either consistent or inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or notwithstanding its inconsistency, a finding that it is needed to meet the Administrator's obligations under this chapter.
[Northwest Power Act, §6(c)(1)(D)(ii), 94 Stat. 2718.]

**839d(c)(1)(D)[cont.]**. In the case of subsection (f) of this section, such decision shall be treated as satisfying the applicable requirements of this subsection and of subsection (f) of this section, if it includes a finding of probable consistency, based upon the Administrator's evaluation of information available at the time of completion of the hearing under this paragraph. Such decision shall include the reasons for such finding.
[Northwest Power Act, §6(c)(1)(D), 94 Stat. 2718.]

**839d(c)(2)**. Within sixty days of the receipt of the Administrator's decision pursuant to paragraph (1)(D) of this subsection, the Council may determine by a majority vote of all members of the Council, and notify the Administrator—

**839d(c)(2)(A)**. that the proposal is either consistent or inconsistent with the plan, or
[Northwest Power Act, §6(c)(2)(B), 94 Stat. 2718.]

**839d(c)(2)(B)**. if no plan is in effect, that the proposal is either consistent or inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(c)(2)(B), 94 Stat. 2718.]

**839d(c)(3)**. The Administrator may not implement any proposal referred to in paragraph (1) that is determined pursuant to paragraph (1) or (2) by either the Administrator or the Council to be inconsistent with the plan or, if no plan is in effect, with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title—

**839d(c)(3)(A)**. unless the Administrator finds that, notwithstanding such inconsistency, such resource is needed to meet the Administrator's obligations under this chapter, and
[Northwest Power Act, §6(c)(3)(A), 94 Stat. 2718-9.]

**839d(c)(3)(B)**. until the expenditure of funds for that purpose has been specifically authorized by Act of Congress enacted after December 5, 1980,
[Northwest Power Act, §6(c)(3)(B), 94 Stat. 2719.]

Implementation of proposals

**839d(c)(4)**. Before the Administrator implements any proposal referred to in paragraph (1) of this subsection, the Administrator shall—

**839d(c)(4)(A)**. submit to the appropriate committees of the Congress the administrative record of the decision (including any determination by the Council under paragraph (2)) and a statement of the procedures followed or to be followed for compliance with the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.],
[Northwest Power Act, §6(c)(4)(A), 94 Stat. 2719.]

**839d(c)(4)(B)**. publish notice of the decision in the Federal Register, and
[Northwest Power Act, §6(c)(4)(B), 94 Stat. 2719.]

**839d(c)(4)(C)**. note the proposal in the Administrator's annual or supplementary budget submittal made pursuant to the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following).
[Northwest Power Act, §6(c)(4)(C), 94 Stat. 2719.]

**839d(c)(4) [cont.]**. The Administrator may not implement any such proposal until ninety days after the date on which such proposal has been noted in such budget or after the date on which such decision has been published in the Federal Register, whichever is later.
[Northwest Power Act, §6(c)(4), 94 Stat. 2719.]

**839d(c)(5)**. The authority of the Council to make a determination under paragraph (2)(B) if no plan is in effect shall expire on the date two years after the establishment of the Council.
[Northwest Power Act, §6(c)(5), 94 Stat. 2719.]

Acquisition of other than major resources

**839d(d). Acquisition of resources other than major resources**
The Administrator is authorized to acquire a resource, other than a major resource, whether or not such resource meets the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title but which he determines is an experimental, developmental, demonstration, or pilot project of a type with a potential for providing cost-effective service to the region. The Administrator shall make no obligation for the acquisition of such resource until it is included in the annual budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.].

[Northwest Power Act, §6(d), 94 Stat. 2719.]

**839d(e). Effectuation of priorities; use of customers and local entities**

**839d(e)(1)**. In order to effectuate the priority given to conservation measures and renewable resources under this chapter, the Administrator shall, to the maximum extent practicable, make use of his authorities under this chapter to acquire conservation measures and renewable resources, to implement conservation measures, and to provide credits and technical and financial assistance for the development and implementation of such resources and measures (including the funding of, and the securing of debt for, expenses incurred during the investigation and preconstruction of resources, as authorized in subsection (f) of this section).

[Northwest Power Act, §6(e)(1), 94 Stat. 2719.]

**839d(e)(2)**. To the extent conservation measures or acquisition of resources require direct arrangements with consumers, the Administrator shall make maximum practicable use of customers and local entities capable of administering and carrying out such arrangements.

[Northwest Power Act, §6(e)(2), 94 Stat. 2719.]

Acquisition agreements

**839d(f). Agreements; investigation and initial development of renewable resources other than major resources; reimbursement of investigation and preconstruction expenses**

**839d(f)(1)**. For resources which the Administrator determines may be eligible for acquisition under this section and satisfy the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or, if a plan is in effect, to be consistent with the plan, the Administrator is authorized to enter into agreements with sponsors of—

Renewable resources

**839d(f)(1)(A)**. a renewable resource, other than a major resource, to fund or secure debt incurred in the investigation and initial development of such resource, or

[Northwest Power Act, §6(f)(1)(A), 94 Stat. 2719.]

**839d(f)(1)(B)**. any other resource to provide for the reimbursement of the sponsor's investigation and preconstruction expenses concerning such resource (which expenses shall not include procurement of capital equipment or construction material for such resource).

[Northwest Power Act, §6(f)(1)(B), 94 Stat. 2720.]

**839d(f)(1) [cont.]**. In the case of any resource referred to in subparagraph (B) of this paragraph, such reimbursement is authorized only if—

Reimbursement of expenses

**839d(f)(1)(B)(i)**. such resource is subsequently denied State citing approval or other necessary Federal or State permits, or approvals,

[Northwest Power Act, §6(f)(1)(B)(i), 94 Stat. 2720.]

**839d(f)(1)(B)(ii)**. such investigation subsequently demonstrates, as

determined by the Administrator, that such resource does not meet the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or is not acceptable because of environmental impacts, or

[Northwest Power Act, §6(f)(1)(B)(ii), 94 Stat. 2720.]

**839d(f)(1)(B)(iii)**. after such investigation the Administrator determines not to acquire the resource and the sponsor determines not to construct the resource.

[Northwest Power Act, §6(f)(1)(B)(iii), 94 Stat. 2720.]

**839d(f)(2)**. The Administrator may exercise the authority of this subsection only after he determines that the failure to do so would result in inequitable hardship to the consumers of such sponsors. The Administrator may provide reimbursement under this subsection only for expenses incurred after December 5, 1980.

[Northwest Power Act, §6(f)(2), 94 Stat. 2720.]

**839d(f)(3)**. Any agreement under paragraph (1) of this subsection shall provide the Administrator an option to acquire any such resource, including a renewable resource, and shall include such other provisions, as the Administrator deems appropriate, for the Administrator's recovery from such sponsors or any assignee of the sponsors, if such sponsor or assignee continues development of the resource, of any advances made by the Administrator pursuant to such agreement.

[Northwest Power Act, §6(f)(3), 94 Stat. 2720.]

**839d(f)(4)**. The Administrator shall not reimburse any expense incurred by the sponsors (except necessary expenses involved in the liquidation of the resource) after the date of a final denial of application for State citing approval or after the date the Administrator determines that the resource to be inconsistent with the plan or the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.

[Northwest Power Act, §6(f)(4), 94 Stat. 2720.]

**839d(g). Environmental impact statements**

At the request of the appropriate State, any environmental impact statement which may be required with respect to a resource, to the extent determined possible by the Administrator in accordance with applicable law and regulations, may be prepared jointly and in coordination with any required environmental impact statement of the State or any other statement which serves the purpose of an environmental impact statement which is required by State law.

[Northwest Power Act, §6(g), 94 Stat. 2720.]

Billing credits

## Pacific NW Power Act (continued)

**839d(h). Billing credits**

**839d(h)(1)**. If a customer so requests, the Administrator shall grant billing credits to such customer, and provide services to such customer at rates established for such services, for—

**839d(h)(1)(A)**. conservation activities independently undertaken or continued after December 5, 1980, by such customer or political subdivision served by such customer which reduce the obligation of the Administrator that would otherwise have existed to acquire other resources under this chapter, or
[Northwest Power Act, §6(h)(1)(A), 94 Stat. 2720.]

**839d(h)(1)(B)**. resources constructed, completed, or acquired after December 5, 1980, by a customer, an entity acting on behalf of such customer, or political subdivision served by the customer which reduce the obligation of the Administrator to acquire resources under this chapter. Such resources shall be renewable resources or multipurpose projects or other resources which are not inconsistent with the plan or, in the absence of a plan, not inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(h)(1)(B), 94 Stat. 2720-1.]

**839d(h)(2)**. The energy and capacity on which a credit under this subsection to a customer is based shall be the amount by which a conservation activity or resource actually changes the customer's net requirement for supply of electric power or reserves from the Administrator.
[Northwest Power Act, §6(h)(2), 94 Stat. 2721.]

**839d(h)(3)**. The amount of credits for conservation under this subsection shall be set to credit the customer implementing or continuing the conservation activity for which the credit is granted for the savings resulting from such activity. The rate impact on the Administrator's other customers of granting the credit shall be equal to the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually saved by the activity for which the credit is granted.
[Northwest Power Act, §6(h)(3), 94 Stat. 2721.]

**839d(h)(4)**. For resources other than conservation, the customer shall be credited for net costs actually incurred by such customer, an entity acting on behalf of such customer, or political subdivision served by such customer, in acquiring, constructing, or operating the resource for which the credit is granted. The rate impact to the Administrator's other customers of granting the credit shall be no greater than the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually produced by the resource for which the credit is granted.
[Northwest Power Act, §6(h)(4), 94 Stat. 2721.]

**839d(h)(5)**. Retail rate structures which are voluntarily implemented by the Administrator's customers and which induce conservation or installation of consumer-owned renewable resources shall be considered, for purposes of this subsection, to be (A) conservation activities independently undertaken or carried on by such customers, or (B) customer-owned renewable resources, and shall qualify for billing credits upon the same showing as that required for other conservation or renewable resource activities.
[Northwest Power Act, §6(h)(5), 94 Stat. 2721.]

**839d(h)(6)**. Prior to granting any credit or providing services pursuant to this subsection, the Administrator shall—

**839d(h)(6)(A)**. comply with the notice provisions of subsection (c) of this section, and include in such notice the methodology the Administrator proposes to use in determining the amount of any such credit;
[Northwest Power Act, §6(h)(6)(A), 94 Stat. 2721.]

**839d(h)(6)(B)**. include the cost of such credit in the Administrator's annual or amended budget submittal to the Congress made pursuant to the Federal Columbia River Transmission System Act (16 U.S.C. 838(j))[16 U.S.C. 838 et seq.];
[Northwest Power Act, §6(h)(6)(B), 94 Stat. 2721.]

Excess resources

**839d(h)(6)(C)**. require that resources in excess of customer's reasonable load growth shall have been offered to others for ownership participation or other sponsorship pursuant to subsection (m) of this section, except in the case of conservation, multi-purpose projects uniquely suitable for development by the customer, or renewable resources; and
[Northwest Power Act, §6(h)(6)(C), 94 Stat. 2721.]

**839d(h)(6)(D)**. require that the operators of any generating resource for which a billing credit is to be granted agree to operate such resource in a manner compatible with the planning and operation of the region's power system.
[Northwest Power Act, §6(h)(6)(D), 94 Stat. 2721.]

Contracts

**839d(i). Contracts**
Contracts for the acquisition of resources and for billing credits for major resources, including conservation activities, entered into pursuant to this section shall contain such terms and conditions, applicable after the contract is entered into, as will—

**839d(i)(1)**. insure timely construction, scheduling, completion, and operation of resources.
[Northwest Power Act, §6(i)(1), 94 Stat. 2721.]

**839d(i)(2)**. insure that the costs of any acquisition are as low as reasonably possible, consistent (A) with sound engineering, operating, and safety practices, and (B) the protection, mitigation, and enhancement of fish and

wildlife, including related spawning grounds and habitat affected by the development of such resources, and
[Northwest Power Act, §6(i)(2), 94 Stat. 2722.]

**839d(i)(3)**. insure that the Administrator exercises effective oversight, inspection, audit, and review of all aspects of such construction and operation.
[Northwest Power Act, §6(i)(3), 94 Stat. 2722.]

**839d(i) [cont.]**. Such contracts shall contain provisions assuring that the Administrator has the authority to approve all costs of, and proposals for, major modifications in construction, scheduling or operations and to assure that the Administrator is provided with such current information as he deems necessary to evaluate such construction and operation.
[Northwest Power Act, §6(i), 94 Stat. 2722.]

**839d(j). Obligations not to be considered general obligations of United States or secured by full faith and credit of United States**

**839d(j)(1)**. All contractual and other obligations required to be carried out by the Administrator pursuant to this chapter and shall be secured solely by the Administrator's revenues received from the sale of electric power and other services. Such obligations are not, nor shall they be construed to be, general obligations of the United States, nor are such obligations intended to be or are they secured by the full faith and credit of the United States.
[Northwest Power Act, §6(j)(1), 94 Stat. 2722.]

Obligations secured by revenues

**839d(j)(2)**. All contracts entered into by the Administrator for the acquisition of resources pursuant to this chapter shall require that, in the sale of any obligations, all offerings and promotional material for the sale of such obligations shall include the language contained in the second sentence of paragraph (1) of this subsection. The Administrator shall monitor and enforce such requirement.
[Northwest Power Act, §6(j)(2), 94 Stat. 2722.]

**839d(k). Equitable distribution of benefits**
In the exercise of his authorities pursuant to this section, the Administrator shall, consistent with the provisions of this chapter and the Administrator's obligations to particular customer classes, insure that benefits under this section, including financial and technical assistance, conduct of conservation demonstrations, and experimental projects, services, and billing credits, are distributed equitably throughout the region.
[Northwest Power Act, §6(k), 94 Stat. 2722.]

Equitable distribution of benefits

**839d(l). Investigations**

**839d(l)(1)**. The Administrator is authorized and directed to investigate opportunities for adding to the region's resources or reducing the region's power costs through the accelerated or cooperative development of resources

located outside the States of Idaho, Montana, Oregon, and Washington if such resources are renewable resources, and are now or in the future planned or considered for eventual development by nonregional agencies or authorities that will or would own, sponsor, or otherwise develop them. The Administrator shall keep the Council fully and currently informed of such investigations, and seek the Council's advice as to the desirability of pursuing such investigations.
[Northwest Power Act, §6(l)(1), 94 Stat. 2722.]

Interregional exchanges

**839d(l)(2)**. The Administrator is authorized and directed to investigate periodically opportunities for mutually beneficial interregional exchanges of electric power that reduce the need for additional generation or generating capacity in the Pacific Northwest and the regions with which such exchanges may occur. The Council shall take into consideration in formulating a plan such investigations.
[Northwest Power Act, §6(l)(2), 94 Stat. 2722.]

**839d(l)(3)**. After the Administrator submits a report to Congress pursuant to paragraph (5) of this subsection, the Administrator is authorized to acquire resources consistent with such investigations and consistent with the plan or, if no plan is in effect, with the priorities of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title. Such acquisitions shall be in accordance with the provisions of this subsection.
[Northwest Power Act, §6(l)(3), 94 Stat. 2722.]

**839d(1)(4)**. The Administrator shall conduct the investigations and the acquisitions, if any, authorized under this subsection with the assistance of other Federal agencies as may be appropriate.
[Northwest Power Act, §6(l)(4), 94 Stat. 2723.]

**839d(1)(5)**. No later than July 1, 1981, the Administrator shall submit to the Congress a report of the results of the investigation undertaken pursuant to this subsection, together with the prospects for obtaining additional resources under the authority granted by this subsection and for reductions in generation or generating capacity through exchanges.
[Northwest Power Act, §6(l)(5), 94 Stat. 2723.]

**839d(m). Offering of reasonable shares to each Pacific Northwest electric utility**

Shares offer to utilities

Except as to resources under construction on December 5, 1980, the Administrator shall determine in each case of a major resource acquisition that a reasonable share of the particular resource, or a reasonable equivalent, has been offered to each Pacific Northwest electric utility for ownership, participation, or other sponsorship, but not in excess of the amounts needed to meet such utility's Regional load.
[Northwest Power Act, §6(m), 94 Stat. 2723.]

Improvements funded by Administrator

**839d-1**. Without further appropriation and without fiscal year limitation, the Secretaries of the Interior and Army are authorized to plan, design, construct,

operate and maintain generation additions, improvements and replacements, at their respective Federal projects in the Pacific Northwest Region, and to operate and maintain the respective Secretary's power facilities in the Region, that the respective Secretary determines necessary or appropriate and that the Administrator subsequently determines necessary or appropriate, with any funds that the Administrator determines to make available to the respective Secretary for such purposes. Each Secretary is authorized, without further appropriation, to accept and use such funds for such purposes: **Provided,** That such funds shall continue to be exempt from sequestration pursuant to section 255(g)(1) of the Balanced Budget and Emergency Deficit Control Act of 1985 [2 U.S.C. 901-922]: **Provided further,** That this section not modify or affect the applicability of any provision of this chapter. This provision shall be effective on October 1, 1993.
[Energy Policy Act of 1992, P. L. No. 102-486, Title XXIV, §2406, Oct. 24, 1992, 106 Stat. 3099.]

**839e. Rates**

Rates for sale and distribution of power

**839e(a). Establishment; periodic review and revision; confirmation and approval by Federal Energy Regulatory Commission**

**839e(a)(1)**. The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the cost associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law. Such rates shall be established in accordance with sections 9 and 10 of the Federal Columbia River Transmission System Act (16 U.S.C. 838) [16 U.S.C. 838g and 838h], section 5 of the Flood Control Act of 1944 [16 U.S.C. 825s], and the provisions of this chapter.
[Northwest Power Act, §7(a)(1), 94 Stat. 2723.]

Approval by FERC

**839e(a)(2)**. Rates established under this section shall become effective only, except in the case of interim rules as provided in subsection (i)(6) of this section, upon confirmation and approval by the Federal Energy Regulatory Commission upon a finding by the Commission, that such rates—

**839e(a)(2)(A)**. are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,
[Northwest Power Act, §7(a)(2)(A), 94 Stat. 2723.]

**839e(a)(2)(B)**. are based upon the Administrator's total system costs, and
[Northwest Power Act, §7(a)(2)(B), 94 Stat. 2723.]

**839e(a)(2)(C)**. insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.
[Northwest Power Act, §7(a)(2)(C), 94 Stat. 2723.]

Application of rates

**839e(b). General application of rates to meet general requirements**

**839e(b)(1)**. The Administrator shall establish a rate or rates of general application for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric utilities under section 839c(c) of this title. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads, first from the electric power acquired by the Administrator under section 839c(c) of this title and then from other resources.
[Northwest Power Act, §7(b)(1), 94 Stat. 2723.]

**839e(b)(2)**. After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for general requirements of such customers if, the Administrator assumes that—

**839e(b)(2)(A)**. the public body and cooperative customers' general requirements had included during such five-year period the direct service industrial customer loads which are—

**839e(b)(2)(A)(i)**. served by the Administrator, and
[Northwest Power Act, §7(b)(2)(A)(i), 94 Stat. 2724.]

**839e(b)(2)(A)(ii)**. located within or adjacent to the geographic service boundaries of such public bodies and cooperatives;
[Northwest Power Act, §7(b)(1)(A)(ii), 94 Stat. 2724.]

Section 7(b)(2) analysis

**839e(b)(2)(B)**. public body, cooperative, and Federal agency customers were served, during such five-year period, with Federal base system resources not obligated to other entities under contracts existing as of December 5, 1980, (during the remaining term of such contracts) excluding obligations to direct service industrial customer loads included in subparagraph (A) of this paragraph;
[Northwest Power Act, §7(b)(2)(B), 94 Stat. 2724.]

## Pacific NW Power Act (continued)

**839e(b)(2)(C)**. no purchases or sales by the Administrator as provided in section 839c(c) of this section were made during such five-year period;
[Northwest Power Act, §7(b)(2)(C), 94 Stat. 2724.]

**839e(b)(2)(D)**. all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—

**839e(b)(2)(D)(i)**. purchased from such customers by the Administrator pursuant to section 839d of this title, or
[Northwest Power Act, §7(b)(2)(D)(i), 94 Stat. 2724.]

**839e(b)(2)(D)(ii)**. not committed to load pursuant to section 839c(b), of this section
[Northwest Power Act, §7(b)(2)(D)(ii), 94 Stat. 2724.]

**839e(b)(2)(D) [cont.]**. and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator; and
[Northwest Power Act, §7(b)(2)(D), 94 Stat. 2724.]

**839e(b)(2)(E)**. the quantifiable monetary savings, during such five-year period, to public body, cooperative and Federal agency customers resulting from—

**839e(b)(2)(E)(i)**. reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified under subparagraph (D) of this paragraph, and
[Northwest Power Act, §7(b)(2)(E)(i), 94 Stat. 2724.]

**839e(b)(2)(E)(ii)**. reserve benefits as a result of the Administrator's actions under this chapter
[Northwest Power Act, §7(b)(2)(E)(ii), 94 Stat. 2724.]

**839e(b)(2)(E)[cont.]**. were not achieved.
[Northwest Power Act, §7(b)(2)(E), 94 Stat. 2724.]

**839e(b)(3)**. Any amounts not charged to public body, cooperative, and Federal agency customers by reason of paragraph (2) of this subsection shall be recovered through supplemental rate charges for all other power sold by the Administrator to all customers. Rates charged public body, cooperative, or Federal agency customers pursuant to this subsection shall not include any costs or benefits of a net revenue surplus or deficiency occurring for the period ending June 30, 1985, to the extent such surplus or deficiency is caused by—

Supplemental rate charges

**839e(b)(3)(A)**. a difference between actual power deliveries and power deliveries projected for the purpose of establishing rates to direct service industrial customers under subsection (c)(1) of this subsection, and
[Northwest Power Act, §7(b)(3)(A), 94 Stat. 2724.]

**839e(b)(3)(B)**. an overrecovery or underrecovery of the net costs incurred by the Administrator under section 839c(c) of this title as a result of such difference.
[Northwest Power Act, §7(b)(3)(B), 94 Stat. 2724.]

**839e(b)(3) [cont.]**. Any such revenue surplus or deficiency incurred shall be recovered from, or repaid to, customer over a reasonable period of time after July 1, 1985, through a supplemental rate charge or credit applied proportionately for all other power sold by the Administrator at rates established under other subsections of this section prior to July 1, 1985.
[Northwest Power Act, §7(b)(3), 94 Stat. 2724-5.]

**839e(b)(4)**. The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section 839c(b) of this title, exclusive of any new large single load.
[Northwest Power Act, §7(b)(3), 94 Stat. 2725.]

**839e(c). Rates applicable to direct service industrial customers**

DSI rates

**839e(c)(1)**. The rate or rates applicable to direct service industrial customers shall be established—

**839e(c)(1)(A)**. for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c(c) of this title, based upon the Administrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and
[Northwest Power Act, §7(c)(1)(A), 94 Stat. 2725.]

**839e(c)(1)(B)**. for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.
[Northwest Power Act, §7(c)(1)(B), 94 Stat. 2725.]

**839e(c)(2)**. The determination under paragraph (1)(B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

**839e(c)(2)(A)**. the comparative size and character of the loads served,
[Northwest Power Act, §7(c)(2)(A), 94 Stat. 2725.]

**839e(c)(2)(B)**. the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and
[Northwest Power Act, §7(c)(2)(B), 94 Stat. 2725.]

**839e(c)(2)(C)**. direct and indirect overhead costs,
[Northwest Power Act, §7(c)(2)(C), 94 Stat. 2725.]

**839e(c)(2) [cont.]**. all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.
[Northwest Power Act, §7(c)(2), 94 Stat. 2725.]

**839e(c)(3)**. The Administrator shall adjust such rates to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers.
[Northwest Power Act, §7(c)(3), 94 Stat. 2725.]

**839e(d). Discount rates; special rates**

**839e(d)(1)**. In order to avoid adverse impacts on retail rates of the Administrator's customers with low system densities, the Administrator shall, to the extent appropriate, apply discounts to the rate or rates for such customers.
[Northwest Power Act, §7(d)(1), 94 Stat. 2725.]

Low-density discounts

**839e(d)(2)**. In order to avoid adverse impacts of increased rates pursuant to this chapter on any direct service industrial customer using raw minerals indigenous to the region as its primary resource, the Administrator, upon request of such customer showing such impacts and after considering the effect of such request on his other obligations under this chapter, is authorized, if the Administrator determines that such impacts will be significant, to establish a special rate applicable to such customer if all power sold to such customer may be interrupted, curtailed, or withdrawn to meet firm loads in the region. Such rate shall be established in accordance with this section and shall include such terms and conditions as the Administrator deems appropriate.
[Northwest Power Act, §7(d)(2), 94 Stat. 2725.]

**839e(e). Uniform rates; rates for sale of peaking capacity; time-of-day, seasonal, and other rates**

Nothing in this chapter prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.
[Northwest Power Act, §7(e), 94 Stat. 2726.]

Rate forms

**839e(f). Basis for rates**
Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under section 839c(c) of this title and additional resources which, in the determination of the Administrator, are applicable to such sales.
[Northwest Power Act, §7(f), 94 Stat. 2726.]

**839e(g). Allocation of costs and benefits**

Allocation of costs

Except to the extent that the allocation of costs and benefits is governed by provisions of law in effect on December 5, 1980, or by other provisions of this section, the Administrator shall equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, conservation, fish and wildlife measures, uncontrollable events, reserves, the excess costs of experimental resources acquired under section 839d of this title, the cost of credits granted pursuant to section 839d of this title, operating services, and the sale of or inability to sell excess electric power.
[Northwest Power Act, §7(g), 94 Stat. 2726.]

**839e(h). Surcharges**
Notwithstanding any other provision of this section (except the provisions of subsection (a) of this section), the Administrator shall adjust power rates to include any surcharges arising under section 838b(f) of this title, and shall allocate any revenues from such charges in such manner as the Administrator determines will help achieve the purposes of section 838b(f) of this title.
[Northwest Power Act, §7(h), 94 Stat. 2726.]

**839e(i). Procedures**

Rate-making procedures

In establishing rates under this section, the Administrator shall use the following procedures:

**839e(i)(1)**. Notice of the proposed rates shall be published in the Federal Register with a statement of the justification and reasons supporting such rates. Such notice shall include a date for a hearing in accordance with paragraph (2) of this subsection.
[Northwest Power Act, §7(i)(1), 94 Stat. 2726.]

Hearings

**839e(i)(2)**. One or more hearings shall be conducted as expeditiously as practicable by a hearing officer to develop a full and complete record and to receive public comment in the form of written and oral presentation of views, data, questions, and argument related to such proposed rates. In any such hearing—

**839e(i)(2)(A)**. any person shall be provided an adequate opportunity by the hearing officer to offer refutation or rebuttal of any material submitted by any other person or the Administrator, and
[Northwest Power Act, §7(i)(2)(A), 94 Stat. 2726.]

**839e(i)(2)(B)**. the hearing officer, in his discretion, shall allow a reasonable opportunity for cross examination, which, as determined by the hearing officer, is not dilatory, in order to develop information and material relevant to any such proposed rate.
[Northwest Power Act, §7(i)(2)(B), 94 Stat. 2726.]

**839e(i)(3)**. In addition to the opportunity to submit oral and written material at the hearings, any written views, data, questions, and arguments submitted by persons prior to, or before the close of, hearings shall be made a part of the administrative record.
[Northwest Power Act, §7(i)(3), 94 Stat. 2726.]

**839e(i)(4)**. After such a hearing, the Administrator may propose revised rates, publish such proposed rates in the Federal Register, and conduct additional hearings in accordance with this subsection.
[Northwest Power Act, §7(i)(4), 94 Stat. 2726.]

**839e(i)(5)**. The Administrator shall make a final decision establishing a rate or rates based on the record which shall include the hearing transcript, together with exhibits, and such other materials and information as may have been submitted to, or developed by, the Administrator. The decision shall include a full and complete justification of the final rates pursuant to this section.
[Northwest Power Act, §7(i)(5), 94 Stat. 2726-7.]

**839e(i)(6)**. The final decision of the Administrator shall become effective on confirmation and approval of such rates by the Federal Energy Regulatory Commission pursuant to subsection (a)(2) of this section. The Commission shall have the authority, in accordance with such procedures, if any, as the Commission shall promptly establish and make effective within one year after December 5, 1980, to approve the final rate submitted by the Administrator on an interim basis, pending the Commission's final decision in accordance with such subsection. Pending the establishment of such procedures by the Commission, if such procedures are required, the Secretary is authorized to approve such interim rates during such one-year period in accordance with the applicable procedures followed by the Secretary prior to December 5, 1980,. Such interim rates, at the discretion of the Secretary, shall continue in effect until July 1, 1982.
[Northwest Power Act, §7(i)(6), 94 Stat. 2727.]

Interim rates

**839e(j). Cost figures to be indicated on rates schedules and power billings**
All rate schedules adopted, and all power billings rendered, by the Administrator pursuant to this section shall indicate—

**839e(j)(1)**. the approximate cost contribution of different resource categories to the Administrator's rates for the sale of energy and capacity, and
[Northwest Power Act, §7(j)(1), 94 Stat. 2727.]

**839e(j)(2)**. the cost of resources acquired to meet load growth within the region and the relation of such cost to the average cost of resources available to the Administrator.

[Northwest Power Act, §7(j)(2), 94 Stat. 2727.]

**839e(k). Statutory basis for procedures used in establishing rates or rate schedules**

Rates for nonfirm

Notwithstanding any other provision of this chapter, all rates or rate schedules for the sale of nonfirm electric power within the United States, but outside the region, shall be established after December 5, 1980, by the Administrator in accordance with the procedures of subsection (i) of this section (other than the first sentence of paragraph (6) thereof) and in accordance with the Bonneville Project Act [16 U.S.C. 832 et seq.], the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.]. Notwithstanding section 201(f) of the Federal Power Act [16 U.S.C. 824(f)], such rates or rate schedules shall become effective after review by the Federal Energy Regulatory Commission for conformance with the requirements of such Acts and after approval thereof by the Commission. Such review shall be based on the record of proceedings established under subsection (i) of this section. The parties to such proceedings under subsection (i) of this section shall be afforded an opportunity by the Commission for an additional hearing in accordance with the procedures established for ratemaking by the Commission pursuant to the Federal Power Act [16 U.S.C. 791a et seq.].

Review by FERC

[Northwest Power Act, §7(k), 94 Stat. 2727.]

**839e(l). Rates for sales outside United States; negotiations**

Negotiated rates outside U.S.

In order to further the purposes of this chapter and to protect the consumers of the region, the Administrator may negotiate, or establish, rates for electric power sold by the Administrator to any entity not located in the United States which shall be equitable in relation to rates for all electric power which is, or may be, purchased by the Administrator or the Administrator’s customers from entities outside the United States. In establishing rates other than by negotiation, the provisions of subsection (i) of this section shall apply. In the case of any negotiation with an entity not located in the United States, the Administrator shall provide public notice of any proposal to negotiate such rates. Such negotiated rates shall be not less than rates established under this chapter for nonfirm power sold within the United States but outside the region. The Administrator shall also afford notice of any rates negotiated pursuant to this subsection.

[Northwest Power Act, §7(l), 94 Stat. 2727.]

Payments

**839e(m). Impact aid payments; formula**

**839e(m)(1)**. Beginning the first fiscal year after the plan and program required by section 838b(d) and (h) of this title are finally adopted, the Administrator may, subject to the provisions of this section, make annual impact aid payments to the appropriate local governments within the region with respect to major transmission facilities of the Administrator, as defined

in section 3(c) of the Federal Columbia River Transmission Act [16 U.S.C. 838a(c)]—

**839e(m)(1)(A)**. which are located within the jurisdictional boundaries of such governments,
[Northwest Power Act, §7(m)(1)(A), 94 Stat. 2727-8.]

**839e(m)(1)(B)**. which are determined by the Administrator to have a substantial impact on such governments, and
[Northwest Power Act, §7(m)(1)(B), 94 Stat. 2728.]

**839e(m)(1)(C)**. where the construction of such facilities, or any modification thereof, is completed after December 5, 1980, and, in the case of a modification of an existing facility, such modification substantially increases the capacity of such existing transmission facility.
[Northwest Power Act, §7(m)(1)(C), 94 Stat. 2728.]

Payment formula

**839e(m)(2)**. Payments made under this subsection for any fiscal year shall be determined by the Administrator pursuant to a regionwide, uniform formula to be established by rule in accordance with the procedures set forth in subsection (i) of this section. Such rule shall become effective on its approval, after considering its effect on rates established pursuant to this section, by the Federal Energy Regulatory Commission, In developing such formula, the Administrator shall identify, and take into account, the local governmental services provided to the Administrator concerning such facilities and the associated costs to such governments as the result of such facilities.
[Northwest Power Act, §7(m)(2), 94 Stat. 2728.]

**839e(m)(3)**. Payments made pursuant to this subsection shall be made solely from the fund established by section 11 of the Federal Columbia River Transmission System Act [16 U.S.C. 838i]. The provisions of section 13 of such Act [16 U.S.C. 838k], and any appropriations provided to the Administrator under any law, shall not be available for such payments. The authorization of payments under this subsection shall not be construed as an obligation of the United States.
[Northwest Power Act, §7(m)(3), 94 Stat. 2728.]

**839e(m)(4)**. No payment may be made under this subsection with respect to any land or interests in land owned by the United States within the region and administered by any Federal agency (other than the Administrator), without regard to how the United States obtained ownership thereof, including lands or interests therein acquired or withdrawn by a Federal agency for purposes of such agency and subsequently made available to the Administrator for such facilities.[8]
[Northwest Power Act, §7(m)(4), 94 Stat. 2728.]

8 §8 of this Act consists of amendments to existing law and is codified as part of the statutes that it amends. See, e.g., Transmission System Act §11(b)(6) 16 U.S.C. §838i(b)(6) *supra*, page 64.

**839e(n). Limiting the inclusion of costs of protection of, mitigation of damage to, and enhancement of fish and wildlife, within rates charged by the Bonneville Power Administration, to the rate period in which the costs are incurred**

Notwithstanding any other provision of this section, rates established by the Administrator, under this section shall recover costs for protection, mitigation and enhancement of fish and wildlife, whether under this chapter or any other Act, not to exceed such amounts the Administrator forecasts will be expended during the fiscal year 2002-2006 rate period, while preserving the Administrator's ability to establish appropriate reserves and maintain a high Treasury payment probability for the subsequent rate period.

[As amended Pub.L. 106-60, § 316, Sept. 29, 1999, 113 Stat. 497.]

**839f. Administrative provisions**

Contracts

**839f(a). Contract authority**

Subject to the provisions of this chapter, The Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. 832a(f)). Other provisions of law applicable to such contracts on December 5, 1980, shall continue to be applicable.

[Northwest Power Act, §9(a), 94 Stat. 2729-30.]

**839f(b). Executive and administrative functions of Administrator of Bonneville Power Administration; sound and businesslike implementation of chapter**

The Administrator shall discharge the executive and administrative functions of his office in accordance with the policy established by the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), section 7152(a)(2) and (3) of title 42, and this chapter. The Secretary of Energy, the Council, and the Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and business-like manner. Nothing in this chapter shall be construed by the Secretary, the Administrator, or any other official of the Department of Energy to modify, after, or otherwise affect the requirements and directives expressed by the Congress in section 7152(a)(2) and (3) of title 42 or the operations of such officials as they existed prior to December 5, 1980.

[Northwest Power Act, §9(b), 94 Stat. 2730.]

Contracts outside Pacific Northwest

**839f(c). Limitations and conditions on contracts for sale or exchange of electric power for use outside Pacific Northwest**

Any contract of the Administrator for the sale or exchange of electric power for use outside the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 2 and 3 of the Act of August 31, 1964 (16 U.S.C. 837a and 837b) for any contract for the sale, delivery, or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest. In applying such sections for the purposes of this subsection, the term "surplus energy" shall mean electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy, and the term "surplus

peaking capacity" shall mean electric peaking capacity for which there is no demand in the Pacific Northwest at the rate established for the disposition of such capacity. The authority granted, and duties imposed upon, the Secretary by sections 5 and 7 of such Act (16 U.S.C. 837e and 837f) [16 U.S.C. 837d and 837f] shall also apply to the Administrator in connection with resources acquired by the Administrator pursuant to this chapter. The Administrator shall, in making any determination, under any contract executed pursuant to section 839c of this title, of the electric power requirements of any Pacific Northwest customer, which is a non-Federal entity having its own generation, exclude, in addition to hydroelectric generated energy excluded from such requirements pursuant to section 3(d) of such Act (16 U.S.C. 837b(d)), any amount of energy included in the resources of such customer for service to firm loads in the region if (1) such amount was disposed of by such customer outside the region, and (2) as a result of such disposition, the firm energy requirements of such customer or other customers of the Administrator are increased. Such amount of energy shall not be excluded, if the Administrator determines that through reasonable measures such amount of energy could not be conserved or otherwise retained for service to regional loads. The Administrator may sell as replacement for any amount of energy so excluded only energy that would otherwise be surplus.

[Northwest Power Act, §9(c), 94 Stat. 2730.]

**839f(d). Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer**

No restrictions contained in subsection (c) of this section shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i)(1)(B) and (i)(3) and subject to:

**839f(d)(1)**. any contractual obligations of the Administrator,

[Northwest Power Act, §9(d)(1), 94 Stat. 2730.]

**839f(d)(2)**. any other obligations under existing law, and

[Northwest Power Act, §9(d)(2), 94 Stat. 2730.]

**839f(d)(3)**. the availability of capacity in the Federal transmission system,

[Northwest Power Act, §9(d)(3), 94 Stat. 2731.]

**839f(d) [cont.]**. the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.

[Northwest Power Act, §9(d), 94 Stat. 2730-1.]

Judicial Review

**839f(e). Judicial review; suits**

**839f(e)(1)**. For purposes of sections 701 through 706 of title 5, the following actions shall be final actions subject to judicial review—

**839f(e)(1)(A)**. adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;
[Northwest Power Act, §9(e)(1)(A), 94 Stat. 2731.]

**839f(e)(1)(B)**. sales, exchanges, and purchases of electric power under section 839c of this title;
[Northwest Power Act, §9(e)(1)(B), 94 Stat. 2731.]

**839f(e)(1)(C)**. the Administrator's acquisition of resources under section 839d of this title;
[Northwest Power Act, §9(e)(1)(C), 94 Stat. 2731.]

**839f(e)(1)(D)**. implementation of conservation measures under section 839d of this title;
[Northwest Power Act, §9(e)(1)(D), 94 Stat. 2731.]

**839f(e)(1)(E)**. execution of contracts for assistance to sponsors under section 839d(f) of this title;
[Northwest Power Act, §9(e)(1)(E), 94 Stat. 2731.]

**839f(e)(1)(F)**. granting of credits under section 839d(h) of this title;
[Northwest Power Act, §9(e)(1)(F), 94 Stat. 2731.]

**839f(e)(1)(G)**. final rate determinations under section 839e of this title; and
[Northwest Power Act, §9(e)(1)(G), 94 Stat. 2731.]

**839f(e)(1)(H)**. any rule prescribed by the Administrator under section 839e(m)(2) of this title.
[Northwest Power Act, §9(e)(1)(H), 94 Stat. 2731.]

Record of final action

**839f(e)(2)**. The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole. The scope of review of an action under section 839d(c) of this title shall be governed by section 706 of title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of title 5.
[Northwest Power Act, §9(e)(2), 94 Stat. 2731.]

**839f(e)(3)**. Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.
[Northwest Power Act, §9(e)(3), 94 Stat. 2731.]

**839f(e)(4)**. For purposes of this subsection—

**839f(e)(4)(A)**. major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d(c)(4)(B) of this title;
[Northwest Power Act, §9(e)(4)(A), 94 Stat. 2731.]

**839f(e)(4)(B)**. resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;
[Northwest Power Act, §9(e)(4)(B), 94 Stat. 2731.]

**839f(e)(4)(C)**. conservation measures shall be deemed to be implemented upon execution of the contract or grant therefore; and
[Northwest Power Act, §9(e)(4)(C), 94 Stat. 2731.]

**839f(e)(4)(D)**. rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.
[Northwest Power Act, §9(e)(4)(D), 94 Stat. 2731.]

**839f(e)(5)**. Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. 832 et seq.], the Act of August 31, 1964 (16 U.S.C. 837-837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.
[Northwest Power Act, §9(e)(5), 94 Stat. 2731-2.]

Legal challenges

**839f(f). Tax treatment of interest on governmental obligations**
For purposes of enabling the Administrator to acquire resources necessary to meet the firm load of public bodies, cooperatives, and Federal agencies from a governmental unit at a cost no greater than the cost which would be applicable in the absence of such acquisition, the exemption from gross

income of interest on certain governmental obligations provided in section 103(a)(1) of title 26 shall not be affected by the Administrator's acquisition of such resources if—

**839f(f)(1)**. the Administrator, prior to contracting for such acquisition, certifies to his reasonable belief, that the persons for whom the Administrator is acquiring such resources for sale pursuant to section 839c of this title are public bodies, cooperatives, and Federal agencies, unless the Administrator also certifies that he is unable to acquire such resources without selling a portion thereof to persons who are not exempt persons (as defined in section 103(b) of title 26), and
[Northwest Power Act, §9(f)(1), 94 Stat. 2732.]

**839f(f)(2)**. based upon such certification, the Secretary of the Treasury determines in accordance with applicable regulations that less than a major portion of the resource is to be furnished to persons who are not exempt persons (as defined in section 103(b) of title 26).
[Northwest Power Act, §9(f)(2), 94 Stat. 2732.]

**839f(f) [cont.]**. The certification under paragraph (1) shall be made in accordance with this subsection and a procedure and methodology approved by the Secretary of the Treasury. For purposes of this subsection, the term "major portion" shall have the meaning provided by regulations issued by the Secretary of the Treasury.
[Northwest Power Act, §9(f), 94 Stat. 2732.]

FERC review of investor-owned utility rates

**839f(g). Review of rates for sale of power to Administrator by investor-owned utility customers**
When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer under section 839c(c) or 839d of this title, the Federal Energy Regulatory Commission shall, in accordance with section 824h of this title—

**839f(g)(1)**. convene a joint State board, and
[Northwest Power Act, §9(g)(1), 94 Stat. 2732.]

**839f(g)(2)**. invest such board with such duties and authority as will assist the Commission in its review of such rates.
[Northwest Power Act, §9(g)(1), 94 Stat. 2732.]

**839f(h). Companies which own or operate facilities for the generation of electricity primarily for sale to Administrator**

**839f(h)(1)**. No "Company" (as defined in section 79b(a)(2) of title 15), which owns or operates facilities for the generation of electricity (together with associated transmission and other facilities) primarily for sale to the Administrator under section 839d of this title shall be deemed an "electric utility company" (as defined in section 79b(a)(3) of the title 15), within the meaning of any provision or provisions of chapter 2C of title 15, if at least

90 per centum of the electricity generated by such company is sold to the Administrator under section 839d of this title, and if—

**839f(h)(1)(A)**. the organization of such company is consistent with the policies of section 79a(b) and (c) of title 15, as determined by the Securities and Exchange Commission, with the concurrence of the Administrator, at the time of such organization; and
[Northwest Power Act, §9(h)(1)(A), 94 Stat. 2732.]

**839f(h)(1)(B)**. participation in any facilities of such "company" has been offered to public bodies and cooperatives in the region pursuant to section 839d(m) of this title.
[Northwest Power Act, §9(h)(1)(B), 94 Stat. 2733.]

**839f(h)(2)**. The Administrator shall include in any contract for the acquisition of a major resource from such "company" provisions limiting the amount of equity investment, if any, in such "company" to that which the Administrator determines will be consistent with achieving the lowest attainable power costs attributable to such major resource.
[Northwest Power Act, §9(h)(2), 94 Stat. 2733.]

**839f(h)(3)**. In the case of any "company" which meets the requirements of paragraph (1), the Administrator, with the concurrence of such Commission, shall approve all significant contracts entered into by, and between, such "company" and any sponsor company or any subsidiary of such sponsor company which are determined to be consistent with the policies of section 79a(b) and (c) of title 15 at the time such contracts are entered into. The Administrator and the Securities and Exchange Commission shall exercise such approval authority within sixty days after receipt of such contracts. Such contracts shall not be effective without such approval.
[Northwest Power Act, §9(h)(3), 94 Stat. 2733.]

**839f(h)(4)**. Paragraph (1) of this subsection shall continue to apply to any such "company" unless the Administrator or the Securities and Exchange Commission, or both, through periodic review, (A) determine at any time that the "company" no longer operates in a manner consistent with the policies of section 79a(b) and (c) of title 15 and in accordance with this subsection, and (B) notify the "company" in writing of such preliminary determination. This subsection shall cease to apply to such "company" thirty days after receipt of notification of a final determination thereof. A final determination shall be made only after public notice of the preliminary determination and after a hearing completed not later than sixty days from the date of publication of such notice. Such final determination shall be made within thirty days after the date of completion of such hearing.
[Northwest Power Act, §9(h)(4), 94 Stat. 2733.]

**839f(i). Electric power acquisition or disposition**

Acquisition and disposition of electric power

**839f(i)(1)**. At the request and expense of any customer or group of customers of the Administrator within the Pacific Northwest, the Administrator shall, to the extent practicable—

**839f(i)(1)(A)**. acquire any electric power required by (i) any customer or group of customers to enable them to replace resources determined to serve firm load under section 839c(b) of this title, or (ii) direct service industrial customers to replace electric power that is or may be curtailed or interrupted by the Administrator (other than power the Administrator is obligated to replace), with the cost of such replacement power to be distributed among the direct service industrial customers requesting such power; and
[Northwest Power Act, §9(i)(1)(A), 94 Stat. 2733.]

**839f(i)(1)(B)**. dispose of, or assist in the disposal of, any electric power that a customer or group of customers proposes to sell within or without the region at rates and upon terms specified by such customer or group of customers, if such disposition is not in conflict with the Administrator's other marketing obligations and the policies of this chapter and other applicable laws.
[Northwest Power Act, §9(i)(1)(B), 94 Stat. 2733.]

**839f(i)(2)**. In implementing the provisions of subparagraphs (A) and (B) of paragraph (1), the Administrator may prescribe policies and conditions for the independent acquisition or disposition of electric power by any direct service industrial customer or group of such customers for the purpose of assuring each direct service industrial customer an opportunity to participate in such acquisition or disposition.
[Northwest Power Act, §9(i)(2), 94 Stat. 2733.]

**839f(i)(3)**. The Administrator shall furnish services including transmission, storage, and load factoring unless he determines such services cannot be furnished without substantial interference with his power marketing program, applicable operating limitations or existing contractual obligations. The Administrator shall, to the extent practicable, give priority in making such services available for the marketing, within and without the Pacific Northwest, of capability from projects under construction on December 5, 1980, if such capability has been offered for sale at cost, including a reasonable rate of return, to the Administrator pursuant to this chapter and such offer is not accepted within one year.
[Northwest Power Act, §9(i)(3), 94 Stat. 2734.]

**839f(j). Retail rate designs which encourage conservation and efficient use of electric energy, installation of consumer-owned renewable resources, and rate research and development**

Report

**839f(j)(1)**. The Council, as soon as practicable after December 5, 1980, shall prepare, in consultation with the Administrator, the customers, appropriate State regulatory bodies, and the public, a report and shall make recommendations with respect to the various retail rate designs which will

encourage conservation and efficient use of electric energy and the installation of consumer-owned renewable resources on a cost-effective basis, as well as areas for research and development for possible application to retail utility rates within the region. Studies undertaken pursuant to this subsection shall not affect the responsibilities of any customer or the Administrator which may exist under the Public Utility Regulatory Policies Act of 1978.
[Northwest Power Act, §9(j)(1), 94 Stat. 2734.]

**839f(j)(2)**. Upon request, and solely on behalf of customers so requesting, the Administrator is authorized to (A) provide assistance in analyzing and developing retail rate structures that will encourage cost-effective conservation and the installation of cost-effective consumer-owned renewable resources; (B) provide estimates of the probable power savings and the probable amount of billing credits under section 839d(h) of this title that might be realized by such customers as a result of adopting and implementing such retail rate structures; and (C) solicit additional information and analytical assistance from appropriate State regulatory bodies and the Administrator's other customers.
[Northwest Power Act, §9(j)(2), 94 Stat. 2734.]

**839f(k). Executive position for conservation and renewable resources**

Executive for conservation

There is hereby established within the administration an executive position for conservation and renewable resources. Such executive shall be appointed by the Administrator and shall be assigned responsibility for conservation and direct-application renewable resource programs (including the administration of financial assistance for such programs). Such position is hereby established in the senior executive service in addition to the number of such positions heretofore established in accordance with other provisions of law applicable to such positions.
[Northwest Power Act, §9(k), 94 Stat. 2734.]

**839g. Savings provisions**

**839g(a). Rights of States and political subdivisions of States**

Nothing in this chapter shall be construed to affect or modify any right of any State or political subdivision thereof or electric utility to—

**839g(a)(1)**. determine retail electric rates, except as provided by section 839c(c)(3) of this title;
[Northwest Power Act, §10(a)(1), 94 Stat. 2734.]

**839g(a)(2)**. develop and implement plans and programs for the conservation, development, and use of resources; or
[Northwest Power Act, §10(a)(2), 94 Stat. 2734.]

**839g(a)(3)**. make energy facility citing decisions, including, but not limited to, determining the need for a particular facility, evaluating alternative sites,

and considering alternative methods of meeting the determined need.

[Northwest Power Act, §10(a)(3), 94 Stat. 2734.]

**839g(b). Rights and obligations under existing contracts**

Nothing in this chapter shall alter, diminish, or abridge the rights and obligations of the Administrator or any customer under any contract existing as of December 5, 1980.

[Northwest Power Act, §10(b), 94 Stat. 2735.]

**839g(c). Statutory preferences and priorities of public bodies and cooperatives in sale of federally generated power**

Nothing in this chapter shall alter, diminish, abridge, or otherwise affect the provisions of other Federal laws by which public bodies and cooperatives are entitled to preference and priority in the sale of federally generated electric power.

[Northwest Power Act, §10(c), 94 Stat. 2735.]

**839g(d). Contractual rights under provisions later found to be unconstitutional**

If any provision of this chapter is found to be unconstitutional, then any contract entered into by the Administrator, prior to such finding and in accordance with such provisions, to sell power, acquire or credit resources, or to reimburse investigation and preconstruction expenses pursuant to section 839c of this title, and section 839d(a), (f) or (h) of this title shall not be affected by such finding.

[Northwest Power Act, §10(d), 94 Stat. 2735.]

**839g(e). Treaty and other rights of Indian tribes**

Nothing in this chapter shall be construed to affect or modify any treaty or other right of an Indian tribe.

[Northwest Power Act, §10(e), 94 Stat. 2735.]

**839g(f). Reservation of electric power for Montana; Hungry Horse and Libby Dams and Reservoirs**

The reservation under law of electric power primarily for use in the State of Montana by reason of the construction of Hungry Horse and Libby Dams and Reservoirs within that State is hereby affirmed. Such reservation shall also apply to 50 per centum of any electric power produced at Libby Reregulating Dam if built. Electric power so reserved shall be sold at the rate or rates set pursuant to section 839e of this title.

[Northwest Power Act, §10(f), 94 Stat. 2735.]

**839g(g). Rights of States to prohibit recovery of resource construction costs through retail rates**

Nothing in this chapter shall be construed to affect or modify the right of any State to prohibit utilities regulated by the appropriate State regulatory body from recovering, through their retail rates, costs during any period of resource construction.

[Northwest Power Act, §10(g), 94 Stat. 2735.]

**839g(h). Water appropriations**

Nothing in this chapter shall be construed as authorizing the appropriation of water by any Federal, State, or local agency, Indian tribe, or any other entity or individual. Nor shall any provision of this chapter of any plan or program adopted pursuant to the chapter (1) affect the rights or jurisdictions of the United States, the States, Indian tribes, or other entities over waters of any river or stream or over any groundwater resource, (2) alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by the States, or (3) otherwise be construed to alter or establish the respective rights of States, the United States, Indian tribes, or any person with respect to any water or water-related right.

[Northwest Power Act, §10(h), 94 Stat. 2735.]

**839g(i). Existing Federal licenses, permits, and certificates**

Nothing in this chapter shall be construed to affect the validity of any existing license, permit, or certificate issued by any Federal agency pursuant to any other Federal law.

[Northwest Power Act, §10(i), 94 Stat. 2735.]

**839h. Separability of provisions**

If any provision of section 839b(a) through (c) of this title or any other provision of this chapter or the application thereof to any person, State, Indian tribe, entity, or circumstance is held invalid, neither the remainder of section 839b of this title or any other provisions of this chapter, nor the application of such provisions to other persons, States, Indian tribes, entities, or circumstances, shall be affected thereby.

[Northwest Power Act, §12, 94 Stat. 2735.]

Case: 26-2569, 11/06/2026, DktEntry: 45.1, (155 of 170)

96TH CONGRESS } HOUSE OF REPRESENTATIVES { REPT. 96-976
2d Session } { Part I

# PACIFIC NORTHWEST ELECTRIC POWER PLANNING AND CONSERVATION ACT

MAY 15, 1980.—Ordered to be printed

Mr. STAGGERS, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

together with

## MINORITY AND ADDITIONAL VIEWS

[To accompany S. 885 which on September 5, 1979, was jointly referred to the Committee on Interstate and Foreign Commerce and the Committee on Interior and Insular Affairs.]

[Including Cost Estimate of the Congressional Budget Office]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (S. 885) to assist the electrical consumers of the Pacific Northwest through use of the Federal Columbia River Power System to achieve cost-effective energy conservation, to encourage the development of renewable energy resources, to establish a representative regional power planning process, to assure the region of an efficient and adequate power supply, and for other purposes, having considered the same, report favorably thereon with an amendment and recommends that the bill as amended do pass.

CONTENTS

| | Page |
|---|---|
| The amendment | 2 |
| Background and need | 23 |
| Purpose of the legislation | 27 |
| Summary of the legislation | 27 |
| Legislative background | 30 |
| Committee action | 33 |

| | Page |
|---|---|
| General explanation | 33 |
| a. Protection of the preference clause | 33 |
| b. BPA financing and Federal "guarantees" | 35 |
| c. Removal of BPA restrictions on acquisitions or "purchase" of power to meet needs | 36 |
| d. Capability versus output—"Dry Hole" | 38 |
| e. Public Utility Holding Company Act of 1935 | 40 |
| f. Tax exempt financing by public bodies | 42 |
| g. The bill's impact on other regions | 43 |
| h. Fish and wildlife | 44 |
| Section-by-section analysis | 49 |
| Inflationary impact statement | 74 |
| Congressional Budget Office estimate | 74 |
| Cost of legislation | 76 |
| Committee on Government Operations | 76 |
| Oversight findings | 77 |
| Changes in existing law made by the bill, as reported | 77 |
| Minority and additional views | 80 |

## THE AMENDMENT

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

### SHORT TITLE AND TABLE OF CONTENTS

SECTION 1. This Act, together with the following table of contents, may be cited as the "Pacific Northwest Electric Power Planning and Conservation Act."

### TABLE OF CONTENTS

Sec. 1. Short title and table of contents.
Sec. 2. Purposes.
Sec. 3. Definitions.
Sec. 4. Regional planning and participation.
Sec. 5. Sale of power.
Sec. 6. Conservation and resource acquisition.
Sec. 7. Rates.
Sec. 8. Amendments to existing law.
Sec. 9. Administrative provisions.
Sec. 10. Savings provisions.

### PURPOSES

SEC. 2. The purposes of this Act are—

(1) to encourage, through the unique opportunity provided by the Federal Columbia River Power System, conservation and efficiency in the use of electric power and the development of renewable resources within the Pacific Northwest and to assure the Pacific Northwest an adequate, efficient, and reliable power supply consistent with applicable environmental and other provisions of law;

(2) to provide for the participation and consultation of the Pacific Northwest States, local governments, consumers, customers, users of the Columbia River System (including Federal and State fish and wildlife agencies and appropriate Indian tribes), and the public at large within the region in the development of regional plans and programs related to energy conservation, renewable resources, other resources, and the protection, mitigation, and enhancement of fish and wildlife resources and in the orderly planning of the Federal Columbia River Power System;

(3) to provide that the customers of the Bonneville Power Administration and their consumers continue to pay all costs necessary to produce, transmit, and conserve resources to meet the region's electric power requirements, including the amortization of the Federal investment in the Federal Columbia River Power System;

(4) to insure, subject to the provisions of this Act—

(A) that the authorities and responsibilities of State and local governments, electric utility systems, and other non-Federal entities for the regu-

porting this legislation. The requirement that actions be consistent with the plan is vital to the plan's effectiveness. However, the Committee does not intend that the procedures available to check on such consistency should be used by the Council or any interested person in such a way as to frustrate the overall purpose of the plan or the BPA in meeting its obligations. To avoid such a possibility, the Committee expects the hearing officer to carry out his duties expeditiously and fairly. Although an adequate record is needed, delay is not.

Any final determination by the Administrator is judicially reviewable pursuant to section 9(e).

Section 4(k) reaffirms the bill's intent to encourage broad participation in the planning process. By soliciting opinions from its customers, the Administrator and the Council will have access to additional valuable information. This section also affirms the bill's intent not to abridge authorities of State and localities, electric utilities and other non-Federal entities. Similarly, section 4(l) provides a machanism to open the planning process to regional governmental bodies' ideas and initiatives, including Indian tribes.

Section 4(m) requires that by October 1, 1986, the Council conduct and complete an analysis of conservation measures implemented and renewable resources acquired under the Act since enactment for the purpose of making certain determinations set forth in this section. Once the BPA receives the Council's analysis (which shall be available to the public), the Administrator may determine that section 3(4)(D) shall no longer apply any particular conservation measure or resource if he finds any result or effect described in the referenced section. Like other BPA determinations, this one is also subject to judicial review.

*Section 5. Sale of power*

Section 5(a) makes clear that all power sales, including exchange sales, under this bill are subject at all times to the preference provisions of the Bonneville Project Act, as discussed earlier in this report. These provisions retain and assure preference and priority in BPA power sales to public bodies and cooperatives. This provision works together with a number of other provisions contained in this bill (section 5(b)), which provides that sales to preference customers cannot be restricted to less than the full amount of power from Federal base system resources; section 5(b)(2) which states that the five-year pullback provisions of the Project Act will apply to all investor owned utility contracts; section 7(c)(1)(A) tying the rate for preference customers to the costs of Federal base system resources; and the rate ceiling in section 7(b).

Section 5(b)(1) requires the Administrator to offer to sell to each preference agency and to each investor-owned utility the firm power it needs to meet its firm power load within the region to the extent that it cannot meet its load with its own resources. Those resources must be the resources used in the year prior to enactment of this bill and such other resources that will be used to serve its firm load in the region.

Section 5(b)(2) is a reaffirmation of the five-year pullback provision of the Bonneville Project Act.

Section 5(b)(3) authorizes the Administrator to sell electric power to Federal agencies in the region. Although Federal agencies are

not preference customers, these Federal agency customers have depended upon the Administrator for power supply. It is intended that BPA will continue to serve them.

By requiring that preference customers, IOU's and Federal agency customers comply with the Administrator's standards for service, Section 5(b)(4) ensures that the Administrator will not be required to serve any technologically-unprepared customer that cannot meet the necessary technical service criteria. BPA may periodically review and revise these standards.

Pursuant to section 5(b)(5), the Administrator is to include in the contracts for the sale of power to utilities provisions permitting restriction of his obligations to meet such customers' full requirements during any period of insufficiency. In the case of public bodies, cooperatives and Federal agencies, the contract must specify a reasonable period between the date the notice is issued and the date it is to take effect. With the authority to acquire power, such insufficiency would be for that period of time required for BPA can acquire additional power resources. The phase "on a planning basis" is intended to clarify that BPA will make determination of power entitlements or allocations on reasonable future estimate, under this section. This does not reach power deliveries during operating curtailments which is a matter for State and local governments.

By specifying the amount of power to which preference customers and Federal agencies are entitled, Section 5(b)(6) ensures compliance with the preference clause by guaranteeing that preference customers as a group and Federal agencies may not be contractually restricted until their loads exceed the firm capability of the Federal base system resources. It also permits individual preference customers better to plan to meet their future power needs by enabling them to determine the minimum amount of power they will receive in the event of an insufficiency.

Section 5(c) permits power exchange and power sales whereby rate relief will be provided residential customers of investor-owned utilities. Although all utilities are permitted to enter into such sales, its benefits are likely to be limited to utilities that are not entitled to service as a preference customer. The sale is permitted where a utility offers for sale to the Administrator an amount of electric power equal to that utility's residential load. When such an offer is made the Administrator shall acquire, by purchase, such power at that utility's average system cost and shall offer to sell the same amount of power back to the utility at the rate charged preferenced customers for their general requirements for resale to that utility's residential users within the region only. There is an exception for utilities where service lies both within and without the region as defined in section 3. The requirement is not likely to result in parity in the retail rates being paid by consumers of preference customers and consumers of investor-owned utilities, but it should equalize the wholesale costs of the electric power with a resulting benefit the investor-owned utilities' customers.

Average system cost is established pursuant to section 5(C)(7) and the rates for resale are established under section 7(b)(1). Section 5(c)(2) ramps in the exchange from 50 percent of the residential load in the year beginning July 1, 1980 to 100 percent in the year beginning July 1, 1985.

The cost of the exchange during the first five years is charged to the rates applicable to DSI's under section 7(c)(1)(A). Testimony given to the Committee indicated that it was necessary to phase in the exchange in order to minimize the dramatic rate increases to the Administrator's direct service industries.

Section 5(c)(3) requires that the benefits of this exchange be passed directly through to residential customers.

Section 5(c)(4) permits a utility to terminate the exchange if the rate ceiling of section 7(b)(3) is applied and the resulting surcharge makes the exchange uneconomic to the utility. The terms and conditions of any termination must be mutually agreed to in advance of any termination.

Section 5(c)(5) provides that although the Administrator must offer to sell an amount of power equivalent to the residential load of the utility, BPA may obtain the power from other sources if it is available at less cost than the cost of purchasing the power offered by the utility. Such acquisitions are subject to the provisions of sections 4 and 6.

Pursuant to section 5(c)(6), a utility exchanging power under this section will receive, in the event of insufficiency, an entitlement to the amount of power acquired by the Administrator from, or on behalf of, such utility and the exchange of power would continue during period of declared insufficiency.

Section 5(c)(7) provides for establishing the "average system cost," as that term is used in section 5(c)(1) by BPA in consultation with the Council, BPA's customers, and the State ratemaking agencies. This method is subject to review and approval by the Federal Energy Regulatory Commission. The average system cost may not include (a) the cost of additional resources needed to serve new large single loads, (b) the cost of additional resources needed to serve load growth outside the region, (c) the costs of any generating facility which is terminated prior to commercial operation. The term "new large single load" is defined in this section to mean any load that will result in an increase in power needs of 10 or more average megawatts in any consecutive 12-month period.

Section 5(d) authorizes the Administrator to sell power to existing direct service industrial customers that have a BPA contract at the date this bill is enacted. Initial long-term 20-year contracts are to be offered by BPA to these customers in accordance with section 5(g). In return for these new contracts, the DSI's would have to agree to terminate their current contracts. Subsequent contracts for these DSI's are authorized but not mandated. The initial contracts shall provide each direct service customer an amount of power equivalent to that which such customer is entitled under its existing contract dated January or April 1975 for the sale of "industrial firm power." These power sales to these existing direct service customers will also provide a portion of the Administrator's reserves for firm power loads within the region. The bill is silent on peaking reserves, but it is presumed that they would be similar to those under present contracts.

The amount of power the DSI's are entitled to receive under these initial contracts is expressed in section 5(d)(1) in terms of an entitlement under their present contracts, rather than in terms of the amount of power being used at a particular time.

The contracts with the DSI's now provide reserves for the region. These are basically capacity reserves and energy reserves. Under certain conditions, BPA can interrupt power sold to DSI's. Capacity reserves permit brief interruptions of the entire DSI load and repeated two-hour interruptions (up to five minutes) of half the load. In this manner, the authority to interrupt provides peaking reserves and reserves for forced outages and system reliability. The energy reserves are of two types, an operating reserve and a planning reserve. An operating reserve of roughtly 25 percent of the DSI load which may be interrupted including instances of law or critical stream flow conditions or an account of the unanticipated growth of regional firm loads; in order to protect the Administrator's firm loads within the region at any time and for any period, as determined by BPA. A planning reserve is an additional 25 percent of these DSI loads which may, upon advance notice, be withdrawn to protect firm loads from projected peak and energy deficits caused by the Administrator's planned resources being delayed or available at a lesser capability than planned.

The BPA provides credits to the DSI's for power interruptions under current contracts. The GAO, in its September 1979 report, discussed the credits then established for such interruptions as follows:

The BPA provides credits to the DSI's for power interruptions under current contracts. The GAO, in its September 1979 report, discussed the credits then established for such interruptions as follows:

> When BPA exercises the right to interrupt the DSI loads for more than one hour, it grants the DSI's discounts known as availability credits. During a 3½ year period (January 1975 through June 1978) BPA withheld almost 9 billion kilowatt hours of energy, which is equal to about 9 percent of the total planned DSI load for that period. For these interruptions, the DSI's were granted a total of almost $38 million in credits—about 14 percent of BPA's gross sales to them.
>
> When they are interrupted, DSI's are granted availability credits in a series of steps. The first step grants a credit of almost $7 million to be shared by all the DSI's when the power interruption lasts for more than one hour but does not exceed 5 percent of the total energy requested during the year. The next step grants an additional $10 million credit when the energy restricted exceeds 5 percent but is not 10 percent.

The GAO also said in the report that during January 1979, such credits tended to cause BPA power system schedulers to delay interruption of DSI loads because of the cost to BPA. However, they ultimately did so.

The BPA has since revised these credits and is expected to examine them again in connection with the new contracts.

The Committee amendment calls for new DSI contracts. The amendment does not require that they be identical to the current contracts concerning reserves, credits, and other matters, but provides BPA with considerable flexibility to prepare and negotiate contracts and adopt rates that insure that conditions relating to re-

serves are not so stringent as to render the reserves provided by the DSI's largely ineffective. As noted, the GAO expressed concern that previous rates adopted by BPA for DSI sales inhibited the use of reserves furnished by the DSI contracts.

Additionally, since the linchpin of this legislation is conservation and regional planning, the Committee expects that the DSI's will do their part to conserve energy and cooperate with BPA and the Council in the implementation of any plan adopted by the Council.

The Committee is aware that one of the direct service industrial customers entitled to an initial contract under this section, Alumax Aluminum Co., has not begun construction of its proposed aluminum reduction plant at Umatilla, Oregon, because of litigation and other factors. Since the Pacific Northwest faces potential major power shortages in the early to mid-1980's, the BPA should examine whether the initial contract offered Alumax should provide for delayed construction and operation of the plant to allow the region to cure the predicted power shortages. Further, before power is acquired by Bonneville to serve this load, there should be contractual assurances regarding the dates of completion and operation of the reduction plant.

Section 5(d)(2) expressly prohibits sale to new DSI's.

Section 5(d)(3) prohibits BPA from selling to existing DSI's amounts of power in addition to their entitlement except in accordance with strict procedures. These procedures require the BPA to determine that such sales are consistent with the plan. Also, the Council must approve such sales. This limitation and the amount of power available to DSI's should serve as significant incentives for the DSI's to conserve that power for the purpose of additional DSI production.

Under existing contracts, the DSI's qualify to receive additional power for the purpose of making improvements not related to increasing a DSI facility's level of production. The Committee understands that this has been intepreted by BPA to include such measures as pollution control devices which, of course do not, relate to a facility's production. Although this power is probably included as part of the current entitlement of the DSI's, the Committee expects the BPA to be assured that such power does not fall into the category of new power sales to increase production under such 5(d)(3).

Section 5(e)(1) insures that customers' contractural entitlement to firm power will not be restricted below the amount of power which they are providing the Administrator pursuant to section 6 and further requires that any excess of such entitlement in any given year shall be made available to other customers of the same class. This section also defines which customers are of the same class. Section 5(e)(2) ensures that entitlements of a customer (under subsection (e)(1) are additive.

Section 5(f) provides that power that is not needed to meet BPA's obligations under subsections (b), (c), and (d) is to be sold in accordance with this Act and existing law.

Section 5(g)(1) specifies that the Administrator must simultaneously offer appropriate customers the initial long-term 20-year contracts and initiate negotiations with such customers within nine months after enactment. The customer has one year to complete negotiations and accept the offer or lose the benefits of these provisions.

Section 5(g)(3)–(5) concern the acceptance and effective date of power sales contracts under the Act and in particular, ensure that the benefits of the 5(c) exchange begin on a specified date even if the DSI contracts are not executed until later.

Paragraph 5(g)(6) places a floor under the power entitlements of individual public body, cooperative and Federal agency customers in the event of an insufficiency during the initial contract. A minimum contractual entitlement enhances the customers' ability to plan.

Section 5(g)(7) is intended to ensure that a challenge (on the basis that the Administrator lacks legal authority on account of insufficient power resources) to the initial contracts required to be offered under this Act will not be sustained. In obtaining new resources, however, BPA must do so in accordance with this bill. This provision does not override any other provision of this bill. To the extent that additional power is required to meet these initial contract commitments, BPA can use its existing short-term authority as well as its authority under this Act.

*Section 6. Conservation and resource acquisition*

Section 6(a) requires the Administrator to acquire conservation, conservation measures and renewable resources installed by residential and small commercial consumers in meeting his obligations to satisfy the load of his customers. These measures and resources must be consistent with the priority tests of section 4(e)(1) and the considerations of section 4(e)(2). The Administrator need not await a plan to utilize this authority. He must, however, apply these section 4(e) provisions to the proposed acquisition. A nonexclusive list of authorized conservation measures is provided in this subsection.

Section 6(a)(3) contains the BPA's authority to acquire resources other than conservation and end-use renewables to meet contract obligations after taking into account conservation. This expanded authority is distinguishable from the Administrator's existing authority in accordance with the Federal Columbia River Transmission Act which permits the Administrator to purchase power on a short-term basis to meet temporary deficiencies in electric power which he is obligated by contract to supply.

Except as specifically provided elsewhere, section 6(b) provides that acquisition of resources pursuant to section 6 are to be consistent with the plan developed by the Council under section 4. If the resources are not consistent with the plan, or if there is no plan in effect, then the Administrator may acquire these resources so long as the Administrator determines that they are consistent with the priorities and considerations of section 4(e)(1) and 4(e)(2). This determination, where the resource is not consistent with the plan, is subject to the procedural requirements of section 4(i). If the resource is a major resource, the acquisition must be in accordance with section 6(c).

In acquiring a resource under this section, the Administrator will not own or construct any generating resources. The Administrator's acquisition will be by contract to pay for the capability or, in some cases, a specific amount of power from a utility's system or power associated with a generating resource or conservation resource or group of resources.

96TH CONGRESS } HOUSE OF REPRESENTATIVES { REPT. 96-
2d Session } { 976, Part II

# ASSISTING THE ELECTRICAL CONSUMERS OF THE PACIFIC NORTHWEST THROUGH USE OF THE FEDERAL COLUMBIA RIVER POWER SYSTEM TO ACHIEVE COST-EFFECTIVE ENERGY CONSERVATION, TO ENCOURAGE THE DEVELOPMENT OF RENEWABLE ENERGY RESOURCES, TO ESTABLISH A REPRESENTATIVE REGIONAL POWER PLANNING PROCESS, TO ASSURE THE REGION OF AN EFFICIENT AND ADEQUATE POWER SUPPLY, AND FOR OTHER PURPOSES

SEPTEMBER 16, 1980.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

together with

## SUPPLEMENTAL, ADDITIONAL, SEPARATE, and DISSENTING VIEWS

[To accompany S. 885]

[Including the cost estimate of the Congressional Budget Office]

The Committee on Interior and Insular Affairs, to whom was referred the bill (S. 885) to assist the electrical consumers of the Pacific Northwest through use of the Federal Columbia River Power System to achieve cost-effective energy conservation, to encourage the development of renewable energy resources, to establish a representative regional power planning process, to assure the region of an efficient and adequate power supply, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Page 1, line 3, strike all after the enacting clause and insert the following:

67-549 O - 80

(g) Nothing in this Act shall obligate the Federal Government for the performance of any new contracts executed by the Administrator or Council directly or indirectly unless specifically authorized by Congress.

(h) The reservation under law of electric power for use in the State of Montana by reason of the construction of Hungry Horse and Libby Dams and Reservoirs within that State, plus 50 per centum of any electric power produced at Libby Reregulating Dam if built, is hereby affirmed. Electric power so reserved shall be sold at the rate or rates set pursuant to section 7.

EFFECTIVE DATE

SEC. 11. This Act shall be effective on the date of enactment, or October 1, 1980, whichever is later. The term "date of enactment of this Act" as used in this Act shall be either such date or October 1, 1980.

## PURPOSE

One of the primary purposes of S. 885 [1] is to allow the Pacific Northwest to resolve the competing claims to the Federal energy resources of the region and enable it to focus its attention on the task of developing an economical, adequate, efficient and reliable power system for the future. Additional purposes include: the implementation and development of conservation and renewable energy programs; the establishment of a regional public planning process to enable all regional entities and the public at large to participate in the region's electrical energy decision making process; the protection, mitigation and enhancement of the fish and wildlife resources of the Columbia River and its tributaries; and the preservation of the authorities and responsibilities of non-Federal entities in the electrical energy field. It is not, however, a purpose of this legislation to interfere in any way with, or modify, the statutory rights of preference customers either within or without the region; nor is this legislation intended to be a precedent for any other region of the country.

## BACKGROUND AND NEED

Formed in 1937, pursuant to the provisions of the Bonneville Project Act (16 U.S.C. 832; 50 Stat. 731), the Bonneville Power Administration (BPA) was given the authority to build and operate transmission facilities and dispose of electric power to be generated by the Federally constructed Bonneville Dam located on the Columbia River. BPA's authority has been statutorily expanded over the years so that today it transmits and markets the power generated at 30 Federal dams constructed by the Bureau of Reclamation (now the Water and Power Resources Service) and the Army Corps of Engineers located in the Pacific Northwest. At present, BPA markets over 50 percent of all the electricity consumed in its marketing area. This power is transmitted through a vast system of power lines built by BPA (80 percent of the region's high voltage transmission lines are BPA's), and the dams and transmission system are collectively referred to as the Federal Columbia River Power System (FCRPS).

[1] S. 885 was approved by the Senate on August 3, 1979. Comparable, though not identical, measures referred to the Committee on Interior and Insular Affairs included: H.R. 3508, by Mr. Ullman (for himself, Mr. Foley, Mr. McCormack, Mr. Duncan of Oregon, Mr. Hansen, Mr. Pritchard, Mr. Symms, Mr. AuCoin, Mr. Bonker, Mr. Dicks, Mr. Lowry, and Mr. Swift); H.R. 4137 and H.R. 4159, by Mr. Weaver; H.R. 5146, by Mr. Ullman; and H.R. 6677, by Mr. Swift.

BPA has no express statutory authority to own, construct or purchase the output or capability of electric generating plants except to meet short term deficiencies. Its sole statutory duty is to market and transmit the power generated at Federal hydroelectric projects. Under a "regional preference and reciprocal act" (16 U.S.C. 837; 78 Stat. 756), BPA's marketing area is defined as including the States of Washington, Oregon, Idaho, and that part of Montana lying west of the Continental Divide. That Act also prohibits BPA from selling Federal power to entities outside the region if there is a demand for that power within the region, and affords similar regional priority with respect to other Federal projects outside the Pacific Northwest for sales to the Pacific Northwest.

The original Bonneville Project Act, like other Federal power marketing laws, contains a "preference clause". This clause requires that BPA, although statutorily authorized to sell power to all types of customers, must give first right and priority to that power to "public bodies and cooperatives". "Public bodies" are defined to include "States, public power districts, counties, and municipalities, including agencies or subdivisions of any thereof". If a shortage of power is contemplated, BPA's other customers must do without, in order that "public bodies and cooperatives" continue to receive the Federal power to which they are entitled.

The class of customers generally considered within the definition of "public bodies and cooperatives" is quite large and diverse. It is presently composed of 36 municipal utilities, 54 rural electric cooperatives, and 26 entities known as PUDs (Public Utility Districts in Washington and People's Utility Districts in Oregon)—a total of 116 "public bodies and cooperatives". These customers are collectively referred to as "preference customers" of BPA. BPA's present contracts with these customers expire during the period from 1983 to 1994.

For a variety of reasons, preference customers proliferated in Washington while meeting with only limited organizational success in Oregon, Idaho, and western Montana. As a consequence, 57 percent of the residential consumers in Washington today are served by preference customers of BPA while only 21 percent, 18 percent, and 21 percent of the residential consumers in Oregon, Idaho and western Montana, respectively, are served by preference customers of BPA. Those consumers not served by preference customers are served by the seven investor-owned utilities of the region. These utilities are referred to as "IOU's".

During BPA's early years, the type of utility ownership serving an area was of little practical consequence. Because of the massive, preinflation era development of Federal dams in the Pacific Northwest, there was an abundance of low cost Federal hydropower, and BPA was able to meet the needs of its preference customers with substantial amounts of Federal hydro remaining. This surplus power was sold to the IOUs in the region and directly to aluminum and other electro-process industries which located in the region during the 1940's and 1950's because of the abundance of power. These industrial customers are directly served by BPA and, hence, are known as direct-service industrial customers or "DSIs". BPA's contracts with DSIs contain provisions whereby BPA can "interrupt" or curtail deliveries of power to the fifteen operating DSIs (six of which are aluminum companies) under a variety of operat-

ing and planning contingencies and therefore provide the region with valuable and necessary energy and capacity reserves. Together, the DSIs account for about one-third of BPA's firm and nonfirm energy sales. BPA's present contracts with the DSIs expire during the period from 1981–1991.

By the mid-1960's, it became apparent that Federal hydropower abundance would soon come to an end. The Pacific Northwest had run out of economic and environmentally acceptable new sites for large scale, multi-purpose Federal hydroelectric projects. This, combined with projected increases in electrical energy consumption, indicated to BPA and others that additional non-Federal sources of power would soon be required to meet the needs of the region.

Faced with this perceived need, BPA, in cooperation with over 100 utilities in the region, embarked upon Phase I of the Hydro-Thermal Power Program. Under this program, BPA would continue to build the region-wide high voltage transmission system while the utilities in the region would be responsible for building and operating thermal (coal and nuclear) plants sized, located and scheduled to meet regional loads. To provide for the expansion of the region's power supplies and to reduce financing costs for preference customers building plants, BPA developed the concept of "net billing".

Under net billing, a preference customer of BPA agrees to pay a certain percentage of a thermal plant's annual costs in return for an equivalent percentage of that plant's output. The preference customer then assigns its percentage of project output to BPA and BPA credits the preference customer's monthly bill for other energy and services received from BPA with an amount equal to the preference customer's share of the monthly costs of the thermal plant.

In other words, the preference customer receives a monthly power bill from BPA "net" of its share of thermal plant costs. Once BPA receives the preference customer's share of the output of the thermal plants, it combines those resource costs with that of the Federal hydroelectricity, in keeping with normal utility ratemaking practices, and sells the aggregate supply to all its customers, including the DSIs, at "melded" rates sufficient to recover all of the costs of producing and transmitting both the thermal and Federal hydro.

Net billing allowed BPA to use its limited authority to acquire non-Federal power without obtaining direct statutory authority to purchase power on a long-term basis. Net billing was specifically approved in the reports accompanying the Public Works Appropriations Acts of 1970 and 1971, as Congress was kept apprised of progress of the Hydro-Thermal Program, although some have criticized the appropriateness of this kind of congressional authority.

Net billing was also supposed to reduce the costs of thermal plants built by preference customers since, under the net billing agreements, BPA was required to credit each preference customers' power bill with that customer's share of the thermal plant's cost, regardless of whether BPA actually received power from the plant. This shifted the risk of a failed plant, or "dry hole" as it is called, from the owner systems to all of BPA's customers in the region whose rates would be raised to compensate for the costs of the non-

producing plant. This made revenue bonds sold by these preference customers to finance the thermal plants more secure. This, in turn, led to better bond ratings with lower interest rates and lowered overall construction costs.

The IOUs in the region did not participate in net billing, partly because BPA did not sell them any significant power to net bill against. Under Phase I, the IOUs were expected to build their own thermal plants to meet their load growth requirements and to replace the hydropower they had been receiving from BPA but would lose in 1973 when their 20-year power sale contracts with BPA expired. BPA could not renew the IOUs contracts because it estimated that it would need the power to serve preference customers, as mandated by the preference clause, and to serve the DSIs as required by their contracts still in effect. (The IOUs have not received any firm power from BPA since 1973. However, estimates in the late 1960's indicated that thermal power costs would be only slightly higher than the cost of Federal hydro. Thus, the IOUs and their retail consumers were not expected to suffer severe cost impacts as a result of losing access to BPA wholesale power.)

The utilities in the region began to implement Phase I immediately. The IOUs began constructing their thermal plants and the preference customers, through a joint operating agency known as the Washington Public Power Supply System (WPPSS) began constructing the net billed plants. In addition, the utilities and BPA sought enactment of legislation which would allow BPA to operate on a "self-financed" basis, whereby BPA could directly apply its revenues to its costs and would be authorized to sell bonds to the U.S. Treasury to raise funds to construct additions to the regional transmission system. This legislation, which was eventually enacted in 1974 as the Federal Columbia River Transmission System Act (16 U.S.C. 838; 88 Stat. 1376), was intended to free BPA from the uncertainties of the appropriations process (though Congress retained considerable authority to disapprove any element of the BPA program) and to allow BPA to construct transmission additions on a timetable compatible with that of the thermal plants.

Phase I soon ran into trouble. First, the costs of the net billed plants began to rise, which would soon exhaust the net billing capability of the BPA System. Second, in 1973, the Internal Revenue Service issued regulations which effectively prevented further participation by BPA in net billing. Third, thermal plant cost escalation also struck the IOUs. This, in turn, forced the IOUs to raise their retail rates which, in many instances, meant that customers of IOUs would end up with higher retail rates (as much as 300% higher) than customers of preference customers of BPA. Rates of preference customers were also going to go up because of the cost escalations of the net billed plants, but these escalations would be mitigated somewhat for many years since the high cost net billed resources were to be "melded" with a large block of quite low cost Federal hydro.

Faced with the limitations of Phase I, the utilities and BPA embarked upon Phase II of the Hydro-Thermal Power Programs in early 1974. Under Phase II, each class of utility agreed to build its own new generation (no net billing for preference customers) and the DSIs were to help make the plan economically feasible by providing a market for any excess power from Phase II projects. As

before, BPA would provide certain transmission and other such services such as peaking and reserves. However, Phase II was killed before it got off the ground by a 1975 Federal District Court ruling requiring the preparation of an environmental impact statement on BPA's role in the regional power system. The delay associated with the preparation of the EIS and soaring construction costs created substantial power planning uncertainties for the region's utilities and DISs and, as a result, Phase II was scrapped.

The uncertainties caused by the demise of Phase II were compounded on June 24, 1976, when BPA, in furtherance of its belief that Federal power would not be adequate to meet the projected demands of its preference customers, issued Notices of Insufficiency to these customers. These notices had the legal effect of relieving BPA of liability for any failure to satisfy its preference customers load growth needs after July 1, 1983. BPA also informed its DSI customers that it would probably not be able to renew their power sale contracts when they expire in the period from 1981 to 1991 since it will need the energy "freed up" with the expiration of those contracts to meet the growing requirements of its preference customers, which, by virtue of the preference clause, have first right to it.

Additional power planning uncertainties arose on July 28, 1977, when legislation was enacted in the State of Oregon creating the Oregon Domestic and Rural Power Authority (DRPA). This legislation is intended to make the entire State of Oregon a preference customer of BPA for the purpose of securing a pro rata share of Federal hydro sufficient to meet the total demands of Oregon domestic and rural consumers.

The impetus for DRPA can be traced back to BPA's early years. As was mentioned above, preference customers flourished in the State of Washington but not in Oregon, Idaho and western Montana. While all types of utilities (including IOUs in Oregon) were receiving low cost Federal hydro from BPA, this difference was of no consequence. However, since 1973, when BPA stopped selling power to IOUs, they have had to rely on (as it has turned out) increasingly expensive thermal power. Preference customers, on the other hand, still rely primarily upon low cost Federal hydro. Consequently, wholesale power costs to IOUs are usually higher than those faced by preference customers in the region. Since Oregon is primarily served by IOUs and Washington is primarily served by preference customers, consumers in Oregon (and Idaho and western Montana), on the average, pay more for their electricity at retail than those in Washington.

The State of Oregon has not been alone in its efforts to obtain access to the supply of Federal hydro. On November 14, 1977, the City of Portland, Oregon, filed two lawsuits against BPA in Federal District Court in Portland in an attempt to secure Federal hydro from BPA for the city, which is presently served by two investor-owned utilities. In addition, efforts are being made within the State of Oregon and elsewhere in the region to form new "public bodies and cooperatives" eligible to receive Federal hydro from BPA.

BPA, in recognition of the fact that the Federal resources available to it will be insufficient to meet the requirements of its existing preference customers after 1983, let alone the requirements of any new preference customers such as the Oregon Domestic and Rural

Power Authority, began the process of developing a policy for allocating the Federal power it sells and issued a proposed allocation policy in September, 1979. Under this proposal, existing and any new preference customers will be limited to a pro rata share of BPA power after 1991. Unfortunately, these shares will fall far short of meeting their requirements, especially if most of the DSIs become customers of the preference utilities upon the expiration of their present contracts with BPA or if new preference customer systems are formed. Before 1991, no BPA customer will be assured of getting its requirements met by BPA or certain in advance how much power it will be entitled to. Existing preference customers will, for the most part, be limited to supplies in accordance with their existing contracts, although they may be able to secure some indeterminate amount of additional power as the DSI contracts expire. New preference customers will divide up most of the power "freed up" by expiring DSI contracts, but the amount available to each will be impossible to determine in advance and will likely be insufficient to meet their needs.

It is clear that this allocation policy, once it is finalized and reviewed administratively within the Department of Energy, will be vigorously challenged in the Federal courts. The cost disparity between the Federal resources marketed by BPA, even with the tremendous cost escalations of the three net billed thermal plants presently under construction in the region factored in, and alternative sources of energy is too great for any of the potential claimants to the BPA supply—existing preference customers, the DSIs and potential new preference customers—to ignore. These challenges will undoubtedly be taken to the nation's highest court and could literally take years to resolve. The City of Portland lawsuits and potential lawsuits over the status of Oregon's Domestic and Rural Power Authority will only add to the complexity and length of these legal proceedings.

While these proceedings are being resolved, no utility or other claimant will know for certain how much of the Federal power it will eventually be entitled to receive from BPA and, consequently, will not know what energy resources it should plan to develop for its own use. Unfortunately, current forecasts already show that the Pacific Northwest could experience serious power shortages during any critical water year in the 1980's. The delays associated with the above-mentioned power planning uncertainties will only exacerbate this existing power supply problem.

Available evidence indicates that the frequency and extent of these projected power shortages could be substantially reduced through the implementation of cost-effective conservation programs throughout the Pacific Northwest region. Unfortunately, it appears that the region presently lacks the means with which to undertake the necessary regional conservation effort. Legal and institutional constraints have limited the ability of individual utilities in this area. The ability of BPA to carry out these conservation programs is also limited since its authority to engage in these activities is minor and since it cannot borrow funds to finance their implementation. As a consequence, the Pacific Northwest is unable to "capture" the economic and power supply benefits available through the implementation of effective, region-wide conservation programs.

Many regional observers are of the opinion that the above-mentioned power planning and supply problems and the pending administrative/judicial battle over the allocation of the Federal hydroelectric resources in the Pacific Northwest can only be avoided through enactment of Federal legislation which: (1) lets the Congress decide which regional entities should have access to the Federal hydroelectricity marketed by BPA; (2) authorizes BPA to play a central role in the Pacific Northwest's electric energy decision making process; and (3) expands the authority of BPA to permit it to acquire additional resources on a long-term basis to meet the needs of the region. In addition, it is believed that such legislation can provide the institutional framework necessary for the implementation of effective, region-wide conservation programs, allow the residential and small farm consumers of the region's non-preference utilities to share in the economic benefits of the Federal hydroelectric resources without impinging upon the protections provided to existing or new preference customers of BPA by the preference clause of the Bonneville Project Act, establish a workable public planning process, and facilitate the protection, mitigation, and enhancement of the region's fish and wildlife resources. Finally, it is felt that these legislative goals can be accomplished without adversely affecting other regions of the nation.

The power planning and supply uncertainties presently facing the Pacific Northwest, if left unresolved, could eventually lead to severe economic, social, and environmental disruptions throughout the region. Most parties agree that this type of Federal legislation, although providing for the expansion of BPA's authorities, properly recognizes the unique Federal presence in the Pacific Northwest without creating precedents for other regions and offers the only viable solution to the region's electrical energy problems.

## Explanation of S. 885, as Recommended by the Committee on Interior and Insular Affairs

The Committee on Interior and Insular Affairs adopted one amendment to S. 885 striking all after the enacting clause and inserting in lieu thereof the text of a substitute bill. The following explanation is of this Committee substitute and all references to "the bill", "the legislation", or "S. 885" in the explanation are to this Committee substitute.

The substitute recommended by the Committee on Interior and Insular Affairs contains a variety of provisions designed to enable the Pacific Northwest to solve the electric power planning uncertainties presently facing it, including these basic features: (1) The establishment of a comprehensive public planning process; (2) a requirement that the Administrator of BPA offer new long-term power sale contracts to preference customers, Federal agencies, investor-owned utilities, and existing direct-service industrial customers of BPA; (3) a power exchange for the benefit of the region's residential and small farm consumers; (4) a grant of additional authority to the Administrator of BPA to require him to acquire on a long-term basis the resources necessary to meet his contractual requirements to his customers; (5) revised rate directives; (6) comprehensive energy conservation provisions; and (7) provisions for the