**No. 26-2569**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

AVISTA CORPORATION, *et al.*
*Petitioners,*

*v.*
BONNEVILLE POWER ADMINISTRATION, *et al.*
*Respondents,*

*and*
NORTHWEST REQUIREMENTS UTILITIES, *et al.*,
*Intervenors*

On Petition for Review Under the Northwest Power Act

**RESPONDENT'S SUPPLEMENTAL EXCERPTS OF RECORD**

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
*Assistant General Counsel*

NEAL M. GSCHWEND
*Attorney*

Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208
503-230-3128

SCOTT E. BRADFORD
*United States Attorney*
*District of Oregon*

SEAN E. MARTIN
*Assistant U.S. Attorney*

RICHARD A. GREENE
*Special Asst. U.S. Attorney*
P.O. Box 3621
Portland, OR 97208
503-230-4626

*Attorneys for Respondents*

# RESPONDENT BONNEVILLE POWER ADMINISTRATION'S SUPPLEMENTAL EXCERPTS OF RECORD INDEX



| Document Description | Date Filed/ Published | Page Nos. in AR | Page Nos. in SER |
|---|---|---|---|
| Investor-owned utilities (IOU) Cover Letters to Executed Residential Purchase and Sale Agreements | varies | AR_00409-20 | SER-3 – SER-14 |
| BPA Provider of Choice Policy Record of Decision (excerpts) | March 2024 | AR_003312-24; AR_003594-601 | SER-15 – SER-35 |
| BPA Provider of Choice Policy (excerpts) | March 2024 | AR_003668-72; AR_003711-14 | SER-36 – SER-44 |
| BPA Post-2028 Residential Exchange Program Workshop Presentation (excerpts) | January 23, 2024 | AR_003722-24; AR_003737 | SER-45 – SER-48 |
| IOU Post-2028 Residential Exchange Program Workshop Presentation (excerpts) | June 27, 2023 | AR_003772-73; AR_003802-10 | SER-49 – SER-59 |
| 2012 Residential Exchange Program Settlement Agreement (excerpts) | July 2011 | AR_005149-53; AR_005162; AR_005169-70; AR_005186 | SER-60 – SER-68 |
| 1978 House Subcommittee Legislative Hearings on H.R. 13931 (excerpts) | September 19, 27, December 11, 13, and 14, 1978 | AR_007083-96; AR_007139-273 | SER-69 – SER-217 |

IDAHO POWER®

June 3, 2026

**SENT VIA ELECTRONIC MAIL**

Bonneville Power Administration
Attn: Scott K. Wilson
905 NE 11th Ave.
P.O. Box 3621
Portland, OR 97208
skwilson@bpa.gov

Subject: Residential Purchase and Sale Agreement between Bonneville Power Administration and Idaho Power Company

Dear Mr. Wilson:

Please find enclosed a copy of the Residential Purchase and Sale Agreement (the RPSA) between the Bonneville Power Administration (BPA) and Idaho Power Company (Idaho Power), executed by Idaho Power consistent with the statements below.

On April 24, 2026, Idaho Power and five other investor-owned utilities filed a petition for review (the Petition) under the Northwest Power Act in the United States Court of Appeals for the Ninth Circuit of BPA's final action dated March 6, 2026 issuing a Record of Decision, titled *2026 Residential Purchase and Sale Agreement*, and adopting a template RPSA (Final Action). Review of the Final Action is within the exclusive jurisdiction of the Ninth Circuit as set forth in Section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5) , and Section 14.1 of the RPSA.

In the event the Ninth Circuit, Federal Energy Regulatory Commission (FERC), or any other court of competent jurisdiction vacates, or otherwise finds the Final Action unlawful and remands the Final Action for further action by BPA, BPA must take additional action necessary to respond to that decision, to include amendment of this RPSA consistent with any such decision, as set forth in Section 14.2 of the RPSA.

By executing the RPSA, Idaho Power does not waive, and specifically reserves any and all rights pursuant to the RPSA and applicable law, including (without limitation) the right to challenge the Final Action through litigation of the Petition in the Ninth Circuit and the right to take any

1221 W. Idaho St (83702)
P.O. Box 70
Boise, ID 83707

steps necessary to effectuate appropriate action (including with respect to any order(s) or judgment(s) by any court of competent jurisdiction and/or FERC).

Sincerely,

Julia Hilton
VP and General Counsel

Enclosure
JH:cd

NorthWestern Energy
Delivering a Bright Future

June 2, 2026

Scott K. Wilson
Power Customer Services Manager
Bonneville Power Administration
P. O. Box 3621
Portland, Oregon 97208-3621

*via email to skwilson@bpa.gov*

**RE: Residential Purchase and Sale Agreement Offer**

Please find enclosed a copy of the Residential Purchase and Sale Agreement (the RPSA) between the Bonneville Power Administration (BPA) and NorthWestern Corporation d/b/a NorthWestern Energy (NorthWestern), executed by NorthWestern consistent with the statements below.

On April 24, 2026, NorthWestern and five other investor-owned utilities filed a petition for review (the Petition) under the Northwest Power Act in the United States Court of Appeals for the Ninth Circuit of BPA's final action dated March 6, 2026 issuing a Record of Decision, titled *2026 Residential Purchase and Sale Agreement,* and adopting a template RPSA (Final Action). Review of the Final Action is within the exclusive jurisdiction of the Ninth Circuit as set forth in Section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5), and Section 14.1 of the RPSA.

In the event the Ninth Circuit, Federal Energy Regulatory Commission (FERC), or any other court of competent jurisdiction vacates, or otherwise finds the Final Action unlawful and remands the Final Action for further action by BPA, BPA must take additional action necessary to respond to that decision, to include amendment of this RPSA consistent with any such decision, as set forth in Section 14.2 of the RPSA.

By executing the RPSA, NorthWestern does not waive, and specifically reserves any and all rights pursuant to the RPSA and applicable law, including (without limitation) the right to challenge the Final Action through litigation of the Petition in the Ninth Circuit and the right to take any steps necessary to effectuate appropriate action (including with respect to any order(s) or judgment(s) by any court of competent jurisdiction and/or FERC).

If you have any questions or concerns, please feel free to contact me at (406) 497-2759 or elaine.rich@northwestern.com.

Sincerely,

Elaine A. Rich

Elaine A. Rich
Assistant Controller

Enclosure:
NorthWestern's 2026 RPSA

cc:
Paulina Cornejo, ypcornejo@bpa.gov
Rich Greene, ragreene@bpa.gov
Neal Gschwend, nmgschwend@bpa.gov
Ann Hill, ann.hill@northwestern.com
Jeff Olsen, jeff.olsen@northwestern.com
Kim Thompson, ktthompson@bpa.gov

PACIFICORP

825 NE Multnomah St
Portland, OR 97232

June 3, 2026

Scott K Wilson
Power Customer Service Manager
Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

Re: PacifiCorp Residential Purchase and Sale Agreement – Contract 26PS-55003

Dear Mr. Wilson

Please find enclosed a copy of the Residential Purchase and Sale Agreement (the RPSA) between the Bonneville Power Administration (BPA) and PacifiCorp, executed by PacifiCorp consistent with the statements below.

On April 24, 2026, PacifiCorp and five other investor-owned utilities filed a petition for review (the Petition) under the Northwest Power Act in the United States Court of Appeals for the Ninth Circuit of BPA's final action dated March 6, 2026 issuing a Record of Decision, titled *2026 Residential Purchase and Sale Agreement,* and adopting a template RPSA (Final Action). Review of the Final Action is within the exclusive jurisdiction of the Ninth Circuit as set forth in Section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5), and Section 14.1 of the RPSA.

In the event the Ninth Circuit, Federal Energy Regulatory Commission (FERC), or any other court of competent jurisdiction vacates, or otherwise finds the Final Action unlawful and remands the Final Action for further action by BPA, BPA must take additional action necessary to respond to that decision, to include amendment of this RPSA consistent with any such decision, as set forth in Section 14.2 of the RPSA.

By executing the RPSA, PacifiCorp does not waive, and specifically reserves any and all rights pursuant to the RPSA and applicable law, including (without limitation) the right to challenge the Final Action through litigation of the Petition in the Ninth Circuit and the right to take any steps necessary to effectuate appropriate action (including with respect to any order(s) or judgment(s) by any court of competent jurisdiction and/or FERC).

In addition, as you are aware, PacifiCorp is in the process of transferring its Washington retail service area obligations to Portland General Electric, pursuant to a transaction announced on February 17, 2026. Upon completion of the transaction, PacifiCorp will have no qualifying residential and small farm load in Washington. Exhibits A and B include notation of this transaction. PacifiCorp anticipates that the transaction will be complete in 2027, which is prior to Fiscal Year 2029 when the RPSA contract period begins. PacifiCorp will coordinate with BPA and Portland General Electric on the treatment of Residential Exchange Program benefits for Washington customers post-closing of the transaction.

Please let me know if you have any questions.

*Tony Worthington*

Tony Worthington
Federal Transmission Manager
PacifiCorp

**Portland General Electric Company**
Legal Department
121 SW Salmon Street, 1WTC1301
Portland, Oregon 97204
Phone 503-464-7701
Fax 503-464-2200
portlandgeneral.com

**David F. White**
Senior Managing General Counsel
david.white@pgn.com

June 3, 2026

Scott K. Wilson
Power Customer Services Manager
Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208

Re: Residential Purchase and Sale Agreement

Dear Mr. Wilson:

Please find enclosed a copy of the Residential Purchase and Sale Agreement (the RPSA) between the Bonneville Power Administration (BPA) and Portland General Electric (PGE), executed by PGE consistent with the statements below.

On April 24, 2026, PGE and five other investor-owned utilities filed a petition for review (the Petition) under the Northwest Power Act in the United States Court of Appeals for the Ninth Circuit of BPA's final action dated March 6, 2026 issuing a Record of Decision, titled *2026 Residential Purchase and Sale Agreement,* and adopting a template RPSA (Final Action). Review of the Final Action is within the exclusive jurisdiction of the Ninth Circuit as set forth in Section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5), and Section 14.1 of the RPSA.

In the event the Ninth Circuit, Federal Energy Regulatory Commission (FERC), or any other court of competent jurisdiction vacates, or otherwise finds the Final Action unlawful and remands the Final Action for further action by BPA, BPA must take additional action necessary to respond to that decision, to include amendment of this RPSA consistent with any such decision, as set forth in Section 14.2 of the RPSA.

By executing the RPSA, PGE does not waive, and specifically reserves any and all rights pursuant to the RPSA and applicable law, including (without limitation) the right to challenge the Final Action through litigation of the Petition in the Ninth Circuit and the right to take any steps necessary to effectuate appropriate action (including

with respect to any order(s) or judgment(s) by any court of competent jurisdiction and/or FERC).

Sincerely,

David White (Jun 3, 2026 15:46:24 PDT)

David F. White
Senior Managing General Counsel

Enclosure:
PGE's RPSA Contract

AVISTA

June 1, 2026

Bonneville Power Administration
905 NE 11th Ave.
PO Box 3621
Portland, OR 97208
Attn: Scott K. Wilson - PSW-6
Western Power Customer Service Manager
Sent via Email: skwilson@bpa.gov
With copy to: ypcornejo@bpa.gov

**RE: Post-2028 Long-Term Residential Purchase and Sale Agreement between Avista Corporation and Bonneville Power Administration**

Please find enclosed a copy of the Residential Purchase and Sale Agreement (the RPSA) between the Bonneville Power Administration (BPA) and Avista Corporation (Avista), executed by Avista consistent with the statements below.

On April 24, 2026, Avista and five other investor-owned utilities filed a petition for review (the Petition) under the Northwest Power Act in the United States Court of Appeals for the Ninth Circuit of BPA's final action dated March 6, 2026 issuing a Record of Decision, titled *2026 Residential Purchase and Sale Agreement,* and adopting a template RPSA (Final Action). Review of the Final Action is within the exclusive jurisdiction of the Ninth Circuit as set forth in Section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5), and Section 14.1 of the RPSA.

In the event the Ninth Circuit, Federal Energy Regulatory Commission (FERC), or any other court of competent jurisdiction vacates, or otherwise finds the Final Action unlawful and remands the Final Action for further action by BPA, BPA must take additional action necessary to respond to that decision, to include amendment of this RPSA consistent with any such decision, as set forth in Section 14.2 of the RPSA.

By executing the RPSA, Avista does not waive, and specifically reserves any and all rights pursuant to the RPSA and applicable law, including (without limitation) the right to challenge the Final Action through litigation of the Petition in the Ninth Circuit and the right to take any steps necessary to effectuate appropriate action (including with respect to any order(s) or judgment(s) by any court of competent jurisdiction and/or FERC).

If you have any questions or comments please contact the undersigned.

**AVISTA CORPORATION**

By: ____________________________
Travis R. Lindsey
Senior Counsel

Enclosure(s)
- Post-2028 Long-Term Residential Purchase and Sale Agreement

PSE PUGET SOUND ENERGY

Puget Sound Energy
P.O. Box 97034
Bellevue, WA 98009-9734
pse.com

May 26, 2026

Scott K. Wilson
Power Customer Services Manager
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208-3621
Email: skwilson@bpa.gov

**RE: Residential Purchase and Sale Agreement Offer for Puget Sound Energy, Inc.**

Dear Mr. Wilson,

Attached please find an executed version of the Residential Purchase and Sale Agreement, Contract No. 26PS-55005 (the "RPSA") between the Bonneville Power Administration ("BPA") and Puget Sound Energy, Inc. ("PSE"), executed by PSE subject to and consistent with the statements below.

On April 24, 2026, PSE and five other investor-owned utilities filed a petition for review (the "Petition") in the United States Court of Appeals for the Ninth Circuit under the Northwest Power Act, challenging BPA's final action dated March 6, 2026 (the Record of Decision titled *2026 Residential Purchase and Sale Agreement, Administrator's Record of Decision*) which adopted the template RPSA (the "Final Action"). Review of the Final Action lies within the exclusive jurisdiction of the Ninth Circuit pursuant to Section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5), and Section 14.1 of the RPSA.

If the Ninth Circuit, the Federal Energy Regulatory Commission ("FERC"), or any other court or tribunal of competent jurisdiction vacates, remands, or otherwise determines that the Final Action is unlawful, BPA will be required to take such further action as may be necessary to comply with that determination, including, as applicable, amendment of the RPSA consistent with Section 14.2.

By executing the RPSA, PSE does not waive, and expressly reserves, any and all rights available under the RPSA and applicable law, including without limitation: (i) the right to prosecute the Petition before the Ninth Circuit; (ii) the right to seek or obtain relief from any court or regulatory authority, including FERC; and (iii) the right to take any actions necessary to give effect to any order, judgment, or other directive issued by a court or regulatory body of competent jurisdiction.

Please contact D-D Smith at (425) 462-3157 with any questions.

Sincerely,

Mary Kipp
President and Chief Executive Officer
Email: mary.kipp@pse.com

**cc**: Kim Thompson (ktthompson@bpa.gov)
Richard Greene (ragreene@bpa.gov)
Neal Gschwend (nmgschwend@bpa.gov)

Chairman Brian Rybarik (brian.rybarik@utc.wa.gov)
Commissioner Ann Rendahl (ann.rendahl@utc.wa.gov)
Commissioner Milt Doumit (milt.doumit@utc.wa.gov)

**Attachment**: Residential Purchase and Sale Agreement, Contract No. 26PS-55005, between Bonneville Power Administration and Puget Sound Energy, Inc.

# Bonneville Power Administration
# Provider of Choice Policy
# Record of Decision
# March 2024

# Table of Contents


**1. Introduction .......... 1**

**2. Principles, Goals and Emerging Landscape .......... 5**

Issue 1: Should Bonneville change its proposed principles or adopt new principles? .......... 5

Issue 2: Should Bonneville make edits to or add new goals to its Provider of Choice goals? .......... 9

Issue 3: Should the Policy address tribal treaty and trust obligations? .......... 13

Issue 4: Should Bonneville address tribal engagement in its Policy and/or ROD? .......... 14

Issue 5: Should Bonneville consider additions to its emerging landscape section? .......... 15

Issue 6: Should Bonneville's power supply obligation under Provider of Choice contracts ensure customers are able to meet WRAP requirements? .......... 18

Issue 7: Should Bonneville address day-ahead market process issues in the Policy? .......... 20

Issue 8: Should Bonneville acknowledge the Thacker Pass Project's role in decarbonization and align its Policy to support this initiative? .......... 25

Issue 9: Should Bonneville's Provider of Choice process take a more comprehensive approach in considering other process implications? .......... 27

Issue 10: Should Bonneville change its Provider of Choice process timeline to ensure all issues are resolved ahead of contract signing? .......... 28

Issue 11: Should Bonneville change its process to engage a broader audience? .......... 31

**3. Provider of Choice Foundational Service Elements .......... 34**

3.1 Net Requirements .......... 34

Issue 12: Should Bonneville include in its planned products contract offering the sale of additional capacity to meet such customers' PRM as part of meeting a customer's net requirements load? .......... 34

Issue 13: Should Bonneville revise the peak net requirements calculation proposed in the draft Policy? .......... 36

Issue 14: How will Bonneville implement peak net requirements across the products offered in Provider of Choice contracts? .......... 43

Issue 15: Is Bonneville's proposed method to determine the firm peaking capability of customers' non-federal resources (peak net requirements calculation) consistent with Bonneville's statutory obligations? .......... 48

Issue 16: Should Bonneville commit to a reoccurring process to reevaluate the peak net requirements calculation? .......... 53

Issue 17: Will peak net requirements limit Bonneville and/or customers' ability to participate in WRAP or day-ahead markets? .......... 54

3.2 Tiered Rate Construct .......... 57

Issue 18: Should Bonneville continue to offer tiered rates? .......... 57

Issue 19: Should Bonneville address rate-related issues in the Policy? .......... 58

3.3 Serving Load .......... 62

Issue 20: Should Bonneville commit to more robust engagement for the Resource Program and resource acquisition? .......... 62

Issue 21: Should Bonneville commit to acquiring certain types of resources in the Policy? ....65
Issue 22: Should Bonneville amend the Policy to assume a future lower output produced by the four lower Snake River dams or to state its intention to comply with President Biden's September 27, 2023, Memorandum, Restoring Healthy and Abundant Salmon, Steelhead, and Other Native Fish Populations in the Columbia River Basin (President's Memorandum)? ....68
Issue 23: Should Bonneville set the amount of power sold at a PF Tier 1 rate for the term of the contract? Should Bonneville change the amount of power sold at a PF Tier 1 rate if there are significant changes to the federal system's capability? ....70
Issue 24: Should Bonneville ensure that a customer's ability to purchase power at a PF Tier 1 rate is not reduced if they invest in conservation for the Provider of Choice contract period? ....73
Issue 25: Should Bonneville offer contracts under which customers agree to waive their section 6(h) right to request billing credits? ....74
Issue 26: How will Bonneville define new and existing resources in the Provider of Choice contracts, and how will it apply each resource type? ....77
Issue 27: Should Bonneville describe how a proposed 5(b)9(c) Policy update may impact net requirements or cost implications across products? ....78
Issue 28: Should Bonneville allow customers to use market purchases to serve Above-CHWM load? ....79
Issue 29: Should Bonneville partner with tribal, state and public utility customers, and/or provide seed money, to proactively seek out federal funding for clean energy projects? ....80
Issue 30: Should Bonneville document a policy approach for large, utility scale batteries used to serve customer loads under the Provider of Choice contracts? ....81
Issue 31: Should Bonneville offer the PF Tier 1 non-federal resource allowance as proposed? ....83
Issue 32: Should Bonneville expand eligibility for the non-federal resource allowance to include power purchase agreements? ....85
Issue 33: Should Bonneville require that resources be directly connected to a customer's distribution system to be eligible for the non-federal resource allowance? ....86
Issue 34: Should Bonneville expand the distribution system requirement for the non-federal resource allowance to allow for resources connected to the distribution system of a joint operating entity (JOE) member? ....87
Issue 35: Should Bonneville change the non-federal resource allowance eligibility start date to 2025? ....88
Issue 36: Should customers have the option to choose between applying new resources to the non-federal resource allowance or using them to serve Above-CHWM load? ....89
Issue 37: Will applying a resource under the non-federal resource allowance change a customer's CHWM and/or load shaping amounts? ....90

Issue 38: How will resources qualifying for the non-federal resource allowance be treated in regard to customer obligations to purchase RSS? Should Bonneville clarify what constitutes potential "additional capacity costs" that are mentioned in the draft Policy? ........ 91
Issue 39: Should Bonneville raise the minimum threshold for non-federal resource tracking in the Provider of Choice contract to higher than the 1 MW nameplate? ........ 91
Issue 40: Should Bonneville change the non-federal resource minimum threshold size for tracking prior to the Provider of Choice contracts? ........ 93
Issue 41: Should the Provider of Choice Policy address how Bonneville could support consumer-owned resources developed before FY 2029 that are less than 1 MW? ........ 94
Issue 42: Should the Provider of Choice and 5(b)9(c) policies clarify that a customer dedication of non-federal resources will not reduce CHWM eligibility in Provider of Choice or future contracts? ........ 95
Issue 43: Should Bonneville commit to providing RSS and NRFS in the draft Policy? ........ 97
3.4 Contract High Water Marks ........ 100
Issue 44: Should Bonneville allow a JOE to pool its CHWM? ........ 100
Issue 45: Should Bonneville establish a peak CHWM in order to tier capacity? ........ 101
3.4.1 CHWM Calculation ........ 103
Issue 46: Should Bonneville modify its public process to set Provider of Choice CHWMs? ........ 103
Issue 47: Should Bonneville complete the CHWM calculation in FY 2026? ........ 105
Issue 48: Should Bonneville use a single year for the index year and, if so, should the index year be FY 2023? ........ 107
Issue 49: Should Bonneville include an economic adjustment to the PF-eligible load used in the Provider of Choice CHWM calculation? If so, how should it be defined? ........ 109
Issue 50: Should certain Flathead's Weyerhaeuser load qualify for an economic adjustment due to its use of the Offsite Green Exception/Offsite Renewables Exception? ........ 114
Issue 51: Should resources that were temporarily removed in FY 2023 be included in the CHWM calculation at their originally dedicated Exhibit A resource amounts? ........ 115
Issue 52: Should Bonneville include resources that will not generate after 2028 in the Provider of Choice CHWM calculation? When would Bonneville require resource removal be granted for a resource to be excluded from the Provider of Choice CHWM calculation? ........ 117
Issue 53: Should Bonneville exclude the Western Area Power Administration (WAPA) Blackfeet Nation (Blackfeet) tribal allocation (WAPA resource) from Glacier Electric Cooperative's (Glacier) CHWM calculation? ........ 119
Issue 54: Should Bonneville adopt the proposed CHWM calculation base allowance? ........ 120

Issue 55: Should Bonneville include a headroom adjustment in the CHWM calculation? ....... 121
Issue 56: Should Bonneville change its proposed CHWM conservation adjustment? ... 122
Issue 57: Should Bonneville credit self-funded conservation to the PF-eligible load in lieu of the conservation adjustment? ....... 125
Issue 58: Should Bonneville increase the new specified resource adjustment to 100%? ....... 126
Issue 59: Should Idaho Falls Power's (Idaho Falls) resource, the Bulb Turbine Project (Bulb Turbines), be eligible to receive the new specified resource adjustment as part of the Provider of Choice CHWM calculation? ....... 129
Issue 60: Should Bonneville change the reporting date ranges for the CHWM conservation adjustment and/or the new specified resource adjustment beyond FY 2023 to enable additional conservation achievements and resources to qualify? ....... 132
Issue 61: Should Bonneville increase the load growth adjustment from 25% to a higher percentage? ....... 133
Issue 62: Should Bonneville maintain its proposed approach to calculating the proportional share adjustment to the CHWM calculation? ....... 135
Issue 63: Should Bonneville maintain the proposed CHWM calculation for returning public utilities? ....... 139
3.4.2 Subsequent CHWM Adjustments ....... 140
Issue 64: Should additional CHWM adjustment categories increase the sum of all CHWMs? ....... 141
Issue 65: Should Bonneville commit to acquiring additional firm power for subsequent CHWM adjustments? ....... 141
Issue 66: Should the Policy include a subsequent CHWM adjustment category to provide additional CHWM for mutually agreed upon annexations of non-Bonneville loads? ....... 142
Issue 67: Should Bonneville adopt a small utility adjustment? If adopted, should Bonneville increase access to the small utility adjustment and/or provide additional support to small utilities? ....... 144
Issue 68: Should Bonneville offer a new public utility adjustment as a subsequent CHWM adjustment category? ....... 147
Issue 69: Should Bonneville offer a tribal utility adjustment as proposed in the draft Policy? ....... 147
Issue 70: Should Bonneville expand eligibility for the tribal utility adjustment to include utilities operating on reservations pursuant to a 638 contract? ....... 150
Issue 71: Should Bonneville offer a subsequent CHWM adjustment for DOE Richland's vitrification plant load if/when it becomes operational? ....... 151
Issue 72: Should Bonneville provide additional CHWM to account for historic CF/CT loads? ....... 154
**4. Products and Services at Priority Firm Rates ....... 157**
Issue 73: Should Bonneville offer a suite of product options? Should the suite of products be equitable? ....... 157

Issue 74: Should Bonneville re-evaluate its position on how non-federal resources are dedicated and applied to meet load across products? .......... 159
Issue 75: Should Bonneville provide all product offerings to customers that operate a balancing authority? .......... 162
Issue 76: Should Bonneville commit that products will fit emerging needs and will change as needs change? .......... 163
Issue 77: Should Bonneville offer a resource adequacy transfer product? .......... 166
Issue 78: Should Bonneville explore a firm surplus PRM service? .......... 167
Issue 79: Should Bonneville clarify the timeline for product switching? .......... 169
4.1 Load Following .......... 171
Issue 80: Should Bonneville offer the Load Following product as proposed? .......... 171
Issue 81: Should Bonneville clarify in the Policy that the Load Following product will serve a customer's hourly energy and peak net requirements load? .......... 171
Issue 82: Should Bonneville define the contractual shape requirements of non-federal resources for the Load Following product as well as the applicability of charges that would apply to non-federal resources? .......... 173
4.2 Block and Block with Shaping Capacity Option .......... 174
Issue 83: What standard shapes will Bonneville offer for the Block product? .......... 174
Issue 84: How often should Bonneville recalculate the shape of a customer's block during the Provider of Choice contract period? .......... 176
Issue 85: Will Bonneville's Block contracts include language that clearly obligates the customer to manage its resources to meet its loads beyond what Bonneville provides under the product? .......... 177
Issue 86: What is Bonneville trying to achieve with the Block with Shaping Capacity option and how will Bonneville establish implementation details for the Block with Shaping Capacity option? .......... 180
4.3 Slice/Block .......... 183
Issue 87: Should Bonneville commit to offering a Slice/Block product for the Provider of Choice contract period? Should Bonneville commit to a specific Slice/Block product offering? .......... 183
Issue 88: Should Bonneville commit to re-examining the Requirements Slice Output (RSO) test? .......... 186
Issue 89: Should Bonneville reconsider its timeline to address Slice/Block product issues? .......... 187
Issue 90: Should Bonneville clarify how it plans for Slice/Block? .......... 188
Issue 91: Should Bonneville affirm the Slice/Block product is not available to IOUs? .......... 189
4.4 Above-CHWM Load Service .......... 190
Issue 92: Should customers elect their Above-CHWM load service option at contract signing? .......... 191
Issue 93: Should Bonneville provide more opportunities for electing Above-CHWM load service options? .......... 192

Issue 94: Should Bonneville remove the supply limitation for service to loads under the Short-Term Tier 2 rate? ........ 196
Issue 95: Should Bonneville use uncommitted firm power to serve all PF Tier 2 rates at a cost equivalent to a PF Tier 1 rate? ........ 199
Issue 96: Should Bonneville address general questions regarding the Tier 2 offerings and elections? ........ 203
Issue 97: Should Bonneville offer planned block product customers Tier 2 Above-CHWM service options in flat monthly blocks? ........ 204
**5. Products and Services at New Resource Rate and Industrial Firm Power Rate ........ 205**
Issue 98: What are the terms and conditions for Bonneville sales to IOUs for firm power under section 5(b) of the Northwest Power Act? ........ 206
Issue 99: Should Bonneville update its NLSL Policy? ........ 208
Issue 100: Should Bonneville clarify the NLSL Policy to address historical Administrator determinations of NLSLs whose annual consumptive demand no longer meets the statutory definition of an NLSL? ........ 209
Issue 101: Should Bonneville seek improvements to its NLSL implementation process? ........ 210
Issue 102: Should a customer be able to exempt or remove an NLSL from the Provider of Choice contract and forgo any right to serve the NLSL with firm power at the NR rate? ........ 211
Issue 103: Should Bonneville facilitate the use of NLSLs for demand response whether through WRAP, WEIM or dispatched by Bonneville? ........ 212
Issue 104: Should a customer's service election for an NLSL apply for the Provider of Choice contract period? When should Bonneville require customers to make their service election for existing NLSLs? ........ 213
Issue 105: Should Bonneville grant an Offsite Green Exception/Offsite Renewables Exception for Flathead's NLSL? ........ 217
Issue 106: Should Bonneville allow Port Townsend Paper's DSI load to transition to be served through a local utility? If yes, should Jefferson receive additional CHWM to serve previous DSI load in its service territory? ........ 219
**6. Rate Discounts ........ 220**
Issue 107: Should Bonneville continue to offer the IRD and LDD during the Provider of Choice contract period? ........ 220
Issue 108: Should Bonneville clarify the IRD program budget? ........ 222
Issue 109: Should Bonneville modify the IRD eligibility criteria? ........ 223
Issue 110: Should Bonneville accept monthly irrigation load data for other years from potential IRD participants that do not have monthly irrigation load data for FY 2018 through FY 2022? ........ 225
Issue 111: Should Bonneville increase the 12 consumers per pole mile (C/M) ratio threshold for LDD eligibility? ........ 225
Issue 112: Should Bonneville evaluate how underground distribution lines are accounted for in the LDD C/M ratio? ........ 227
Issue 113: Should Bonneville provide a "phase out" adjustment for customers who no longer qualify for the LDD? ........ 228

**7. Power Delivery ....... 229**
Issue 114: Should Bonneville add language that addresses the deliverability of Bonneville provided electric power to customers? ....... 230
Issue 115: Should Bonneville change its approach to transmission and transfer service planning for power deliveries? Should Bonneville specify how the Provider of Choice contracts will interact with Bonneville's open access transmission tariff and transmission services? ....... 232
Issue 116: Should Bonneville join an RTO to support transfer service? ....... 236
Issue 117: Should Bonneville clarify that it will continue offering the Mid-C over non-firm exchange? ....... 237
Issue 118: Should Bonneville pass-through to a customer the costs of transfer service associated with service to NLSLs? ....... 238
Issue 119: Should Bonneville clarify the details regarding customers holding their own transfer agreements with third-party providers? ....... 246
Issue 120: To what extent should Bonneville require that non-federal resources obtain firm transmission and/or designation as a Network Resource in order to be eligible for transfer service from Bonneville that is recovered in the Tier 1 cost pool, and what happens if firm transmission is unavailable? ....... 249
Issue 121: Should Bonneville clarify requirements for consumer-owned resources outside of Bonneville's balancing authority area? ....... 253
Issue 122: Should Bonneville limit its financial support for non-federal transfer service to the last leg of transmission? ....... 254
Issue 123: Should Bonneville adjust the limits for transfer service support for non-federal resources? ....... 257
Issue 124: Should Bonneville clarify its commitment to quality of service from third-party transmission providers? ....... 260
Issue 125: Should Bonneville clarify its proposed treatment of transfer service for ancillary services and losses? ....... 263
**8. Carbon ....... 266**
Issue 126: Should Bonneville more explicitly describe or commit to how it will support decarbonization in the Policy? ....... 266
Issue 127: Should Bonneville offer a 100% carbon-free product? ....... 268
Issue 128: Should Bonneville convey the environmental attributes of the power sold, including emissions and any RECs, commensurate with a customer's firm power purchase amount and rate elections? ....... 272
Issue 129: Does preference apply to environmental attributes? ....... 274
Issue 130: Should Bonneville pursue the use of hourly RECs or energy attribute credits (EACs) at this time? ....... 282
Issue 131: Should Bonneville allow customers to elect to transfer their Bonneville RECs to third parties or other customers? ....... 282
**9. Long-term Cost-Management ....... 283**
Issue 132: Should Bonneville formalize its commitment to cost management in the Policy? ....... 283

Issue 133: Should Bonneville commit to a specific approach to financial risk policy in the Policy/ROD and 19-year contracts? ........ 285
Issue 134: Should Bonneville create a contract off-ramp tied to costs? ........ 287
**10. Conservation ........ 288**
Issue 135: Should Bonneville modify its energy conservation program? ........ 289
Issue 136: Should Bonneville commit to offer EEI funding reimbursement for utility scale batteries, demand response, and other demand-side management strategies? ........ 290
**11. Residential Exchange Program ........ 293**
Issue 137: Should Bonneville require power customers to waive their section 5(c) right to request participation in the REP? ........ 294
**12. New Long-term Contract ........ 301**
Issue 138: Should Bonneville offer a "replacement required" off-ramp provision in the contract whereby customers would have the right to terminate their power sales contract if they find a replacement purchaser? ........ 301
Issue 139: Should Bonneville commit to developing alternative contracts or contract provisions for customers that do not want their load served by a day-ahead market? ........ 302
Issue 140: Should the duration of the Provider of Choice contracts be 19 years as proposed? ........ 303
Issue 141: Should Bonneville offer standardized contracts as proposed? ........ 306
Issue 142: Should Bonneville include a take-or-pay obligation in the Provider of Choice contracts as proposed in the draft Policy? ........ 307
Issue 143: Should Bonneville change its proposed approach to requiring load and resource information? ........ 307
Issue 144: Should Bonneville add a policy section to address ongoing processes and administrative tasks associated with the Provider of Choice contracts? ........ 308
Issue 145: Should Bonneville set forth parameters or criteria in the contract specifying which, if any, significant changes in the region would trigger a “reopener” to the Provider of Choice contracts? ........ 309
Issue 146: Should Bonneville have flexibility to amend contracts and the PRDM as proposed? ........ 311
Issue 147: Should Bonneville uphold the draft Policy position on governing law and dispute resolution procedures? ........ 312
**13. Environmental Analysis ........ 313**
**Appendix A: Abbreviations/Acronyms ........ 314**
**Appendix B: List of Comments ........ 318**
**Appendix C: Environmental Form Letters Received ........ 322**
**Appendix D: ROD Revision History ........ 347**

# 1. Introduction

The Bonneville Power Administration (Bonneville) Provider of Choice Policy (Policy) dated March 2024 addresses the agency's regional power marketing policy for fiscal year (FY) 2028 through FY 2044. The Policy represents the culmination of multiple years of regional engagement designed to shape Bonneville's long-term power sales contracts following the expiration of Regional Dialogue contracts in September 2028. It reflects the outcome of an extensive, multi-year public process that involved customers and interested parties that worked with Bonneville to help craft and design policy proposals.

In this record of decision (ROD), Bonneville addresses issues raised during the public comment period held between July 20, 2023, and October 13, 2023. A list of commenters, affiliations and comment numbers is provided in Appendix B. The ROD is organized based on corresponding sections in the Policy.

Section 5(b) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act) requires that "[w]henever requested, the Administrator shall offer to sell to each requesting public body and cooperative . . . and to each requesting investor-owned utility [IOU] electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds . . ." the utilities' resources. 16 U.S.C. § 839c(b)(1) (2022). Over a hundred customers have a right to request a contract under section 5(b).

The first set of contracts developed to implement section 5(b) under the Northwest Power Act were negotiated and offered 9 months after the passage of the Northwest Power Act on December 5, 1980. These contracts expired in 2001. Like other federal power marketing administrations, Bonneville develops power marketing policies prior to the commencement of negotiating and offering new long-term power sales contracts to guide key power marketing and product details. For example, in 1999 Bonneville issued its Power Subscription Strategy, to describe how Bonneville intended to meet its section 5(b) obligations in a deregulated energy market environment for FY 2001 through FY 2011. *See generally Power Subscription Strategy,* 64 Fed. Reg. 149 (Jan. 4, 1999). The Power Subscription Strategy was followed up by the Long-Term Regional Dialogue Policy, which set the parameters for developing the Regional Dialogue contracts and tiered rate construct. *See Notice of Final Policy; Bonneville Power Administration Long-Term Regional Dialogue* Policy, 72 Fed. Reg. 45,238 (Aug. 13, 2007). These contracts govern power deliveries from Bonneville under section 5(b) from FY 2012 through FY 2028. This Policy, the Provider of Choice Policy, builds from the Long-Term Regional Dialogue Policy and establishes Bonneville's power marketing paradigm that will guide development of the section 5(b) contracts for power deliveries for FY 2028 through FY 2044.

### Public Process

In 2016, Bonneville initiated discussions with its regional firm power customers regarding the future of Bonneville's products, services and rates upon which to lay the foundation for the successor agreements to Regional Dialogue contracts.

**Focus 2028**. Bonneville's Focus 2028 effort involved conversations around the region regarding Bonneville's future competitiveness. Among the multiple issues confronting the agency, it was clear that to be competitive Bonneville would need to address its costs and ultimately future rate levels. Through this conversation Bonneville developed and issued its 2018 – 2023 Strategic Plan, wherein Bonneville committed to hold periodic regional conversations to understand the challenges customers face. The first conversations about future Policy and contracts were held in this forum.

**Provider of Choice Early Engagement**. Following Focus 2028, Bonneville held a series of power customer meetings beginning in late 2019 through summer 2020. Bonneville absorbed customer input on their post-2028 needs for products, services, contracts and rate structure. Bonneville released its findings from these discussions in the Provider of Choice 2020 Engagement Summary[1] published in October 2020. In March 2021, Bonneville released the Provider of Choice Initial Staff Leanings[2] that built off the early engagement and served as a starting point for further customer discussions.[3] These discussions explored policy issues to promote understanding of foundational issues ahead of Bonneville's planned concept paper.

**Concept Papers**. In October 2021, Bonneville received a request to pause the release of its concept paper from three of its power customer organizations: the Public Power Council[4] (PPC), Northwest Requirements Utilities[5] (NRU), and Washington Public Agencies Group[6] (WPAG). The purpose of the pause was to give public power customers time to collaborate and produce a public power concept paper. In March 2022, Bonneville received the Public Power Post-2028

---

[1] The Provider of Choice Customer Engagement Summary is available at https://www.bpa.gov/-/media/Aep/power/provider-of-choice/final-2020-prov-of-choice-customer-engagement-summary-10-07-2020.pdf.
[2] The Provider of Choice Initial Staff Leanings is available at https://www.bpa.gov/-/media/Aep/power/provider-of-choice/post-2028-initial-leanings-03-9-21.pdf.
[3] Meeting materials from the 2021 forum are available at https://www.bpa.gov/energy-and-services/power/provider-of-choice/resources.
[4] PPC is a trade association of Northwest public power, representing the full diversity of utilities with preference rights to purchase wholesale power and transmission services from Bonneville.
[5] NRU represents 58 Load Following customers, which together account for roughly one-third of Bonneville's PF loads.
[6] WPAG utilities include Benton Rural Electric Association, Eugene Water and Electric Board, Umatilla Electric Cooperative, the Cities of Port Angeles, Ellensburg and Milton, Washington, the Towns of Eatonville and Steilacoom, Washington, Elmhurst Mutual Power and Light Company, Lakeview Light & Power, Ohop Mutual Light Company, Parkland Light and Water Company, Public Utility Districts No. 1 of Clallam, Clark, Cowlitz, Grays Harbor, Jefferson, Kittitas, Lewis, Mason, and Skamania, Washington, Public Utility District No. 3 of Mason County, Washington, and Public Utility District No. 2 of Pacific County, Washington.

Concept Paper,[7] a submittal by several entities, as well as another paper[8] submitted by Pacific Northwest Generating Cooperative (PNGC), representing the interests of its electric cooperative utility members. These concept papers identified customer perspectives on key issues such as whether to tier rates. The papers also identified areas where customers wanted to start policy conversations. These public power concept papers helped inform Bonneville's policy development of concepts raised in Bonneville's own concept paper as well as alternatives considered during policy development workshops.

**Provider of Choice Concept Paper**. Bonneville published its Provider of Choice Concept Paper[9] on July 14, 2022. The concept paper served as a starting point for policy development workshops by outlining Bonneville's initial conceptualization of what would ultimately be encompassed in the Policy. The concept paper focused on service to publicly owned utilities and provided some discussion of section 5(b) service for IOUs.

**Policy Workshops**. Between April 2022 and April 2023, Bonneville held 25 public workshops attended by hundreds of interested parties to provide grounding in the policy issues, invite deliberation and proposals, and discuss the intent and design of policy elements. Bonneville encouraged active workshop participation and invited informal comments that were considered in the development of this policy. Bonneville publicly noticed workshops on Bonneville's event page and through Bonneville's Tech Forum email distribution list which reaches customers and other interested stakeholders. Initial workshops were virtual-only due to the ongoing COVID-19 pandemic. Starting in December 2022, many workshops were offered as hybrid meetings with the opportunity to attend in-person or remain "virtual."

Bonneville's policy workshops concluded in a series of public meetings conducted throughout the region in April 2023. These meetings were led by senior executives from Bonneville Power Services and were held in Burley, Idaho, Spokane, Wash., Missoula, Mont., Tacoma, Wash., Eugene, Ore., and Portland, Ore. The meetings offered attendees an overview of the draft policy direction based on feedback from earlier policy workshops. The meetings were largely listening sessions and gave Bonneville the opportunity to engage at a local level and hear voices from around the Pacific Northwest region.

Bonneville also actively participated in a technical Peak Net Requirements Task Force from August 2022 through February 2023. Customers requested that Bonneville form the task force to learn about and discuss Bonneville's approach to how it determines the peak net load requirements of its power customers. The goal of this task force was to coalesce on a peak net requirements calculation. Bonneville proposed a peak net requirements calculation in

---

[7] The Public Power Post-2028 Concept Paper is available at https://www.ppcpdx.org/wp-content/uploads/FINAL-Post-2028-Concept-Paper-3-30-22.pdf.
[8] The Post-2028 BPA Contract and Framework Concept Paper is available at https://www.pngcpower.com/wp-content/uploads/PNGC-Post-2028-Framework-Concept-Paper-03-31-22.pdf.
[9] The Provider of Choice Concept Paper is available at https://www.bpa.gov/-/media/Aep/power/provider-of-choice/bpa-provider-of-choice-concept-paper-final-july-2022.pdf.

workshops in spring 2023 and indicated that implementation would be discussed as part of the Provider of Choice policy implementation and contract development phase.

### Release of the draft Provider of Choice Policy

Bonneville released its draft Policy on July 20, 2023.[10] Bonneville published a notice in the Federal Register on July 24, 2023, and opened a public comment period from July 20, 2023, to October 13, 2023.

On July 26, 2023, Bonneville held a public meeting to provide an overview of the draft Policy and answer clarifying questions. On August 1, 2023, Bonneville held an additional public meeting to give the region an opportunity to ask clarifying questions. Bonneville also answered questions during the comment period when requested.

Bonneville received and considered over 16,800 written comments from customers, interested parties, and the general public. A list of commenters, affiliations and comment numbers is provided in Appendix B. All comments received during the public comment period are posted to Bonneville's public comment webpage.

### Planned Products Workshops

Bonneville did not provide detailed product design in the draft Policy. After multiple requests for further discussion, Bonneville hosted three workshops in late 2023 that focused on planned products. These workshops were limited in scope with objectives that included: (1) discussing the intent and features of a proposed Block with Shaping Capacity option product, (2) working towards a shared understanding of the impact of a day-ahead market on power products, and (3) promoting an understanding of the detailed processes and timelines that follow the final Policy and ROD release, including the 2029 Public Rate Design Methodology (PRDM) process and other related processes. Bonneville specified that these workshops were pre-decisional in nature and were not part of the formal public comment process. In the workshops Bonneville assumed that its draft Policy positions would be maintained and recognized product design discussed may change based on the final Policy.

### Next Steps

The Policy sets the foundation for the next critical phase in the Provider of Choice process – the policy implementation and contract development phase. Bonneville will hold workshops to discuss policy implementation details that will result in updated power contract language applicable to the type of product a customer elects to purchase. Bonneville will develop and offer new contracts, including an opportunity for interested parties to provide public comment on draft contracts prior to finalization and offering. If warranted, Bonneville may release a

---

[10] The draft Policy is available at https://www.bpa.gov/-/media/Aep/power/provider-of-choice/draft-provider-of-choice-policy.pdf.

to meet its contractual firm power sales obligations. As addressed in Issue 90, in order to manage the Slice/Block product, Bonneville must plan in both the short- and medium-term to ensure the system can meet the uncertainty of how much slice right-to-power customers will request ahead of real-time operations.

Bonneville intends to provide detailed emissions accounting for physical power purchased. Customers may choose to use this information to make distinctions about emissions for reporting purposes in their respective jurisdictions. Bonneville will provide transparent accounting of the fuel mix and conveyance of environmental attributes. Bonneville anticipates its methods to account and convey environmental attributes will be flexible enough to adapt to the variety of existing and evolving state program needs, but Bonneville will evolve its methods as needed to provide a durable framework.

The last topic within this issue is the NWEC group's comment that it is uncomfortable with Bonneville's statement about disposing of additional RECs at its discretion. While the Provider of Choice contracts will represent a significant portion of Bonneville's sales, Bonneville does make other types of power sales and those sales may have environmental attributes associated with them. Conversely, certain sales may not need to convey environmental attributes if there is no value or regulatory purpose that justifies doing so. In such cases it may be beneficial for Bonneville to retain the attributes and dispose of them in other ways. Therefore, Bonneville believes that retaining any additional RECs, either for sale or for retirement, is reasonable. Accordingly, Bonneville will adopt the draft Policy proposal on this issue.

The NWEC Group also recommends that Bonneville determine the allocation of RECs in advance of Provider of Choice contract. POC-028-NWEC-Group. Bonneville intends to provide separate REC conveyance for power purchased at PF Tier 1 rates, PF Tier 2 rates, the NR rate, the FPS rate, and the IP rate. Not all resources that make up a particular cost pool will necessarily create RECs. Bonneville will determine a customer's base allocation of RECs by applying the physical sale of megawatt hours purchased from Bonneville at a particular rate to the percentage of qualifying resources assigned to that rate's cost pool. Additional details about REC allocation will be discussed during the policy implementation and contract development phase.

## Issue 129: Does preference apply to environmental attributes?

**Policy Proposal**

In Section 7.1 of the draft Policy, Bonneville stated it would "convey the environmental attributes of the power sold, including emissions and any [RECs], commensurate with a customer's firm power purchase amount and rate elections."

**Public Comments**

Many customers and customer groups state that Bonneville has, in the draft Policy, provided what they refer to as a "clear articulation of the rights of preference customers to the environmental attributes of the federal system." POC-044-Big-Bend; POC-012-Grant; POC-014-Cowlitz; POC-029-PPC; POC-031-NRU; POC-033-Snohomish; POC-007-Modern. After characterizing Bonneville's position, these commenters stated that they agree with it. For example, EWEB stated that it "agrees with BPA's affirmation that preference includes the environmental attributes of the federal system . . . and we thank BPA for clearly articulating these rights in their Draft Policy." POC-044-EWEB. Similarly, Grant commented that it "supports BPA's articulation of the rights of preference customers to the environmental attributes of the FBS." POC-012-Grant.

Cowlitz appeared to understand Bonneville has not made such a statement, but it asked Bonneville to do so: "now is the time for BPA to make a clear statement of why public entities and cooperatives have a preference and priority to the environmental attributes of BPA's federal generation." POC-014-Cowlitz.

Other commenters appeared to believe Bonneville has signaled the opposite. For example, OPALCO and PNGC took issue with the Section 7.1.1 of the draft Policy, stating that it was "alarming from a BPA customer perspective." OPALCO and PNGC stated it "is unacceptable for BPA to retain any RECs" and "[w]e firmly assert that all RECs associated with the FCRPS in its entirety belong to its preference customers." Thus, OPALCO and PNGC appeared to believe Bonneville has indicated there is no preference right, at least with regard to RECs. POC-013-OPALCO; POC-046-PNGC.

NRU made a general assertion that "preference applies not only to the output of the FBS, but also to the capacity and environmental attributes therefrom." POC-031-NRU. PPC stated that preference equates to "first right of access to [FBS] resources at cost, which Public Power views as a fully bundled power product with first in right entitlement to all the energy, capacity, and environmental attributes (e.g., Renewable Energy Credits and low carbon attributes) of such resources." PPC also stated "[t]he post-2028 contracts must fully address this preference right . . .." POC-029-PPC.

Lastly, WPAG and Cowlitz raised a related issue regarding preference and Bonneville's potential treatment of environmental attributes with regard to IOUs. They stated that they "do not support, and would strongly object to, any post-2028 allocation of power and/or environmental attributes from the federal system to the investor-owned utilities." POC-045-WPAG; POC-014-Cowlitz. WPAG continued, "[a]ll indications at this time are that all firm power from the federal system and associated environmental attributes will be needed to meet the net requirements of preference customers during the Provider of Choice contract timeframe." WPAG believed that, under such circumstances, allocating a portion of the power and/or environmental attributes of the federal system to the IOUs "would be a clear violation of preference rights under the Bonneville Project Act §§ 4 and 5 as well as NWPA §§ 5(a) and 10(c)." POC-045-WPAG.

**Evaluation and Decision**

*I. Bonneville's Policy is unchanged*

To avoid uncertainty, Bonneville wishes to emphasize that nothing in this ROD or the final Policy changes what Bonneville proposed in the draft Policy on this issue. Namely, Bonneville's approach will still be to convey the environmental attributes of the power sold, including emissions and any RECs, commensurate with the physical sales associated with a customer's firm power purchase amount and rate elections. As explained in Issue 128, this approach is reasonable and was widely supported by commenters. *See*, *e.g.*, POC-045-WPAG, at 24. "[W]e reemphasize our support of the policies expressed in Draft Policy 7.1, which affirm that the environmental attributes . . . will be conveyed 'commensurate with a customer's firm power purchase amount and rate elections.'"; POC-033-Snohomish, at 5 "Snohomish believes that allocating RECs based on actual power purchased best fits customer needs and is the most effective allocation framework for meeting state compliance requirements."; POC-028-NWEC-Group, at 6 "We think it is appropriate for BPA to convey RECs to customers based on the actual amount of power purchased under Provider of Choice."

Bonneville remains committed to assisting customers with their efforts to comply with state renewable energy and greenhouse gas reduction programs. Bonneville is adopting in the final Policy numerous proposals, such as emissions accounting (Section 7.1.2), rate treatment (Section 7.1.1), and REC transfer to third parties (Section 7.1.1) that are intended to aid those customers that must meet state and local compliance requirements. Consistent with those actions, the discussion below clarifies the basis for Bonneville's decision.

*II. Environmental attributes are varying, state-defined concepts*

As a foundation for this issue, it is important to understand that the concept of "environmental attributes" has varying definitions and understandings, primarily driven by what must be demonstrated to meet individual state programs applicable to retail utilities. There is no standard definition across states, or even programs within the same state (and there is no federal statute or regulation governing Bonneville's treatment of these concepts), and the state programs and definitions continue to evolve.[44] Therefore this discussion will use the term "environmental attributes" in a general sense.

---

[44] These points are well illustrated by a recent order from the Oregon Public Utility Commission. *See Investigation Into House Bill 2021 Implementation Issues*, OPUC Docket No. UM 2273, Order No. 24-002 (Jan. 5, 2024). The order discusses various Oregon laws "relating broadly to the sources and environmental content of electricity" and notes that the interaction of these laws can create "a complex question in Oregon and across jurisdictions." *Id*. at 5, 8. The order also recognizes that "state legislatures and agencies adopt varied approaches to define the bounds of the regulations they are creating. In a regional electricity system in which utilities and electricity service suppliers generate electricity, make market purchases and sales from a broad geographic footprint, and serve load in

The oldest and most commonly thought-of environmental attribute is a REC, a concept which emerged in the late 1990's to early 2000's. A REC is generally used as a compliance instrument for a state's renewable portfolio standard (RPS). In this context, it is a "certificate" demonstrating that one megawatt of power was generated by a source that the state defined as "renewable" (such as wind, or solar).

In comparison, a state cap-and-trade program (or cap-and-invest) is largely only concerned with the emissions attributes of whatever generator created the power. Thus, for cap-and-trade purposes, a generator like hydro or nuclear—which would not typically be defined as "renewable" under a state's RPS—is nonetheless carbon free. The "environmental attribute" of the energy is the simple fact that it was generated by a resource that did not emit greenhouse gases. Compliance with the cap-and-trade program is demonstrated by reporting of the generation sources for electricity.[45] Accordingly, these programs do not care if a REC was created for the same power and that REC has been separated, sold, and used for compliance with another state's RPS program.

The concept of these two systems changed significantly in 2019 with the passage of Washington's CETA. CETA is unique in that it will not consider a renewable resource to be "carbon free" if there is not a REC bundled with the power, and CETA defines renewable resources to include existing hydro (this is an expansion from the resources that were typically defined as renewable by states' RPSs). Thus CETA expanded the need to create RECs to cover all existing hydro, otherwise CETA would not recognize hydro as "carbon free." CETA requires that all environmental attributes be kept together; a REC may not be used for compliance if the underlying power and associated emissions are claimed for another state program. Accordingly,

---

multiple states, states must develop mechanisms to identify the electricity subject to their emissions regulatory programs." *Id*. at 14.

Similarly, commenter the NWEC Group (joined by various environmental groups and NGOs) recognized the varied and evolving nature of state programs and definitions, stating that Bonneville's proposal "will also provide more transparency in accounting and is more likely to align with regional carbon and clean energy policy as it evolves during the contract term." (POC-028-NWEC-Group, at 6); *see also* Deborah Kapiloff *et al.*, Greenhouse Gas Accounting Systems in Wholesale Regional Electricity Markets: Considerations for the Western Interconnection, W. Res. Advocates at 4 (Jan. 2022), available at https://westernresourceadvocates.org/wp-content/uploads/2022/01/2022_0119_GHG_Accounting_-Regional-Markets_f.pdf ("Today, there is no multi-state regional greenhouse gas accounting framework in the West. Instead . . . each individual state has its own regulations – or not. Some states have established ambitious greenhouse gas reduction targets that include prescriptive policies for tracking compliance with climate goals, while others have no emission reduction goals or requirements. States also vary in how they regulate greenhouse gas emissions; some measure only those emissions produced in-state, while others also account for emissions associated with imported electricity or other out-of-state emission sources.").

[45] This is why Bonneville sells what states describe as "Asset Controlling Supplier (ACS) power" to certain counterparties for use in compliance with cap-and-trade programs. The ACS construct is derived from state cap-and-trade and GHG reporting programs' need to identify a specific resource and the emissions that are associated with the resource. In Bonneville's case, the specific resource is Bonneville's system of generators and the associated system-wide emissions rate (that states assign to Bonneville) is the "ACS emissions factor."

if the underlying power is claimed under another state's cap-and-trade program then the REC cannot be used to demonstrate use of carbon-free power under CETA. So, from the viewpoint of CETA, a REC is no longer just a *type* of environmental attribute (signifying energy from a state-defined "renewable" resource under an RPS), instead the REC itself *contains* all the environmental attributes—meaning it is the embodiment of the carbon-free emissions characteristics of the underlying energy, as well as the "renewable" nature of the generator that created the energy. Notably, to date only Washington's CETA contemplates a REC in this manner. Other states, such as California, recognize that hydro is carbon-free without having to create RECs to make it so.

The draft Policy did not address the application of the Bonneville Project Act's preference clause regarding any of these state-law-derived concepts of environmental attributes. Bonneville stated in the draft Policy that it would convey the environmental attributes of the power sold, including emissions and any RECs, commensurate with a customer's firm power purchase amount and rate elections. Many of the commenters appear to read more into Bonneville's proposal, asserting that Bonneville has "clearly articulated" that statutory preference applies to environmental attributes. *See, e.g.*, POC-044-EWEB: "EWEB agrees with BPA's affirmation that preference includes the environmental attributes of the federal system . . . and we thank BPA for clearly articulating these rights in their Draft Policy." Other commenters acknowledge that Bonneville has not made such a statement but they suggest "now is the time" to do so. POC-014-Cowlitz. And others believe that Bonneville is disregarding preference. POC-013-OPALCO; POC-046-PNGC.

The commenters' varying understandings of preference, and their assertions that Bonneville has concluded (or should conclude) that preference applies, necessitate that Bonneville set forth its position on this issue. This will ensure parties do not misunderstand Bonneville's position when drafting the contracts,[46] and this will avoid confusion when discussing environmental attributes in other forums (such as day-ahead market discussions and residential exchange).

*III. Preference is a statutory right of access to electric energy in specific situations*

The comments on this issue describe preference as a broad, conceptual framework. For example, NRU asserts that "preference applies not only to the output of the FBS, but also to the capacity and environmental attributes therefrom." POC-031-NRU. Similarly, PPC states that preference equates to "first right of access to [FBS] resources at cost, which Public Power views

---

[46] For example, NRU's comment reflects the misunderstanding and shows how it could be a problem when drafting the contracts: "NRU appreciates the fact that Bonneville clearly articulates [a] preference customer right to the environmental attributes" and "NRU looks forward to working with Bonneville through the implementation and contract development phases to ensure the contract language documenting that conveyance is clear and unquestionable." (POC-031-NRU, at 43). Similarly, PPC states: "[t]he post-2028 contracts must fully address this preference right . . . ." (POC-029-PPC, at 2).

as a fully bundled power product with first in right entitlement to all the energy, capacity, and environmental attributes (*e.g.*, Renewable Energy Credits and low carbon attributes) of such resources." POC-029-PPC. However, none of the comments provide legal authority or analysis in support of these views.

As reflected in comments there are many points of view regarding preference and environmental attributes. Bonneville evaluated this issue and has concluded that it will convey the environmental attributes of the power sold, including emissions and any RECs, commensurate with a customer's firm power purchase amount and rate elections. However, the basis for this decision is not preference. There are several reasons why preference is not applicable.

*First*, the plain language of the preference clause of the Bonneville Project Act of 1937 states: "the administrator shall at all times, in disposing of *electric energy* generated at said project, give preference and priority to public bodies and cooperatives." 16 U.S.C. § 832c(a) (2022) (emphasis added). The Northwest Power Act of 1980 reaffirmed that preference applies to electric energy, aka power: "All *power* sales . . . shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 . . . ." 16 U.S.C. § 839c(a) (emphasis added); *see also* 16 U.S.C. § 839g(c) (2022) ("preference and priority in the sale of federally generated electric *power*." (emphasis added)). Accordingly, the plain language of preference applies only to "electric energy" or "power sales."[47]

To this end, no commenters assert that the draft Policy denies public customers preference to the electric power Bonneville intends to sell under its Provider of Choice contracts. *See Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037, 1046 (9th Cir. 2007) ("There is no allegation here that BPA failed to provide the power necessary 'to meet the firm power load' of its preference customers." (quoting 16 U.S.C. § 839c(b)(1))). The statutory preference language does not require Bonneville to apply the concept of "preference" by extrapolation to intangible benefits created by states. States cannot alter federal rights or create new federal obligations on Bonneville's sale of power. Only Congress has that power. There is nothing in either the plain language of Bonneville's statutes or legislative history that indicate congressional intent to create an obligation to apply statutory preference to the varying, state-defined concepts of environmental attributes.

*Second*, preference applies only in specific situations. Namely, when there are competing applications for an allocation of a limited amount of electric energy between a public body and a private entity, Bonneville must give priority to the public body. 16 U.S.C. § 832c(b) (2022); *See also Aluminum Co. of Am. v. Cent. Lincoln People's Util. Dist.,* 467 U.S. 380, 393 (1984). There is nothing about this tie-breaking function that suggests Bonneville must convey environmental attributes.

---

[47] This includes capacity. *See* 16 U.S.C. § 839a(9).

*Third*, preference's role is not implicated here. There are no conflicting or competing applications for an allocation of electric energy, which would trigger the application of statutory preference to power. PPC's comment illustrates this point well. PPC states "[t]he post-2028 contracts must fully address this preference right by ensuring that BPA does not offer to sell any portion of the energy, capacity, and/or environmental attributes of the Federal system to non-preference customers before providing a timely and meaningful opportunity to its preference customers to exercise their preference rights." POC-029-PPC. PPC presents a hypothetical that *if* there were a competing application, the Administrator would need to give public customers a meaningful opportunity to exercise their preference rights before selling to others. However, because there is no competing application for power, there is no obligation on the Administrator to apply preference.

What is implicated here is section 5(b) of the Northwest Power Act. If public customers execute a Provider of Choice contract they are exercising their section 5(b) right to buy from Bonneville "whenever requested." 16 U.S.C. § 839c(b) (2022). Bonneville has determined, in the final Policy, that it will convey all the attributes commensurate with the physical sale of power. But it is not preference that is causing that outcome; rather, it is Bonneville's policy that if a customer takes physical power, then Bonneville will convey the intangible state-defined benefits along with it. In other words, it is the mere fact of the sale itself and Bonneville's willingness to agree in this final Policy that it will "convey the environmental attributes of the power sold . . . commensurate with a customer's firm power purchase amount . . . ."

*Fourth*, preference is to supply; it does not speak to price. As the Ninth Circuit explained: "[we have] rejected the premise that preference customers were entitled to purchase not just available power, but the cheapest available power." *Golden Nw.*, 501 F.3d at 1046 (citing *Cent. Lincoln Peoples' Util. Dist. v. Johnson,* 735 F.2d 1101, 1125 (9th Cir. 1984) (quotation omitted)). The preference provisions "protect the preference customers' access to power supply; they do not speak directly to price." *Id*. By suggesting that preference entitles them to environmental attributes, the public customers are effectively arguing that preference protects price by requiring Bonneville to convey something that will lower their state regulatory compliance costs. Preference does not speak to price, so it cannot give them a right to receive a state-defined concept that would make the power more valuable to them.

For all these reasons, preference is not applicable to the intangible, varying, state-defined concepts of environmental attributes. Environmental attributes and RECs are recent concepts created under state laws, with differing definitions, which continue to change. These concepts were not contemplated at the time when preference was established.[48] And there is no federal law directing Bonneville's treatment of these concepts. Thus, Bonneville has discretion in this

[48] Certainly not when preference was first established in the Reclamation Act of 1906 nor in any subsequent federal statutes with a preference clause, including the Bonneville Project Act of 1937 and the Northwest Power Act of 1980. RECs emerged in the late 1990s to early 2000s, and the notion of environmental attributes (variously defined) came some years later.

area and it is reasonable, as a matter of policy, for Bonneville to conclude these non-power characteristics can accompany Bonneville's sales of power.[49]

*IV. Preference does not entitle public customers to "all" RECs*

As noted above, OPALCO's and PNGC's comments state that "it is unacceptable for BPA to retain any RECs" and "[w]e firmly assert that all RECs associated with the FCRPS in its entirety belong to its preference customers." POC-013-OPALCO; POC-046-PNGC. First, the discussion above explains why this assertion is wrong. Second, Bonneville has never given public customers "all" RECs. Prior to Regional Dialogue contracts, Bonneville sold RECs only to interested parties. Thus, there is no precedent or requirement that all RECs be conveyed to public customers. Lastly, if OPALCO and PNGC's argument were taken to its logical conclusion, then public customers would have preference to "all" RECs no matter how much power they bought, which would produce the absurd result that section 5(b) creates a right to buy only environmental attributes without *any* power. For these reasons, and those discussed above, the statutory preference to electric power is not implicated for environmental attributes, including RECs, and does not entitle public customers to "all" RECs.

*V. Environmental attributes and Investor-Owned Utilities*

The last issue is WPAG's and Cowlitz's comments state that they "do not support, and would strongly object to, any post-2028 allocation of power and/or environmental attributes from the federal system to the investor-owned utilities." POC-045-WPAG; POC-014-Cowlitz. WPAG takes the position that allocating a portion of the environmental attributes of the federal system to the IOUs "would be a clear violation of preference rights." POC-045-WPAG.

As discussed above, Bonneville has explained that preference does not apply to environmental attributes. Bonneville has also explained its decision that the environmental attributes associated with Bonneville's system will follow the physical sale of power. To the extent that WPAG and Cowlitz's comments are directed at the REP under Northwest Power Act section 5(c), those comments are outside the scope of the Provider of Choice process. Bonneville will determine how to implement the REP in the separate process that is underway for that program.

*VI. Conclusion*

The state-defined characteristics of the power that customers buy from Bonneville will flow to those customers commensurate with the physical amount of power they buy. Bonneville remains committed to assisting customers with their efforts to comply with state renewable energy and carbon programs, as reflected in the commitments throughout the Policy.

[49] Bonneville's public customers are not the sole and exclusive purchasers of the entire electrical generation produced by Bonneville's system.

# Bonneville Power Administration
# Provider of Choice Policy
# March 2024

# Table of Contents

**1. Introduction** .......... **1**
1.1 Principles and Goals .......... 2
1.2 Emerging Landscape .......... 4
**2. Provider of Choice Foundational Service Elements** .......... **6**
2.1 Net Requirements .......... 6
2.2 Tiered Rate Construct .......... 8
2.3 Serving Load .......... 9
2.3.1 Power at Priority Firm Tier 1 Rates .......... 9
2.3.2 Augmentation .......... 10
2.3.3 Non-federal Resources .......... 13
2.4 Contract High Water Marks .......... 15
2.4.1 CHWM Calculation .......... 15
2.4.2 Subsequent CHWM Adjustment Categories .......... 24
**3. Products and Services at Priority Firm Rates** .......... **27**
3.1 Product Basics .......... 28
3.2 Load Following .......... 30
3.3 Block .......... 30
3.3.1 Block with Shaping Capacity Option .......... 30
3.4 Slice/Block .......... 31
3.5 Above-CHWM Load Service .......... 32
**4. Products and Services at New Resource Rate and Industrial Firm Power Rate** .......... **34**
4.1 5(b) for Investor-Owned Utilities .......... 35
4.2 New Large Single Loads .......... 35
4.3 Direct Service Industry Customer .......... 35
**5. Rate Discounts** .......... **36**
5.1 Irrigation Rate Discount .......... 36
5.2 Low Density Discount .......... 37
**6. Power Delivery** .......... **37**
6.1 Transmission .......... 38
6.2 Transfer Service .......... 38
**7. Carbon** .......... **42**
7.1 Environmental Attributes .......... 42
7.1.1 Renewable Energy Credits .......... 43
7.1.2 Emissions Accounting .......... 43
**8. Long-term Cost-Management** .......... **43**
**9. Conservation** .......... **44**
**10. Residential Exchange Program** .......... **44**
**11. New Long-term Contracts** .......... **45**
**12. Environmental Analysis** .......... **50**
**APPENDIX – Abbreviations/Acronyms** .......... **51**

# 1. Introduction

The Bonneville Power Administration (Bonneville) has supplied reliable, affordable and low-carbon wholesale electric power to public power utility and investor-owned utility (IOU) customers serving retail consumers throughout the Pacific Northwest for over 85 years. This proud tradition is rooted in the agency's enabling legislation, and Bonneville looks forward to building on this legacy in the years ahead.

When requested by an eligible public body or IOU, section 5(b) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act) directs the Administrator to offer a contract to meet the firm power load of the customer to the extent that such firm power load exceeds the capability of the customer's resources. Before offering such contracts, Bonneville has historically engaged with regional utilities and interested parties in a regional power sales policy and contract-development process to gain an understanding of their electric power needs and perspectives, which help shape Bonneville's power marketing policy and future contracts.

Developing the Provider of Choice Policy (Policy) is the first formal step of this effort and represents the culmination of a multi-year regional engagement designed to shape Bonneville's long-term power sales policy and contracts that will follow the expiration of the current Regional Dialogue contracts in September 2028. Regional engagement to this point has been comprised of an extensive, iterative, structured public process involving customers and interested parties who submitted proposals and provided feedback to Bonneville on a variety of important and challenging issues. Through the Policy and contracts, Bonneville looks to affirm its status as customers' "Provider of Choice" for years to come.

In 2016, Bonneville launched the Focus 2028[1] effort, which led to the first Provider of Choice discussions. Bonneville held periodic regional conversations to understand the current challenges facing utility customers as well as receive perspectives on these customers' future needs. Bonneville continued customer outreach with a year of educational sessions with public power that covered the foundational issues that would underpin the Provider of Choice Concept Paper.[2]

The Provider of Choice Concept Paper, published on July 14, 2022, set forth Bonneville's initial positions and considerations for Provider of Choice contract policies, products and services. The concept paper preceded a series of policy development workshops that provided grounding in the policy topics, discussed the intent and design of policy elements, and invited deliberation

[1] Focus 2028 was a forum for regional leaders to begin to develop a common understanding of the types of industry changes and strategic choices Bonneville may face to maintain its cost competitiveness and financial strength.

[2] The Provider of Choice Concept Paper is available at https://www.bpa.gov/-/media/Aep/power/provider-of-choice/bpa-provider-of-choice-concept-paper-final-july-2022.pdf.

and proposals. Participants provided informal comments that helped shape the policy development over the course of the year-long process.

Bonneville released a draft Policy on July 20, 2023, and collected comments through October 13, 2023. This Policy reflects Bonneville's final policy decisions, and the accompanying record of decision (ROD) responds to whether Bonneville adopted commenter requests.

With this Policy in hand, Bonneville will again engage the region in a public process to determine how to implement the Policy and codify these policy decisions in Provider of Choice contracts. Bonneville, in coordination with its power customers, will draft contracts and accompanying documentation and release the contract templates for public comment. The goal is to have all firm power customers request and execute new contracts by the end of calendar year 2025. Bonneville and customers will use the time between contract signing and power deliveries, slated to start October 1, 2028, to ensure a smooth transition between contracts.

Bonneville launched a process in January 2024 to develop the post-2028 rate design for its public rates — the 2029 Public Rate Design Methodology (PRDM) — that will update and replace the current Tiered Rates Methodology (TRM). This process will include a series of educational workshops to establish baseline knowledge of rates as well as explore potential options for changes to the rate design applicable to the Provider of Choice contracts. Bonneville will draft the PRDM with consideration of public input before introducing the methodology in a Northwest Power Act section 7(i) rate proceeding, expected to occur around the time of the BP-26 Rate Case. Bonneville may also consider other policy updates and new or enhanced business systems as needed to support the Provider of Choice contracts.

## 1.1 Principles and Goals

The Provider of Choice principles and goals are a cornerstone, intended to guide development of this Policy and the subsequent contracts. They convey Bonneville's aspirations for what future power sales contracts could provide to regional power customers through products and services. They also provide a framework against which Bonneville and the region will assess policy and contract decisions.

### 1.1.1 Principles

Bonneville's Provider of Choice principles below guide the Policy and contract development.

1. **Tier 1 firm power rates are set at the lowest possible rates consistent with sound business principles.** Bonneville sells electric power at cost to its customers and strives to provide competitive rates. This includes considering its business needs and preserving the near and long-term value of the Federal Columbia River Power System (FCRPS) for the region.

2. **Provider of Choice Policy and contracts are consistent with Bonneville's statutes.** Bonneville offers contracts to provide power to customers to meet their firm power

load net of their non-federal resources. This principle includes ensuring there are adequate resources to meet Bonneville's contractual load obligations.

3. **Contracts provide long-term supply of electric power through standardized products and services and transparent processes.** Bonneville develops its Policy and offers and implements standardized contracts transparently.

4. **Provider of Choice Policy and contracts provide financial stability for Bonneville and support Bonneville's regional obligations and commitments.** Bonneville's Policy and contracts support its financial obligations and objectives, such as its ability to meet all debt obligations. Offerings provide value to customers and the region while minimizing risk for Bonneville and customers.

### 1.1.2 Goals

The Provider of Choice goals below embody Bonneville's aspirations for the Policy and contracts.

1. **Provider of Choice Policy and contracts are regionally supported.** Bonneville's regional firm power customers and the region generally support the Policy and contracts offered by Bonneville. The region will be engaged throughout the transparent process and regular input will ensure Bonneville meets this goal.

2. **The Federal Base System is fully subscribed to supply customers' net requirements.** Bonneville offers attractive products and services at competitive rates.

3. **Product and service offerings are equitable.** Bonneville's product offerings balance benefits, costs and risks while recognizing differences in customers' needs and interests.

4. **Contracts offer customers flexibility to invest in and integrate non-federal resources.** Bonneville will look for opportunities to accommodate the use and integration of customers' non-federal resources as part of power sales contracts and support customers meeting their firm power supply needs while limiting risk and cost increases to applicable power rates.

5. **Contracts support customers meeting national and regional objectives.** Bonneville supports customers in meeting their applicable compliance requirements. Current and emerging issues to be considered include clean energy policies, distribution of environmental attributes, emerging markets and electrification.

6. **Contracts are administratively straightforward and implementable.** Bonneville's contracts simplify the implementation of products and services in a way that minimizes administrative complexity and costs while taking into consideration customers' needs.

legal right to serve the load, and the acquiring utility has obtained an ownership interest in the distribution facilities and properties in the territory sought to be annexed.

Bonneville will use established and periodically updated Guidelines Regarding Request for Transfer Service to New Points of Delivery, referenced in Section 6.2.5, to assess alternate delivery options, cost-effectiveness, and quality of service for new and annexed load.

# 7. Carbon

National, state, and local efforts to shift the energy industry toward carbon-free resources include reducing GHG emissions, increasing the use of renewables, and electrifying transportation and other sectors traditionally dependent on fossil fuels. Some states have also mandated that retail utilities and other load serving entities achieve a 100% carbon-free power supply. This includes Washington's Clean Energy Transformation Act (CETA) mandate of 100% carbon-free by 2045. Moving toward a carbon-free future is a collective challenge that will take industry-wide efforts and require new energy and capacity resources to ensure sufficient supply for meeting load and maintaining grid reliability.

As the Pacific Northwest tackles the challenge of decarbonization, Bonneville will strive to meet future load needs with cost-effective, carbon-free resources when acquisitions are required. But Bonneville cannot provide 100% carbon-free power or offer a 100% carbon-free product at this time.

Bonneville sells power produced largely from a system of federal resources, which is on average 95% carbon-free. This system of resources includes the federal hydropower system, the Columbia Generating Station (CGS), as well as non-federal resources and market purchases. Market purchases help Bonneville meet near-term and real-time energy demands not met by the base federal system. Current energy markets do not delineate the generating source for power sold in these markets. States with GHG reporting programs consider this power to be unspecified, and they attribute a default emissions factor to all unspecified power purchases akin to a natural gas generator. Bonneville is optimistic that electricity markets and state accounting practices will evolve to provide options for clean near-term and real-time purchases in the future. Bonneville anticipates that the federal system will move closer to 100% carbon-free over the Provider of Choice contract period. Bonneville intends to provide information through its Resource Program and other public forums on ways Bonneville is achieving its strategic goals related to decarbonization, which in turn customers can use to demonstrate progress toward their state targets.

## 7.1 Environmental Attributes

Bonneville will convey the environmental attributes of the power sold, including emissions and any renewable energy credits (RECs), commensurate with a customer's firm power purchase amount and rate elections.

### 7.1.1 Renewable Energy Credits

Bonneville will convey RECs based on the actual amount of power purchased by a customer. Bonneville will provide separate REC conveyance for power purchased at PF Tier 1 rates, PF Tier 2 rates, the NR rate, and the IP rate. Not all resources that make up a particular cost pool will necessarily create RECs. Bonneville will determine a customer's base allocation of RECs by applying the megawatt hours purchased from Bonneville at a particular rate to the percentage of qualifying resources assigned to that rate's cost pool. For example, a PF customer purchasing power at a PF Tier 1 rate would receive RECs based on the number of RECs generated by the resources assigned to the Tier 1 cost pool. Bonneville can convey, retire or otherwise dispose of additional RECs created by the federal system not associated with firm power sales at its discretion.

A customer will be able to elect whether Bonneville transfers their RECs to them, to another customer, to a third-party-managed REC market account or to a Bonneville-managed subaccount. Bonneville will not provide remarketing services for these RECs under Provider of Choice.

### 7.1.2 Emissions Accounting

Bonneville intends to provide separate emissions accounting for power purchased at PF Tier 1 rates, PF Tier 2 rates, FPS rates, the NR rate, and the IP rate. For example, Bonneville will convey emissions attributed to resource(s) that comprise the Long-term Tier 2 rate pool to customers electing the Long-term Tier 2 rate.

Bonneville envisions it will convey a single emissions accounting associated with power sold at PF Tier 1 rates and not attempt to create emissions accounting subcategories within power sold at PF Tier 1 rates.

Bonneville will provide transparent accounting of the fuel mix and conveyance of environmental attributes. Bonneville anticipates its methods to account and convey environmental attributes will be flexible enough to adapt to the variety of existing and evolving program needs, but Bonneville will evolve its methods as needed to provide a durable framework.

## 8. Long-term Cost-Management

Bonneville understands the value that customers place on the cost of power supplied by Bonneville and its need to practice prudency in cost-management. Bonneville intends to continue to promote accountability, trustworthiness, and transparency to guide its projected costs so that customers continue to have ample opportunities to understand and provide input. While not legally required, Bonneville has established norms in access and transparency to financial information by establishing processes that provide the region the opportunity to comment on Bonneville's projected costs for the upcoming rate period. Bonneville offers quarterly financial and business performance updates, which allow the region to understand

any variance from planned business performance. Bonneville intends to continue to evaluate financial health goals as part of its ongoing strategic and financial plans, which help provide financial goals for the agency.

## 9. Conservation

Bonneville's conservation program acquires reliable, cost-effective conservation to reduce the Administrator's load obligation. When Bonneville moved to a tiered rate construct under Regional Dialogue, it created a direct nexus between the cost and impact of conservation for each customer that necessitated a restructuring of Bonneville's conservation program. The conservation program that Bonneville and its customers established in the Regional Dialogue contract period has been successful in achieving consistent, reliable energy savings.

With the continuation of tiered rates under Provider of Choice, Bonneville proposes to maintain its approach to conservation acquisition and does not intend to pursue major changes to its conservation program. Bonneville will continue to acquire conservation through customer achievements. Bonneville intends to allocate EEI budgets to customers proportional to the amount of load supplied with firm power sold at a PF Tier 1 rate. Bonneville will offer a diverse set of conservation measures that customers may implement within their service territories and report to Bonneville. Once reported, customers may request payment for qualifying measures using established EEI budgets or report measures as self-funded.

Ahead of October 1, 2028, Bonneville intends to engage customers in a separate public process to discuss potential program changes, including a re-evaluation of the appropriate self-funding percentage. Bonneville is open to discussing conservation program improvements that may better serve customers' needs, lead to more effective conservation program implementation, and be more adaptive to an evolving energy landscape. Following this engagement, Bonneville will update the ECAs to reflect any program changes and meet the needs of the Provider of Choice contracts.

## 10. Residential Exchange Program

Section 5(c) of the Northwest Power Act establishes Bonneville's statutory obligation to regional utilities participating in Bonneville's Residential Exchange Program[24] (REP). The REP provides residential and farm retail ratepayers of Pacific Northwest utilities with high-cost resources (public power and investor-owned) access to the cost benefits of low-cost Bonneville power through a power "exchange." While the REP is not within the scope of the Provider of Choice Policy and contracts, REP costs must be recovered in Bonneville's power rates.

Bonneville currently implements the REP through a settlement that is set to expire in 2028. Bonneville is engaging regional parties in a two-phased approach to develop the post-2028 REP

[24] More information on REP is available at https://www.bpa.gov/energy-and-services/power/residential-exchange-program.

implementation of the program. The first phase, referred to as the settlement phase, is exploring whether a follow-on REP settlement can be reached. During this phase, Bonneville will develop scenario analysis with potential levels of REP benefits for IOU and public stakeholders to consider. Bonneville anticipates completing its scenario analysis by early 2024. If a settlement is reached, Bonneville would likely conduct a section 7(i) rate-making process to consider and evaluate the settlement for statutory compliance. The timing of such a process depends on the success of REP settlement negotiations.

If an REP settlement is not achieved or appears unlikely, Bonneville would turn its attention from facilitating settlement to preparing for the traditional implementation of the REP. With the expiration of the current REP settlement in 2028, a number of previously settled legal and policy issues will become live issues. In preparation for this transition, a collection of processes, policies, and proceedings would be needed to ensure that Bonneville has the necessary components of the REP ready for the BP-29 Rate Case implementation of the REP. Those processes would likely address, at a minimum, the following:

- 7(b)(2) legal interpretation.
- 7(b)(2) implementation methodology.
- Average System Cost methodology, consultation process, Federal Energy Regulatory Commission filing.
- 5(c)(5) In lieu Policy.
- Residential purchase and sales agreement negotiation and development.
- Treatment of environmental attributes of the FCRPS.

The timing for commencing these processes will depend on the status of the REP settlement negotiations. If no settlement is reached, all of these processes must be completed by the time rates go into effect for the post-2028 period.

### 10.1 Residential Exchange Program for PF Customers

Under Regional Dialogue and the TRM, PF customers agreed to a limited waiver of their participation in the REP. Specifically, PF customers were permitted to only receive REP payments from Bonneville for certain resources. The customers' limited waiver reduced the cost of the REP in the PF Tier 1 rates, preserving the value of the Tier 1 system, which was a foundational element of the TRM and the Regional Dialogue contracts. Bonneville intends to expand upon that principle in the Provider of Choice contracts and include a provision whereby PF customers would waive their participation in the REP for the Provider of Choice contract period. This proposal will reduce the costs of the REP recovered in a PF Tier 1 rate as well as reduce the administrative burden and complexity of administering the REP.

## 11. New Long-term Contracts

Bonneville will offer and execute Provider of Choice contracts to utilities in late 2025. Bonneville will begin power deliveries under these contracts on October 1, 2028, following the




# Post 2028 Residential Exchange Program
# January 23, 2024

9:00 am - Noon

Join the WebEx Meeting

https://mybpa.webex.com/mybpa/j.php?MTID=m5428e1e7bf3c05ae317111803bbb4b8c

Join by Meeting Number: 1-415-527-5035; Access Code: 2760 750 9032#

Meeting Password: EUgPif7m*67

POST
2028
REP

# Agenda for January 23, 2024

| Time | Topic | Presenter(s) |
| --- | --- | --- |
| 9:00 – 9:05 | Opening and Introductions | Paulina Cornejo |
| 9:05 – 9:30 | IOUs and Publics Settlement Development Discussion | Various |
| 9:30 – 10:15 | REP Benefits Analysis | Stephanie Adams |
| *10:15 – 10:30* | *BREAK* | |
| 10:30 – 11:45 | Deep Dive into Scenarios | Stephanie Adams |
| 11:45 – 11:55 | Path Forward | Daniel Fisher |
| 11:55 - Noon | Closing | Paulina Cornejo |

POST 2028 REP

**For Internal Discussion Only - Pre-Decisional, Deliberative Process, FOIA-Exempt.**

# **Recap:** Post 2028 REP Process

- The initial REP public process concluded in September 2023; it was designed to educate participants and prepare for settlement negotiations.
- Feedback from Publics, IOUs and the Oregon commission suggested an REP settlement was unlikely at the time.
- BPA committed to sharing updated REP analysis in January of 2024 that reflects updates to major forecast components informed by the BP-24 Rate Case and includes additional scenarios requested by participants.
- BPA is also seeking feedback from stakeholders regarding their discussions and perspectives on development of an REP settlement at this workshop; time has been allotted on the agenda.

# Major Take-Aways

- In the near-term REP benefits are higher and a refresh of the major components illustrates the variability that can materialize from rate period to rate period.
- In the long-term REP benefits are lower and the change is relatively small.
  - Scenario results produce a wide range in benefits.

| $ millions | FY 2024-25 | FY 2029-30 |
|---|---|---|
| Reference Case | $ 108 | $34 |
| COU Best Case | $(160) | $(186) |
| IOU Best Case | $301 | $304 |




Center of boxes represents the median line; the outer box represents the 25 and 75th percentiles. Whiskers the minimum and maximums.




# Post 2028 Residential Exchange Program
# June 27, 2023

9:00 am - Noon

Join the WebEx Meeting

https://bpa.webex.com/bpa/j.php?MTID=mdae6959037ea82893b433a6dd52a1696

Join by Meeting Number: 1-415-527-5035; Access Code: 2760 825 9075#

Meeting Password: WApvNfvk358

POST
2028
REP

# Agenda for June 27, 2023

| Time | Topic | Presenter(s) |
|---|---|---|
| 9:00 – 9:10 | Introduction | Scott Winner |
| 9:10 – 9:40 | PPC’s Presentation | Mike Deen |
| 9:40 – 10:25 | WPAG’s Presentation | Ryan Neale |
| *10:25 – 10:40* | *BREAK* | |
| 10:40 – 11:40 | IOUs’ Presentation | IOU Reps |
| 11:40 – 11:50 | Questions and Feedback | All |
| 11:50 - Noon | Closing Comments and Next Steps | Michael Edwards |

POST
2028
REP

B O N N E V I L L E   P O W E R   A D M I N I S T R A T I O N



# IOUs' Presentation

POST
2028
REP

# June 27, 2023
# IOU REP Presentation

*Each IOU reserves the right to argue any position, including any additional positions, in a future REP proceeding or settlement discussion.*



# Guiding Principles



# Guiding Principles

- A fundamental purpose of the NWPA is allow the residential and small farm consumers served by the region's IOUs to share in the economic benefits of lower cost Federal resources marketed by BPA. (See Senate Report 96-272, page 14, regarding Senate bill 885: a Purpose and major element–To extend the benefits of Federal Columbia River Power System to the residential and farming consumers of investor-owned utilities.)
    - These benefits include the value of carbon intensity and other environmental attributes of Federal resources.

# Guiding Principles

- The NWPA Residential Exchange provides for an actual exchange of power through a purchase and sale. (*See* NWPA 5(c))
- Specifically, NWPA 5(c)(1) provides that –
  - Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.
- Similarly, NWPA 5(b)(1) provides, in relevant part, that –
  - Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act … electric power to meet … firm power load …

# Guiding Principles

- BPA sales of power under NWPA 5(c)(1) are system sales of Federal power
  - BPA's "Whitepaper For 'Provider Of Choice' Contract Discussions: Why BPA Is Required To Sell From A Pooled System Of Resources" (located at https://legacy.bpa.gov/providerofchoice/Documents/BPA%20Whitepaper%20on%20System%20Sales.pdf ) explains that BPA is required to sell power as "system sales"
  - A system sale is a sale to a customer, usually wholesale, from the seller's system as a whole, without identifying a specific resource as being the creator of the power being sold (Whitepaper at page 1)

# Guiding Principles

- BPA sales of power under NWPA 5(c)(1) are system sales of Federal power (cont.)
  - BPA system sales of Federal power under NWPA 5(c)(1) — like those to preference agencies under NWPA section 5(b)(1) to meet their general requirements — include the carbon intensity and other environmental attributes of such power
    - The rates for BPA sales under NWPA 5(c)(1) and BPA sales to preference agencies under NWPA 5(b)(1) are based on the cost of Federal system power (*see* Whitepaper at pages 5-6; *see also* NWPA 7(b)(1)), and such sales share in the environmental attributes of such power.
    - More fundamentally, environmental attributes associated with Federal power from carbon-free generation are an inherent characteristic of that power and are as such included in the sale of that power

# Guiding Principles

- Prior to the 2012 REP Settlement, the REP was generally implemented (through settlement or not) as financial payments to utilities

- The 2012 REP Settlement provided for financial payments to IOUs and the transfer of certain environmental attributes (or their value) to IOUs

# Guiding Principles

- Under the REP implemented as provided by the NWPA, (i) power equal to the loads of the IOU residential and small farm consumers is to be sold by IOUs to BPA (unless BPA acquires in lieu power as provided in NWPA 5(c)(5)), and (ii) an equal amount of Federal system power is to be sold by BPA to IOUs.

  - NWPA contemplates that residential and small farm consumers share – through an exchange of power – in the benefits of the Federal Columbia River Power System

  - Carbon intensity and other environmental attributes in BPA's Federal power are a considerable benefit of the FCRPS

  - The carbon intensity and other environmental attributes of Federal power must be reflected in REP benefits received from BPA

B O N N E V I L L E   P O W E R   A D M I N I S T R A T I O N

## Residential Exchange Program Settlement Agreement Proceeding (REP-12)

# ADMINISTRATOR'S FINAL RECORD OF DECISION

# APPENDIX A: 2012 REP SETTLEMENT AGREEMENT

July 2011

REP-12-A-02A

**This page intentionally left blank**

## TABLE OF CONTENTS

**Page**

2012 REP Settlement Agreement ....................................................................................1

Revised REP Settlement Agreement ............................................................................98

List of Entities Signing the Revised REP Settlement Agreement ..............................................100

Contract No. 11PB-12322

## REP SETTLEMENT AGREEMENT

### Table of Contents


| Section | | Page |
|---|---|---|
| 1. | Effective Date; Binding Rights and Initial Obligations | 2 |
| 2. | Definitions | 4 |
| 3. | Establishment of REP Settlement Benefits | 11 |
| 4. | Interim Agreement True-Up Payment Amounts | 17 |
| 5. | Environmental Attributes | 18 |
| 6. | Allocation to IOUs of REP Settlement Benefits | 19 |
| 7. | Waivers and Satisfaction of Obligations and Claims | 24 |
| 8. | Legislation | 27 |
| 9. | Dispute Resolution | 27 |
| 10. | Parties' Actions with Respect to Litigation; Court Determination of Unenforceability of Settlement | 33 |
| 11. | No Admission, Precedential or Evidentiary Effect; Reservation of Rights | 35 |
| 12. | Representations | 35 |
| 13. | Miscellaneous | 35 |
| 14. | Parties' Rights and Obligations Related to Qualifying Conditions. | 38 |
| 15. | Signatures | 42 |

**Exhibits and Attachments**

| | |
|---|---|
| Exhibit A – | Form of REP Settlement Implementation Agreement |
| Exhibit B – | PF-02 Customer Percentages and Customer-Specific PF-02 Refunds |
| Exhibit C – | Renewable Energy Certificates and Carbon Attributes to IOUs |
| Exhibit D – | Illustrative Table for Section 6 |
| Exhibit E – | Arbitration Procedures |
| Exhibit F – | Not Used |
| Exhibit G – | Not Used |
| Exhibit H – | Template Replacement Form of Exhibit H to COU Parties' CHWM Contracts |

**RECITALS**

A. BPA, entities in the IOU Group and entities in the COU Group are parties or intervenors to *Idaho Public Utilities Commission, et al. v. Bonneville Power Administration* (Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942, 08-74957 (Consolidated) USCA-Ninth Circuit) and to *The Association of Public Agency Customers, et al. v. Bonneville Power Administration* (Docket Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161, 08-75165 (Consolidated) USCA-Ninth Circuit) (collectively, the "Current Litigation").

B. BPA, entities in the IOU Group and entities in the COU Group are also parties or intervenors to *Avista Corporation, et al. v. Bonneville Power Administration* (Docket Nos. 09-73160, 09-73201, 09-73225, 09-73228, 09-73230, 09-73247, 09-73249, 09-73251, 09-73252, 09-73254, 09-73264, 09-73269, 09-73271, 09-73274, 09-73281 (Consolidated) USCA-Ninth Circuit) and to *Portland General Electric Company, et al. v. United States Department of Energy, et al.* (Docket Nos. 09-73288, 09-73289, 09-73317, 09-73322, 09-73326 (Consolidated) USCA-Ninth Circuit) (collectively, together with any challenges in the U.S. Court of Appeals for the Ninth Circuit to BPA's WP-10 rates, the "Related Litigation").

C. The Parties desire to resolve certain disputes underlying the Current Litigation and Related Litigation and to settle matters relating to the payment of benefits and the recovery of costs of IOU participation in the Residential Exchange Program for the Settlement Period.

**SETTLEMENT AGREEMENT**

This REP Settlement Agreement ("Settlement Agreement"), dated as of ____________ ___, 2011 is entered into by and among the Bonneville Power Administration and the undersigned investor-owned utilities, state public utility commissions, Citizens' Utility Board of Oregon, consumer-owned utilities, consumer-owned utility associations, and other BPA power customers.

**1. EFFECTIVE DATE; BINDING RIGHTS AND INITIAL OBLIGATIONS**

**1.1 Effective Date and Term.** This Settlement Agreement will take effect as to all Parties on the Effective Date in accordance with section 1.4.1, and will take effect with respect to the Initial Obligations applicable to all Parties other than BPA in accordance with section 1.2. This Settlement Agreement will expire upon the expiration of Fiscal Year 2028.

**1.2 Parties' Representations and Warranties Related to Signing Settlement Agreement; Conditions Precedent to Initial Obligations.**

**1.2.1 Representation and Warranties Related to Signing Settlement Agreement.** By signing this Settlement Agreement, each Party represents and warrants, with respect to itself only, to each other Party that as of the date of such signing the execution, delivery, and performance of this Settlement Agreement (i) are within its powers, (ii) have been duly authorized by all necessary action on its behalf, and all other necessary consents or approvals (including any necessary regulatory consents or approvals) have been obtained and are in full force and effect, and (iii) do not violate any of the terms and conditions of any applicable law or materially violate any contracts to which it is a party.

**1.2.2 Conditions Precedent to Initial Obligations.** The Initial Obligations of the Parties other than BPA will take effect when the following conditions precedent have been satisfied:

"WP-07S ROD" means the "2007 Supplemental Wholesale Power Rate Case: Administrator's Final Record of Decision" issued on September 22, 2008.

"WP-10 ROD" means the "2010 Wholesale Power Rate Adjustment Proceeding: Administrator's Final Record of Decision" issued on July 21, 2009.

**3. ESTABLISHMENT OF REP SETTLEMENT BENEFITS**

**3.1 Schedule of REP Settlement Benefits and Applicability of Ratesetting Provisions.**

**3.1.1 Schedule of REP Settlement Benefit Payments to IOUs.** BPA will pay in total, as REP Settlement Benefits to the IOUs for each Fiscal Year, the Scheduled Amounts set forth in Table 3.1, except as otherwise provided in section 3.6, in which case BPA will instead pay to the IOUs, as REP Settlement Benefits, the amounts determined pursuant to section 3.6. The amounts set forth in Table 3.1 are not subject to direct or indirect adjustment, whether for inflation, interest, or otherwise, but the Parties recognize BPA may, in establishing rates consistent with this Settlement Agreement, round its rates such that the Scheduled Amounts paid to the IOUs differ from the Scheduled Amounts set forth in Table 3.1 below by no more than one thousand dollars ($1,000) for any Fiscal Year.

| Table 3.1<br>Scheduled Amounts | |
|---|---|
| **Fiscal Year** | **(in millions)** |
| 2012 | $182.1 |
| 2013 | $182.1 |
| 2014 | $197.5 |
| 2015 | $197.5 |
| 2016 | $214.1 |
| 2017 | $214.1 |
| 2018 | $232.2 |
| 2019 | $232.2 |
| 2020 | $245.2 |
| 2021 | $245.2 |
| 2022 | $259.0 |
| 2023 | $259.0 |
| 2024 | $273.6 |
| 2025 | $273.6 |
| 2026 | $286.1 |
| 2027 | $286.1 |
| 2028 | $286.1 |

**3.1.2 BPA Ratesetting Obligations.** For each Fiscal Year, BPA will develop rates and refund amounts, in the Rate Proceeding for the applicable Rate Period, such that (i) the COU Parties' PF Rates and refund amounts will be consistent with sections 3.2 through 3.5, and (ii) rates and refund amounts applicable to Non-Settling Entities will be consistent with BPA's determination as described in section 3.7(iii). BPA may not recover costs of Scheduled Amounts or Refund Amounts from COU Parties in any manner other than through Applicable Rates or Surcharged Rates.

Recovery and Return" (WP-10-FS-BPA-07), to be owed to the applicable IOUs as Interim Agreement True-up Payment Amounts ("Interim Agreement True-up Payment Amounts") under the Interim Agreements; *provided,* that BPA payment of Interim Agreement True-up Payment Amounts pursuant to section 9(a)(1) of each Interim Agreement will commence no later than as follows:

(i) If no petition or other legal action is filed in a court with jurisdiction for review of the lawfulness of this Settlement Agreement, then payments by BPA of such amounts will commence 95 calendar days after the Effective Date; or

(ii) If one or more petitions or other legal actions are filed in a court with jurisdiction for review of the lawfulness of this Settlement Agreement, then BPA will commence payment of such amounts 30 days after a final, non-appealable order by such court that dismisses such actions or challenges or that otherwise upholds this Settlement Agreement, provided, however, that if such final, non-appealable order upholds this Settlement Agreement in less than all respects, BPA will make such payments to the maximum extent consistent with such final, non-appealable order.

Upon the satisfaction of the condition in (i) or (ii) above, the True-up Payment Event described in section 8 of such Interim Agreements will be deemed to have occurred. In addition, if Congress adopts legislation as contemplated by section 8 of this Settlement Agreement, then any applicable IOU may elect to receive its Interim Agreement True-up Payment Amount by providing BPA with written notice of such election, in which case, (a) the True-up Payment Event described in section 8 of the Interim Agreement of such electing IOU will be deemed to have occurred and the Interim Agreement True-up Payment Amount of such IOU will be deemed due and payable to such IOU, and (b) BPA will pay to such IOU its Interim Agreement True-up Payment Amount no later than 30 days after BPA's receipt of such notice.

As specified in the Interim Agreements, the applicable IOUs' respective Interim True-up Payment Amounts are the principal amounts set forth in Table 4, together with applicable interest:

**Table 4 (Interim True-up Payment Principal Amounts)**

| **IOU** | **Interim True-up Payment Principal Amounts** |
|---|---|
| Avista | $2,410,000 |
| NorthWestern Energy | $10,199,000 |
| Portland General | $12,007,000 |
| PSE | $56,994,000 |

The Interim Agreement True-up Payment Amounts are in addition to and not a component of the REP Settlement Benefits provided for in section 3.

## 5. ENVIRONMENTAL ATTRIBUTES

**5.1 IOUs.** Consistent with and pursuant to Exhibit C, BPA will convey certain Tier 1 RECs and Carbon Credits (or the revenues generated by the sale of such) for each Fiscal Year to IOUs that are Participating IOUs for such Fiscal Year; provided, however, if any Non-Settling

Entity does not amend Exhibit H of its CHWM Contract in the same manner described for COU Parties in section 5.2, then BPA will (i) convey to the IOUs the value of such Non-Settling Entity's share of the Tier 1 RECs and Carbon Credits that would otherwise have been available for transfer to the IOUs by paying to the IOUs the value of such Tier 1 RECs and Carbon Credits, and (ii) to the maximum extent possible, recover the cost of such conveyance in rates applicable to such Non-Settling Entity pursuant to BPA's ratemaking authority as provided in section 9 in Exhibit H to such Non-Settling Entity's CHWM Contract.

**5.2** **COU Parties**. Each COU Party hereby agrees that Exhibit H of its CHWM Contract is, as of the Effective Date, replaced in its entirety consistent with the template form of Exhibit H set forth as Exhibit H to this Settlement Agreement. BPA will, within 60 days of the Effective Date, deliver to each COU Party a replacement Exhibit H to its CHWM Contract identical in form to the Exhibit H attached to this Settlement Agreement except for the insertion of the appropriate contract number and customer name, which will be effective from the Effective Date without further action or signature by BPA or the COU Party.

**5.3** **COUs That Are Non-Settling Entities.** BPA will ask each Non-Settling Entity that has a CHWM Contract to amend Exhibit H of its CHWM Contracts in the same manner described in section 5.2 for COU Parties.

## 6. ALLOCATION TO IOUS OF REP SETTLEMENT BENEFITS

The REP Settlement Benefits to be paid to the IOUs in accordance with section 3, together with any Environmental Attributes (or their value) to be transferred to the IOUs in accordance with section 5, will be distributed among the IOUs consistent with this section 6 and each IOU will, for each Fiscal Year, receive its IOU-Specific REP Settlement Benefit Amount and its share of any Environmental Attributes (or their value) as determined in accordance with this section 6.

For each Fiscal Year, BPA will develop rates, in the Rate Proceeding for the applicable Rate Period, such that each IOU will be paid its IOU-Specific REP Settlement Benefit Amount as calculated for such Fiscal Year pursuant to this section 6.

**6.1** **Determination of IOU-Specific REP Settlement Benefit Amount.**

**6.1.1** **Calculation of IOU-Specific REP Settlement Benefit Amounts.** For each Fiscal Year, in the Rate Proceeding for the applicable Rate Period, each IOU's IOU-Specific REP Settlement Benefit Amount will be calculated according to the following formula:

| | | |
|---|---|---|
| IOU-Specific REP Settlement Benefit Amount for such IOU for such Fiscal Year | = | the algebraic sum of (i) the product of (a) the IOU Specific Unconstrained Amount for such IOU multiplied by (b) the Constrained Total Benefit Ratio for such Fiscal Year, and (ii) the amount of any adjustment for such IOU pursuant to section 6.2. |
| | | |
| where: | | |

**11. NO ADMISSION, PRECEDENTIAL OR EVIDENTIARY EFFECT; RESERVATION OF RIGHTS**

**11.1 No Admission.** This Settlement Agreement reflects the compromise of disputed issues, claims, and defenses and does not constitute any Party's admission or concession with respect to the merits of any such disputed issues, claims, or defenses.

**11.2 No Precedential or Evidentiary Effect.** Neither this Settlement Agreement nor its performance will (i) constitute any Party's agreement to any underlying principle or statutory interpretation in any context, (ii) constitute any Party's agreement to any methodology other than for purposes of implementing this Settlement Agreement in accordance with its terms for the Payment Period, or (iii) serve as procedural or substantive precedent regarding any matter in any context other than BPA proceedings to implement the terms of this Settlement Agreement.

**11.3 Status of BPA Interpretation and Methodologies Upon Expiration of Settlement Agreement.** Before the start of the Fiscal Year 2029, BPA will conduct a proceeding and issue a record of decision to determine, for the period starting with Fiscal Year 2029, whether, and if so, how, to modify or replace its legal interpretation of, and methodology for implementing, sections 7(b)(2) and 7(b)(3) of the Act. Each Party retains its rights to seek judicial review of BPA's actions and determinations in such proceeding. No Party will assert that any other Party is precluded, as a result of performance of this Settlement Agreement, from seeking judicial review of such actions and determinations.

**12. REPRESENTATIONS**

Each Party makes the following representations and warranties, for itself only, to each other Party:

**12.1 Authority to Execute.** The execution, delivery, and performance of this Settlement Agreement (i) are within its powers, (ii) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals (including any necessary regulatory consents or approvals) have been obtained and are in full force and effect, and (iii) do not violate any of the terms and conditions of any applicable law or materially violate any contracts to which it is a party.

**12.2 Binding Obligation.** This Settlement Agreement constitutes a legal, valid, and binding obligation, enforceable against it in accordance with its terms.

**13. MISCELLANEOUS**

**13.1 Notices; Right to Notice of Disputes and Amendments.**

**13.1.1 Manner of Notices.** All notices, requests or other communications required under this Settlement Agreement must be in writing and will be deemed "given": (i) if delivered in person or by courier, upon receipt by the intended recipient or upon the date of delivery (as confirmed by, if delivered by courier, the records of such courier), (ii) if sent by facsimile transmission, when the sender receives confirmation from the sending facsimile machine that such facsimile transmission was transmitted to the facsimile number of the addressee, (iii) if mailed, upon the date of delivery as shown by the return receipt therefore, (iv) if delivered by a nationally recognized mail delivery service, upon the date of delivery; or (v) if delivered electronically. Notices must be sent to the addresses compiled by BPA and posted on BPA's website at http://www.bpa.gov/corporate/finance/ ascm/index.cfm.

# PACIFIC NORTHWEST ELECTRIC POWER ISSUES

## HEARINGS

BEFORE THE

SUBCOMMITTEE ON ENERGY AND POWER

OF THE

COMMITTEE ON
INTERSTATE AND FOREIGN COMMERCE
HOUSE OF REPRESENTATIVES

NINETY-FIFTH CONGRESS

SECOND SESSION

ON

## H.R. 13931

A BILL TO ASSIST THE ELECTRICAL CONSUMERS OF THE PACIFIC NORTHWEST THROUGH USE OF THE FEDERAL COLUMBIA RIVER POWER SYSTEM TO ACHIEVE COST-EFFECTIVE ENERGY CONSERVATION, TO ENCOURAGE THE DEVELOPMENT OF RENEWABLE RESOURCES, TO ESTABLISH A REPRESENTATIVE REGIONAL POWER PLANNING PROCESS, TO ASSURE THE REGION OF AN EFFICIENT AND ADEQUATE POWER SUPPLY, AND FOR OTHER PURPOSES

SEPTEMBER 19, 27, DECEMBER 11, 13, AND 14, 1978

**Serial No. 95–193**

Printed for the use of the
Committee on Interstate and Foreign Commerce

U.S. GOVERNMENT PRINTING OFFICE
42-650 O WASHINGTON : 1979

H501-70

## COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

HARLEY O. STAGGERS, West Virginia, *Chairman*

JOHN E. MOSS, California
JOHN D. DINGELL, Michigan
PAUL G. ROGERS, Florida
LIONEL VAN DEERLIN, California
FRED B. ROONEY, Pennsylvania
JOHN M. MURPHY, New York
DAVID E. SATTERFIELD III, Virginia
BOB ECKHARDT, Texas
RICHARDSON PREYER, North Carolina
CHARLES J. CARNEY, Ohio
RALPH H. METCALFE, Illinois
JAMES H. SCHEUER, New York
RICHARD L. OTTINGER, New York
HENRY A. WAXMAN, California
ROBERT (BOB) KRUEGER, Texas
TIMOTHY E. WIRTH, Colorado
PHILIP R. SHARP, Indiana
JAMES J. FLORIO, New Jersey
ANTHONY TOBY MOFFETT, Connecticut
JIM SANTINI, Nevada
ANDREW MAGUIRE, New Jersey
MARTY RUSSO, Illinois
EDWARD J. MARKEY, Massachusetts
THOMAS A. LUKEN, Ohio
DOUG WALGREN, Pennsylvania
BOB GAMMAGE, Texas
ALBERT GORE, Jr., Tennessee
BARBARA A. MIKULSKI, Maryland

SAMUEL L. DEVINE, Ohio
JAMES T. BROYHILL, North Carolina
TIM LEE CARTER, Kentucky
CLARENCE J. BROWN, Ohio
JOE SKUBITZ, Kansas
JAMES M. COLLINS, Texas
LOUIS FREY, Jr., Florida
NORMAN F. LENT, New York
EDWARD R. MADIGAN, Illinois
CARLOS J. MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
W. HENSON MOORE, Louisiana
DAVE STOCKMAN, Michigan
MARC L. MARKS, Pennsylvania

W. E. WILLIAMSON, *Chief Clerk and Staff Director*
KENNETH J. PAINTER, *First Assistant Clerk*
WM. MICHAEL KITZMILLER, *Professional Staff*
RANDALL E. DAVIS, *Professional Staff (Minority)*

---

### SUBCOMMITTEE ON ENERGY AND POWER

JOHN D. DINGELL, Michigan, *Chairman*

RICHARD L. OTTINGER, New York
ROBERT (BOB) KRUEGER, Texas
PHILIP R. SHARP, Indiana
ANTHONY TOBY MOFFETT, Connecticut
BOB GAMMAGE, Texas
JOHN M. MURPHY, New York
DAVID E. SATTERFIELD, Virginia
TIMOTHY E. WIRTH, Colorado
ANDREW MAGUIRE, New Jersey
MARTY A. RUSSO, Illinois
EDWARD J. MARKEY, Massachusetts
DOUG WALGREN, Pennsylvania
ALBERT GORE, Jr., Tennessee
HARLEY O. STAGGERS, West Virginia
(ex officio)

CLARENCE J. BROWN, Ohio
CARLOS J. MOORHEAD, California
JAMES M. COLLINS, Texas
W. HENSON MOORE, Louisiana
DAVE STOCKMAN, Michigan
EDWARD R. MADIGAN, Illinois
SAMUEL L. DEVINE, Ohio
(ex officio)

FRANK M. POTTER, Jr., *Staff Director and Counsel*
DAVID B. FINNEGAN, *Counsel*
ANDREW ATHY, Jr., *Counsel*

# CONTENTS


| | Page |
|---|---|
| Hearings held on— | |
| September 19, 1978 | 1 |
| September 27, 1978 | 181 |
| December 11, 1978 (Seattle, Wash.) | 309 |
| December 13, 1978 (Portland, Oreg.) | 515 |
| December 14, 1978 (Boise, Idaho) | 815 |
| Text of— | |
| H.R. 13931 | 4 |
| Statement of— | |
| Altman, Roger C., Assistant Secretary for Domestic Finance, Department of the Treasury | 26 |
| Attneave, Chris, Eugene Future Power Committee, Inc | 543, 545 |
| Bardin, David J., Administrator, Economic Regulatory Administration, Department of Energy | 36, 40 |
| Baucus, Hon. Max, a Representative in Congress from the State of Montana | 181, 190 |
| Bertrand, Dan, president, North Central Washington Central Labor Council | 369, 398 |
| Bogard, Becky, legislative counsel, National Rural Electric Cooperative Association | 205 |
| Boldt, Jim, executive director, Washington Public Utility Districts' Association | 441 |
| Bonker, Hon. Don L., a Representative in Congress from the State of Washington | 311 |
| Bottinger, R. Ted, chairman, Washington State's Committee on Energy and Utilities | 314 |
| Brown, Hon. Walter F., Oregon State senator | 661, 705 |
| Bruce, James E., president, Idaho Power Co | 853 |
| Canfield, Monte E., Jr., Director, Energy and Minerals Division, General Accounting Office | 36, 126 |
| Carlson, Jack, vice president, Washington State Commercial Passenger Fishing Vessel Association | 483, 506 |
| Castle, Del, Seattle Longshoreman's Union | 414, 427 |
| Cavanaugh, Frank, senior staff, Department of the Treasury | 26 |
| Cellarius, Richard, member, board of directors, Sierra Club | 369, 395 |
| Chaney, Ed, director, Northwest Resource Information Center, Inc | 876, 879 |
| Chatburn, Hon. J. Vard, representative, State of Idaho | 836 |
| Clack, David A., board chairman and president, Old National Bancorporation | 441, 461 |
| Coffey, Forrest G., public affairs director, The Boeing Co | 414, 419 |
| Criswell, Jack R., on behalf of Public Power Council, and Northwest Public Power Association | 205 |
| Curtis, Henry G., consultant, on behalf of BPA Industrial Customers | 876 |
| Davidson, C. Girard, Portland, Oreg | 802, 809 |
| Dicks, Hon. Norman D., a Representative in Congress from the State of Washington | 312 |
| Donaldson, John R., chairman, Columbia River Fisheries Council | 717, 742 |
| Dorran, Russell N., manager, Umatilla Electric Cooperative Association | 717 |
| Drapkin, Dennis, Senior Staff, Department of the Treasury | 26 |
| Duncan, Hon. Robert, a Representative in Congress from the State of Oregon, on behalf of Hon. Robert W. Straub, Governor, State of Oregon | 181, 518 |
| Eckman, Tom, chairperson, energy committee, Washington Environmental Council | 441, 462 |
| Ellis, John W., president, Puget Sound Power & Light Co | 369, 372 |

Statement of—Continued Page
Evans, Hon. John V., Governor, State of Idaho 181, 184, 816
Farley, Michael, executive director, Common Cause 543, 551
Farrell, Russell C., Portland, Oreg 805, 805
Ferrie, Robert, president, Italco Aluminum Corp 369, 383
Ford, Pat, Idaho Conservation League 853, 861
Frisbe, Don C., board chairman, president, Pacific Power & Light Co. 661, 698
Germond, Norma Jean, Lake Oswego, Oreg 625
Gill, Rockne, counsel, Public Power Council 205
Girmus, Ben, Estacada, Oreg 625, 635
Goldschmidt, Hon. Neil, mayor, city of Portland 640
Granger, Richard, chairman, Washington State Association of Counties Energy Committee 314, 323
Hale, Leland, energy project coordinator, Western Environmental Trade Association of Washington 441, 465
Haley, Wendell P., Oregon division, Izaak Walton League of America. 717, 771
Hall, Kirk, director, office of energy, State of Idaho 181, 816
Harville, John P., executive director, Pacific Marine Fisheries Commission 661, 692
Helton, Harry V., northwest operations manager, Reynolds Metal Co. 543, 553
Henderson, Mrs., Oreg 783, 794
Higgs, Kenneth, U.S. Fish and Wildlife Service, Office of the Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior 836, 838
Hohl, Joan, energy research coordinator, Washington Public Interest Research Group 369
Holmes, Paul, program coordinator, Oregon-Washington division, National Farmers Union 717, 718
Hudson, Edward G., president, Puget Sound Council of Governments, and cochairman, Local Government Northwest Electrical Energy Task Force 314, 319
Ivancie, Francis J., commissioner, department of public utilities, Portland, Oreg 284, 519
Jones, Allen, coordinator, Northwest Energy Options 441, 448
Jones, Herschel F., on behalf of Seattle Chamber of Commerce 483, 508
Kahn, Stan, Portland, Oreg 802
Kempton, M. H., president, board of directors, Raft River Electric Cooperative 853, 864
Lamson, Robert D., executive vice president, Spencer Products Co. 483
Landry, Arlene, Portland, Oreg 625, 631
Lee, Kai, institute for environmental studies, University of Washington 483, 488
Lynch, Tom, Eugene, Oreg 802, 803
McClain, David W., research analyst, Oregon Institute of Technology. 876, 886
McKean, John W., member, Pacific Fishery Management Council. 783, 796
McCormick, Hon. Mike, a Representative in Congress from the State of Washington 310
McGovern, Hon. George, a U.S. Senator from the State of South Dakota 23
McIsaac, George S., Assistant Secretary for Resource Applications, Department of Energy 36
Maribona, Paco, coordinator, Solar Oregon Lobby 625, 636
Marritz, Robert C., counsel, Pacific Northwest Utilities Conference Committee 414, 416
Marts, Marion, Institute for Environmental Studies, University of Washington 483, 486
Marvet, Lloyd K., on behalf of For Laws on Board 683, 798
Meeds, Hon. Lloyd, a Representative in Congress from the State of Washington 181, 187
Meuret, Forrest L., vice president and legislative director, Save Oregon's Resources Today, Inc., and on behalf of Oregon Wildlife Federation 783, 790
Miles, Harold C., chairman, utility committee, Idaho Consumer Affairs, Inc 876, 878
Mills, Dennis, on behalf of Victor Atiyeh, Governor-elect, State of Oregon 540
Molle, James E., Oregon Solar Institute 625, 627
Moment, Samuel, Portland, Oreg 783

 

Statement of—Continued

| | Page |
|---|---|
| Monroe, David, director, region 5, Aluminum Workers International Union, AFL-CIO | 717, 722 |
| Munro, Sterling, Administrator, Bonneville Power Administration, Department of Energy | 36, 46 |
| Nelson, James, Northwest production manager, Green Giant Co | 369, 397 |
| Nelson, Olga M., on behalf of Oregon State Grange | 543, 613 |
| Nightingale, Wesley, on behalf of Lane County Audubon Society | 717, 720 |
| Piper, David E., manager, Public Power Council | 543 |
| Platt, John C., executive director, Oregon Environmental Council | 661, 666 |
| Pritchard, Hon. Joel, a Representative in Congress from the State of Washington | 313 |
| Radin, Alex, executive director, American Public Power Association | 205, 232 |
| Ragsdale, Hon. Mike, Oregon State representative on behalf of the Western Conference of the Council of State Governments | 661 |
| Redman, Eric, on behalf of Direct-Service Industrial Customers, of the Bonneville Power Administration | 205, 250 |
| Redmon, Rick, consultant, Italco Aluminum Corporation | 369 |
| Reid, Andrew, on behalf of Portland Decommission Alliance | 802, 806 |
| Revelle, Randy, chairman, energy committee, Seattle City Council | 314, 326 |
| Ribe, Mally, on behalf of League of Women Voters | 414, 426 |
| Richards, Monte, Idaho Fish and Game Commission | 816 |
| Robison, Kenneth, senator-elect, State of Idaho | 836, 840 |
| Roskie, Hon. George, Montana State senator, the Western conference of the Council of State Governments | 661 |
| Rust, Gerald H., Jr., chairman, board of commissioners, Lane County (Oreg.) | 519, 523 |
| Samsel, Ray, Columbia River Inter-Tribal Fish Commission | 543, 590 |
| Sandison, Gordon, Department of Fisheries, State of Washington | 414, 421 |
| Schneider, Thomas J., commissioner, Montana Public Service Commission | 288 |
| Scott, Douglas, Northwest representative, Sierra Club | 205, 212 |
| Self, Kenneth W., board chairman, Freightliner Corp., subsidiary of Consolidated Freightways, Inc | 661, 690 |
| Shade, Robert A., director of emergency services, Boise Cascade Corp | 853, 857 |
| Sheldon, Alan C., vice president, environment and energy resources, Aluminum Company of America | 876, 883 |
| Short, Robert H., president, Portland General Electric Co | 205, 240 |
| Smith, Hugh, counsel, Portland General Electric Co | 205 |
| Springer, Ted C., counsel, Idaho Cooperative Utilitites Association, Inc | 853, 862 |
| Stachon, Eric, on behalf of For Laws on Board | 802, 811 |
| Stafne, Scott, on behalf of Salmon Fisheries in Washington and Alaska | 483, 504 |
| Stratton, James F., director, University of Oregon Survival Center | 661, 688 |
| Straub, Hon. Robert W., Governor, State of Oregon | 535 |
| Streeter, Jack, president, South Western Idaho Development Association | 853, 859 |
| Sulzbach, Wilbur, Sandy, Oreg | 625, 630 |
| Swift, Glen, Portland, Oreg | 625, 632 |
| Symms, Hon. Steven D., a Representative in Congress from the State of Idaho | 816 |
| Trent, John, Hillsboro, Oreg | 625, 629 |
| Vajonc, Ed, field representative for Hon. Bob Packwood, a U.S. Senator from the State of Oregon | 519, 528 |
| Vincent, Grant, Oreg | 783, 793 |
| Ward, Conley, Jr., commissioner, Idaho Public Utilities Commission | 181, 836, 842 |
| Weiner, Ruth F., professor of environmental studies, Western Washington University | 483, 500 |
| Wertz, William F., Jr., national committee member, U.S. Labor Party | 441, 472 |
| Widmer, Walter, on behalf of Consumer Power League | 717, 724 |
| Williams, Ken, Portland, Oreg | 802, 808 |
| Williams, Luke, president and chief executive officer, American Sign & Indicator Corp | 441, 446 |
| Williams, Wayne L., director, Peoples Organization for Washington Energy Resources | 414 |
| Williams, Willie, Roseburg, Oreg | 802, 812 |
| Williamson, Paul, on behalf of Oregonians for Utility Reform | 783, 789 |

Additional material submitted for the record by—
Aluminum Company of America, letter, dated November 22, 1978, from Ms. Walden to Mr. Pritsky re accomplishments of the aluminum industry to conserve energy ........ 885
Baucus, Hon. Max, a Representative in Congress from the State of Montana:
Letter, dated September 19, 1978, from Mr. Judge to Mr. Baucus re State of Montana's recommended amendments to H.R. 13931 ........ 192
Resolution of Midwest Electric Consumers Association ........ 199
Boise Cascade Corp., attachment to Mr. Shade's prepared statement, information on operations in Pacific Northwest region for 1977 ........ 859
Columbia River Fisheries Council, attachment to Mr. Donaldson's prepared statement, recommendations of Columbia River Fisheries Council for instream flows in the Columbia and Snake Rivers ........ 748
Columbia River Inter-Tribal Fish Commission, attachments to Mr. Samsel's prepared statement:
Memorandum of understanding ........ 592
BPA opinion M-36835 ........ 598
Consumer Power League, attachment to Mr. Widmer's prepared statement, documentation regarding power costs of selected publicly and privately owned utilities ........ 727
Direct-Service Industrial Customers of the Bonneville Power Administration, attachment to Mr. Redman's prepared statement, letter, dated September 25, 1978, from Mr. Redman to Chairman Dingell re attachments A and B ........ 254
Energy and Power Subcommittee, Committee on Interstate and Foreign Commerce, advertisement from Washington State newspaper ........ 145
Energy Department:
Attachments to Mr. Munro's prepared statement:
Allocation of Bonneville Power resources discussion paper, with forwarding letter ........ 114
Bonneville Power Administration responses to Congressman Dingell's questions of September 8, 1978 ........ 62
Conservation measures of Bonneville Power Administration ........ 151
Letter, dated June 24, 1976, from Mr. Hodel to Mr. Mahoney re contract No. 14-03-38576—notice of insufficiency ........ 122
Preparation of option papers evaluating BPA and regional power system alternatives ........ 73
Table 1—West group area leads and resources ........ 124
General Accounting Office: Attachment to Mr. Canfield's prepared statement, other GAO comments on H.R. 13931 ........ 138
Idaho Cooperative Utilities Association, Inc., letter, dated December 21, 1978, from Mr. Springer to Chairman Dingell re BPA authorization and responsibility to purchase resources ........ 872
Idaho, State of, letter, dated December 27, 1978, from Mr. Greenley to Chairman Dingell re fish flow recommendations for the Snake and Columbia Rivers ........ 824
Italco Aluminum Corp., attachment to Mr. Ferrie's prepared statement, addendum—Role of the Direct-Service Industries in the power supply system of the Pacific Northwest ........ 391
Izaak Walton League of America, attachment to Mr. Haley's prepared statement, letter, dated December 6, 1977, from James Belknap to Dan Hodel re response to BPA role in the Pacific Northwest ........ 773
Moment, Samuel, attachments to his prepared statement:
Additional statement ........ 787
Letter, dated December 15, 1978, to Mr. McCormack re further response to questions raised during colloquy with Mr. McCormack ........ 788
Montana Public Service Commission, attachment to Mr. Schneider's prepared statement, before the House Subcommittee on Water and Power Resources, Committee on Interior and Insular Affairs ........ 295

Additional material submitted—Continued

National Rural Electric Cooperative Association, attachments to Ms. Bogard's prepared statement: Page

Exhibit A—Draft amendments to the Pacific Northwest Electric Power Supply and Conservation Act ..... 264

Pacific Northwest Electric Power Planning and Conservation Act ..... 267

Resolution—Pacific Northwest Electric Power Supply and Conservation Act ..... 263

Supplemental views of the National Electric Cooperative Association ..... 266

Northwest Energy Options, attachment to Mr. Jones' prepared statement, the Bonneville reform bill ..... 460

Oregon Environmental Council, attachment to Mr. Platt's prepared statement and additional material:

Letter, dated January 2, 1979, from Mr. Platt to Chairman Dingell re additional material ..... 678

Petition against BPA, private and special interest utilities ..... 677

Oregon Institute of Technology, final resource assessment report for 1978 ..... 887

Oregon State Grange, attachment to Mrs. Nelson's prepared statement, the preference clause ..... 614

Pacific Marine Fisheries Commission, attachments to Mr. Harville's prepared statement:

Resolution 4—Establish minimum flows for fisheries—Snake and Columbia Rivers ..... 696

Resolution 9—Recognition of water requirements for anadromous salmonids by water use and water management entities ..... 696

Resolution 11—Support concept of compensation for fish production potential of habitat ..... 697

Resolution 12—Establish priority water usage and protect habitat for fish ..... 697

Portland, city of, Hon. Neil Goldschmidt, mayor, attachments to prepared statement:

City of Portland regarding H.R. 13931 ..... 649

Statement before the Subcommittee on Water and Power Resources, Committee on Interior and Insular Affairs, December 7, 1977 ..... 645

Statement before U.S. Senate Committee on Energy and Natural Resources ..... 642

Portland General Electric Co., attachments to Mr. Short's prepared statement:

Statement of John W. Ellis ..... 248

Statement of Don C. Frisbee ..... 249

Puget Sound Power & Light Co., attachments to Mr. Ellis' prepared statement:

Exhibit B—Levelized fixed charges ..... 383

Map showing service area ..... 382

Raft River Electric Cooperative, attachments to Mr. Kempton's prepared statement:

Exhibit 1—Approximate cost to produce an acre of wheat ..... 866

Exhibit 2—Approximate cost to produce an acre of potatoes ..... 866

Reynolds Metal Co., Harry V. Helton, Northwest operations manager, additional submitted materials:

Letter, dated January 2, 1979, from Mr. Helton to Chairman Dingell re additional materials and answers to questions asked during the coloquy ..... 556

Statement before U.S. Senate Committee on Energy and Natural Resources (Aug. 25, 1978) ..... 557

Statement before U.S. Senate Committee on Energy and Natural Resources (Apr. 8, 1978) ..... 561

Statement of Gordon C. Culp before Subcommittee on Water and Power Resources ..... 565

Additional material submitted—Continued

Seattle City Council, attachments to Mr. Revelle's prepared statement:

| | Page |
|---|---|
| City of Seattle's proposed amendments to the Pacific Northwest Electric Power Planning and Conservation Act | 334 |
| Letter, dated December 19, 1978, from Mr. Revelle to Chairman Dingell re answers to questions asked during coloquy | 362 |
| Resolution 25783 | 348 |
| Statement of Mr. Revelle to Subcommittee on Water and Power Resources, Committee on Interior and Insular Affairs | 330 |
| Sierra Club, attachments to Mr. Scott's prepared statement: | |
| Amendment to H.R. 13931 | 218 |
| Excerpt from Seattle Post-Intelligencer—BPA must pay $30 million a year for Trojan nuclear plant | 218 |
| Northwest regional electric energy | 219 |
| Statement of James T. Blomquist | 221 |
| Statement of Douglas Scott | 231 |
| Washington Public Power Supply System | 217 |
| Solar Oregon Lobby, attachments to Mr. Maribona's prepared statement: | |
| Public Power Action Group | 638 |
| Ron Dechter's statement | 639 |
| Rough draft 1979 Oregon Solar Lobby platform | 638 |
| Treasury Department: | |
| Attachment to Mr. Altman's prepared statement, statutes which preclude Federal guarantees of tax-exempt obligations | 31 |
| Direct borrowing from the Treasury | 34 |
| Specific language of sections 6, 8, and 9 | 26 |
| University of Washington, letter dated December 20, 1978 from Mr. Lee and Mr. Marts to Chairman Dingell, re further comment to their prepared statement on H.R. 13931 | 498 |
| Washington Public Utility Districts' Association, attachment to Mr. Boldt's prepared statement, resolution on regional power Federal legislation | 445 |
| Washington, State of, attachments to Mr. Sandison's prepared statement: | |
| Minimum flows at the Columbia River Forks | 425 |
| Minimum flows at the Lower Columbia River dams | 424 |
| Minimum flows at Mid-Columbia River dams | 423 |
| Statements submitted for the record by— | |
| Aluminum Company of America | 1078 |
| American Society of Civil Engineers, seattle section | 898 |
| Anaconda Co., The | 1022 |
| Audubon Society of Portland | 941 |
| City of Tacoma, Wash | 908 |
| Cole, Pat R | 915 |
| Columbia River Basin Fisheries Alliance | 931 |
| Columbia River Fisherman's Protective Union | 935 |
| Common Cause of Montana | 1012 |
| Fidalgo Environmental Council/SCANP | 893 |
| Hanna Mining Co., The | 1045 |
| Hogan, Frances A | 967 |
| Headwaters Alliance | 1017 |
| Izaak Walton League of America, Inc | 925, 928 |
| Lamson, Robert D | 919 |
| Mid-West Electric Consumers Association | 1082 |
| Missouri Basin Municipal Power Agency | 1049 |
| Montana Associated Utilities Legislative Committee | 1009 |
| Montana Power Co | 980 |
| Montana Public Service Commission | 990 |
| Municipal Electric Authority of Georgia | 1049 |
| National Marine Fisheries Service | 939 |
| Natural Resources Defense Council, Inc | 1063 |

Statements submitted for the record by—Continued — Page
Northern Plains Resource Council — 1003
Nuclear Information & Resource Service — 913
Public Power Action Group — 945
Quaintance, Charles W — 969
Rinkenburger, Erwin — 924
Smiley, D. Patrick — 1036
Stauffer Chemical Co — 1015
Taylor, Rena — 961
Trojan Decommissioning Alliance — 954
Vigilante Electric Cooperative, Inc — 998
Letters submitted for the record by—
Clearwater Conservation Forum, Lee Milner, coordinator — 1093
Dechert, Thomas V — 1094
Gersh, Frank Sutton — 1099
Hyde, Cameron — 1096
North Dakota, State of, Arthur A. Link, Governor — 1091
Wyoming, State of, Ed Herschler, Governor — 1092

## ORGANIZATIONS REPRESENTED AT HEARINGS

Aluminum Company of America, Alan C. Sheldon, vice president, environment and energy resources.
Aluminum Workers International Union, AFL-CIO, David Monroe, director, region 5.
American Public Power Association, Alex Radin, executive director.
American Sign and Indicator Corp., Luke Williams, chief executive officer.
Boeing Company, The, Forrest G. Coffey, public affairs director.
Boise Cascade Corp., Robert A. Shade, director of energy services.
BPA Industrial Customers, Henry G. Curtis, consultant, on behalf of.
Columbia River Fisheries Council, John R. Donaldson, chairman.
Columbia River Inter-Tribal Fish Commission, Ray Samsel.
Consumer Power League, Walter Widmer, on behalf of.
Common Cause, Michael Farley, executive director.
Direct-Service Industrial Customers of the Bonneville Power Administration, Eric Redman, on behalf of.
Energy Department:
- Bardin, David J., Administrator, Economic Regulatory Administration.
- McIsaac, George S., Assistant Secretary for Resource Applications.
- Munro, Sterling, Administrator, Bonneville Power Administration.

Eugene Future Power Committee, Inc., Chris Attneave.
For Laws on Board:
- Marvet, Lloyd K., on behalf of.
- Stachon, Eric, member.

Freightliner Corp., subsidiary of Consolidated Freightways, Inc., Kenneth W. Self, board chairman.
General Accounting Office, Monte E. Canfield, Jr., Director, Energy and Minerals Division.
Green Giant Co., James Nelson, Northwest production manager.
Idaho Conservation League, Pat Ford.
Idaho Consumer Affairs, Inc., Harold C. Miles, chairman, utility committee.
Idaho Cooperative Utilities Association, Inc., Ted C. Springer, counsel.
Idaho Power Co., James E. Bruce, president.
Idaho, State of—
- Evans, Hon. John V., Governor.
- Hall, Kirk, director, office of energy.
- Robinson, Kenneth, senator-elect.
- Ward, Conley, public utilities commissioner.

Interior, Department of the, Kenneth Higgs, U.S. Fish and Wildlife Service, Office of the Assistant Secretary for Fish and Wildlife and Parks.
Italco Aluminum Corp.:
- Ferrie, Robert, president.
- Redmon, Rick, consultant.

ORGANIZATIONS REPRESENTED AT HEARINGS—Continued

Izaak Walton League of America, Wendell P. Haley, Oregon division.
Lane County Audubon Society, Wesley Nightingale, on behalf of.
Lane County (Oreg.) Gerald H. Rust, Jr., chairman, board of commissioners.
League of Women Voters, Mally Ribe, on behalf of.
Local Government Northwest Electrical Energy Task Force, Edward G. Hudson, cochairman.
Montana Public Service Commission, Thomas J. Schneider, commissioner.
National Farmers Union, Paul Holmes, program coordinator, Oregon-Washington division.
National Rural Electric Cooperative Association, Becky Bogard, legislative counsel.
North Central Washington Central Labor Council, Dan Bertrand, president.
Northwest Energy Options, Allen Jones, coordinator.
Northwest Public Power Association, Jack R. Criswell. on behalf of.
Northwest Resource Information Center, Inc., Ed Chaney, director.
Old National Bancorporation, David A. Clack, board chairman and president.
Oregon Environmental Council, John C. Platt, executive director.
Oregon Institute of Technology, David W. McClain, research analyst.
Oregon Solar Institute, James E. Molle.
Oregon State Grange, Olga M. Nelson, on behalf of.
Oregon Wildlife Federation, Forrest L. Meuret, on behalf of.
Oregonians for Utility Reform, Paul Williams, on behalf of.
Pacific Fishery Management Council, John W. McKean, member.
Pacific Marine Fisheries Commission, John P. Harville, executive director.
Pacific Northwest Utilities Conference Committee, Robert O. Marritz, counsel.
Pacific Power & Light Co., Don C. Frisbe, board chairman, president.
Peoples Organization for Washington Energy Resources, Wayne L. Williams, director.
Portland, city of, department of public utilities, Francis J. Ivancie, commissioner.
Portland Decommission Alliance, Andrew Reid, on behalf of.
Portland General Electric Co.:
- Short, Robert H., president.
- Smith, Hugh, counsel.

Public Power Council:
- Criswell, Jack R., on behalf of.
- Gill, Rockne, counsel.
- Piper, David E., manager.

Puget Sound Council of Governments, Edward G. Hudson, president.
Puget Sound Power & Light Co., John W. Ellis, president.
Raft River Electric Cooperative, M. H. Kempton, president, board of directors.
Reynolds Metal Co., Harry V. Helton, Northwest operations manager.
Salmon Fisheries in Washington and Alaska, Scott Stafne, on behalf of.
Save Oregon's Resources Today, Inc., Forrest L. Meuret, vice president and legislative director.
Seattle Chamber of Commerce, Herschel F. Jones, on behalf of.
Seattle City Council, energy committee, Randy Revelle, chairman.
Seattle Longshoreman's Union, Del Castle.
Sierra Club:
- Cellarius, Richard, member, board of directors.
- Scott, Douglas, Northwest representative.

Solar Oregon Lobby, Paco Maribona, coordinator.
South Western Idaho Development Association, Jack Streeter, president.
Spencer Products Co., Robert D. Lamson, executive vice president.
Treasury Department:
- Altman, Roger C., Assistant Secretary for Domestic Finance.
- Cavanaugh, Dennis, Senior Staff.
- Drapkin, Dennis, Senior Staff.

Umatilla Electric Cooperative Association, Russell N. Dorran, manager.
U.S. Labor Party, William F. Wertz, Jr., national committee member.
Washington Environmental Council, Tom Eckman, chairperson, energy committee.
Washington Public Interest Resesearch Group, Joan Holl, energy research coordinator.
Washington Public Utility Districts' Association, Jim Boldt, executive director.

ORGANIZATIONS REPRESENTED AT HEARINGS—Continued

Washington State Association of Counties Energy Committee, Richard Granger, chairman.
Washington State Commercial Passenger Fishing Vessel Association, Jack Carlson, vice president.
Washington, State of, Gordon Sandison, department of fisheries.
Washington State's Committee on Energy and Utilities, R. Ted Bottinger, chairman.
Western Conference of the Council of State Governments, the:
  Ragsdale, Hon. Mike, Oregon State representative.
  Roskie, Hon. George, Montana State senator.
Western Environmental Trade Association of Washington, Leland Hale, energy project coordinator.

# PACIFIC NORTHWEST ELECTRIC POWER ISSUES

---

**TUESDAY, SEPTEMBER 19, 1978**

House of Representatives,
Subcommittee on Energy and Power,
Committee on Interstate and Foreign Commerce,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 2:35 p.m., in room 2123, Rayburn House Office Building, Hon. John D. Dingell, chairman, presiding.

Mr. Dingell. The subcommittee will come to order.

The Chair apologizes to all present for the inconvenience which has been imposed upon them by the fact the Chair was detained in a markup in another committee this morning and had to postpone the hearings and then the fact that a sequence of votes on the floor has precluded me from commencing the hearings at the designated time, as had been my wish. So the apologies of the Chair before he commences the hearings.

The Chair does have a brief statement which, without objection, will be inserted in total and I will excerpt therefrom. The Chair observes that today we begin 2 days of hearings on H.R. 13931 and related bills concerning the future use and development of electric energy in the Pacific Northwest. Additional hearings on this legislation may be scheduled later, very possibly in the affected region.

The Chair begins the consideration of the legislation with no preconceived notions and it is the intention of the Chair and the committee to try to achieve all possible information relative to the legislation, also relative to the questions which might be involved therein.

The legislation is significant. It is important to the Pacific Northwest, including the public and private utilities, the State and local governments and, most importantly, the electric consumers of the region.

I want particularly to commend Congressman Meeds and the other House cosponsors of this bill, as well as Senator Jackson, who has sponsored an identical bill in the Senate. They have developed a proposal which identifies issues of concern to many diverse groups in the region and provides possible solutions to them.

This bill represents a good beginning to the ultimate resolution of these problems and it is one to which our subcommittee will give careful thought in the coming days. It is a fact of life, however, that the 95th Congress is rapidly drawing to a close and that the press of other matters may prevent this legislation from being enacted this

year. We will do what we can to avoid this situation, because the evidence before us strongly indicates that Federal legislation in this area is necessary.

The Pacific Northwest is a region which is quite unlike any other in this country. Until recently its power supplies were provided almost exclusively by low cost hydroelectric generation, much of which had been constructed and operated by the Federal Government.

The Bonneville Power Administration has occupied a preeminent role in marketing the federally generated power and it has played an almost equally important role in assuring that public and private utilities were able to coordinate their efforts to insure that the power resources of the region were operated to provide some measure of efficiency in operation.

The Bonneville Project Act gives a definite preference to certain types of power users, and the effects of this preference clause have provided useful and gainful employment for many lawyers in the Pacific Northwest for years. The way in which this preference clause will be impacted by the bill before us is not altogether clear to many, and this is one of several issues which we will be considering in the next few days.

We are informed that the region faces a serious problem in that future projected resources are unlikely to be adequate to meet projected demand, a situation not like that which exists elsewhere in the country. BPA can no longer be certain of its ability to sell firm power to utilities in the region, and direct-service industrial customers have been notified that their contracts, which are due to expire between 1981 and 1991, cannot be renewed. Utility systems in the region are being forced to turn to thermally generated power, both coal- and nuclear-fired, and this in turn threatens considerably higher power rates within a region which has been accustomed to far lower power costs in the past and substantial development of resources.

The bill before us addresses this complex set of issues in an imaginative way. Perhaps its most critical step is to create what amounts to a homogenized power pool within the region, thus minimizing the existing disparity between customers of public and private utilities.

The effect of this pool, under the broad and discretionary powers of the Bonneville power administrator, is to provide a smoothing of this disparity and to encourage the construction of additional resources—or of conservation programs, which amounts to the same thing, at perhaps significantly lesser costs—at the lowest possible costs to the consumers of the region. We want to consider carefully the need for this bill and its possible effects.

This bill is of vital concern to the consumers of the region. As indicated earlier, it raises a number of difficult issues, some of which reach far beyond the borders of the Columbia River Basin in their implications. These include: Impact on traditional Federal marketing priorities, timetables for the implementation of vitally needed energy conservation programs, as well as the adequacy of those programs, the standards to be imposed upon the administrator of BPA, the adequacy of provisions for public participation, the costs of such a program to the Federal Treasury, the provisions for the acquisition

of additional generating capacity and the purchase of power, the impact on the preference clause, antitrust questions, tax issues and more.

This subcommittee is impressed by the urgency and difficulty of these issues. We hope that the witnesses today and at following hearings will help us to understand the precise nature of these issues and their implications and to eliminate or minimize these concerns so that the bill can be moved toward enactment as quickly as may reasonably be done.

Without objection the text of H.R. 13931 will be printed at this point in the record.

[Testimony resumes on p. 23.]

[The text of H.R. 13931 follows:]

authorities to encourage voluntary conservation and to devise effective mechanisms for establishing, enforcing and achieving compliance with mandatory conservation standards." If the intent of this provision is to be achieved despite the deceptively low residential electric rates mandated by other provisions of the bill, the Administrator must be provided with some means of assuring that consumers actually take advantage of conservation opportunities.

To address these concerns and to ensure that H.R. 13931 is at least broadly consistent with the related provisions of the pending NEA, while preserving its essential features. I recommend the following:

1. The Administrator of the Bonneville Power Administration should be specifically authorized to require, as a condition of wholesale contracts, that distribution utilities institute comprehensive conservation programs, in cooperation with State and local governments. A surcharge based on marginal costs for those customers or utilities failing to take advantage of conservation opportunities should be considered in the process of program design.

2. The Administrator of the Bonneville Power Administration should be specifically directed to exercise his wholesale contracting authority under this bill in harmony with the NEA ratemaking standards and utility conservation initiatives, as determined by the Secretary of Energy. We believe that flexibility exists within the bill's pricing and allocation provisions to develop retail rate structures that promote efficient energy use patterns.

3. The role of State public utility commissions in exercising oversight of retail rate structures and conservation programs implemented under terms of H.R. 13931 should be encouraged. State PUC's and nonregulated utilities should be assured the flexibility to administer relevant NEA provisions.

With these considerations, H.R. 13931 would effectively encourage energy conservation and production efficiency in a manner that is equitable and that meets the unique needs of the Northwest.

I appreciate the opportunity of appearing before the subcommittee to address this important legislative proposal.

Mr. OTTINGER. Thank you, Mr. Bardin.

We will next hear from the Administrator of the Bonneville Power Administration, Mr. Munro.

## STATEMENT OF STERLING MUNRO

Mr. MUNRO. Mr. Chairman, my name is Sterling Munro, Administrator of the Bonneville Power Administration. My full statement has been submitted for the record along with the written answers to the 19 questions received in a letter from the chairman of this committee. [See p. 62.]

My full statement includes a brief history of the role of the Bonneville Power Administration in the Northwest. In my oral testimony I shall omit the history entirely and start with the current situation, Mr. Chairman.

Mr. OTTINGER. Your full statement will appear in the record.

Mr. MUNRO. At the outset may I offer for the record two documents which, Mr. Chairman, because of their length, you may wish to treat as exhibits. One is a set of option papers completed by the BPA staff July 18, 1978, and publicly released throughout the region. It analyzes the various options available for BPA to address the electric energy problems facing the region. The second is a Bonneville staff paper released publicly on June 2, 1978, describing more fully some of the anticipated allocation problems referred to in my prepared statement. [See pp. 73 and 114.]

Mr. OTTINGER. Those will also be included in the record.

Mr. MUNRO. The current situation is one which finds BPA unable to serve preference customer load growth after 1983 or to execute our

new contracts with industrial customers after they expire, one by one, between 1981 and 1991.

The committee understands well—but my written statement recounts for the record—the failure of previous attempts to overcome the region's power supply problems by means of a joint public-private hydrothermal power program. BPA and the region are now confronted with the question of how to allocate the limited amount of electric power BPA does have. It is an ugly question that threatens to pit preference customer against preference customer and to encourage other divisions within the region.

I offer for the record a copy of the formal notice of insufficiency which we had to send our customers in 1976, along with a table showing how BPA has reached the end of its power resources. I also offer tables showing how, on the basis of present utility forecasts and present construction schedules and given critical water conditions, the region will be short of power in every year between now and 1989. And, of course, there are no new power-generating facilities yet under construction or committed in the region for 1990 and beyond. [See p. 124.]

Mr. OTTINGER. Those documents will also be included in the record.

Mr. MUNRO. Thank you, Mr. Chairman. If BPA were to be given authority, as provided in H.R. 13931, to implement conservation programs and purchase additional power supplies—with priority going first to cost-effective conservation and then from powerplants utilizing renewable resources—it should enable us to act in time and put an end to the argument over who is to be served how much Federal power and who has to be left without.

The bill authorizes us to meet the needs of preference customers and—also subject to the availability of power and operation of the preference clause—the requirements of investor-owned utilities as well. The investor-owned utilities would pay higher rates than preference customers based on BPA costs for power supplies acquired from conservation and new powerplants.

However, the residential and limited irrigation load requirements of the investor-owned utilities would be supplied at the same rate as offered to preference customers, but only if the investor-owned utilities sell an equivalent amount of power to BPA at their own average costs.

While this legislation does not expressly assure that the cost benefits intended for residential consumers of the investor-owned utilities will actually be passed on to those consumers, I would propose to include in BPA contracts a provision to that effect.

BPA also would be able to sign long-term contracts with direct service industrial customers, although at substantially higher rates than we currently charge these customers in order to have an assured long-term supply. The new long-term contracts would continue to allow interruption of service to industries whenever necessary to maintain service to other BPA customers, and this contribution to the reliability of electric service throughout the region would be reflected in the new rates for industries.

I must note that this legislation does not require marginal cost pricing in order to reduce electric power consumption and that this omission will cause some observers to question whether we can achieve all reasonable cost-effective conservation without that tool.

I think the answer is that marginal cost pricing, although theoretically sound, would impose serious dislocation and economic adjustment problems, more so in the Northwest than anywhere else in America. This is because there is a greater difference between actual-cost pricing for electricity and replacement-cost pricing in the Northwest than anywhere else in America.

But even with actual-cost pricing, average retail prices for electricity in the Pacific Northwest are expected to increase faster than nationally because the Northwest presently benefits from a low-cost hydroelectric base.

This legislation would assure that BPA invests in conservation, and it does not preclude time-of-day rates and other measures to give the public appropriate price signals. The marginal cost test will be applied in the determination of cost-effectiveness of specific investments or programs. There is a whole host of conservation measures which, I think, can be accomplished within the test of cost-effectiveness.

Currently there does not exist in the Pacific Northwest a coordinated regionwide energy conservation program. This legislation will cure that through the authority to invest in cost-effective conservation and with the directive to give conservation first priority in acquiring new resources and through the provisions for public participation in power policy decisions

This legislation authorizes BPA to purchase and, if necessary, construct plants utilizing renewable resources, although it does not authorize BPA to construct any new hydro projects. The Administration believes that it is not appropriate for the BPA to undertake directly the construction of renewable generating facilities using low cost Treasury capital.

With respect to construction of conventional facilities we believe the authorization should be limited to small applications or unusual circumstances, such as combustion turbines that will provide emergency service for loss of an underwater cable or overhead transmission feeder line, and we believe that this limitation should be set forth clearly in the legislation.

This bill does not authorize BPA to construct any new hydro projects. If more hydro is to become part of the region's solution, that would require separate authorization from the Congress for the Corps of Engineers or the Bureau of Reclamation to proceed with specific projects or FERC licensing of non-Federal construction.

This bill includes provisions which should allay any fear that Bonneville Power Administration would become so powerful that it could impose its will on the region.

First, there are the provisions for State and public participation, inculding the two specific advisory councils, whose views must be reported to the legislative committees of Congress along with the proposed acquisition contracts and evidence of compliance with the National Environmental Policy Act of 1969.

The Administrator also must publish notice of the proposed acquisition in the Federal Register and cannot execute the contract until 90 days after submittal to Congress. Finally, no financial commitment may be incurred in connection with proposed purchase contracts until it has been reviewed as part of the budget process.

This language does give the appearance that the Administrator could proceed on a major program or power purchase contracts unless the Congress has adopted a specific statute prohibiting it. While I personally would feel profoundly inhibited from proceeding with any program or power purchase to which there was substantial objection, the Congress may wish to consider whether more specific review procedures could be devised and incorporated in this bill.

Second, the bill does not require any utility to purchase wholesale power from BPA. BPA is merely authorized to meet the requirements of those who apply. The only justification we have for purchasing more power is to serve the needs of our customers, and any utility or group of utilities can exclude BPA from its plans. Thus, if BPA tried to impose its will on the region, it would more likely find its role reduced rather than enlarged.

One additional safeguard is that BPA must be guided by the policies set by Congress and the Department of Energy. We cannot go it alone.

A corollary question, of course, is why BPA should be given the lead responsibility for the region's future power supply. I think consensus has developed within the region that BPA is the only regionwide entity capable of exercising this responsibility.

BPA is uniquely equipped to play the role. We alone are a regionwide agency. We already market more than half the power and own about 80 percent of the region's high voltage transmission system. The Federal hydro generating resources provide the means for making most effective use of renewable resources and of conventional thermal resources as well. We have many of the necessary relationships established with the region's public and private utilities and with the States.

We have a congressional mandate to recognize and serve the public interest. We have the basic tools, if Congress wishes to give us the additional authority and responsibility, to become even more of a unifying force among the States, utilities and environmental, consumer and other interests in the region.

However, as Assistant Secretary McIsaac has stated, the administration has a number of important concerns with the new financing tools and authorities which the bill would make available to BPA. We at Bonneville believe that the modifications urged by the administration are consistent with broad principles of Federal assistance and financial practice and do not detract from the major objectives of this legislation. In addition, certain refinements need to be made in many areas of the bill.

We at BPA will be working in the Department of Energy and with others in the administration as we complete the review of this legislation, and any suggested amendments and clarifying changes will be submitted to the committee as soon as possible.

Mr. Chairman and members of the committee, I believe this legislation is a logical extension of the Bonneville Project Act and that what you do here may be as important to the future of our region today as the Bonneville Project Act was destined to be 41 years ago.

Thank you again for this opportunity to be heard.

[Testimony resumes on p. 126.]

[Mr. Munro's prepared statement follows:]

## STATEMENT OF STERLING MUNRO, ADMINISTRATOR, BONNEVILLE POWER ADMINISTRATION

Mr. Chairman, Members of the Committee, thank you for this opportunity to present views and concerns on H.R. 13931 from a regional perspective. Assistant Secretary McIsaac has addressed those issues in the legislation that relate to national policy, and the Administration's current major concerns.

I will start with a brief history of the role of the Bonneville Power Administration in the Northwest. Then I will cover BPA's present situation, especially the shortage of power resources available to us to meet all the demands upon us, and the problems that this situation creates. I shall enumerate some of the other regional power problems that BPA believes need to be addressed. Then I shall comment on how BPA believes the bill before the Committee addresses those problems. Finally, I shall deal with the role that the bill assigns to BPA, both the heavy responsibility and the restraints this bill places upon us with respect to the region's future power supply.

### BPA'S BASIC ROLE

For 41 years, the Bonneville Power Administration has served as the wholesale marketing agent for power generated at Bonneville Dam and—as they were added to the Federal Columbia River Power System—29 other Federal hydroelectric projects, including Grand Coulee Dam. In recent years, we have also marketed large but limited amounts of power acquired from non-Federal thermal generating plants by means of "net billing" and other exchange agreements. BPA does not own or operate any thermal power plants.

Nor do we build or operate the Federal dams from which we market the power—the U.S. Corps of Engineers and the Bureau of Reclamation do that. But Bonneville builds the transmission facilities necessary to carry the output of these dams to load centers. We also carry non-Federal power on our lines, delivering it from the owners' generating plants to their load centers. The Bonneville transmission system includes more than 12,000 miles of bulk power lines at voltages ranging up to 500 kV ac and 800 kV dc. One big direct current line and two big alternating current lines connect our system with systems in California. Four high voltage lines connect our system with British Columbia utilities.

Altogether, we market at wholesale rates more than 50 percent of the power sold in the region, giving preference—as directed by the Bonneville Project Act of 1937—to co-ops and public bodies (such as PUDs and municipals). Our high voltage backbone transmission grid has more than 80 percent of the region's transmission capacity—and we transmit a great deal of non-Federal power for a fee. Most of the power we market at wholesale goes to public bodies, co-ops, and investor-owned utilities which own the distribution systems and sell at retail to residential and other end-use customers. But we also sell wholesale power directly to large industrial plants and government agencies.

Our service territory embraces the States of Oregon, Washington, Idaho, and that part of Montana west of the Continental Divide, plus small adjacent portions of Montana, Wyoming, Utah, Nevada, and California. Our total of 147 customers in the Pacific Northwest includes 116 public and cooperative utilities, 8 investor-owned utilities, 17 individual customers, and 6 government agencies. We also have contracts with 11 utilities in California, one in British Columbia, and one in Eastern Montana for a total of 160 customers.

In addition to power sales to these utilities and industries, BPA provides reserves and load factoring services and has interconnections with nearly all of the region's utilities. We play a substantial role in forecasting the region's future power needs. We directly assist in the preparation of individual utility forecasts accounting for about 13 percent of the region's total load and review and comment on forecasts accounting for another 23 percent. So we have a hand in forecasting 36 percent of the regional load. Our industrial customer load, which is a constant contract amount, currently accounts for another 22 percent of the region's total loads, although contract provide that more than half their supply can be cut back under certain shortage situations.

## THE TRANSITION TO THERMAL

Until the mid-1960's, the region was served almost 100 percent by hydroelectricity from a combination of Federal and non-Federal dams. Under a joint BPA and public and private utility Hydro-Thermal Power Program adopted in 1968 to meet regional needs, several large thermal power plants were added to the mix. Today, the region's power supply is closer to 80 percent hydro and 20 percent base load thermal, and almost all additions to the region's electric energy supply—under contsruction or now planned—are thermal, which will further change the mix. The Federal hydro system will continue to provide the majority of the peaking capacity required to shape the region's resources to match load. None of the thermal plants is Federally constructed or owned, but all are operated as one integrated system along with the Federal dams as well as non-Federal hydroelectric resources in the region.

Bonneville Power Administration served as a catalyst to bring together the investor-owned utilities, public bodies, and co-ops to develop an 8-plant Hydro-Thermal Power Program. At that time, it was thought the program could be extended to serve the region's needs far into the future, at least until the year 2000. Time and events have demonstrated how overly optimistic were those high hopes.

But back then, in the late 60's, things looked quite different. For one thing, costs *were* different. For example, investor-owned utilities were getting cost estimates promising that future nuclear and coal power costs would be only slightly higher than hydro from BPA. At that time, most of the region's investor-owned utilities had contracts with BPA for part of their power supply. That these contracts would expire in August 1973 with diminishing supplies from BPA for a few more years, did not trouble the investor-owned utilities greatly when they contemplated the estimates then being made as to costs for alternative power supplies. The investor-owned utilities were quite willing to take on full responsibility for their own needs as the Hydro-Thermal Power program required them to do.

Similar cost estimates led the public bodies and co-ops to view the Hydro-Thermal Power Program not only as a viable short-run solution, but—with a continuation thereof—as a *long-run* solution to their requirements. Under the net-billing provisions of the Hydro-Thermal Power Program, the public bodies would build thermal power plants to meet their future requirements and sell the output of the plants back to BPA. BPA would bear the costs, whatever they turned out to be, by taking the thermal power output into the Federal system and blending the costs with Federal hydro power. BPA would credit the thermal power costs against the participating utilities' bills for the blended power purchased from BPA. But we agreed in our contracts with the constructing utilities that—for the protection of bondholders—we would not enter into additional net-billing agreements unless the amount of the annual power bills owed by BPA preference customers amounted to at least 115 percent of the total annual costs of the net-billed generating plants. We also had specific directions from Congress that none of the costs for thermal plants was to be passed on to the nation's taxpayers, and that BPA's costs of acquiring thermal plant output was to be paid through increased rates to its customers. In the late '60s, in view of cost estimates for thermal power then, it appeared that BPA would have enough net-billing capability to accommodate the full requirements of public bodies and co-ops to the Year 2000, perhaps longer.

## THE END OF A FALSE HOPE

So the private utilities commenced their plants and the public bodies theirs, and some were undertaken jointly. BPA agreed to take into its system via net billing all of the output of two nuclear power plants being built by Washington Public Power Supply System (WPPSS), the WPPSS 70 percent share of a third nuclear project, and the City of Eugene's 30 percent share of Portland General Electric Co.'s Trojan nuclear power plant. By 1986, the first year that these four net-billed projects are now expected to be producing their full combined generating capacity, the BPA share will represent 24.7 percent of the firm energy capability of the Federal System.

The big problem is that the BPA share also represents more than 100 percent of our net-billing capability under existing BPA revenues from preference customer participants. Our net-billing capability was used up so quickly because of unanticipated cost escalation. These four projects will cost on average about double the original estimates. The costs in excess of our net-billing capacity have been paid in cash by BPA from its revenue. There was a further complication. A Treasury Department Regulation prevented BPA's preference customers from issuing tax-exempt bonds to finance future plants from which BPA would acquire a major portion of the output. The Hydro-Thermal Power Program which was thought to be a viable solution for the region's power requirements through the end of the century has fallen short of projected needs of public bodies and co-ops already.

The investor-owned utilities' construction program went forward to supply private power's full needs. But instead of having all the power they need at costs not greatly different from those for wholesale power from BPA, the investor-owned utilities suddenly found themselves confronted with costs that were destined to drive their retail rates up much faster than the retail rates of public bodies and co-ops served by BPA. They were confronted with the necessity of building expensive new thermal power plants not only to supply their load growth but also to replace the firm power BPA had once supplied to them. A cry soon rose from consumers served by investor-owned utilities demanding a share of the benefits of low-cost Federal power. In some cases, new public bodies were formed, demanding equal preference rights with established public bodies and co-ops.

* * * AND THE BEGINNING AND END OF ANOTHER

But that is getting ahead of the story. Only slightly daunted, BPA and the region's utilities developed the format for a new Hydro-Thermal Power Program to meet their needs when the first eight projects no longer would do the job. They called the new program Phase 2. The original Hydro-Thermal Power Program came to be called, retroactively, Phase 1.

Under Phase 2, the preference customers individually or jointly were to build new facilities, and individual preference customers would buy from the constructing utility or group of utilities at actual costs. BPA was to act as the agent for all the public bodies and co-ops, arranging to sell temporary surpluses, "shape" generation to fit loads, provide transmission and reserves, and otherwise make it all possible, short of paying for the new thermal power plants by net billing or other means.

A key element—in fact *the* key to Phase 2—was the willingness of the preference customers at the point in time to forego their preference rights with respect to power that would be sold to direct-service industrial (DSI) customers under long-term contracts. The rates to be paid by the DSIs were to be increased to the melded costs of the thermal plants to be built by the public bodies and co-ops. Another quid pro quo was a caveat that the industrial customers would provide the region with electric power reserves beyond those which the industries already provided by virtue of the interruptible provisions in their contracts with BPA. The new contracts would give BPA the right to curtail up to 75 percent of deliveries to the aluminum plants and other DSIs whenever the power is required by BPA's other customers because of plant delays. The investor-owned utilities were to construct their own thermal plants and share in the DSI reserves.

But court action stopped Phase 2 before it could be tested. A proposed contract between BPA and Alumax-Pacific Corporation (the so-called "Alumax" contract) containing the applicable Phase 2 provisions was challenged first. The trial judge ruled the contract valid but unenforceable without an environmental impact statement (EIS) on the environmental and socio-economic aspects of the Alumax Plant and the Phase 2 aspects of the contract. Meanwhile, the Natural Resources Defense Council (NRDC) brought suit to prevent implementation of any other Phase 2 arrangements, including BPA wheeling, scheduling, load factoring, and all the provisions necessary to make usable the output from the Phase 2 thermal power plants to be built by the public and private utilities. The trial judge ordered BPA to prepare an EIS on Phase 2 or any substitute program.

BPA has appealed the two court decisions. But with BPA lacking sufficient Federal hydroelectricity and net-billed thermal power to guarantee serving

preference customer load growth after 1983, the preference utilities could not wait to provide for their load growth in the mid-1980's and beyond. Phase 2 was abandoned. The investor-owned utilities were not highly dependent upon Phase 2, of course, and the preference utilities chose to sign a purchase agreement for WPSS nuclear units 4 and 5 leaving BPA out of the equation.

THE PROBLEMS COMPOUND

BPA not only found itself without adequate power supplies to serve preference customer load growth after 1983, but also without supplies to extend the contracts of direct-service industries when present contracts expire between 1981 and 1991. Today, BPA and the region have to face the question of how to allocate the limited amount of low cost power BPA does have.

It is an ugly question that threatens to pit preference customer against preference customer and to encourage other more obvious divisions within the region.

I offer for the record a copy of the formal Notice of Insufficiency which we had to send our customers in 1976, along with a table showing how BPA has reached the end of its power resources. I also offer tables showing how—on the basis of present utility forecasts and present construction schedules, and given critical water conditions—the region will be short of power in every year between now and 1989. And, of course, there are no new power generating facilities yet under construction or committed in the region for 1990 and beyond.

If BPA were to be given authority, as this legislation provides, to implement cost-effective conservation programs and purchase additional power supplies—with priority going first to cost-effective conservation and then to renewable resources—it should enable us to act in time and diminish if not end the argument over who is to be served how much Federal power and who has to be left without.

POWER SUPPLY

I have attached tables showing the extent of power resources available to BPA and the impending regional power shortage and have explained how our region got into this dilemma. I also have explained how Phase 1 and Phase 2 of the Hydro-Thermal Program have failed to get us out of the mess we are in. I do think this legislation provides a solution.

The bill authorizes BPA to meet the needs of the preference customers and, subject to the availability of power and the preference clause, the requirements of investor-owned utilities, as well. Preference customers would pay BPA's lowest rate. The investor-owned utilities would pay higher rates based on BPA costs for power supplies acquired from conservation and new power plants. However, the residential and limited irrigation loads of the investor-owned utilities would be supplied at the same rate as available to preference customers, but only if the investor-owned utilities sell an equivalent amount of power to BPA at their own average costs. BPA also would be able to sign long-term contracts with direct-service industrial customers although at substantially higher rates than we currently charge these customers.

While permitting the region's power supply needs to be met, the bill would limit construction of new generating facilities to only those needed to supply power that cannot be supplied through cost-effective conservation. We like the idea that BPA would be required to treat conservation as a resource and give it first priority—investing in it ahead of new generating facilities to the extent that conservation could free up kilowatthours at costs no greater than for the same number of kilowatthours produced in a new generating plant—for that is the direction BPA's new conservation policy is taking. Only after all that can be accomplished through cost-effective conservation has been set in motion, could BPA augment its supplies with power from new generating plants. And then we would be required to rely on cost-effective renewable resources to the extent practical before turning to other resources. Under the bill BPA would not be authorized to construct any new conventional generating facilities, except possibly for transmission system reliability. Others would do the constructing, but we would be authorized to purchase from them the power supply we could not acquire through investment in conservation, or through purchase or construction of renewable resources.



 

ALLOCATIONS

This legislation, in our opinion, would permit BPA to solve the question of allocating Federal power among competing applicants by giving us enough power to meet all the demands upon our system without violating the preference law. The preference law, incorporated into 27 different statutes and stated 5 different ways in the Bonneville Project Act alone, requires BPA in disposing of Federal power to "give preference and priority to public bodies and cooperatives." The Bonneville Project Act also includes a 5-year "pull-back" provision that applies to BPA sales to investor-owned utilities but *not* to BPA sales to its direct-service industrial customers. Whenever the electricity we sell to investor-owned utilities is likely to be needed by preference customers, and if the contracts with investor-owned utilities have more than 5 years to run, we can terminate the contracts by giving 5 years' notice, as required by existing law which is not changed by this law. As for sales to DSIs, this power becomes available to supply preference loads only upon expiration of the DSI contracts. Typically our contracts run for 20 years. Again, that is the limit of existing law. All but one of the investor-owned utility contracts for firm power have expired and our current DSI contracts expire one by one between 1981 and 1991.

Because supplies are running short, and because of the growing differences in the cost of wholesale power as between preference utilities and non-preference utilities, we now find new preference utilities being formed, ad we find the City of Portland and the two investor-owned utilities serving that city going to court to challenge the way we apply the preference law.

With nothing having happened yet to enable BPA to be certain as to our ability to meet the full requirements of existing preference customers after 1983, let alone other customers, we have started a formal Public Involvement Procedure to determine our future allocations policy. That is to say, we have started the difficult if not impossible job of trying to play Solomon. Let me give you some examples of the kinds of allocations questions we will have to answer soon if this legislation is not passed or if some other solution to power supply is not found in the meantime:

Can we turn down a newly formed preference customer today any more than BPA could turn down a newly formed preference customer 30 or 40 years ago?

Can we tell the public they cannot share in the benefits of the Federal System unless they first form a public body or co-op, and then tell them the new public body or co-op doesn't qualify for equal treatment because of lack of power?

Should a preference customer whose current contract expires in 1984 be offered a new 20-year requirements contract if the same offer cannot be made later to a preference customer whose current contract expires in 1994?

Should allocation decisions be related in some way to the conservation efforts or successes of the individual utilities? If so, how should "success" be measured?

What about a direct-service industrial customer whose contract expires and who applies to the local utility for service? If that utility happens to be a preference customer, should we—and could we, under the law—turn down an application from that preference customer for the supply necessary to serve our former DSI if power happens to be available for a time?

If not, should contracts contain load growth limitations or withdrawal provisions, in which case they wouldn't be requirements contracts at all?

In the legislation before the Committee, the preference law remains unchanged. All power sold by BPA would continue to be subject to the preference of public bodies and co-ops, and if new preference agencies were formed they would be served once adequate resources were available on the BPA system. BPA would pull back power from investor-owned utilities on 5 years' notice if necessary to serve preference loads. This bill allows continued sales outside the region of power not required in the region.

TRYING TO HOLD RATES DOWN

The wholesale power rates charged by BPA do not alone determine the retail rates of the utilities served by BPA, whose rates must be approved by local utility boards and commissions or by regulatory bodies. But the ultimate rates of these utilities are significantly affected by the cost of wholesale power from BPA. They also are affected by other cost factors, especially whether the local distribution system serves a concentrated or widely scattered population. Con-

sequently BPA's wholesale rates may be responsible for more than half of one preference utility's revenue requirements, but less than one-third of another's.

Therefore, when BPA's wholesale rates must be nearly doubled in December, 1979—as they must be for us to continue to fully recover all Federal Columbia River Power System costs, and thus discharge our statutory obligations—the retail power rates of utilities that get their wholesale power from us will not double. Nor will the rates of all these utilities increase by the same percentage. A near-doubling of BPA wholesale rates will require some utilities to raise their rates by 30 percent and other by 40 or 50 percent and so on, depending upon what portion of their total costs are represented by the cost of wholesale power.

Investor-owned utilities, of course, no longer purchase any substantial amounts of firm power from BPA, but they do purchase capacity and non-firm energy from us. Future changes in BPA's wholesale power rates would affect them less. The bill, if passed, would enable them once again to purchase substantial amounts of BPA power. The investor-owned utilities' ultimate rates to consumers are set by utility commissions in each state, and passage of this legislation would not affect the rights of the state utility commissions to regulate the retail rates of the investor-owned utilities. While this legislation does not expressly assure that the cost benefits intended for residential consumers will be actually passed on to these consumers, I would propose to include in BPA contracts a provision to that effect. I would further welcome from this Committee an amendment which would assure for all time that similar provisions are incorporated in future BPA contracts.

With respect to the rights of local boards and commissions to determine the retail rates of the public bodies and co-ops, this bill does not affect those rights, either. Nor would it interfere with the right of each state to determine the terms and conditions for siting of non-Federal thermal power plants in its jurisdiction.

BPA is interested in keeping power rates as low as possible consistent with sound accounting and financial management practices for the sake of all its consumers. For the first 28 years of our existence, BPA was able to hold the line on rates and still discharge all our obligations to the Treasury. In 1965 BPA found it necessary to raise rates in an amount necessary to increase its revenues by a mere 3 percent and in 1974 by approximately 27 percent. The huge BPA wholesale rate increase in store in 1979 is three-quarters due to the high costs of the net-billed power we will be taking into our system from the thermal power plants built under Phase 1 of the Hydro-Thermal Power program. Additional increases in our wholesale power rates appear certain in the years ahead as we contemplate the ever-higher costs of new power supplies.

We believe this legislation will help keep long run average power costs lower for all of the region's consumers. It will do so, first, by requiring that we give top priority to cost-effective conservation. Only after setting all practical conservation programs in motion could we turn to plant additions. Conservation is the only way that I know to stretch present supplies of low-cost power. But this bill will help hold down power costs from any necessary new generating plants as well.

For one thing, with BPA as the purchaser of the output of new generating plants, the constructing agencies will be able to obtain lower-cost financing. Having the full backing of the Federal Columbia River Power System behind BPA purchases gives investors more confidence. That, alone, keeps interest rates lower. And, of course, it has been the ratepayers of both investor-owned and publicly owned utilities and the direct-service industries in the region whose power purchases paid for the equity that has been established in the Federal Columbia River Power System. Another reason that BPA purchase of power will provide lower financing costs is that it will pool the benefits and risks among all the ratepayers of the region—without subsidy in conformance with accepted principles of prudent business operation. Additionally, special provision is made to identify BPA as an exempt body for IRS purposes, to the extent that BPA acquires power from power plants built and owned by tax-exempt public agencies that are used primarily to serve their loads. Section 9(e) should be clarified so that it could not be interpreted to confer on the Bonneville Power Administrator authority to exempt from Federal income taxes the interest on obligations issued by State or local governments to finance construction of facilities for production of electric power for purchase by Bonneville. The Administration is opposed to the granting of any such authority since tax exempt determinations are the function of the Department of the Treasury.

A limited exemption from the Holding Company Act is also provided to enable the investor-owned utilities to cooperatively construct facilities, provided that not less than 75 percent of the output is sold to BPA.

This legislation in our judgment increases the likelihood of additional coordinated planning, construction and operation of power facilities, and holds to a minimum the need for new construction. Utilities would be building the plants the region needs collectively and not just for their individual needs. The rate implications of a "one system" approach to planning are considerable, and all beneficial.

RATE DISPARITY

Retail rates differ widely from utility to utility within public power and from utility to utility within private power. Some private rates are lower than some public power rates; the rates of a large private utility serving a metropolitan area may be lower, for example, than the rates of small co-ops serving thinly populated rural areas. Nevertheless, private power rates for equivalent population densities are generally higher than public power rates, and this rate disparity is perceived to be growing because public power has access to low-cost Federal power through BPA while private power does not.

Certainly, there can be no doubt that private utilities—cut off from BPA firm power in the early 70's, and forced to rely on their own resources—have had to face the higher costs of coal and nuclear power well ahead of public power entities. Public power, too, had had to come to grips with thermal power costs but has benefitted from BPA's ability to meld thermal power acquisitions with huge amounts of very low cost hydro.

And, certainly, there is no disputing the fact that some Northwest residents are up in arms because they are served by private power at rates two to three times higher than residents of nearly communities served by public power.

The legislation before the Committee could ameliorate the situation considerably by making investor-owned utilities eligible for a supply of BPA power equivalent to the investor-owned utilities' residential and small irrigation loads, and ultimately at the same price that BPA charges preference customers. This legislation would also ameliorate this problem to the extent it helps hold rates down generally, as already discussed.

THE INDUSTRIES

With all of these problems, why should Congress or the region or BPA be concerned with providing the BPA direct-service industries with a continued supply of power? Or, because our DSIs will be losing the benefits of present contracts of low cost power, perhaps I should ask the reverse question: why should Congress be expected to approve legislation such as this that increases costs for one category of customer in order to benefit the others?

Treating the second question first, the answer is simply that EPA's direct-service industrial contracts do not have long to run, some expiring as early as 1981. But under this bill, the DSI customers that will lose the benefits of low cost power contracts will gain the benefits of assured supply. The assured supply for the long run will bring higher costs, true, but costs not as high later as they otherwise would have to be.

As for the basic question, why should BPA continue to serve these industrial loads at all; the answer is that the DSIs provide important benefits to the nation and the region, including added reliability for electric systems, job opportunities, and a supply of aluminum. These benefits would be diminished if these industries were supplied in some other way, and they would be lost entirely, with repercussions for the nation as well as the region, if these industries were forced out of the region, out of the country, or out of business for lack of power supplies.

As regards the reliability benefits, the DSI contracts allow BPA to interrupt sales to the DSIs during emergencies or extended periods of insufficient power supply. This means the Northwest—in contrast to other areas—does not need to build as much generating capacity for reserves to protect against generator failures, transmission outages, low-water conditions, or delays in construction. The direct-service industries are uniquely able to tolerate interruption of service with little or not advance warning.

The other major benefit DSIs provided to the region is efficient use of the region's power resources. DSIs can make use of interruptible power—the kind that cannot be guaranteed for delivery day in and day out, but which is avail-

able when streamflows are good. Refusing to serve industries after their present contracts run out would increase the possibility of water being wasted over the spillways of dams, as once was the case, instead of being routed through turbine generators. And it might mean loss of jobs and production in the region.

From a national point of view, the Bonneville direct-service industries now provide 30 percent of the nation's total aluminum capacity. Aluminum as a light metal is expected to have a larger and larger role, fitting well into the the nation's energy conservation program and absolutely essential to national defense. Any disruption to regional aluminum production produces a potential threat to national supply of this essential product, and raises the probability of need for imports at a time when the nation's balance of payments is growing less favorable by the day.

FORECASTING

The whole matter of electric power forecasting is somewhat subjective, and certainly something less than an exact science.

Present forecasts by the utilities show that all 13 conventional power plants—9 nuclear and 4 coal—scheduled for completion between now and 1989 to meet regional loads not only are necessary, but even if completed on schedule would leave our region power short if we had low water periods as we did in 1973 and 1977. At the other end of the forecasting spectrum, there is the view that only the 7 power plants already under construction are needed by 1989, and that the remainder of our power needs can be offset by conservation. There are several in-between points of view.

If the utilities forecast is accepted, it means we must make some decisions quickly as to what comes after 1989. It presently takes 12 years or longer to get a new nuclear plant on line, and almost as long for a coal-fired generating plant or a major hydro addition. Conservation, itself, takes time to develop and implement. If a lower estimate is accepted as to demand for electric energy, or if we were willing to gamble on good streamflows, or if lead time for conservation or construction of renewable or other generating plants could be significantly shortened—under those circumstances we could take more time than current utility forecasts indicate we have to make decisions about future power supply.

The utilities' own forecasts of future needs have been lowered each of the past four or five years, principally in recognition of greater conservation, but construction schedules have slipped so much that we find ourselves faced with projections of bigger shortages in the 1980's than we foresaw when forecasts were higher.

In any event, I think it would help if all the forecasters could be brought into the same room to make a joint forecast, or if every forecast paid more attention to the other forecasts—and that is what this legislation could help accomplish. It requires BPA to consult with the states and the public regarding all aspects of power planning and acquisition—future power requirements, timing, and the type of generation.

BPA also thinks it would help if the region had a better data base relative to end-use consumption, to use in forecasting and to serve as a benchmark for measuring conservation progress. We have made some proposals for jointly developing with the utilities and the state governments and other interested parties a better data base. I think this bill's further encouragement in that direction will be helpful to a truly regional approach to power problems.

CONSERVATION

There presently does not exist in the region a well-coordinated region-wide electrical utility conservation program. Some individual utilities have strong programs, but the vigor and success of the effort varies from utility to utility. All the publicly owned utilities in the region are handicapped by provisions in their state constitutions prohibiting the lending of public credit for private purposes. This has been interpreted to prevent publicly owned utilities from helping finance insulation or investing in many other types of cost-effective conservation.

Since 1973, BPA has conducted a conservotion information and education program of some intensity, highlighted by an annual conservation workshop. We have financed infrared photography flyovers of the service territories, of some utilities. In the operation of our buildings and vehicle fleet, we have reduced our own consumption of all energy by 25 percent since 1973, and we are determined to do better in practicing what we preach. Our transmission R&D

program over the years haas cut line losses by an amount that would serve all the needs of a city of 200,000 annually, mainly by using ever-higher voltages.

Each of the states is pushing conservation increasingly, mainly through building code changes and tax incentives, along with information and education programs. The programs of several Federal agencies also impact conservation.

But the fact remains, there is no coordinated region-wide energy conservation program.

BPA is presently developing a new Conservation Policy aimed to help fill that gap, with the aid of considerable public input from a new Public Involvement Program that we have adopted for public participation in all new major marketing policies or changes in major marketing policies. The new BPA Conservation Policy will have to be published in the Federal Register and offered around the region for further public comment and possible further revision before it becomes final. However, I can say generally that, consistent with this legislation, it will be our policy to treat conservation as a resource and to invest in it.

The key words are "invest in it." One of the reasons we have not been able to move forward with the region-wide BPA insulation program described to the appropriations committees of the House and Senate in 1977 is lack of authority to invest in conservation on the scale required. Continued lack of authority to invest in conservation on a large scale could hamstring the new conservation policy now under development.

This legislation would solve the problems BPA has with respect to investing in conservation. It directs us to do so, to the extent that it is cost-effective, which is to say that our investment in conservation must save at least as many kilowatthours as the same investment would buy from new generating plants. If, for example, BPA could reduce Northwest power demand by an average 500,000 kilowatts by paying some or all of the costs for insulation in homes and other buildings and if that could be done cheaper than we could buy 500,000 average kW from a new power plant, insulation would be the first choice.

This legislation goes even further than directing us to invest in conservation. It says that in purchasing the output from new resources, we must first squeeze out conservation all that can be squeezed out economically, and only then may we acquire additional electric power, first from renewable resources and then, if necessary, from other generating plants. So by giving us authority to invest in conservation, and by directing the conservation receive first priority, along with its provisions for public participation in power policy decisions, this legislation paves the way for the coordinated region-wide conservation program now lacking. Moreover, it would make the region a model in energy conservation for the rest of the nation.

I must note that this legislation does not require marginal cost pricing in order to reduce electric power consumption, and that this omission will cause some observers to question whether we can achieve all reasonable cost-effective conservation without that tool. I think the answer is that marginal cost pricing, although theoretically sound, would impose serious dislocation and economic adjustment problems, more so in the Northwest than anywhere else in America. This is because there is a greater difference between actual-cost pricing for electricity and replacement-cost pricing in the Northwest than anywhere else in America. But even with actual-cost pricing, average retail prices for electricity in the Pacific Northwest are expected to increase faster than nationally because the Northwest presently benefits from a low-cost hydro-electric base. This legislation would assure that BPA invests in conservation, and it does not preclude time-of-day rate and other measures to give the public appropriate price signals. The marginal cost test will be applied in the determination of cost-effectiveness of specific investments or programs. The Congress in this legislation does not direct us to charge our customers the same high price for all power, including the existing low-cost Federal hydro, as represented by costs for power from expensive new facilities. I think consumers will appreciate it and that they will respond positively to the cost-effective measures this legislation requires.

There is another question that we hear asking how we can expect to accomplish conservation while at the same time working toward the lowest rates possible. Some people think the two goals are incompatible. I believe the public will not respond favorably if we ask consumers to pay more than the actual cost of new power supplies, or to pay more than the cost of conservation measures that will make additional electric energy available at costs cheaper or not greater

 

than from new generating plants. There are a whole host of conservation measures which I think can be accomplished within the test of cost-effectiveness. And I think we owe it to the public to try to hold costs to the minimum possible.

RENEWABLE RESOURCES

The conservation provisions in this legislation and the requirement that we encourage the development of renewable resources to the maximum practical extent (cost effective and feasible) before turning to conventional resources for additional power supplies generally reflect the energy priorities that we believe are appropriate for the Pacific Northwest.

The Columbia River uniquely endows our region with the capaibility to make some inherently unreliable new power methods reliable. The sun doesn't always shine, and the wind doesn't always blow. Solar power and wind power—as well as some other alternative power systems—cannot be counted upon for round-the-clock day-in and day-out performance. They need some sort of back-up system. The Columbia River gives our region that back-up. Acting as a giant storage battery, the Columbia's storage dams can hold back water—up to a point—while the solar and wind systems and other new systems are producing electricity. The water can be released to provide continuous service whenever the new systems might not be able to produce electricity.

BPA is eager to help the nation get on with the job of establishing co-generation, solar and wind and geothermal and other new systems, as viable methods for meeting future power requirements. We presently have studies underway to determine where the wind blows with sufficient force and frequency to justify windmill generators in our region, and we have asked the Department of Energy to locate one or two of its large experimental units in our region. We have some small-scale solar experiments underway with a view toward advancing the state of the art. We also are participating in a geothermal demonstration project in Idaho. And we have contracted with a private firm to complete by year's end a survey of the co-generation potential in our region—co-generation being the use of by-product steam or other waste heat from industrial processes to produce on-site electricity. BPA already markets under special arrangements a small amount of co-generation from a handful of industrial plants in the Northwest, and we have offered to make similar marketing arrangements for co-generation from others. This legislation would be helpful in that regard.

Might I just mention, in passing, that we regard the Columbia River as an enormous renewable resource in itself. The ocean's waters evaporated by the sun are carried by clouds over the mountains of the Northwest where the moisture is dropped in the form of rain or snow that fills the Columbia and its tributaries. This water produces its bounty of electricity on the way back to the sea, where the process starts all over again and repeats itself year after year after year. Further, the full potential of the Columbia River System has not been developed. Some sites that were judged not economic to develop in days past would no doubt be found economic in light of today's rapidly increasing energy costs, and certainly not all of the economically feasible sites have environmental problems of such magnitude as to rule them out of our thinking as we plan for the additional resources our region will need.

This legislation authorized BPA to purchase and if necessary construct plants utilizing renewable resources, though it does authorize BPA to construct any new hydro projects. The Administration believes that it is not appropriate for the BPA to undertake directly the construction of renewable generating facilities using low-cost Treasury capital. If more hydro is to become part of the region's solution, that would require separate authorization for the Corps of Engineers or the Bureau of Reclamation to proceed with specific projects or FERC licensing of non-Federal construction.

We believe the authorization to construct generating plants should be limited to small applications or unusual circumstances such as combustion turbines that will provide emergency service for loss of an underwater cable or overhead transmission feeder line, and we believe that this limitation should be set for clearly in the legislation.

A "ONE SYSTEM" APPROACH

For all of the considerable cooperation between and among utilities of the region, and for all of the integration of the region's transmission system, our

region is still a long way from totally integrated planning and construction of new generation. Yet, if one utility or a group of utilities is short for any reason, the entire region must share the shortage. And although the states have developed guidelines for handling shortages, there is not, at this time, any plan for regional sharing of shortages, not even those that might result from a resource development cancelled or from delays in construction or from lack of success in achieving the full anticipated results of conservation.

This legislation addresses this problem by giving BPA authority to purchase the power necessary not only for future preference loads, but for non-preference loads as well. But by prohibiting BPA from actually constructing conventional resources, the legislation assures continuation of the diversity of ownership that now characterizes the region. Authority for BPA to purchase power is sufficient, we believe, to assure the "one utility" or "one system" approach that is needed to minimize the amount of construction as well as construction costs and operating costs.

STATE AND PUBLIC PARTICIPATION

The provisions for meaningful participation by the states and the public, I believe, will enhance the "one system" approach to planning and construction of new facilities. The bill requires BPA to review a proposed resource acquisition with the states and two new advisory boards—one comprised of utilities and other of members of the public appointed by the regional governors—and submit their comments along with evidence of compliance with the National Environmental Policy Act of 1969 to the Congress.

BPA has received a great deal of input from the states and the region's interest groups in the development of its Role EIS and as a result of the Public Involvement Procedures adopted last fall and already being utilized in connection with our proposed new conservation policy, our allocations policy, and our current rate review. This bill takes us an appropriate step forward with its specific mandate. We are required to consult directly with each of the four Northwest governors and two clearly defined advisory councils regarding not only resource acquisitions, but all facets of our program, including conservation and transmission, and the forecasting and planning for those programs.

One result will be assurance that the states' own estimates of their power requirements, based on their own projections of their rate of economic growth, would be considered in BPA's plans. Another is that it should help the states with their siting determinations, by involving them at an early stage in assessing the need for additional resources; the decisions as to where to site new projects would, of course, remain with the states.

Another result, I hope—and I believe—will be more credible forecasts. This has to be the result if the region can develop jointly a better data base and show that the different views, assumptions, and conclusions of utility and non-utility people have been taken into account.

Future electric power decisions involve substantial commitments of the region's natural and economic resources. Inadequate planning and construction of facilities could have an adverse effect on the economy, job opportunities, lifestyles and the standard of living. We welcome the opportunity this bill provides to involve more of our citizens in the decision-making process, and the additional public understanding and support for mutually-arrived at decisions that should result.

BIG GOVERNMENT

This bill includes provisions which should allay any fear that Bonneville Power Administration would become so powerful that it could impose its will on the region.

First, there are the provisions for state and public participation including the two specific advisory councils, whose views must be reported to the legislative committees of Congress along with the proposed purchase contracts and evidence of compliance with the National Environmental Policy Act of 1969. The Administrator also must publish Notice in the Federal Register and cannot execute any contract until 90 days after submittal to Congress. Finally, no financial commitment may be incurred in connection with proposed purchase contracts until it has been reviewed as a part of the budget process.

This language does give the appearance that the Administrator could proceed on a major program or purchase unless the Congress has adopted a specific stat-

 

ute prohibiting it. While I personally would feel profoundly inhibited from proceeding with any program or power purchase to which there was substantial objection, the Congress may wish to consider whether more specific review procedures could be devised and incorporated in this bill.

Second, the bill does not require any utility to purchase wholesale power from BPA. BPA is merely authorized to meet the requirement of those who apply. The only justification we have for purchasing more power is to serve the needs of our customers, and any utility or group of utilities can exclude BPA from its plans. Thus, if BPA tried to impose its will on the region, it would more likely find its role reduced rather than enlarged.

One additional safeguard is that BPA must be guided by the policies set by Congress and the Department of Energy—we cannot go it alone.

WHY BONNEVILLE?

A corollary question, of course, is why BPA should be given the lead responsibility for the region's future power supply? I think consensus has developed within the region that BPA is the only region-wide entity capable of exercising this responsibility.

BPA is uniquely equipped to play the role. We alone are a region-wide agency. We already market more than half the power and own about 80 percent of the region's high voltage transmission system. The Federal hydro generating resources provide the means for making most effective use of renewable resources, and of conventional thermal resources, as well. We have all the necessary relationships established with the region's public and private utilities and with the states. We have a Congressional mandate to recognize and serve the public interest. We have the basic tools, if Congress wishes to give us the additional authority and responsibility, to become even more of a unifying force among the states, utilities and environmental, consumer and other interests in the region.

## SUMMARY

To summarize, BPA supports the intent of this legislation because:

1. The region faces serious problems relating to future power supply and policy.
2. Prior attempts to deal with these problems without legislation have fallen short.
3. The legislation addresses the concerns of existing preference customers with respect to the adequacy of future power supply and price.
4. It improves the prospects for new preference customers having all their requirements met by BPA.
5. It gives the residential and limited irrigation loads of private utilities a share of low-cost Federal power.
6. It permits our industrial customers to obtain the long-term power supplies they need to stay in business in this region.
7. It addresses the concerns of environmentlists and others, including BPA, with respect to maximizing the benefits of conservation and renewable resources.
8. It seeks to develop a better coordinated "one system" approach to forecasting and planning and constructing future power requirements that cannot be met through conservation.
9. It maintains the diversity of ownership that has served the region well through the years.
10. It addresses the rights of the states with respect to siting and power planning, attempting to assure them and the public a meaningful voice in future power decisions.
11. It could avoid the need for BPA and the region to make allocation decisions that could only exacerbate divisions of opinion within the region, lead to more court actions and delays that would worsen the region's power supply problems.
12. It seeks to place a combination of responsibilities and restraints on BPA that gives the region assurance that neither we nor some other entity would become too dominant in the region.

However, as Assistant Secretary McIsaac has stated, the Administration has a number of important concerns with the new financing tools and authorities which the bill would make available to BPA. We at Bonneville believe that the modifications urged by the Administration are consistent with broad principles of

Federal assistance and financial practice and do not detract from the major objectives of this legislation.

Mr. Chairman and Members of the Committee. I believe this legislation is a logical extension of the Bonneville Project Act, and that what you do here may be as important to the future of our region today as the Bonneville Project Act was destined to be 41 years ago. Thank you again for this opportunity to be heard.

---

BONNEVILLE POWER ADMINISTRATION RESPONSES TO CONGRESSMAN DINGELL'S QUESTIONS OF SEPTEMBER 8, 1978

*Question 1.* Section 4(a) of the bill provides for the establishment of two councils. One council is called a "Consumers' Council" and the other a "Utilities' Council."

(*a*) Why is it necessary or desirable to establish two councils, rather than one that includes all these interests, as well as persons representing small business, labor, and environmental views, in order that the views of all of these interests will be heard and considered together, rather than separately?

Answer. It is not necessary to establish two "advisory" councils. It would be possible to consolidate all interests and views into a single advisory board. However, to help assure that diverse viewpoints can be surfaced, articulated, and then carefully considered, the Congress may wish to establish two councils—one comprised of Northwest gubernatorial appointees and the other comprised primarily of electric utility representatives. Half of the gubernatorial appointees would be elected local government officials; the other half would be citizens at large who we expect would represent small business, labor, environmental, consumer, and other views (e.g., senior citizens, migrant workers, welfare recipients, etc.). There is an important division of responsibility and interest between supplying energy and consuming energy, which probably accounts for the division between a Utilities' Council and a Consumers' Council. There is nothing to prevent the two councils from having joint meetings and, in fact, joint meetings can be called for by the Administrator under Sec. 4(a)(3) if it seems useful for all the interests to be heard and considered together rather than separately.

Moreover, Sec. 4(b) requires the Administrator to establish comprehensive public information and public participation programs in the formulation of regional power programs and policies. Such programs should provide opportunities for all interests to be heard and considered together.

*Question 1.* (*b*) If such councils are needed, should not the States and affected Federal agencies also be represented?

Answer. There is no objection to having States represented on one or the other of the advisory councils.

It appears, however, the States would be indirectly represented on both councils. Each member of the Consumers' Council will be appointed by the Governor of his or her respective State. Gubernatorial appointment should itself provide for substantial State involvement. Moreover, in addition to being appointed by the Governors, half of the members of the Consumers' Council must be elected local government officials, all such local governments being creatures of their respective States and subject to State laws from whence they derive their authority.

Those members of the Utilities' Council selected by investor-owned utilities will represent entities that are regulated as to both rates and service by State public utilities commissions or public service commissions. They are also regulated by the States as to energy facilities siting and plant certifications. Hence, there will be substantial indirect State involvement. Those members of the Utilities' Council selected by public bodies, such as public utility districts and municipalities, represent local governmental units whose governing boards are popularly elected under State law. These municipal corporations are also creatures of their respective States having been established pursuant to State law from which they derive their authority. The only council members subject neither to gubernatorial appointment nor to direct State supervision and authority will be rural electric cooperatives and from one to three representatives of BPA's direct-service industrial customers.

Although the States themselves will not be directly represented on either of the two councils, substantial participation by the States will be required. Not

 

only will the States' authorities and responsibilities for ratemaking and energy facilities siting remain unaffected by the bill, and not only will the Governors appoint the members of the Consumers' Council, but direct consultation is required between the Governors and the Administrator. Sec. 4(c) requires the Administrator to prepare a regional power planning and conservation program (including a 20-year load/resource forecast) in consultation with the Governors and further requires that any revision of that program can only be made after consultation with the Governors. Furthermore, Sec. 6(g) requires that prior to execution of any contract for acquisition of major resources, the Administrator shall review the proposal with the Governors and forward their comments and recommendations to the Senate Energy and Natural Resources Committee and to the House Interior Committe for review.

As far as Federal agencies are concerned, formal participation through this bill would not seem necessary. Machinery already exists, as for example the environmental impact statement process, whereby affected Federal agencies participate in resource and power-related matters.

*Question 1.* (*c*) To what extent are these councils inconsistent with the requirements of the Federal Advisory Committee Act, and why should they not be subject to that Act?

Answer. Presumably the specific exemption from the Federal Advisory Committee Act in Section 9(c) of the bill indicates clearly the intent of the sponsors that the advisory councils under this bill functions without the specific restrictions and controls by Federal officials required by the Federal Advisory Committee Act.

*Question 1.* (*d*) Why should a Consumer Council include elected officials?

Answer. The term "Consumer" was probably meant to be an "umbrella" designation that would cover virtually all non-utility interests. Presumably, the purpose of including elected officials is to ensure participation on the council at the local level from representatives in close touch with grassroots sentiments on electric energy.

*Question 1.* (*e*) Why should a Utility Council include direct-service industry customers?

Answer. Direct-service industrial customers account for approximately 22 percent of the total regional electric energy load (West Group Area of the Northwest Power Pool). BPA's power contracts with these industrial customers provide important reserves for the region to protect against generator failures, transmission outages, and delays in construction. Because of these important advantages and contributions to the region's power system and because of the size and significance of these loads to the region, it seems appropriate that their views be represented on the Utilities' Council.

*Question 1.* (*f*) What assurance is there in Section 4(a)(2) that investor-owned and public utilities will have a balanced representation on the council?

Answer. There is no absolute assurance that investor-owned and public agency utilities will have balanced representation on the Utilities' Council. However, those 18 representatives will be selected by the utilities themselves in accordance with rules established by the Administrator. I would propose to establish rules which would assure balanced representation from each group.

*Question 1.* (*g*) What is your understanding of the term "with a view to diversity of backgrounds and interests" when considered not on a councilwide basis, but on a statewide basis, and could it include persons with utility or industry interest ties?

Answer. Presumably, since each Governor must appoint Consumers' Council members "with a view to diversity of backgrounds and interests," he or she would feel constrained not to make all such appointments from the same interest group. The Governor of Washington, for example, would have seven such general-public appointments to make (given Washington's present allocation of Congressional seats) and the bill would oblige her not to appoint all lawyers, or all teachers, or all engineers, or all scientists, or all laborers, or all environmentalists, or all consumerists (in its narrower sense), or all chamber of commerce members, or all labor union officials. The Governor of Montana, on the other hand, would presently have only one such "at large" general-public appointment.

Under the bill, it is possible that persons with utility or industry interests could be appointed by a Governor to the Consumers' Council.

*Question 2.* Section 4(c) of the bill provides for the preparation of regional power planning and conservation programs.

(*a*) How long do you estimate it will take to prepare such a program and what will be its cost? Should not the bill include a timetable for the preparation and implementation of such a program?

Answer. It is anticipated that after completion of the legislation, it will take approximately 2 years to prepare the initial regional power planning and conservation program. Although we cannot accurately estimate the costs, we expect it could be in the order of $3 million. We would use existing personnel as much as possible to minimize the cost of preparing the program. Where special expertise is required that is not now available on the staff, consultants will be utilized until such staff expertise is available. Although we would expect to proceed as effectively as possible to prepare the program, the Congress may wish to set a deadline. We plan to review the program continuously.

*Question 2.* (*b*) What is the current capability of BPA to prepare such a program, and what procedures would BPA employ to ensure adequate and effective public participation in the preparation of such a program?

Answer. BPA has had considerable experience in formulating or in serving as the lead agency in formulating regional electric power programs such as the Hydro-Thermal Power Program, the Coordination Agreement, Columbia River Treaty, Pacific Northwest-Pacific Southwest Interties, and others. The comprehensive regional power and conservation program required by this bill would also utilize the extensive pattern of cooperative relationships existing in the Pacific Northwest. BPA has recently strengthened its staffs in energy conservation and in the field of public involvement and would intend full public participation in development and review of the program. We will also utilize consulting services when appropriate. On balance, BPA is substantially prepared to move ahead.

*Question 2.* (*c*) We note that the provisions of section 5, 6 (except 6(c)), and 7 of the bill do not appear to require that they be carried out in accordance with such a program. Should not the bill provide that the authorities in these sections must be utilized only in accordance with such a program, particularly in the case of all of the provisions of section 6 of the bill?

Answer. Such a requirement would be inconsistent with those purposes of the bill which require immediate implementation; for example, the bill sets a deadline of July 1, 1979 for the exchange to provide rate relief for domestic and small farm loads of investor-owned utilities. In addition, BPA should not be required to defer action on conservation or renewable resource facilities pending development of the initial regional power planning and conservation program.

*Question 2.* (*d*) Section 4(c) calls for a 20-year regional load/resource forecast. What is the current BPA load/resource forecast horizon, and how is that forecast prepared? Is that forecast accepted by all utilities and others in the region?

Answer. The region's utilities and BPA jointly prepare a 20-year forecast of loads and resources annually. BPA participates directly in the preparation of load forecasts for approximately 100 consumer-owned electric utility systems. Large consumer-owned and investor-owned utilities prepare their own forecasts. These are combined by the Subcommittee on Loads and Resources of the Pacific Northwest Utilities Conference Committee (PNUCC) into the single refined forecast. The estimates are generally accepted by representatives of the utility industry, but a number of other interests in the region question their validity.

*Question 3.* What is your understanding of section 3(c) of the bill?

Answer. Our understanding of section 3(c) of the bill is that BPA must supply the region's needs first by investing in *feasible* and *cost-effective* conservation. Feasibility covers a number of factors that go beyond whether the proposal is cost effective. For example, will it really produce the results for which it was designed, in a manner consistent with environmental and social considerations, and in timely fashion? "Cost-effective" means squeezing out of conservation all the kilowatthours that can be squeezed out at a cost no greater than what it would cost to acquire the same number of kilowatthours by constructing new generating facilities. For example, if we could reduce Northwest power demand by an average 500,000 kilowatts by paying some or all of the costs for insulation in homes and buildings, and if that could be done cheaper than we could buy 500,000 average kilowatts from a new powerplant, insulation would be the first choice. Only after we have determined that we will be able to save all the electric energy we can through feasible and cost-effective conservation measures may we acquire power from new powerplants, and then we must turn to power systems

utilizing waste heat, cogeneration, and renewable resources such as the wind and the sun before we can acquire power from coal and nuclear and other so-called "conventional" powerplants.

*Question 3.* (*a*) What is the significance of the 1983 date in section 3(e)?

Answer. The June 30, 1983, date appearing in section 3(e) of the bill is known regionally as the "date of insufficiency." In accordance with terms of the preference customers' power sales contracts, BPA gave notice that after the date of insufficiency, any BPA obligation to serve firm energy to each preference customer would be limited to an allocation which would be determined under the customers' contracts. The effect of this notice is that a customer's full requirements would thereafter no longer be served by BPA.

*Question 3.* (*b*) Please provide to us a table showing the long-term contracts currently in effect for "electric power resources," the identity of the non-BPA parties, the term of the contracts, the power provided under each, and other pertinent data. Please provide a sample of such.

Answer. BPA acquires the full output of the Hanford NPR, WPPSS No. 1 and WPPSS No. 2 Projects of 852, 1250, and 1100 megawatts capability, respectively. BPA acquires 30 percent of the Trojan Project and 70 percent of the WPPSS No. 3 Project of 1130 and 1240 megawatts capability, respectively. BPA also acquires power under separate exchange agreements as the result of the Columbia River Treaty and Exchange Agreements with both Northwest and Southwest utilities. Enclosed is a sample of a typical net billing agreement. A table showing the data requested is being prepared and will be provided to the Committee when completed.

*Question 4.* (*a*) Please describe the "preference clause" provisions of the BPA Act and provide a table showing the beneficiaries of this clause.

Section 4(a) of the BPA Act provides "In order to insure that the facilities for the generation of electric energy at the Bonneville project shall be operated for the benefit of the general public, and particularly of domestic and rural consumers, the Administrator shall at all times, in disposing of electric energy generated at said project, give preference and priority to public bodies and cooperatives."

Section 4(c) of the BPA Act provides that an application for purchase by a public body or cooperative in any instance shall not be denied on the ground that proposed bonds or other security issues have not been authorized or marketed, until a reasonable period of time has passed.

Section 4(d) of the BPA Act expresses the intent of Congress to preserve preferential status of public bodies and cooperatives, to give adequate time for such entities to be created by election, and to provide the opportunity for necessary financing to be arranged.

The present beneficiaries of this clause are municipal, P.U.D., and cooperative customers listed in Attachment A.

*Question 4.* (*b*) Please explain how this bill will affect that clause and the above beneficiaries and indicate who will benefit from these changes.

Answer. The effect of this bill on the preference customers would be to preserve the preference status and enable BPA to acquire adequate power to continue to serve requirements of existing preference customers as well as newly formed preference customers.

*Question 5.* Please describe the current rate structure of the BPA vis-a-vis its classes of customers and indicate to what extent this bill will affect that rate structure.

Answer. The current rate structure of BPA provides for different rate schedules to be applied to different classes of service. The classes of service and rate schedules are as follows:

(1) A schedule for sale of firm power to utilities and Federal agencies in the Pacific Northwest which provides for seasonal differentials in both energy and capacity charges;

(2) A schedule for sale of industrial firm power to energy intensive, direct-service industrial customers. This schedule is essentially identical to the schedule for sale of firm power to utilities except that a credit is given when BPA exercises its right to restrict deliveries to these customers under the terms of existing contracts;

(3) a schedule for sale of nonfirm energy which is seasonally differentiated but which does not differentiate between sales made in the Pacific Northwest and the Pacific Southwest; and

(4) other minor schedules which provide for sales of firm capacity, firm energy, and reserve power.

BPA is currently undergoing a rate review which is expected to culminate in the approval of new rates effective December 20, 1979. This rate review involves an examination of a number of rate structure issues. BPA has completed a number of studies including a fully allocated cost-of-service study, a long-run incremental cost study, a time-differentiated average cost study, and a rate design study. Based upon these and other analyses, BPA has recently issued an initial proposal of rate schedules which are undergoing a review through a public involvement process prior to submission to the Economic Regulatory Administration for approval. The proposed rate schedules are similar to those currently in effect insofar as they provide for a similar set of rate schedules for different classes of service. However, BPA is proposing changes in the form of individual rate schedules in addition to increases of rate levels.

Under the proposed legislation, rates would continue to be set to assure payment of all costs and obligations of the Federal Columbia River Power System. However, there would be some significant changes from the existing rate structure or from the rate structure which BPA has proposed to become effective in December 1979.

First, BPA would need two rate schedules for the sale of firm power in contrast to the single schedule which currently exists. One such schedule would apply to all loads of preference agencies plus the residential loads of investor-owned utilities and Federal agency loads. The second such schedule (and higher rate) would apply to the remaining loads of the investor-owned utilities which might be served by BPA and any new large industrial loads that might be served by the publicly owned utilities. The first of these rate schedules would be based upon the costs of existing BPA resources until the eligible loads exceeded the available resources. As more power is required, this rate would become a blend of the existing BPA resources and any exchange power sold to BPA by the investor-owned utilities. Subsequently, the cost of new resources, as they are needed and added, would be blended into this lowest rate. The second rate schedule for the sale of all remaining firm power sold by BPA would be based upon the cost of resources purchased by BPA to meet regional load growth mixed with the cost of any resources BPA has left over after its sales to those eligible to buy at the lowest rates.

Second, the rate schedule to BPA's direct-service industrial customers (DSI) during the initial five years following the passage of this bill would be higher than it would otherwise be to offset increased costs resulting from the exchange power which BPA purchases from the IOUs. This rate would be set no lower than the average wholesale power costs of the IOU's residential loads, including the cost of their purchases from BPA. After the initial five years of the program, the rates applicable to the BPA industrial loads would be based upon the rates regional utilities charge their large industrial loads, less an appropriate credit for the reserves which are supplied to the region's system through BPA's right to restrict service to the DSI loads.

In summary, the bill would provide for establishing two different rate schedules for the sales of firm power and would provide different criteria than currently exist for the establishment of rates to direct-service industrial customers. Aside from these directives, BPA would continue to design rates based upon the objectives that currently concern us, including costs, economic efficiency, environmental protection, conservation, and equity.

*Question 6. (a)* What is the current market area of BPA and how will this bill expand that market area?

Answer. BPA's service area consists of the States of Idaho, Oregon, Washington, and the 11 counties of Montana west of the Continental Divide, plus small adjoining portions of Wyoming, Utah, Nevada, and California.

This bill would not expand that marketing area.

*Question 6. (b)* Within the current BPA market area and the expanded area provided by this bill, what portion of electric power is provided by (a) BPA, (b) publicly owned utilities, and (c) investor-owned utilities?

Answer. This bill makes no change in BPA's marketing area. At present, BPA provides roughly 55 percent, publicly owned utilities 20 percent, and investor-owned utilities 25 percent of the power in the BPA marketing area.

*Question 6. (c)* What are the demands forecasted for both market areas for the next 20 years?

**Answer. Again, the bill makes no change in BPA's marketing area. Forecasted demands are:**

| *1978–79* | *1997–98* |
| --- | --- |
| 27,185 MW | 60,410 MW. |

These demand forecasts are utility forecasts. They indicate that loads will grow at significantly slower rates than historically (about 20 years in excess of 7½ percent per year during the 1950's and 1960's). Other forecasts suggest the possibility that future demand for electric energy in the BPA marketing area may increase at an even slower pace than that shown in the above table.

*Question 7.* Please explain what, if any, effect or impact this bill will have or could have on BPA contracts or other arrangements outside its market area, including any impact on the Pacific Northwest-Southwest Intertie.

Answer. This bill will have no effect on existing contracts or other arrangements outside the Bonneville marketing area, nor do I anticipate any effects on future contracts or arrangements, with one exception. Section 8(d) of the bill amends P.L. 88–552, the so called Regional Preference Act, by expanding the provisions of that Act to thermal power as well as hydro. The effect of this amendment would be to prevent the sale of thermal energy outside the BPA marketing area, unless that energy is surplus to the needs of the Pacific Northwest. We anticipate that Pacific Northwest-Southwest Intertie transactions would be similar with or without the bill.

*Question 8.* Please explain how and to what extent this bill will improve public participation in matters covered by the bill consistent with section 102(15) of the DOE Act.

Answer. Sec. 102 of the Department of Energy Organization Act sets forth the purposes of the Act, including (Subsection 15) "to provide for, encourage, and assist public participation in the development and enforcement of national energy programs."

The establishment of a Consumers' Council, all of whose members shall be appointed by the Governors of the Northwest States, with two members to be appointed from each congressional district, and with one of those two members to be an elected local official and the other to be from the general public would be a significant public participation thrust in the development of a regional power program. To the extent that the Utilities' Council, consisting of 18 representatives of the region's utilities, many of which are public bodies and cooperatives, and up to three representatives from direct-service industries, also reflects an important public perspective, it too would contribute toward public participation. The requirement that the Administrator consult with the elected chief executive of each Northwest State in preparing a regional power planning and conservation program, in revising that program, and prior to acquiring major generating resources, and considering that Governors tend to encourage and be sensitive to public views on public matters for which they are responsible, is further involvement of public views. But most particularly, the requirement that the Administrator "establish and maintain comprehensive programs designed to inform the Pacific Northwest public of major regional electric power issues and to obtain public views and reactions concerning those issues" mandates a large-scale citizen involvement effort that is not only consistent with Section 102(15) of the DOE Act, but that substantially reinforces that provision. In addition, the public participation provisions associated with preparation of all required environmental impact statements are also consistent with the DOE Act and would be complemented by this bill.

*Question 9.* The General Accounting Office, in an August 10, 1978, report to the Congress (B–114858) entitled "Region at the Crossroads—The Pacific Northwest Searches for New Sources of Electric Energy," made a number of recommendations to Congress. We request your comments on those recommendations. Also, please indicate to what extent this bill affects those recommendations.

Answer. BPA has not yet submitted comments on the GAO report of August 10, 1978, but did comment very hurriedly on the draft report. Mainly, BPA disagrees with the GAO recommendation that BPA set rates on the basis of replacement costs. Such rates would be disruptive of the Northwest economy and would be contrary to law. The report also recommends many studies, loan and grant programs for energy conservation, and development by BPA of renewable resources. These would require legislative authority to implement, as is being proposed in the bill.

 

We concur with GAO emphasis on energy conservation and development of renewable resources, and the bill mandates priorities for the implementation of conservation and renewable resource development.

*Question 10.* (*a*) Section 6(a) requires conservation by BPA through implementation of measures the Administrator determines are feasible and cost-effective." It directs BPA to "develop conservation proposals and programs which assist the region's electric power consumers to make efficient use of energy." It also directs BPA to provide technical and financial assistance to "regional consumers." These provisions appear to give BPA very broad, but vague, power with no guidelines. For example, they provide for financing residential insulation and financial assistance, but fail to indicate whether this shall be by loan, grants, or guarantees and they do not establish any criteria concerning conditions for such assistance and at what interest rates. We note that in the August 23, 1978, edition of the Portland Oregonian, you were stating that the bill concentrates too much decisionmaking in BPA. Do you agree that Section 6, including Section 6(a), is a good example of that concern? What suggestions could you make for amending the bill to limit or provide greater standards or criteria for BPA in the exercise of Section 6 powers?

Answer. It is desirable that some flexibility be provided in the way BPA undertakes conservation efforts to carry out the mandate of the bill. The Administrator should have authority to commence implementing conservation programs without delay. However, the Congress may wish to make the authorities in sections 6(a) and 6(b) subject to requirements similar to those of section 6(g). Also, the Congress may wish to require that long-range conservation programs and the development of renewable resources based generation must be in accordance with the regional plan required by section 4(c).

*Question 10.* (*b*) The terms "electric power consumers" and "regional consumers" in Section 6(a) are not defined. Please indicate your understanding of those terms.

Answer. My understanding of the undefined terms "region's electric power consumers" and "regional consumers" is that they refer to ultimate retail consumers of electric energy at the point of final sale of electricity. That would include residential, irrigation, commercial and industrial customers of electric utilities, as well as BPA's direct-service customers.

I assume that the bill sponsors did not intend any difference between the two terms.

*Question 10.* (*c*) Do you interpret Section 6(a) as authorizing BPA to prescribe and enforce mandatory conservation standards for the entire region?

Answer. I do not interpret Section 6(a) to authorize BPA either to prescribe or to enforce mandatory conservation standards.

Section 6(a) requires the Administrator to cooperate with BPA customers and with governmental authorities (1) to encourage voluntary conservation and (2) to devise effective mechanisms for establishing, enforcing, and achieving compliance with mandatory conservation standards. It does not seem to authorize the Administrator to establish mandatory conservation standards or to enforce them, only to cooperate with his customers and governmental authorities in devising mechanisms that would make any established mandatory conservation measures effective.

*Question 11.* Section 6(b) states that if BPA "determines" that conservation "will be insufficient to meet the electric power obligations incurred under Section 6," BPA is directed to acquire additional resources.

(*a*) Do you construe this provision to require such a BPA determination prior to exercising the authorities of subsections (c) through (h) of Section 6? If not, why not?

Answer. The determination required in Section 6(b) would be required to carry out the authority referred to in subsection (c) since the authority in subsection (c) can only be exercised after the Administrator has exhausted the authority conferred by subsection (b).

Subsection (d) refers to specific facilities designed to assure transmission system reliability and would not require the determination referred to in subsection (b). The Administration has recommended that the portion of subsection (d) which would authorize the Administrator to construct and operate generating facilities utilizing renewable resources be deleted. If this portion of subsection (d) remains in the bill, the determination required in subsection (b) would still be required for this portion.

Subsection (e) relates to the authority of the Administrator pursuant to subsection (a) as well as subsection (b) and (c); hence, the determination would be required only with reference to the exercise of the authority under subsections (b) and (c).

Subsection (f) does not appear to imply that the subsection (b) determination be made prior to the time the *proposal* for acquisition is converted into an actual acquisition by the Administrator. It should be noted that the Treasury Department has recommended against the authority provided in subsection (f).

Subsection (g) would require the prior subsection (b) determination.

Subsection (h) relates to power to be acquired at the expense of a specific customer as replacement for power curtailed or interrupted by the Administrator. Presumably, this would not require prior determination referred to in subsection (b).

*Question 11.* (*b*) Would that determination be made after an opportunity for public participation?

Answer. It must be assumed that in the exercise of long-term power acquisitions, the Administrator's actions would be a part of a "major marketing policy" and, therefor, would be subject to the extensive provisions BPA has made for public participation. In addition, if such acquisition were a "major Federal action," all of the public participation procedures associated with the preparation of an environmental impact statement would apply. In addition to these technical requirments, the necessity for consistency with the provisions of the power program for the Pacific Northwest developed pursuant to Section 4 would assure a full opportunity for public participation in the development and implementation of the power program.

*Question 11.* (*c*) Section 5 appears to require BPA to enter into significant power sale obligations immediately after enactment of the bill. The obligations could be made long before any effective conservation program under Section 6(a) is established and implemented. Should not BPA be precluded from exercising Section 5 power prior to the establishment by BPA of conservation measures under Section 6(a)?

Answer. A significant purpose of Section 5 appears to be to extend the benefits from the Federal Columbia River Power System to residential and farm consumers in the region. This is effected through the acquisition of resources from a Pacific Northwest utility in an amount equal to the residential and small farm load of that utility. In other words, it is not contemplated that the initial loads to be served by BPA will require resources in addition to those presently existing and committed. The effectiveness of the conservation program to be undertaken in accordance with Section 6(a) will impact the need for additional resources for the region which have not already been constructed or specifically planned.

*Question 12.* Section 6(f) of the bill authorizes BPA to enter into agreement with "sponsors of resources," which, presumably, includes IOU's and PUD's, to fund or secure debt incurred in the investigation and initial "development" of such resources.

(*a*) Why is this authority needed or desirable?

(*b*) What is the potential cost to the United States of this provision?

Answer. The Treasury Department has recommended against this authority.

*Question 12.* (*c*) What is encompassed by the term "initial development?"

Answer. Presumably, the term "initial development" is intended to encompass those costs which would be incurred prior to the time actual construction of a project was authorized by the appropriate state or Federal entity.

*Question 12.* (*d*) The GAO states that more information is needed "before the Federal government makes any firm commitments to guarantee the financing of new thremal power plants in the near future." Do you agree?

Answer. In the context in which the GAO Report calls for additional information prior to Federal involvement in the new thermal power plants, I concur fully. The selection of the type of each new thermal plant to be constructed in the region, its location, its size, the environmental impacts, and its impact on the regional transmission grid must all be fully analyzed. Even prior to the analysis of the foregoing considerations, the actual need for the thermal power-plant, after taking into account the effectiveness of conservation efforts, must be determined. In any event, I assume that the intent of the bill appears to be that BPA's ratepayers and not the Federal government guarantee such thermal plant financing.

42-630—79——6

*Question 13.* It was recently said that the philosophy of the bill is that home and farm consumers of the region will have equal access to, and equal benefits from, low cost Federal hydro power. The bill is said to eliminate the discrimination against such home and farm consumers. Please identify specific provisions of the bill that appear to eliminate such discrimination and show how they assure such equal access.

Answer. Section 5(b) of the bill provides access to low cost Federal power to investor-owned utilities to serve their home and farm consumers. Section 7(b) requires that the wholesale costs of power available to those utilities to serve their residential and farm customers to be the same as the wholesale costs which Bonneville charges to public bodies, cooperatives, and Federal agencies. Access to Federal power is limited by the Bonneville Project Act in that BPA power contracted to investor-owned utilities may be called back on 5-years' notice if BPA could not otherwise meet its obligations to its preference customers. The bill does not require that the benefits of this low cost power be passed through to the home and farm consumers. I would propose to include such requirement by contract.

*Question 14.* Please provide a table showing in brief form the (a) new authorities provided by this bill to BPA, and (b) the changes made to existing BPA authorities.

Answer. (a) New authorities:

(The following descriptions of new authorities are not intended to fully describe the new authorities but are only intended to refer to the general subject matter contained in the referenced section.)

Sec. 4(a)(2)—Establish rules for selection of representatives to Utilities' Council.

Sec. 4(a)(3)—Establish terms and conditions of service on Consumers' Council and Utilities' Council.

Sec. 4(c)—Prepare Regional Power Planning and Conservation Program.

Sec. 5(b)—Acquire electric power from Pacific Northwest utilities at the average cost of resources.

Sec. 6(a)—Implement Regional Conservation Program.

Sec. 6(b)—Acquire additional resources (e.g., renewable).

Sec. 6(c)—Acquire additional resources.

Sec. 6(d)—Construct and operate generating facilities utilizing renewable resources and other facilities determined to be necessary to assure transmission system reliability.

Sec. 6(f)—Participate in investigation and initial development of resources proposed for acquisition.

Sec. 6(h)—Prescribe terms and conditions applicable to acquisition and delivery of power to replace that curtailed or interrupted by the Administrator.

Sec. 7(c)—Impose surcharge on rates to direct-service industrial customers.

Sec. 8(a)—Make expenditures from the Bonneville Fund established pursuant to P.L. 93-454 for purposes of this Act.

Sec. 8(b)—Sell bonds to Treasury Department for purposes of implementing this Act.

Sec. 8(c)—Increase bonding authority by amount necessary to implement purposes of this Act.

Sec. 9(a)—Enable Administrator to serve as conduit without affecting tax exemption which would otherwise apply.

(b) Except as described in the answer to question 14(a) above, the bill does not appear to modify existing authorities except as the provisions of Section 7 establish more explicit rate directives.

*Question 15.* Section 3(j) (sic) defines the term "residential use or load" and includes a 100 horsepower limitation. What is the effect of this limitation?

Answer. The inclusion of farm irrigation and pumping loads not to exceed 100 horsepower per farm in the definition of "residential use or load" in Section 3(i) is evidently intended to ensure that the same benefits which the bill intends to provide for the residential customers of nonpreference investor-owned utilities is also extended to small family size farms served by such utilities as well. The majority of Pacific Northwest farm irrigation and pumping loads are less than 100 horsepower per farm; large corporate size farms which account for a substantial amount of the region's total farm irrigation and pumping, but a relatively small portion of the region's farms, would not qualify for such benefits but would be treated the same as commercial and industrial customers of investor-owned utilities with respect to their irrigation and pumping loads exceeding 100 horsepower.

 

*Question 16.* Does the bill treat industrial users of preference utilities differently from industrial users of nonpreference utilities?

Answer. Yes. Except for new large loads, preference utilities would receive power for their industrial users at the base Bonneville rate. Higher rates would apply to investor-owned utility purchases for their industrial customers.

*Question 17.* (*a*) What impact will this bill have on direct-service companies of BPA; how will they benefit by it; and are they required to make up the costs incurred by BPA under section 5(b) of the bill?

Answer (a) The major benefit to the direct-service industries of BPA under this bill will be an assurance of a long-term power supply. In return for this benefit, the DSI's will be paying a much higher cost for power than they do under existing contracts. They will make up the costs for power incurred by BPA under Section 5(b) (2) until July 1, 1984.

*Question 17.* (*b*) What conservation measures will be applied by this bill to those companies?

Answer. As previously discussed, Bonneville cannot impose mandatory conservation measures under this bill. We intend, however, to enlist the cooperation of the DSI's to improve the energy efficiency of their plants and to take appropriate measures to optimize cogeneration wherever that is feasible.

*Question 17.* (*c*) What is the purpose of the July 1, 1984, date in section 5(b) of the bill?

Answer. By July 1, 1984, the increments of sales of Federal power to investor-owned utilities for their residential loads will have reached 100 percent and the DSI's will no longer be paying on the basis of costs of exchange power acquired under Section 5(b)(2). Their rates thereafter are based on the rates paid by utility-served industries in the region.

*Question 18.* Please explain whether the bill permits a utility under Section 5(b) to obtain a profit on the power sold by BPA to the utility for resale.

Answer. The bill is silent on the subject of profit on the power sold by BPA for resale under section 5(b). However, rates of investor-owned utilities are regulated by state public utilities commissions. The laws of each Northwest State provide that investor-owned utilities are to be allowed to charge rates which provide a fair or reasonable rate of return on investment. Assuming that a utility's investment base is unchanged and all other things constant, any reduction in "above-the-line" expenses of that utility would have to be reflected in a reduction in its rates. Since other expenses are continuing to increase and since the utilities' investment bases are also increasing, it would be accurate to say that (1) total profits of investor-owned utilities, while they may be increasing, will not be affected by this bill, (2) the rate of return on investment should be altogether unaffected by this bill, and (3) total investor-owned utility costs and, therefore, rates will be lower than they otherwise would be without this bill.

Although there is nothing in the bill that would require that investor-owned utilities pass on to their residential customers the benefits of melded BPA power (for example, they and the state regulatory authorities might instead spread those benefits across the board to all IOU customers), I would propose to include in BPA contracts a provision that would require that the benefits flow through at cost exclusively to residential and small irrigation loads. The bill could be amended to require that such provisions for flow-through of benefits be incorporated in future BPA power sales contracts with investor-owned utilities.

*Question 19.* Section 6(d) seems to provide broad authority to BPA. Do you agree that some limitations are needed on this authority? If so, what limitations would you recommend?

Answer. The Administration is opposed to that portion of this section which would authorize BPA to construct generating facilities utilizing renewable resources.

I do not construe the authority to construct such other generating resources as may be determined to be necessary to assure transmission system reliability to be so broad as to require additional limitations. However, I do construe this language to limit the construction of such facilities to those which are necessary to assure a supply of power to those customers of BPA who are subject to inadequate, or perhaps complete failure of, existing transmission facilities. For example, a customer being served at the end of a radial line would be wholly independent upon the integrity of that transmission line, and from an engineering and economical standpoint, it might be wise to install supplemental generation to serve that customer in lieu of additional transmission facilities.

BONNEVILLE CUSTOMER LONG-TERM RESOURCE CONTRACT NUMBERS

| Participant | NPR No. 1[1] | CSPE[2] | Trojan[3] | WPPSS No. 1[4] | WPPSS No. 2[5] | WPPSS No. 3[6] | Capacity-exchange[7] |
|---|---|---|---|---|---|---|---|
| Albion, Idaho | | | | 39217 | 19122 | 39101 | |
| Bandon, Oreg | | | | 39218 | 19123 | 39102 | |
| Benton PUD | 35581 | 47283 | | 39219 | 19124 | 39103 | |
| Benton REA | 35345 | | | 39220 | 19125 | 39104 | |
| Big Bend Coop | 35346 | | | 39221 | 19126 | 39199 | |
| Blachly-Lane Coop | 35351 | | 09182 | 39222 | 19127 | 39105 | |
| Blaine, Wash | | | | 39223 | 19128 | 39106 | |
| Bonners Ferry, Idaho | 35620 | 47284 | | 39224 | 19129 | 39107 | |
| Burley, Idaho | | | | 39318 | 19130 | 39108 | |
| Canby, Oreg | | | 09183 | 39225 | 19131 | 39109 | |
| Cascade Locks, Oreg | 35612 | | | 39226 | 19132 | 39110 | |
| Centralia, Wash | | | | 39228 | 19134 | 39112 | |
| Central Lincoln PUD | 35599 | 47285 | | 39229 | 19135 | 39113 | |
| Central Electric Coop | 35352 | | | 39227 | 19133 | 39111 | |
| Chelan PUD | 35582 | 47286 | | 39230 | | 39114 | |
| Cheney, Wash | 35603 | | | 39231 | 19136 | 39115 | |
| Clallam PUD | 35583 | | | 39232 | 19137 | 39116 | |
| Clark PUD | 35584 | 47287 | | 39233 | 19138 | 39117 | |
| Clatskanie PUD | 35600 | 47288 | 09184 | 39234 | 19139 | 39200 | |
| Clearwater Coop | 35573 | | | 39235 | 19140 | 39118 | |
| Columbia Basin Coop | 35353 | | | 39236 | 19141 | 39119 | |
| Columbia Power Coop | 35354 | | | 39237 | 19142 | 39120 | |
| Columbia REA Coop | 35347 | | | 39238 | 19143 | 39121 | |
| Consolidated Irrigation | | | | 39239 | | 39122 | |
| Consumers Coop | 35355 | | 09185 | 39240 | 19144 | 39123 | |
| Coos-Curry Coop | 35356 | 47289 | | 39241 | 19145 | 39124 | |
| Coulee, Wash | 35604 | 47290 | | 39242 | 19146 | 39125 | |
| Cowlitz PUD | 35585 | 47291 | | 39243 | 19147 | 39126 | |
| Declo, Idaho | | | | 39244 | 19148 | 39127 | |
| Douglas PUD | 35586 | 47292 | | 39245 | | 39128 | |
| Douglas REA Coop | 35357 | | | 39246 | 19149 | 39129 | |
| Drain, Oreg | 35613 | | | 39247 | 19150 | 39130 | |
| East End Coop | | | | 39248 | 19151 | 39131 | |
| Ellensburg, Wash | 35605 | | | 39249 | 19152 | 39132 | |
| Eugene, Oreg | 35614 | 47293 | 09181 | 39250 | | | |
| Fall River Coop | | | | 39319 | 19153 | 39133 | |
| Farmers Coop | | | | 39251 | 19154 | 39134 | |
| Ferry PUD | 35587 | | | 39252 | 19155 | 39135 | |
| Flathood Coop | 35577 | 47294 | | 39253 | 19156 | 39136 | |
| Forest Grove, Oreg | 35615 | 47295 | 09186 | 39254 | 19157 | 39137 | |
| Franklin PUD | 35588 | 47296 | | 39255 | 19158 | 39138 | |
| Grant PUD | 35589 | 47297 | | 39256 | | 39139 | |
| Grays Harbor PUD | 35590 | 47298 | | 39257 | 19159 | 39140 | |
| Harney Coop | 35359 | | | 39258 | 19160 | 39201 | |
| Heyburn, Idaho | | | | 39259 | 19161 | 39141 | |
| Hood River Coop | 35360 | | | 39260 | 19162 | 39124 | |
| Idaho Co. Coop | 35574 | 47299 | | 39261 | 19163 | 39143 | |
| Idaho Falls, Idaho | | | | 39262 | 19164 | 39144 | |
| Inland Coop | 35348 | 47300 | | 39263 | 19165 | 39145 | |
| Kittitas PUD | | | | 39264 | 19166 | 39146 | |
| Klickitat PUD | 35591 | | | 39265 | 19167 | 39147 | |
| Kootenai Coop | 35575 | | | 39266 | 19168 | 39148 | |
| Lane Coop | 35361 | 47301 | | 39267 | 19169 | 39149 | |
| Lewis PUD | 35592 | | | 39268 | 19170 | 39150 | |
| Lincoln Coop (Mont.) | 35578 | 47302 | | 39269 | 19171 | 39151 | |
| Lincoln Coop (Wash.) | | 47303 | 09187 | 39270 | | 39152 | |
| Lost River Coop | | | | 39271 | 19172 | 39153 | |
| Lower Valley Coop | | | | 39272 | 19173 | 39154 | |
| Mason Co. PUD No. 1 | | | | 39273 | 19174 | 39155 | |
| Mason Co. PUD No. 3 | 35593 | | | 39274 | 19175 | 39156 | |
| McCleary, Wash | | | | 39275 | 19176 | 39157 | |
| McMinnville, Oreg | 35616 | 47304 | 09188 | 39276 | 19177 | 39158 | |
| Midstate Coop | 35362 | | | 39277 | 19178 | 39159 | |
| Milton-Freewater, Oreg | 35617 | | | 39278 | 19179 | 39160 | |
| Minidoka, Idaho | | | | 39279 | 19180 | 39202 | |
| Missoula Coop | 33579 | 47305 | | 39280 | 19181 | 39161 | |
| Monmouth, Oreg | 35618 | | 09189 | 39281 | 19182 | 39162 | |
| Montana Power Co | 35621 | | | | | | 51702 |
| Nespelem Coop | 35349 | 47306 | | 39282 | 19183 | 39163 | |
| Northern Lights Coop | 35576 | 47307 | | 39283 | 19184 | 39164 | |
| Northern Wasco PUD | 35601 | | 09190 | 39284 | 19185 | 39165 | |
| Okanogan Electric Coop | | | | 39320 | 19186 | 39166 | |
| Okanogan PUD | 35594 | | | 39285 | 19187 | 39167 | |
| Orcas Coop | 35350 | | | 39286 | 19188 | 39168 | |
| Pacific PUD | 35595 | | | 39287 | 19189 | 39169 | |
| Pacific Power & Light Co | 35622 | 47308 | | | | | 29104 |
| Pend Oreille PUD | | 47309 | | 39288 | | 39170 | |
| Port Angeles, Wash | | 47310 | | 39289 | 19190 | 39171 | |
| Portland General Electric Co | 35623 | 47311 | | | | | |
| Prairie Coop | | | | 39290 | 19191 | 39172 | |
| Puget Sound Power & Light Co | 35624 | 47312 | | | | | |

See footnotes at end of table.

BONNEVILLE CUSTOMER LONG-TERM RESOURCE CONTRACT NUMBERS—Continued

| Participant | NPR No. 1 [1] | CSPE [2] | Trojan [3] | WPPSS No. 1 [4] | WPPSS No. 2 [5] | WPPSS No. 3 [6] | Capacity-exchange [7] |
|---|---|---|---|---|---|---|---|
| Raft River Coop | | | | 39291 | 19192 | 39173 | |
| Ravalli Coop | 35580 | 47313 | | 39292 | 19193 | 39174 | |
| Richland, Wash | 35607 | 47314 | | 39292 | 19194 | 39175 | |
| Riverside Coop | | | | 39294 | 19195 | 39176 | |
| Rupert, Idaho | | | | 39295 | 19196 | 39177 | |
| Rural Coop | | | | 35296 | 19197 | 39178 | |
| Salem Coop | 35363 | 47315 | 09191 | 39297 | 19198 | 39179 | |
| Salmon River Coop | | | | 39298 | 19199 | 39180 | |
| Seattle, Wash | 35608 | 47316 | | 39299 | 19200 | 39181 | |
| Skamania PUD | 35596 | 47317 | | 39300 | 19201 | 39182 | |
| Snohomish PUD | 35597 | 47318 | | 39301 | 19202 | 39183 | |
| South Side Coop | | | | 39302 | 19203 | 39184 | |
| Springfield, Oreg | 35619 | 47319 | 09192 | 39303 | 19204 | 39203 | |
| Sumas, Wash | | | | 39304 | 19205 | 39185 | |
| Surprise Valley Coop | 35569 | | | 39305 | 19206 | 39186 | |
| Tacoma, Wash | 35609 | 47320 | | 39306 | | 39187 | |
| Tanner Coop | | | | 39307 | 19207 | 39188 | |
| Tillamook PUD | 35602 | 47321 | | 39308 | 19208 | 39189 | |
| Umatilla Coop | 35570 | | 09193 | 39309 | 19209 | 39190 | |
| Unity Coop | | | | 39310 | 19210 | 39191 | |
| Vera Irrigation | 35610 | 47322 | | 39311 | 19211 | 39192 | |
| Vigilante Coop | | | | 39312 | 19212 | 39193 | |
| Wahkiakum PUD | 35598 | | | 39313 | 19213 | 39194 | |
| Wasco Coop | 35571 | | | 39314 | 19214 | 39195 | |
| Washington Water & Power Co | 35625 | 47323 | | | | | |
| Wells Coop | | | | 39315 | | 39196 | |
| West Oregon Coop | 35572 | | 09194 | 39316 | 19215 | 39197 | |
| Whatcom PUD | | | | 39317 | | 39198 | |
| Burbank, Calif | | | | | | | 53290 |
| Glendale, Calif | | | | | | | 53295 |
| Los Angeles, Calif | | | | | | | 50323 |
| Pasadena, Calif | | | | | | | 53297 |
| San Diego Gas & Electric | | | | | | | 58638 |
| Southern California Edison Co | | | | | | | 54126 |

[1] BPA acquires full output of the Hanford (NPR) Nuclear Plant (851 MW).

[2] Under the Columbia Storage Power Exchange Agreement, the participants' shares of Canadian Entitlement are exchanged to BPA for power from the Federal System. Participants are currently receiving 1350 MW for the 1978–79 contract year; this amount will gradually reduce to 167 MW by the 2002–2003 contract year, which is the final year of the contract. These are amounts determined under the treaty with Canada for cooperative development of Columbia River Storage in Canada to equal the Canadian Entitlement

[3] BPA acquires 30 percent of the Portland General Electric Trojan nuclear project (total capability of 1130 MW)

[4] BPA will acquire full output of the Washington Public Power Supply System nuclear project (WNP) No. 1 (1250 MW) when this project is energized for commercial operation. Under an assignment agreement (contract No. 14-03-79125), the following utilities are participants in the WNP No. 1 project:

- Alder Coop
- Eatonville, Wash.
- Elmhurst Coop
- Fircrest, Wash.
- Lakeview Coop
- Milton, Wash.
- Ohop Coop
- Parkland Coop
- Peninsula Coop
- Steilacoom, Wash.
- Glacier Coop

[5] BPA will acquire full output of the WNP No. 2 (1100 MW) when this project is energized for commercial operation.

[6] BPA will acquire 70 percent of the WNP No. 3 (total capability of 1240 MW) when this project is energized for commercial operation).

[7] Under the agreements listed. BPA provides capacity and receives energy in return. For the current contract year, energy received will amount to 444 average MW.

---

[U.S. Government Memorandum, Bonneville Power Administration]

Date: March 13, 1978.
In reply refer to: P.
To: Ray Foleen, Deputy Administrator—A.
From: Sterling Munro, Administrator—A.
Subject: Preparation of Option Papers Evaluating BPA and Regional Power System Alternatives.

During the initial 2 months I have served BPA as Administrator I have met with many individuals who share an interest in BPA and the regional power system. Included in those meetings were governors for the four Northwest states, senators and congressmen, many political leaders, and representatives of environmental organizations, the region's utilities, both public and private, and

BPA's industrial customers. It was no surprise that each is aware, as I am, that the Pacific Northwest power system is confronting several very serious problems. In spite of the intensive efforts of many regional interests, there has not yet emerged any consensus of how our power needs should be met and how BPA should fit into the regional power system. Because of these efforts, there seems to be a feeling emerging among the Northwest Congressional delegation that action is needed this year.

Coupled with the lack of consensus regarding pending regional legislation, it seems that many interests in the region have arrived at a common complaint regarding BPA's Draft Role EIS. Many of those commenting have suggested that the Draft Role EIS is not adequate, although we have not had an opportunity to resolve these doubts. The most common criticism is the lack of any specific proposal for BPA's role in the future. They have a point, and, in my opinion, BPA should exercise its leadership role by establishing proposals for BPA and the region's overall power system.

Bonneville, even without any additional legislation, is in an enviable position with respect to the regional power system. BPA alone is a regionwide agency and is responsible for the majority of the region's hydro resources and most of its transmission grid. As a result, BPA has a necessary relationship with all of the region's public and private utilities. BPA also has a duty to recognize and serve the public interest. BPA, therefore, has the ability and the obligation to become a unifying force among state, environmental, and utility interests of the region.

Our experience in the past 5 years is valuable. Phase 2 of the Hydro-Thermal Power Program was an extensive effort to obtain a consensus through complex, interrelated agreements. But Phase 2 was conceived at a time when we assumed that: business would continue as usual without major legislative change; the region would retain a high growth rate of energy consumption; new thermal resources could be developed at relatively low cost; and BPA's direct-service industrial customers could continue to be served by BPA while BPA's preference customers developed and used new thermal resources. It is apparent now that those assumptions are not correct.

The Pacific Northwest Utilities Conference Committee (PNUCC) bill, which I believe still has a chance of being passed by Congress in a modified form, addresses many of the problems identified with Phase 2. However, the bill has drawn criticism since it is essentially a utility bill; a broader consensus will be necessary if the legislation is to be approved by the Congress. If this bill were passed, I am confident that BPA could operate within its parameters to be an effective aid in the development of a regional power program. The "Snohomish Amendment" and the "Billington Alternative" tend to be variations on the basic PNUCC bill which, if passed, would form a similar basis for BPA options and operations.

The Weaver Bill is a different approach to the same problem. It too would offer BPA a means to assist the development of a regional power program. Many of its provisions represent a substantial change in the structure of the region's power system. Both the PNUCC bill and the Weaver bill provide for a strong BPA conservation program and for the acquisition of additional power resources by BPA.

The Draft Role EIS identified many of the major alternative future roles for BPA and the impacts of those roles. The written comments we have received and the public response meetings BPA held in many Northwest cities for the purposes of receiving oral comments on the Draft Role EIS have provided us with valuable insights about the feelings local elected officials, utility representatives, and Northwest ratepayers have about our electric power problems, desirable solutions, and what BPA should do in the future. When BPA prepared and circulated its 1976 Study Paper, substantial advice was received from state and local governments, environmental groups, and our customers about how BPA should support regional solutions to electric power problems. BPA's recent assistance to the PNUCC, the City of Portland, and others, in their evaluation of regional alternatives have given us further insight as to the concerns of regional interests.

With the experience of the past few months, both in our efforts to develop an adequate BPA Role EIS and the efforts of various parties to draft regional legislation, BPA can provide a much better perspective regarding the future of the region's power system. Therefore, I am asking that BPA staff reanalyze BPA's role in several key areas and assess the various options available to BPA. These options should include both options within BPA's existing authority as well as recommendations to Congress for revisions to BPA's existing program.

 

Particularly, BPA's efforts in the areas of conservation, load forecasting, transmission planning, generation location, power allocations, power acquisitions, rates, alternate forms of generation, and oversight of generation construction and operation should be thoroughly reviewed and the various options identified. I concur in your suggestion that Earl Gjelde, along with Larry Hittle and Harvard Spigal, spearhead this effort. In addition, other BPA staff should be made available on a priority basis to provide assistance as they request.

The task force should periodically report its progress and its analysis of and options to BPA's program to us and other key staff. We should be prepared to offer definitive direction to enable the task force to complete its work at an early date.

This effort should not be prolonged, and in view of our previous work and experience with the Study Paper, the Role EIS, and the PNUCC's bill, by the end of April we should be ready to discuss with others the various options and our initial conclusions.

## INTRODUCTION

### BACKGROUND

On numerous occasions over the past three years, utility and industry leaders, state and local elected and appointed officials, and representatives of environmental and consumer groups have met to analyze and resolve the issues and problems surrounding the supply planning, conservation, and distribution of electrical power in the Pacific Northwest. In November 1976 the Bonneville Power Administration (BPA) prepared and circulated a Study Paper for Regional Power Planning in order to stimulate and focus discussion of these issues and their associated problems. In December 1976 the Pacific Northwest Utility's Conference Committee (PNUCC) began intensive study of possible legislation to design a regional power program. Two bills have been introduced into Congress. One bill, S. 2080 and H.R. 9020, was introduced by Senator Henry Jackson and Representative Lloyd Meeds, respectively at the request of the region's utilities. Another bill, H.R. 5862, was introduced by Representative James Weaver. Each of these bills propose considerably different methods for solving regional electric power problems.

Concurrently, Bonneville has prepared a Draft Role Environmental Impact Statement (Draft Role EIS) which explained its role in the Pacific Northwest Power Supply System including its participation in the Hydro-Thermal Power Program and included extensive regional public involvement. Most of the power planning issues and associated problems included in this document have been addressed directly or indirectly in the Draft Role EIS. One consistent criticism of the Draft Role EIS is that Bonneville failed to state a clear proposal for its program. We at Bonneville believe that the attached option papers will aid in that end. However, before Bonneville makes any decision regarding an option or group of options, appropriate procedures and environmental analyses will be completed.

The regional electric power problems described in the Study Paper either still exist, or in some cases, have been aggravated by the passage of 20 months. In addition, other problems have risen. Intense discussions by elected officials and representatives of Bonneville, the utilities, Bonneville's industrial customers, environmental organizations, and consumer groups indicate that, although a regional consensus is emerging with respect to some key principles, disagreement still exists over the most desirable general solution to some of these problems. Some hold that certain problems now being discussed have already been discussed and require no additional rearrangement in the region's existing power system.

Bonneville must respond to specific legal and policy issues that have evolved in recent years and the Role EIS must be completed.

Since its creation, Bonneville has played a unique regional role in the development of the Pacific Northwest's power system. As the marketer of output from major Federal hydro resources in the region and now, as an integrator and transmittor of regional thermal resources, Bonneville developed a coordinated regional system which fulfills important utility obligations as well as broader governmental responsibilities. In the Draft Role EIS, Bonneville's Program goal or mission is described as assuring "a viable electric energy system in the Pacific Northwest while balancing economic, technical, and environmental considerations." Others have stated that Bonneville's obligation is to guide regional power

system development by advocating optimum coordination or a "single or one-utility regional system" approach.

The legal and policy issues now being widely discussed require that Bonneville assess both national and regional objectives as well as its responsibility to its customers, the states, and residents of the region. Failure to develop and implement new policies for all those evolving isues would be inconsistent with Bonneville's responsibilities. Bonneville's obligation to serve both the national and regional public interest requires careful identification of principal options, including continuance of its current practices, in several key decision areas.

This document attempts to summarize many of Bonneville's principal policy options, their relation to each other, and their effect on regional electric power problems. Each of the issues considered herein include at least four possible Bonneville policy strategies or options, ranging from a moderate or restricted regional role usually requiring no major legislative change to a maximum activity option which would require major legislative and/or political change. The general options included in each of the policy strategies are as follows:

A. *Reduced Or Moderate Regional Role/No Additional Legislative Authority.*—Under this option Bonneville would support regional power programs but would exert no more than passive leadership.

B. *Increased Activity/No Additional Legislative Authority.*— Under this option Bonneville would expand its activities in order to exert maximum influence on regional power system policy within its current legislative authority.

C. *Increased Activity/Additional Legislative Authority.*—Under this option Bonneville's authority either in specific areas or in general could be expanded to provide greater Bonneville participation and coordination in regional power system development.

D. *Maximum Activity/Additional Legislative Authority.*—Under this option Bonneville would exercise substantial authority to participate as an overall decisionmaker in the formation of the region's power system.

Though each topic is isolated and discussed in a separate option paper, the topics are interrelated. The selection of one option for a single topic will, in many cases, affect the choice of options for other topics. The selection of one option in one area may necessitate the exclusion of, or otherwise affect options in other areas. Because of this interrelationship of topics, it is probable that any final proposal or overall course of action will contain portions, combinations, or variations of the options presented and discussed.

These option papers should be reviewed in the context of formulating overall policy strategy for the role Bonneville will assume. After reviewing these papers, a general policy strategy can be selected which provides complimentary and consistent options in specific areas.

These papers primarily address power supply and cost impacts associated with each option and strategy. It should be understood that many repercussions will stem from selection of a particular strategy applied to a particular option. It should also be pointed out that not all impacts were addressed nor can they all be anticipated and identified. It is also certainly possible that other options and strategies along with their associated impacts have not been considered.

## POWER SUPPLY, PLANNING, AND CONSERVATION PROBLEMS

A number of electric power supply and planning problems confront the Pacific Northwest. The problems examined here are not a definitive list of all related regional power problems but rather the principal problems which have a direct bearing on decisions which Bonneville must soon make. Bonneville's choice of options for future programs is influenced by the need to find constructive solutions to these problems.

Many of these problems were initially set forth in the 1976 Bonneville Study Paper. Since that time, the problems have intensified, grown more complex, and spawned additional ones. Further, many groups and individuals within the region and nation have since explored in much greater depth the many facets and ramifications of these and associated problems. Here are some key examples:

1. Projected firm power supply deficits, under critical streamflows, even with low load growth forecasts, are continuing to increase in part from delays in the construction of new generating projects. These growing deficits have intensified the uncertainty about the adequacy of the region's power supply to meet future requirements. Although intensified regional conservation efforts in response to

the recent Pacific Northwest drought have kept regional energy use below previous estimates, and to a significant degree have been reflected in current forecasts, it is questionable whether this voluntary conservation can be maintained, let alone increased, to significantly reduce the possibility of future power shortages.

2. Virtually no regionally coordinated electrical power conservation program exists. Cost-effective conservation opportunities as an alternate to increased generation capabilities are thought to exist. Yet they are not fully attainable without a concerted, coordinated regional effort. This lack of an effective regional conservation program creates the potential (a) for an inadequate power supply resulting from uncertainty in the need for new generation development, or (b) for uneconomic generation being constructed in excess of regional need.

3. The Pacific Northwest is uniquely suited to the development of unconventional and renewable resources due principally to the power shaping and storage capability of the region's hydroelectric system. However, there is little concerted and regionally coordinated effort toward their development. Again, as in the area of conservation, without such a regional effort to assure their cost-effective development, their very potential, if unrealized, may adversely impact attainment of an adequate regional power supply.

4. Much of the region's power reserves are embodied in power sales contracts with Bonneville's direct-service industrial customers. As these contracts near expiration, no assurance exists that the power needed by these industries for their operations will be available from Bonneville or elsewhere when the existing contracts expire. The probability that Bonneville will continue to have power available to serve these industries directly is further reduced by new applications for power from public bodies seeking to qualify as preference customers, the overall increased interest in the formation of new preference customers, and the growing needs of existing Bonneville preference customers. Loss of these industries would result in significant adverse economic impacts. If they remain in operation but are served by preference or private utilities, loss of access to the reserves they presently provide would be a serious blow to the ability to achieve a reliable power supply. This could necessitate, at the very least, additional resources development for reserve purposes.

5. Bonneville has begun analyzing its allocation alternatives to prepare for anticipated competing applications for its limited power supply. Extensive time will be required to analyze alternatives and to select a formula for Bonneville's allocation of this power. In addition, it is probable that litigation will further delay implementation of an allocation formula. The lack of a definitive allocation policy, would increasingly hinder planning for future power resource requirements because of inadequate information. This lack of a definitive allocation policy would affect existing and potential preference agencies, and, indirectly, investor-owned utilities and industries.

6. Upon expiration of their Bonneville contracts, the direct service industrial customers may reasonably be expected to apply to their local utility for service. This "new" loan competing as a preference customer load further complicates Bonneville's allocation of its power supply and adds to the planning uncertainties facing utilities and the region.

7. Bonneville's existing power sales contracts and their allocation formula result in increasing wholesale power cost disparities between the following:

a. slow and fast growing preference agencies after 1983;

b. preference agencies with loads over 25 average megawatts and those with loads under 25 average megawatts; and

c. between similar industries served by different utilities and Bonneville.

8. The wholesale power cost disparity between public and investor-owned utilities is continuing to widen. This has resulted in interest, and occasionally action, by state and local officials to achieve rate relief for their constituents who substantially do not now receive the low cost benefits of Bonneville's power. These constituents are the customers of investor-owned utilities. It has also resulted in increased activity regarding the formation of new public utilities which may qualify as Bonneville preference customers.

9. Local government bodies and the State of Oregon have applied to Bonneville to qualify as preference customers and to serve an allocation of power for serving both "government uses" and domestic and rural consumers. In addition, existing and newly formed public entities not presently Bonneville customers have applied for service. Further, there is growing activity to form new preference customers. The possible inclusion of new Bonneville preference customers

 

and the extent of service from Bonneville makes it unclear who should be planning new resources, investor-owned utilities for loads that want to secede or existing public agencies and cooperatives for "new" loads that are not yet their responsibility.

10. Extensive analysis of the Federal System hydro peaking capability indicates that less surplus capacity will be available than was previously anticipated. Increases in existing and new preference agencies' peak requirements combined with this reduction in anticipated Federal System peak capability will result in the investor-owned utilities receiving a diminishing portion of the Federal System hydro peaking capability. The investor-owned utilities will thus be forced to rely more upon their own higher cost new resources to meet not only their load growth but also to replace withdrawn Federal System peaking capability as well. This would cause an added rate impact to the investor-owned utilities with Bonneville's preference customers not bearing the impact of load growth.

11. In an effort to achieve the benefits of lower cost Bonneville power for Portland investor owned utility customers, the City of Portland filed litigation challenging Bonneville's acquisition of net-billed project capability and Bonneville's marketing practices, including the validity of existing power sales contracts with preference agencies. The time required to process this litigation and probable subsequent appeals by either party further prolongs the time when allocation certainty can be achieved.

12. States, local governments, and other regional public groups wish to participate in load and resources forecasting but have not yet developed adequate procedures for implementing that objective. Some states have provisions concerning siting procedures for new projects, but the lack of state and public participation in load and resources forecasts at initial stages has often resulted in frequent delays for the new projects. The rapid escalation of utility financing costs for new resources has increased the importance of close coordination by state and local regulatory bodies and the utilities. Expeditious processing of rate increases must begin with a base of information by a validated regulatory agency.

13. The region is integrated through the regional transmission system without total integration of planning or construction responsibility for new generation. Yet, if one utility or a group of utilities is short for any reason, the entire region will share the shortage.

14. There is no plan for regional sharing of power supply risks of (a) reserves for unanticipated load growth, (b) impacts of a resource development cancelled or shut down due to circumstances beyond the purchasers' or builder's control, (c) shortages due to unplanned delays of new resources, and (d) shortages resulting from a lack of success in anticipated conservation.

15. Financial backing for new regional resources is fractionalized. Beyond present net-billing arrangements, there is no use made of Bonneville's ability to generate revenues as financial backing of regional power supply and conservation development. There is no mechanism to fully exploit all of the region's power assets to secure financing and thus achieve very substantial savings for the region.

16. Beneficial economic and environmental scheduling of resource operation is inhibited by existing ownership and rate structures.

POWER SUPPLY, PLANNING, AND CONSERVATION OBJECTIVES

Selection of Bonneville options should take into consideration those activities which assist the region in attaining the following objectives:

1. *Adequate Power Supply.*—The region should be able to attain an adequate environmentally and economically sound power supply.

2. *Conservation as a Resource.*—All feasible cost-effective energy conservation should be encouraged and funded as a resource to reduce regional needs for additional generation.

3. *Unconventional or Renewable Resources.*—Where feasible and cost-effective, development of unconventional or renewable resources should be stimulated by regionally sponsored research and development projects. Such resources should be encouraged over conventional thermal resources.

4. *Cost Based Rates.*—Cost based wholesale power rates should be retained while using a marginal cost test to evaluate and fund conservation programs and development of unconventional or renewable resources.

5. *Bonneville Orientation.*—The regional orientation of Bonneville should be strengthened in order to better respond to regional needs consistent with national policy goals and objectives.

 

6. *Pursue Regional Power Supply Planning.*—Regional, State, and local power supply and transmission planning and timely coordination of goals and plans for development should be encouraged.

7. *Regional Participation.*—A mechanism for the Pacific Northwest states, local government agencies, utilities, and Bonneville to participate jointly in power supply and transmission planning should be provided. A means for obtaining input from the general public regarding regional power planning should also be created.

8. *Retain State and Local Retail Rate Control.*—The responsibility of state public utility commissions and public, municipal, and cooperative utilities to set retail rates for regional consumers should continue.

9. *State Control of Sites.*—Present state control on siting of generating resources should be retained to enable states to exercise their responsibility for protecting the local environment and regulating utility resource development consistent with regional and national energy policy goals and objectives.

10. *Transmission Development.*—Development of the regional integrated transmission grid based on a single system concept should continue.

11. *Benefit All Regional Consumers.*—The economic benefits of an integrated power supply system including the Federal Columbia River Power System should be passed on. All ultimate consumers of the region should share the risks and benefits of conservation programs and new power supply additions provided.

12. *Region Pays Own Way.*—The region's ratepayers should bear the full cost of the regional power system without subsidy.

### Topic 1—Allocation of Power and Power Costs

*Note.*—Bonneville is currently developing a policy for allocating the power which will be available when existing preference customers' and direct-service industrial customers' power sales contracts terminate. This option paper is not a substitute for the analysis of allocation alternatives now being undertaken, or for the public involvement program Bonneville has initiated to seek suggestions for and comments on a proposed allocation policy. The purpose of this option paper is to identify some of those principal options which must accompany the options on other issues including: power acquisition, load forecasting, rates, and direct-service industries.

#### I. PRINCIPAL FACTORS

A. Bonneville has a limited amount of power available from a fixed number of Federal and non-Federal projects.

B. Bonneville anticipates an increasing number of competing applications from new as well as existing preference agencies for Bonneville power because:

1. Bonneville has a low cost power supply compared to (a) power from new generating projects and alternative resources, including conservation, and (b) current wholesale power costs of some investor-owned utilities;

2. A large amount of the power currently available to Bonneville is sold to non-preference direct-service industrial customers (DSIs); and

3. It is often expeditious for preference customers to meet their loads with power from Bonneville since development of new energy projects is frequently subject to substantial uncertainty and delay in planning, licensing, and construction.

C. The existing difference and anticipated increasing difference between investor-owned utilities' rates and preference customers' rates is creating pressures for (1) a redistribution of Bonneville's comparatively low cost resources, pursuant to new Federal legislation, and/or (2) the formation of new public bodies and cooperatives in order to become preference customers. Increased interest in both activities is widespread in the region. The State of Oregon has a statewide initiative on the November 1978 ballot which would make the formation of new Peoples Utility Districts less complex and cumbersome.

D. Allocation, aside from the process of dividing a scarce commodity, can be essentially a matter of establishing rate differences between classes and grades of power, distinguishing between power from new energy projects and power from other existing generating resources. It is a rate matter only if there is an adequate supply. "Allocation" of costs or benefits through rates is covered in Option Topic No. 10.

E. Allocations of power supply under any option must provide sufficient certainty that resource planning and development can occur. Thus, contract periods

for fixed allocation quantities must cover the lead time for new resources. It is possible that the allocation after that time could be on a rolling basis in order to float to accommodate changing conditions.

II. OPTIONS

A. Allocation to existing preference customers for total load—Option No. 1.

1. *Summary*.—a. Firm power would be allocated to meet the total load growth requirements the 116 existing preference customers of Bonneville as that firm power becomes available upon termination of Bonneville's direct-service industrial customers' power sales contracts.

b. Although DSIs would not directly receive an allocation of Bonneville power, 14 DSI plants are located within or adjacent to the service areas of existing preference customers and could be served by those preference customers. These DSI plants account for approximately 84 percent of Bonneville's industrial power, with a present contract demand of 2,782 average megawatts.

c. The remaining DSIs, investor-owned utilities, and new preference customers would depend upon their own resources and new energy projects to meet their energy requirements.

d. Rates for this group of utilities could be established in a variety of ways. Topic No. 10 on Rates investigates this function.

2. *Significant consequences*.—a. (1) Existing Preference Customers—If no DSI loads are served by preference customers, existing preference customers, as a group, could meet their future energy requirements for an extended period, probably well into the 1990's. Thereafter, preference customers would meet future energy requirements by first withdrawing increasing increments of their own hydro resource capability from investor-owned utilities to the extent they are able and from their WPPSS Nos. 4 and 5 thermal resource capability from DSIs, and subsequently, from new energy projects.

(2) If those DSIs that are located within or adjacent to preference customers' service areas are served by those preference customers upon expiration of DSI power sales contracts with Bonneville, the date preference customers would be dependent upon other energy resources to meet their energy requirements would be advanced to the mid 1980's.

b. Upon expiration of their current Bonneville power sales contracts, direct-service industrial customers would be dependent upon firm and nonfirm energy available from utilities. Preference utilities and surplus power from WPPSS Nos. 4 and 5 would be the principal source of this energy. As the energy requirements of current preference customers increase, Bonneville would be obliged to sell less and less firm energy, and perhaps even nonfirm energy, to DSIs. The DSI would purchase the balance of their requirements from other sources including utilities and new energy projects. Those DSIs located within or adjacent to preference customers' service areas might receive service from those preference customers. If, because of higher energy costs, a direct-service industrial customer were unable to maintain production costs at a competitive level, it might ultimately be forced to terminate Pacific Northwest operations. Regional reserves and other benefits of the DSI's could be lost.

c. Investor-owned utilities would be totally dependent on new energy projects for meeting increases in their firm energy requirements. Preference customers that sold their resource capability to investor-owned utilities would withdraw such sales as their energy requirements exceeded their Bonneville allocations or their Bonneville energy became more expensive than the resources sold to investor-owned utilities. Investor-owned utilities would also be required to serve a greater portion of their current load from new energy projects. Puget Sound Power and Light, Portland General Electric Company, The Washington Water Power Company, and Pacific Power & Light are currently purchasing substantial amounts of power from hydro resources developed and owned by preference customers. Therefore, the difference between Bonneville preference customers' and investor-owned utilities' wholesale power costs and retail rates will rise substantially above current levels.

d. Although the increasing difference between investor-owned utilities' and Bonneville preference customers' rates would create substantial pressure for the creation of new preference customers, Bonneville's allocation of all its resource capability to existing preference customers, unless successfully challenged, would nullify the aspirations of new preference customers to obtain the low-cost benefits of Federal system power.

3. Bonneville does not require additional authority to implement this option unless such an allocation failed to meet the legal requirements of the Bonneville Project Act and related statutes.

B. Allocation to existing and new preference customers—Option No. 2.

1. *Summary.*—As existing preference customers' and direct-service industrial customers' power sales contracts expire, Bonneville would allocate its available energy (not necessarily in proportion to load) to its existing preference customers and to any new preference customers. New publicly and cooperatively owned utilities would be allocated Bonneville power that had not been previously committed to existing preference customers. The duration of such allocations would be contractually specified and might vary depending on the type of load served (e.g., domestic and rural, commercial or industrial, existing or new). Rates could be established to distinguish further between types of uses and customers.

2. *Significant consequences.*—a. Preference customers' allocation of Bonneville's low cost power and resultant wholesale power costs would depend upon pressures for creation of new publicly and cooperatively owned utilities which would qualify for an allocation of Bonneville power and also upon preference customers' service to DSIs with the expiration of their power sales contracts. An increase in allocations from Bonneville to cover preference customer service to DSI's alone would leave little or no Bonneville power available for new preference customers or load growth of existing preference customers. This assumes that allocations would be fixed rather than floating or changing with time. A floating allocation could continually redistribute the limited supply as needs change.

b. DSI power availability and cost would depend upon location of the DSI. Those DSIs located within or adjacent to a preference customers' service area and able to purchase their requirements from preference customers would continue to enjoy comparatively low power costs for a number of years, although their power costs would likely rise above current levels. To meet their energy requirements, DSIs unable to purchase power from preference customers would be dependent upon other energy sources including investor-owned utilities and acquisition of new project capability.

c. Investor-owned utilities' new energy requirements and power costs would be affected by the number and size of new publicly and cooperatively owned utilities created to take advantage of the available supply of low cost Bonneville power. The formation of new publicly and cooperatively owned utilities would, in turn, be affected by the size of the DSI loads served by preference customers upon expiration of the DSI's power sales contracts with Bonneville. As wholesale power costs of the investor-owned utilities increase further, greater and greater pressure for creation of new publicly and cooperatively owned utilities which would qualify as preference customers will be generated.

3. Bonneville does not require additional authority to implement this option unless an allocation failed to meet the legal requirements of the Bonneville Project Act and related statutes.

C. Domestic and Rural Allocation to Preference Customers—Option No. 3.

1. *Summary.*—a. Bonneville would allocate to existing and new preference customers on the basis of domestic and rural loads. Bonneville power, in excess of these essentially residential loads of preference customers, would be allocated to preference customers to serve their commercial and industrial loads including DSI's located within their service area.

b. Bonneville would not execute new DSI power sales contracts when existing contracts expire. The DSIs able to be served by existing preference customers and preference customers commercial and industrial load growth could be temporarily served, at least in part, with Bonneville allocation. However, this allocation would be withdrawn to meet new preference customers' domestic and rural loads and increases in existing preference customers' domestic and rural loads.

c. This allocation would design and structure preference customers' retail rates to assure that economic benefits of low-cost Federal power are realized by domestic and rural consumers.

2. *Significant consequences.*—a. Ultimately, direct-service industries would not purchase power from Bonneville and would depend on other sources of power. Some DSIs could purchase their energy requirements from preference customers who receive a temporary increase in their Bonneville allocation or who had other available resources. However, preference customers serving DSIs would be required to find new generating resources as the Bonneville allocation was withdrawn to meet domestic and rural loads.

 

b. The difference between retail rates for preference customers' domestic and rural consumers and rates of investor-owned utilities would increase, thereby further increasing dissatisfaction with the comparatively higher cost of service from investor-owned utilities. Formation of new publicly and cooperatively owned utilities which would qualify for an allocation of comparatively low-cost Bonneville power would become increasingly desirable.

3. Bonneville does not require additional authority to implement this option unless such an allocation failed to meet the legal requirements of the Bonneville Project Act and related statutes.

D. Increased Power Supply For All Preference Customers—Option No. 4.

1. *Summary.*—Bonneville would serve existing and any new preference customers' total requirements, including all load growth. As all Bonneville power sales contracts expire, Bonneville would allocate its available energy on the same basis to its existing preference customers and to any new preference customers. Bonneville would acquire the capability of new resources, constructed with tax exempt financing, to meet the balance of preference customer requirements which could not be served from existing Federal hydro and net-billed thermal projects. Bonneville firm power could be sold under a variety of rates reflecting the average cost of all of the resource capability Bonneville acquired from Federal and non-Federal generating projects.

2. *Significant consequences.*—a. This option would generally enable preference customers as a group to meet their load growth requirements at a lower average cost than if they developed their own resources. The economies of acquisition of new energy project capability by Bonneville are discussed in the option paper on acquisition.

b. The lower cost for preference customers' resources required to meet load growth complied with the present low cost power would cause the difference between preference customers' and investor-owned utilities' wholesale power costs to continue to widen. This, in turn, would further pressure for formation of new publicly and cooperatively owned utilities which would qualify as preference customers.

c. Upon termination of their existing Bonneville contracts, the DSI's able to be served by preference customers could be supplied. Because Bonneville would eventually meet all new and existing preference customers' total energy requirements, Bonneville would not reduce any preference customer's allocation for reasons other than short term supply problems, and these DSIs would have a continued source of power at relatively low cost. Those DSIs not served would be required to find alternate sources of power as discussed in the DSI option paper.

d. Preference customer service to the DSIs would cause Bonneville to accelerate acquisition of new resource capability to serve total preference customer loads. This would, in turn, substantially increase preference customers' total power costs above the level they would pay if DSIs were not directly served by preference customers.

e. The consequences related to wholesale power costs would depend on the type and cost of resources acquired, the need for reserves to offset the loss of direct DSI service, and the rates adopted. Option papers on acquisition, conservation, unconventional or renewable resources, and rates provide further information on this variation.

3. This option requires that Bonneville have authority to acquire additional resource capability constructed by preference customers with tax exempt financing to serve preference customers' loads.

E. Increased Power Supply For Preference Customers' Requirements, Direct-Service Industrial Customers' Loads and Investor-Owned Utilities' Load Growth—Option No. 5.

1. *Summary.*—This option would differ from the preceding option only to the extent that Bonneville would acquire sufficient resources to serve, in addition to all preference customers' requirements, the loads of its current direct-service industrial customers and regional investor-owned utilities' load growth after their present resources were insufficient. The feasibility and attractiveness of this option could be substantially affected by Bonneville options in the areas of acquisition of new resources, financing, rates, conservation, and other related option topics.

2. *Significant consequences.*—This option would result in higher Bonneville revenue requirements because of a greater number of new energy projects re-

quired for Bonneville to meet the newly acquired investor-owned utility load growth and all DSI loads. Preference customers' wholesale power costs may be increased above the level for the preceding option. However, investor-owned utilities' wholesale power costs would be reduced through lower Bonneville new energy project costs than would be available if the investor-owned utilities developed their own new energy projects. Direct-service industrial customers, as a group, would benefit by having both an assured source of power and power at a lower rate than might be available if new energy projects were developed solely to serve their loads. The wholesale power costs to each group is finally determined by the rates selected.

3. This option requires that Bonneville have authority to acquire capability of new energy projects.

F. Increased Power Supply For Preference Customers' Requirements, Direct-Service Industrial Customers' Loads, and Investor-Owned Utilities' Load Growth and a Portion Of Their Pre-1985 Loads (PNUCC and Snohomish Proposal)—Option No. 6.

1. *Summary.*—a. This option differs from the preceding option in that Bonneville would sell an additional amount of energy to investor-owned utilities equivalent to investor-owned utilities' pre-1985 rural and domestic loads.

b. In addition to acquiring new energy project capability to supply some IOU load growth, Bonneville would acquire an amount of investor-owned utilities' pre-1985 resource capability (Phase 1) equivalent to the investor-owned utilities' domestic and rural loads. The cost of the power acquired by Bonneville from investor-owned utilities' Phase 1 resources for this purpose would be averaged with the cost of a portion of Bonneville's Phase 1 resource capability.

c. Bonneville would sell its resource capability at different rates reflecting (1) a portion of Bonnevile's Phase 1 resource capability at cost to existing preference customers, (2) the balance of Bonneville's Phase 1 resource capability, investor-owned utilities' Phase 1 resource capability acquired by Bonneville, and the capability of new energy projects to supply 50 percent of load growth, and (3) the balance at the cost of new resources. Additional options with regard to alternative rate groups are described in the option paper on rates.

d. The Snohomish PUD proposed amendment to the PUNCC proposed legislation differs in the rate impacts. Generally, the rates to existing preference customers are lower, and the rates to others correspondingly higher than under the PNUCC proposal.

2. *Significant consequences.*—a. This option would result in higher wholesale power costs for Bonneville's preference customers because of inclusion of the average cost of investor-owned utilities' Phase 1 power with some of the Bonneville Phase 1 power costs and because of the specific rate consequences. However, the rates to DSI's bear the majority of these costs.

b. Investor-owned utilities' wholesale power costs would be reduced below the level which would result from the preceding option because investor-owned utilities, at least for a time, would buy back from Bonnevile a quantity of power at a lower cost than the power they sold to Bonneville. The difference between preference customers' and investor-owned utilities' wholesale power costs would narrow. Interest in the formation of new publicly and cooperatively owned utilities which would qualify to receive an allocation of Bonneville power would thereby be reduced.

3. This option requires that Bonneville have authority to purchase new energy project capability and investor-owned utilities' Phase 1 resource capability and perhaps specific rate authority or directives.

G. Allocation Of Lowest Cost Power To Domestic and Rural Consumers and Governmental Uses, With Highest Priority To Preference Customers (Weaver bill)—Option No. 7.

1. *Summary.*—Bonneville would allocate power on the basis of the cost of generation of power for domestic and rural and governmental uses of power, giving preference and priority to public bodies and cooperatives. Bonneville would purchase power, including existing resource capabilities of IOU's, and would establish separate rate pools for power. The lowest block of power would include power from generating facilities having the lowest cost of production. This rate pool would be allocated to preference customers and investor-owned utilities on the basis of a baseline allocation of 1100 kilowatt hours per single family residence per utility. All other users of electric energy would purchase power under the second rate block composed of all other remaining resource capability. If insuffi-

 

cient energy were available to meet total regional energy requirements, publicly and cooperatively owned utilities would have preference and priority to the limited supply of power. This option represents one aspect of Representative Weaver's bill, H.R. 5862. Other important elements affecting acquisition of the region's generating resources, conservation, rates, and methods of generation are discussed in related option papers.

2. *Significant consequences.*—To the extent that Bonneville had inadequate resource capability to serve the needs of all regional consumers, Bonneville wholesale power cost differences between preference customers and investor-owned utilities would be eliminated. Differences in preference customers' and investor-owned utilities' rates would be a function of other factors affecting operation and cost. The economic advantage in creating a new publicly or cooperatively owned utility to receive an allocation of Bonneville power would be diminished.

3. This option would require authority for Bonneville to purchase new and existing resource capability and perhaps for specific rate authority or directions.

## TOPIC 2—ACQUISITION OF GENERATING RESOURCES

### I. PRINCIPAL FACTORS

A. Bonneville's energy resources will be inadequate after 1983 to meet the increased loads of existing preference utilities and the existing loads of Bonneville direct-service industrial customers.

B. No new Federal energy projects of major consequence, other than the net-billed thermal projects, are currently under construction in the region.

C. Annual costs for new energy resources are several times higher than comparable costs for the region's existing hydro resources.

D. The region's investor-owned utilities (IOUs), as a group, are more dependent upon high cost new energy resources for meeting both existing loads and load growth than are preference utilities. In addition, IOU financing costs are higher than public agency financing costs due to the lower interest rates that are available for tax exempt public agency bonds and to the ability of public agencies to finance 100 percent of project construction costs with such bonds.

E. Each utility is responsible for acquiring adequate resources to meet its load, and construction of new energy projects is being undertaken by several utilities and groups of utilities. Projected power supply deficits, even with reduced load growth forecasts, are continuing to increase. This increase is due in part from delays in siting, licensing, and construction of new generating projects.

F. With the obligation to plan, construct, and operate new energy projects fractionalized among individual utilities, it is difficult to systematically design the optimum and most efficient regional power system, to methodically investigate and develop alternative renewable forms of generation, and to integrate the planning for and operation of new generation with the Federal Columbia River Power System (FCRPS). Overall regional resource cases are, therefore, higher than would be the case under optimum conditions.

G. There is no plan for regional sharing of power supply risks of (1) reserves for unanticipated load growth, (2) impacts of a resource development cancelled or shut down due to circumstances beyond the purchaser's or constructor's control, (3) shortages due to unplanned delays of new resources, and (4) shortages resulting from a lack of anticipated conservation results.

H. The Pacific Northwest Utility Conference Committee (PNUCC) acts as a coordinator between regional utility systems and provides a means of communication between utility groups. In supporting regional utilities in the power planning and operating areas, PNUCC assists individual utilities in relating to regional planning problems. The PNUCC, as a voluntary organization, does not have the responsibility or authority to act for individual utilities or to create a regionally based resource pool.

I. The lack of full involvement by Bonneville in acquisition of resources has made the finance of new resources and the coordination of new resources with feasible conservation and unconventional or renewable resources more expensive and less effective. See the discussion of options for financing (Topic No. 9), conservation (Topic No. 3), and unconventional resources (Topic No. 4) for fuller discussion of these subjects.

J. The greater the responsibility for operation and planning of regional resources vested in Bonneville, the greater the need for regional, public control of Bonneville policies and activities.

## II. OPTIONS

A. No Bonneville Acquisition of Additional Resources—Option No. 1.

1. *Summary.*—Bonneville would not acquire additional resources to meet the region's load growth but would integrate new energy projects with the (FCRPS). To the extent practicable, scheduling, transmission, load factoring, storage, and other services from the FCRPS would be available.

2. *Significant consequences.*—a. New resource planning would be performed by individual utilities or a group of utilities. Each utility would be responsible for determining its future energy needs and its requirements for addtional resource capability from new energy projects. Regional needs for generation would be based on the cumulative forecasts of individual utilities, subject to varying degrees of state and local government input. There would be no assurance of overall state, regional or interutility coordination, although some coordination might be expected.

b. Construction of projects would be the responsibility of individual utilities or groups of utilities. Projects offering regional economies could be difficult to construct because of the lack of regional focus in resource planning. Siting decisions would also be less regional in character and be limited in scope to some degree by the owning utility or utilities.

c. Coordination of the operation of individual projects, or coordination between projects, utility systems, and the FCRPS would become more difficult and complex. Implementation of a "one system" concept of operation would be more difficult due to fractionalized responsibilities for operation and maintenance of resources and transmission.

d. The complexity of project ownership arrangements could make the state and Federal regulatory agencies' relationship to a "Balkanized" regional power system complex and undesirable.

e. Because of the lower level of regional coordination and the difficulty of achieving "one system" operation, the cost of existing and new resources could be higher than for the following options.

3. No additional legislative authority would be required.

B. Limited Bonneville Purchase Authority to Meet Preference Customers' Load Growth—Option No. 2.

1. *Summary.*—Bonneville would purchase generating capability to meet contracted load requirements of new and existing preference customers. Preference utilities would be encouraged to develop locally desirable generation alternatives. Bonneville's right to negotiate and purchase power would include purchases from any entity capable of meeting specified criteria (i.e., source, location, size, flexibility) and might include purchase arrangements with the Corps of Engineers or DOE agencies capable of sponsoring, constructing, and operating such resources.

2. *Significant consequences.*—a. Bonneville's resource additions and planning would be based upon the collective contracted needs of the preference customers as a group. Bonneville would have limited participation to assure the optimum size, site, and integration of resources from which it acquires capability through purchase authority.

b. Resources from which Bonneville purchases a share of output capability would be directly coordinated with the operation of other Bonneville resources to minimize the cost to Bonneville's preference customers and the region.

c. Coordination of preference agency planning with that of other regional utilities would be facilitated by the molding of new preference resources with existing Bonneville resources.

d. The security of bonds sold to finance construction of those projects whose capability Bonneville acquired would be enhanced. However, effective interest rates would depend upon, among other things, whether the authorization for Bonneville purchase includes a legislative exemption from IRS industrial revenue bond regulations, or in the alternative, Bonneville obtaining a favorable ruling from IRS under current regulations. Financing of resources not constructed for Bonneville acquisition would be unaffected (see Option No. 9).

e. Differences in resource costs between preference agencies and investor-owned utilities would increase further. To the extent that services from the FCRPS are needed to complement purchased power for preference agencies: the availability of such services for investor-owned utilities would be reduced.

42-650—79——7

f. In judging suitability and deciding on alternatives, the cost effectiveness and feasibility of any Booneville proposals to purchase conventional resource capability would be compared to the cost effectiveness and feasibility of Bonneville's conservation and renewable resource programs (see Option Topics Nos. 3 and 4).

g. Bonneville would have increased oversight obligations related to new resource acquisition (see Option Topic No. 11).

3. Additional legislation would be required to implement this option.

C. Unlimited Bonneville Purchase Authority for All Regional Requirements—Option No. 3.

1. *Summary.*—Bonneville would purchase, to the extent contracts require, new generating capability to meet the requirements of preference customers, the load growth requirements of investor-owned utilities, and the existing loads of direct-service industrial customers. All utilities and other regional entities would be encouraged to develop locally desirable generation alternatives. Bonneville's right to negotiate and purchase power would include purchases from any entity capable of meeting specified criteria (i.e., source, location, size, flexibility) but always limited to amounts which it is contractually obligated to supply.

2. *Significant consequences.*—a. Significant consequences would be similar to those for the preceding option, except that all regional loads, rather than only preference agency loads, would be affected. Moreover, all new regional resources could be affected, too.

b. Bonneville would provide for optimum new resource integration with regional conservation programs and unconventional and renewable resource development.

c. Regional utilities would have contractual control upon the amount of resources acquired by Bonneville to meet load growth. In the event of a major disagreement, a utility or group of utilities could eliminate Bonneville's contractual responsibility to meet their load growth.

d. Regional generation and conservation planning would be simplified and coordinated.

e. Size and amount of generation added to the regional system could be optimized both environmentally and economically.

f. Regional reserves would be minimized, and the reserves provided by DSI loads would continue to be available.

g. Risks related to delays in resource completion energy deficiencies and uncontrollable forces would be spread to all participating regional utilities.

h. With added regional responsibility to acquire generation, Bonneville's regional perspective in dealing with local, regional, and national problems would be more probable.

i. Bonneville proposals for the purchases of resource capability would recognize regional needs and be consistent with national energy policy.

3. Additional legislation would be required to implement this option.

D. Bonneville Purchase Of New and Some Existing Resource Capability—Option No. 4.

1. *Summary.*—In addition to the purchase of resources to meet contracted regional requirements as described in the preceding option. Bonneville could purchase a portion of preference customers' and investor-owned utilities' existing and developing resource capability (Phase 1) if offered. This resource capability would be from projects in operation or currently scheduled to be in operation in the near future and would be in addition to preference customers' shares of plants which Bonneville has already acquired through net billing.

Bonneville would average the cost of the Phase 1 resources purchased from preference customers and investor-owned utilities with the cost of a portion of its own Phase 1 resource capability previously acquired under net billing. In addition to energy from new projects to meet load growth, Bonneville would sell to those utilities selling Phase 1 resources to Bonneville an equal quantity of energy from Bonneville's Phase 1 resources. The rate basis and/or the quantity of Bonneville resources exchanged with such utilities can be varied to achieve different wholesale power cost consequences to the receiving utilities.

2. *Significant consequences.*—a. New energy project economic benefits, resource planning, construction, and oversight of construction and operation would be the same as described in the preceding option.

b. The impact of this option on Bonneville wholesale power costs would be dependent on: the quantity of preference customers and investor-owned utility

Phase 1 resource capability Bonneville acquired as a result of this option, and upon the quantity of Bonneville previously acquired Phase 1 resource capability whose cost was averaged with the cost of this additional Phase 1 resource capability. The greater the quantities at newly acquired Phase 1 resources, the greater will be the increase in Bonneville wholesale power costs, and the greater will be the reduction in wholesale power cost differences between preference customers and investor-owned utilities.

c. As the difference in wholesale power costs between investor-owned utilities and preference customers is reduced, pressure for formation of new preference customers would also be expected to subside.

3. Additional legislative authority would be required to implement this option.

E. Bonneville Purchase Of All Pacific Northwest Existing and Future Resource Capability—Option No. 5.

1. *Summary.*—Bonneville would acquire all generating resource capability in the Pacific Northwest and would be responsible for marketing all electric power in the region. Bonneville, in meeting future energy requirements, would be responsible for keeping the supply of electric energy in balance with the demand for such energy taking into account opportunities to modify demand through cost-effective or feasible conservation.

2. *Significant consequences.*—a. In addition to the consequences discussed in the preceding option, resource planning would be totally coordinated, with the ability to determine the most desirable conventional and unconventional resource mix to meet future energy requirements.

b. This option would result in significant consequences to Bonneville wholesale power costs and utility retail rates. These consequences would flow not from the Bonneville acquisition of all resource capability but from the rates which would be established for both investor-owned utilities and Bonneville's preference customers. If Bonneville adopted uniform rates applicable to all classes of customers, the general consequence would be substantial reduction in any difference in wholesale power costs between investor-owned utilities and preference customers, thereby effectively removing much of the economic advantage to be gained by the creation of a new preference customer. Some cost differences would remain due to the differences in character among utilities, but differences between preference customer and IOU customer rates would be reduced. Rates to ultimate consumers would still vary from utility to utility because of different financing and tax considerations, customer density, number of large industrial customers, and other similar factors.

3. This option would require new authority for Bonneville to purchase new and existing resource capability.

F. Federal Construction Of New Energy Project Capability—Option No. 6.

1. *Summary.*—Rather than purchase the capability of new energy projects constructed by others, as described in preceding options, the Federal Government, under Bonneville direction, could construct new electric energy projects to meet the energy requirements of the region. This option would be compatible with any of options 2 through 5.

2. *Significant consequences.*—a. New energy project planning would be substantially similar to that described for Option No. 5.

b. Construction of all new energy projects by the government could result in some economic benefits. Fuel costs could be reduced through pooling fuel purchases for a substantial number of plants. Surplus fuel at one plant could be shifted to another plant with a fuel deficit. Siting of projects could be facilitated depending upon formal or informal relations developed with the states. It is also possible that licensing, construction time, and costs could be reduced or shortened by standardization of plant design and construction methods for several plants. Financing costs would be dependent upon the financing option selected.

c. The benefits of operation of new energy projects constructed by Bonneville should be substantially the same as described for Option No. 3. Bonneville would assure that new energy projects were fully integrated with the FCRPS and operated to achieve maximum efficiency.

d. Wholesale power costs to the various customer groups would be similar to those discussed under options 4 and 5.

e. Greater regional control over Bonneville would be required.

3. Additional legislative authority would be required to implement this option.

## TOPIC 3—CONSERVATION

*Note.*—Bonneville is currently developing a conservation policy. A draft policy should be ready for public review in November 1978 and the final policy adopted by July 1979. This paper is not a substitute for the analysis of conservation alternatives now underway nor does it circumvent the public involvement program Bonneville has initiated to seek suggestions for and comments on a proposed conservation policy. The purpose of this paper is to identify some of the principal conservation options which must be considered along with options on other issues, including power acquisition, power allocation, load forecasting, and rates.

### I. PRINCIPAL FACTORS

A. The National Energy Policy emphasizes restraint of the growth in energy demand through conservation and improved energy efficiency and proposes that energy resources in plentiful supply be used more widely while use of those in short supply be reduced. The specific options for unconventional and renewable resource development are discussed in Option Topic No. 4.

B. The region's utilities forecast significant electric energy deficits in the next decade.

C. Conservation is recognized as one method—perhaps the fastest, cheapest, and most environmentally satisfactory—to narrow short-term, prospective deficits, and may enable the region to defer construction of some new generating projects, particularly where conservation is "cost effective" vis-a-vis conventional generating resources.

D. Conservation definitions and goals vary widely, and measurement of the effectiveness of conservation measures and programs is difficult and controversial.

E. There are no regional entities, aside from Bonneville (in some modest respects) and the regional U.S. Department of Energy Office, currently coordinating or providing leadership in energy conservation. Each state and local government is taking its own approach to legislation and direction of utilities without major policy assistance from the regional power system members.

F. The prohibition against lending of credit included in the constitutions of regional states precludes many potential conservation programs that would provide for utility investment in private homes and businesses to attain cost effective conservation.

G. Bonneville's limited role in the development and implementation of an effective electric power conservation program is frequently criticized and contrasted with its major role in regional power supply.

H. Risks of shortages resulting from the lack of participated conservation results will necessarily be spread over the entire region.

I. If Bonneville embarks on a regional conservation program, the entire region will benefit, but only Bonneville customers will pay. If Bonneville has power purchase authority and sells power to all utilities in the region and to DSIs, all beneficiaries will pay. If, however, Bonneville sales are limited to preference customers, only their ultimate consumers will pay.

J. The greater Bonneville's responsibility is for conservation extending beyond voluntary measures, the greater the need for local regional control of Bonneville's policies and activities.

### II. OPTIONS

A. Moderate Conservation Activity—Option No. 1.

1. *Summary.*—a. Bonneville's energy conservation program would continue to consist of internal conservation actions, dissemination of conservation information to Bonneville's customers, and encouragement to its customers to implement voluntary conservation programs.

b. Internal actions would include reduction of energy losses on the Bonneville transmission and generating system, "housekeeping" measures at all Bonneville facilities, R&D on conservation technology directly related to Bonneville's program responsibilities, and employee awareness programs.

c. Information dissemination and encouragement to customers would include: speeches and press releases on the need for conservation and on noteworthy examples of conservation, conservation demonstration and feasibility investigation projects, direct customer contact through Bonneville Area Offices, conservation conferences, workshops and meetings, and other efforts such as the infrared fly-over program.

2. *Significant consequences.*—a. Electric energy conservation related activities in Bonneville, the States, U.S. Department of Energy, and the region's utilities would continue to be fragmented, unless the responsibility were assumed by an entity other than Bonneville. This approach would probably inhibit full realization of the regional conservation potential.

b. There would be little or no assurances of improvement in the load-resource deficits forecasted for the future. No utility or group of utilities could undertake the risk of deferring plants and not meeting load due to reliance on voluntary conservation efforts.

3. No additional legislation is required.

B. Aggressive Conservation Efforts for Bonneville Customers Within Existing Authority—Option No. 2.

1. *Summary.*—In addition to activities discussed in Option No. 1, Bonneville would make maximum use of its existing authority to implement a Bonneville customer energy conservation program. Bonneville's efforts would be designed with full public and customer participation and, to the maximum extent practicable, we would be implemented by and through Bonneville's customers. Several conservation strategies could be adopted to assist regional conservation efforts. These strategies would rely principally on voluntary conservation actions by utilities and consumers rather than on mandatory measures. Specific strategies would include all or a portion of the following:

a. Bonneville public information programs would be increased, and Bonneville would develop a conservation curriculum for use in schools or as classes to be offered as a public service.

b. Bonneville, in conjunction with its customers, would develop a system of quantitative conservation goals for its customers and/or for specific types of energy users.

c. Bonneville could use wholesale power rates and/or allocation of Federal power as incentives for conservation. Rates could include a conservation discount, a rebate for costs incurred for conservation, or surcharge imposed for failure to take certain conservation actions. Bonneville could allocate all or a specified block of Federal power based on conservation objectives.

d. Bonneville could strengthen its contractual requirements regarding conservation.

e. Bonneville would expand R&D efforts with its customers into end-use conservation technology not necessarily directly related to Bonneville's program.

f. Bonneville would significantly expand its analytical capability to investigate potential energy conservation measures rather than rely exclusively on studies performed by others.

g. Bonneville could be a leader and the best central regional source for all electric power conservation information in the region.

h. Bonneville would provide technical assistance to utilities, state and local governments, energy-intensive industries, or others concerning design and/or implementation of specific conservation measures and actions.

i. Bonneville would actively seek and/or support state and local conservation actions and legislation to enhance overall effectiveness and consistency of conservation measures on a regional basis.

2. *Significant consequences.*—a. Bonneville would have more constructive influence than at present and would be able to offer constructive assistance on implementation of programs in energy conservation measures enacted at state and local levels.

b. There would be better potential for the adoption of conservation measures on a uniform basis by Bonneville customers than at present.

c. There would be more consistent and better coordinated programs among Bonneville customers.

d. The additional cost of Bonneville conservation measures, to the extent that they are not offset by reduced power requirements (particularly in the short run), would be spread among all Bonneville customers.

e. Bonneville's participation would enable its preference customers to undertake some conservation programs that they would not otherwise be legally permitted to do (e.g., financing of direct insulation in customer buildings.)

3. No additional legislation is required.

C. Selective Expansion in Bonneville Authority—Option No. 3.

1. *Summary.*—In addition to the activities described in the preceding option, Bonneville would adopt stronger measures to encourage conservation through

 

incentives of various kinds but would not impose mandatory measures. Bonneville may be required to accomplish all feasible cost-effective conservation measures prior to acquisition of new resources provided under Option Topic No. 2. Specific strategies would include all or a portion of the following:

a. Bonneville would provide financial assistance for conservation investments such as insulation, solar space or water heating equipment, heat pumps, and small-scale unconventional forms of generation (e.g., cogeneration, wind), through direct loans, loan guarantees, subsidies of loans made by financial institutions (e.g., through special interest rate, guarantees, or repayment provisions), or perhaps outright grants.

b. Bonneville would purchase conservation equipment (e.g., solar-collectors) or materials (e.g., insulation) to be rented or loaned to energy users or producers.

c. Bonneville could utilize its rates to fund conservation programs.

d. Bonneville could contract to meet only that portion of its customers' total requirements which could not be met through cost-effective conservation.

e. Bonneville would provide financial assistance, through deferred billing or loans, to utilities adversely affected in the short run by ultimate consumers' conservation efforts.

f. Bonneville would "buy back" energy saved through conservation from utilities or consumers by rebates or payments for energy not consumed.

g. Bonneville would hire employees to install or contract to have installed conservation equipment and/or materials.

h. Bonneville would establish a system of standards for construction (e.g., insulation levels), appliances (i.e., energy-use labeling), and building materials (e.g., relative effectiveness labeling). Compliance with such standards would be voluntary; although, Bonneville could seek state adoption of mandatory measures.

2. *Significant consequences.*—a. This option would result in greater regional coordination in electric power conservation with a greater likelihood of the adoption of more acceptable conservation measures on a uniform basis throughout the region.

b. Utilities and ratepayers would adopt conservation measures which would otherwise be utilized more slowly or not at all because of high initial cost.

c. Bonneville would be able to offer assistance in conservation measures at state and local levels. Bonneville would be better able to facilitate the effective design and installation of conservation equipment and materials. Bonneville financial assistance to utilities through loans, deferred billing, or "buy-back" arrangements could mitigate the short range impact of effective conservation programs on Bonneville's utility customers.

d. Limitations on the ability to change rates throughout the region or only to select customer classes (e.g., preference customers) could impact the breadth of the conservation programs funded through rates.

3. Additional legislative authority, particularly in the area of financing, would be required to implement this option.

D. Comprehensive Responsibility for Conservation—Option No. 4.

1. *Summary.*—Bonneville would have broad responsibility for development and implementation of electric power conservation measures and could use a range of options with respect to conservation, including regulation of retail rates, regulation of utility and direct industrial customers' conservation programs, rationing of power based on Bonneville's own assessments of needs which could not be met by conservation, and setting mandatory standards for construction, appliance efficiency, and maximum loads for retail customers of various types. In addition, Bonneville could allocate low cost Federal power to conservation related industries and/or purchase or construct facilities to produce conservation equipment and/or materials.

2. *Significant consequences.*—Such comprehensive legislation would obviously give Bonneville much firmer control over most aspects of energy production and control in the region and would ensure maximum uniformity among the various parts of the region in terms of relative amounts of conservation. In terms of effect on total conservation actually achieved, however, a comprehensive regulatory role for Bonneville might not necessarily be more effective than the use of many of the other measures described in the preceding options. This option could create a greater concern to assure that Bonneville is responsive to regional interests, since Bonneville would be a quasi-regulatory agency as well as the implementor of programs. It could also involve unprecedented government intervention in what is otherwise private decisionmaking.

## TOPIC 4—UNCONVENTIONAL OR RENEWABLE ENERGY RESOURCES

### I. PRINCIPAL FACTORS

A. Unconventional energy resources are classified as either near term (available within 15 years or less) or long term (not available for 15 or more years). Long-term unconventional energy resources include fusion, solar electric generation, and other technologies requiring improvements before they are technically practical or economically feasible. Near-term unconventional energy resources in the Pacific Northwest include geothermal, solar heating, biomass, wind, cogeneration, waste products, and low-head hydro.

B. Renewable resources are those generating projects that utilize fuels which are considered renewable. Such resources would include, but are not limited to, solar, wind, tidal, biomass, and both low and conventional hydro.

C. The Pacific Northwest has significant potential for the development of near-term unconventional or renewable resources. Bonneville's present involvement in such resource development is limited to modest research and development on specific projects utilizing geothermal, solar heating, wind, and cogeneration.

D. Present efforts to develop and utilize unconventional or renewable resources are fragmented among the region's utilities, Bonneville's direct service industrial customers, the states, and Federal agencies. There is limited coordination between the developers of various specific projects.

E. Insufficient studies have been conducted on the integration of unconventional or renewable energy resources with the Federal Columbia River Power System. However, it is recognized that many unconventional energy resources, in order to be economically and technically feasible, require backup generation or the capability to store the energy when they generate for later use when needed. The region's hydroelectric system is particularly well suited to act in this manner.

F. Specific environmental impacts of many unconventional or renewable energy resources are not well known. However, environmental problems and concerns are expected to be less for many such resources than for fossil or nuclear fuel powerplants, and public acceptance may be greater. Adverse environmental impacts could, nevertheless, slow or stop development of specific resources.

G. Pacific Northwest states do not provide substantial economic or technical assistance to utilities developing unconventional or renewable resources. The region is hampered by the utilities lack of ability to economically fund unproved or risky resources. Another impediment to development of these resources is the absence of a single Pacific regional entity responsible for the orderly investigation and development of such energy resources.

H. Pacific Northwest utilities have little economic incentive to research and develop unconventional energy resources. Financing for public agencies' development of such resources is difficult if the resource is of unproven feasibility. Investor-owned utilities perceive little return on investment. All utilities are required to recover the cost of unconventional resources from their ratepayers, and the usually higher cost for the development of innovative unconventional energy resources is not attractive to the ratepayers of the utilities. At the present state of technology and in the absence of subsidies, the cost of electric or substitute energy from unconventional resources is generally higher than from conventional powerplants and in many cases by substantial margins.

I. U.S. Department of Energy and EPRI have research, development, and demonstration programs to develop new unconventional or renewable resources for which there is no proven technology. These terminate once the technical feasibility (although not necessarily the economic feasibility) of specific unconventional resource applications has been demonstrated. It should be noted that the utilities, both public and investor-owned, Bonneville's direct-service industries, and Bonneville all contribute to support EPRI's efforts.

J. As in a conservation program, if Bonneville finances unconventional and renewable resource development, the entire region benefits, but only Bonneville customers would pay. If Bonneville has power purchase authority and sells power to all the utilities all the beneficiaries pay. If, however, Bonneville sales are limited to preference customers, only their ultimate consumers will pay.

K. The greater the responsibility for operation, planning, and development of unconventional or renewable resources vested in Bonneville, the greater the need for regional, public control of Bonneville's policies and activities.

## II. OPTIONS

A. No Bonneville Participation—Option No. 1.

1. *Summary.*—Bonneville would not participate in the identification, research, and application of unconventional or renewable resources exclusive of EPRI contributions. Those specific research projects in which Bonneville is now participating would continue until completion, but Bonneville would not participate in any future research projects. Bonneville would offer no active assistance or inducements to utilities, states, or other entities to develop or encourage the widespread commercial application of any unconventional resources.

2. *Significant consequences.*—The Pacific Northwest's efforts to develop and construct unconventional or renewable resources would continue to be fragmented and dependent upon national efforts to develop and prove the commercial feasibility of such resources. State efforts would continue to be limited to encouraging utilities to develop unconventional resources, and, in some cases, discouraging utilities from constructing large, central station fossil and nuclear fuel powerplants. Without economic incentives, utilities would probably not construct unconventional generating resources until such resources were technically feasible and cost effective when compared to conventional generating resources. Some unconventional resources which require limited capital for investigation might be constructed, but the Pacific Northwest would be unable to make optimum use of the potential capability of unconventional resources.

3. No additional legislative authority would be required.

B. Bonneville Encouragement Of Unconventional or Renewable Resource Development—Option No. 2.

1. *Summary.*—a. Bonneville would further expand its present relatively modest role in the investigation, development and application of unconventional or renewable resources. In addition, Bonneville would work toward coordinating with the FCRPS the operation of these resources. Bonneville would actively support the programs of states and utilities in the development of unconventional resources. Bonneville would provide expanded technical assistance regarding the integration of unconventional resources with the region's existing generating resources and transmission system.

b. Bonneville would provide, on an expanded basis, the services necessary to utilize unconventional or renewable resources, including transmission, scheduling, storage, load factoring, reserves, and coordination. Bonneville would further develop specialized staff support to provide these services. Furthermore, Bonneville would provide research and development funding and perhaps some limited subsidization to stimulate investigation of unconventional resources which are particularly promising. Bonneville would also work with DOE and EPRI to secure Pacific Northwest unconventional resource development projects.

c. Bonneville may use its rates and allocation authorities to provide positive incentives for development of these resources.

2. *Significant consequences.* Unconventional or renewable resource development in the region would be substantially enhanced. Bonneville technical assistance and marketing services might improve the economic feasibility of unconventional resources, and Bonneville's encouragement of unconventional resource investigation could result in the development and application of unconventional resources that might not otherwise occur. However, each utility, state, or local government considering development of unconventional resources would be separately responsible for technical investigation, construction, financing, and disposition of the output derived from unconventional resource projects. The extent of unconventional resources development in the Pacific Northwest would continue to be substantially dependent upon the technical feasibility and cost effectiveness of such resources.

3. No additional legislative authority would be required to implement this option.

C. Bonneville Purchase of Unconventional or Renewable Resources—Option No. 3.

1. *Summary.*—In addition to the activities described in the preceding option which would encourage the development and application of unconventional or renewable resources, Bonneville would contract to acquire the output of projects using such resources.

a. The agreements could obligate Bonneville to pay annual costs of selected resource projects with promise regardless of whether such projects were completed or operated at their designed capability. Bonneville would integrate the

output from these projects capability with other Federal system resources. Bonneville, because it purchased project capability, would also provide transmission, load factoring, scheduling, resources, and storage services. The cost of their purchased power would be blended with other Bonneville system costs. Bonneville' purchase of unconventional or renewable resource project capability would permit Bonneville to sponsor demonstration projects indirectly and to ensure the widespread application of technically feasible unconventional resources.

b. A variation would be to limit Bonneville's obligation to pay annual costs to those of a comparable conventional resource. The balance could be covered by the sponsoring entity, the U.S. Department of Energy, EPRI, the state or local government, or any combination.

2. *Significant consequences.*—a. Development and application of unconventional or renewable resources would be facilitated. Financing of unconventional resource capital costs would be both easier and at a lower interest rate because of Bonneville's obligation to pay project annual costs. Similarly, the reluctance of utilities to participate in unconventional resource development and application would be reduced because the economic risk involved in investigating technically unproven and comparatively higher cost unconventional resources would not be borne solely by the utilities' own ratepayers but would be shared by all Pacific Northwest utilities purchasing power from Bonneville.

b. It could require significant increases in Bonneville revenue requirements which might be recovered through additional power sales and/or possibly through rate increases.

c. Unconventional or renewable resources dependent upon experimental or unproven technology would be more likely to be investigated under this option. Bonneville could encourage the evaluation of exotic resources.

d. Bonneville would have the ability to encourage utilities, homeowners, and inventors to develop alternatives, such as direct solar heating, which reduce the demand for electricity. Bonneville could provide a regional focus and perhaps limited funding for research and development programs sponsored by DOE EPRI, and others.

3. Additional legislative authority would be required to enable Bonneville to enter into long term agreements for the purchase of the capability of unconventional resource projects.

D. Bonneville Construction Of Unconventional or Renewable Resource Projects—Option No. 4.

1. *Summary.*—Bonneville would have authority to construct unconventional or renewable resource projects. Bonneville would provide transmission, scheduling, load factoring, reserves, and storage services for the projects that it constructs. Unconventional resources would be integrated with other Federal system resources and the output marketed to Bonneville's power customers in the same manner as other Federal system resource capability. The cost of the new resource capability would be included with other Bonneville system costs. Financing for these projects would be accomplished either by appropriations, sale of Bonneville bonds to the Treasury Department, or by sale of Bonneville bonds to the general public. (Futher discussion of financing alternatives is included in the Financing Option Paper.)

2 *Significant consequences.*—Significant consequences would be substantially similar to those described for the preceding option. However, a higher level of Bonneville participation might ensure the investigation of more unconventional resource projects than would be developed under the preceding option. Development of unconventional or renewable resource projects would not be dependent upon Bonneville's ability to find a utility willing to construct and develop a particular project.

3. Additional legislative authority would be required to enable Bonneville to construct and operate unconventional or renewable resources.

## Topic 5—Direct-Service Industrial Customers

### I. PRINCIPAL FACTORS

A. Bonneville's power sales contracts with its direct-service industrial customers (DSIs) terminate in the period between 1981 and 1991 with the first major contract terminating in 1984. DSIs produce aluminum and other metals; chemicals, and forest products.

B. Bonneville anticipates that when present DSI power contracts expire, existing preference cutsomers and new public bodies will exercise their statutory right to the power now being used to serve DSIs. Bonneville will be precluded from executing new power sales contracts with DSIs with terms and provisions similar to those in existing contracts.

C. Bonneville's DSI customers provide reserves for Bonneville and its utility customers through Bonneville's ability to restrict deliveries of power in order to maintain system reliability or because of periods of shortage, electric disturbances, and delay in completion of specified Federal hydroelectric projects and non-Federal projects whose capability Bonneville has acquired. If these benefits are lost, the region would have to build additional transmission and generating capability Bonneville has acquired. If these benefits are lost, the region would have to build additional transmission and generating capability or accept a considerably reduced grade of service or reliability.

D. DSIs purchased approximately 38 percent of the firm power Bonneville marketed and approximately 20 percent of all the firm power available in the West Group Area of the Northwest. At present, DSIs pay approximately 3 mills per kWh for Bonneville power. DSIs frequently purchase—significant amount of the nonfirm power marketed by Bonneville and also significant portions of that available from others. Without the DSI nonfirm market, this nonfirm energy would have been sold outside the region or spilled.

E. The DSIs, as a result of the uncertainty regarding their future electric power supply, have less and less incentive for making major capital improvements in their plants to achieve greater electrical efficiency, thereby reducing electrical consumption or increasing production efficiency with related job benefits.

F. Seven DSI plants with an industrial firm load of approximately 1,426 average megawatts, representing 43.1 percent of Bonneville's total DSI industrial firm load, are located within areas otherwise served by existing Bonneville preference customers. Seven other DSI plants having an industrial firm load of 1,356.9 average megawatts, representing 41 percent of Bonneville's DSI industrial firm load, are located in the service areas adjacent to existing Bonneville preference customers' service areas and could reasonably be served by such Bonneville preference customers. The remaining seven DSI plants within an industrial firm load of 527 average megawatts, representing 15.9 percent of Bonneville's DSI industrial firm load, are in the service areas of investor-owned utilities and could not readily be served by existing Bonneville preference customers. Attachment 1 lists Bonneville's DSI customers.

## II. OPTIONS

A. Discontinue Bonneville Service—Option No. 1.

1. *Summary.*—Upon expiration of Bonneville's existing power sales contracts with DSIs, Bonneville would not execute new DSI power sales contracts providing a long term, assured supply of power to DSIs. Bonneville would sell DSIs only industrial firm and interruptible power on a short term basis.

2. *Significant consequences.*—Individuals DSIs would exercise one of the four alternatives listed below. The alternative selected would depend on the size of the DSI's load, the availability of Federal and non-Federal power, and the cost of such power. Regardless of the option selected, Bonneville and the region would lose the ability to fully utilize the regional power reserves provided by the interruptability feature of services to DSIs. Each utility and DSI could work out individual arrangements for reserves reflecting their own particular needs. Bonneville might retain some of the reserve features indirectly through service to the utility.

a. Terminate Pacific Northwest operations. DSIs that were unable to secure an adequate amount of power to continue operations, or were unable to secure power at a price which enabled them to continue operations competitive with similar industry located elsewhere (including transportation costs, age of plant, etc.), would terminate Pacific Northwest operations. As many as 12–14,000 direct employees might lose their jobs as affected plants phased out their Northwest operations. Indirect economic dislocations in terms of income, employment, tax revenues, and production rearrangements would also occur.

b. Service from local utility. DSIs may be able to receive service from the local utilities in whose service areas they are located. This option is dependent upon each local utility having an adequate source of power to serve DSI loads

at a satisfactory cost to the DSI. Attachment 1 indicates the location of DSIs with respect to existing utilities' service areas.

(1) Preference utilities power supply in part depends on their Bonneville power supply, which, in turn, depends on the allocation formula Bonneville will select and whether there are competing applications for power from new or existing public bodies or cooperatives. Upon termination of DSI power sales contracts, the amount of Bonneville power obligated to DSIs will be available for reallocation. The preference customer in whose service area the DSI is now or may be located could apply to Bonneville to purchase the power formerly sold by Bonneville directly to the DSI. If Bonneville granted the application, the preference customer could provide the DSI with continued service using Bonneville power to serve all or a portion of the DSI's load.

The subsequent issue is whether Bonneville's allocation policy will provide for withdrawal of that power for reallocation to other preference customer applicants for service to future non-industrial loads. If Bonneville's allocation policy includes such a withdrawal, DSIs receiving future service from preference customers would not have an assured power supply based upon Federal system power but would not be dependent upon their preference customer's ability to acquire or construct other generating resource capability to serve the DSI loads. However, if Bonneville provides long term, firm allocations to preference customers in order to serve DSIs, then existing and new preference customers could not obtain more Federal System power when DSI contracts expire.

(2) Investor-owned utilities' ability to serve and provide DSIs with a continued power supply will be subject to the ability of such utilities to acquire or construct new generating resource capability. Investor-owned utilities do not currently have or forecast sufficient generating resources to serve a large DSI.

(3) In the event that DSIs receive continued service from their local utilities, whether preference or investor-owned, the availability of a very large DSI load on an individual utility system provides an opportunity for the utility to set rates which recover either substantially more or substantially less than the cost of serving the DSI. The rates selected by the utility could depend upon, among other factors, the new cost of generating resources necessary to meet any portion of the utility's load growth, the availability of Bonneville power to the utility to serve a DSI load, and the utility's ratepayers' desire to retain the DSI as a member of the community.

c. Preference generation from joint public agency wholesale supplier. The public bodies and cooperatives could form wholesale power supply entities which would purchase the entire Bonneville power supply and other generating resources. These agencies would then contract with the DSIs to sell the remainder of Bonneville power which is surplus to preference agencies and any additional new resources necessary to meet DSI loads. Any reallocation of Bonneville power either would be subject to Bonneville discretion or new legislative direction. Service to a DSI through a new wholesaler would be contingent upon the agreement of both the DSI and the preference customer in whose service area the DSI is located.

d. Purchase generation from other entities. DSIs could make direct arrangements for the purchase of a power supply from entities which construct new regional generation. While some DSIs have already made such arrangements with the Washington Public Power Supply System (WPPSS) and preference customer participants for the short term purchase of WNP Nos. 4 and 5 project capability that is temporarily surplus to the requirements of participants in those two projects and with Weyerhauser for cogeneration surplus to its needs, these do not substitute for an assured long term power supply. The feasibility of this option depends on availability of power over a long term and a cost low enough to enable them to continue their competitive individual positions. This option represents a substantial, long term contingent liability and obligation mandated by plant financing requirements which some DSIs may be unwilling or unable to accept.

e. Construct own generation. DSIs, individually or jointly with other DSIs or utilities, could construct their own generating resources sufficient to serve their requirements. The feasibility of this option depends on the cost of power from new powerplants and upon the ability and willingness of individual DSIs to apply their limited capital to the construction of high cost, capital intensive generating facilities. The long term financial commitment to new resources is equal to or worse than the liabilities under subsection (c) above.

B. Limited Bonneville Service—Option No. 2.

1. *Summary.*—Bonneville would execute new, long term power sales contracts with DSI's upon expiration of their existing contracts. The new contracts would provide for withdrawal of firm power from the DSIs to serve the growing requirements of existing and new preference customers. In addition, the power sold to DSIs would be subject to restriction in delivery when necessary to assure reliable service to Bonneville's utility customers. The power Bonneville sold to DSIs would, as Bonneville received preference customer applications for additional power, serve a progressively diminishing portion of the DSIs' total requirements. There is presently very little demand by the utilities for this low grade power. However, a significant portion of the total service to DSIs would remain to continue the reserve benefits to Bonneville and the region. Such an arrangement would also preserve an assured regional market for surplus energy otherwise non-conservable in the region.

2. *Significant consequences.*—a. Service to DSIs would provide both operating and planning reserves for the region, thereby reducing the amount of generating resources the region would have to provide as reserves for electric disturbances, adverse hydro conditions, and delays in completion of new generating resources.

b. The power DSIs purchase from Bonneville would provide them with a comparatively low cost block of power which would enhance the DSIs' ability to continue Pacific Northwest operations. The availability of Bonneville power to serve a significant portion of the DSIs' load at a rate based upon Bonneville's cost of service, considering the value of the power reserves DSIs provide, would increase the probability that the DSIs would be able to continue Pacific Northwest operations and remain competitive with similar industries elsewhere. However, as the amount of Bonneville power sold to DSIs was reduced to serve preference customer requirements, or as the delivery of such power was subject to greater interruptions than DSIs could tolerate, the economic feasibility of DSIs' continued operation in the Pacific Northwest would be reduced. Withdrawals of power from DSIs might be fast or slow depending on load growth of existing preference customers and on formation of new preference customers.

c. Such an arrangement would more readily preserve an assured regional market for surplus energy that would otherwise not be available to the region.

d. Bonneville sales to DSIs would allow Bonneville to provide incentives and requirements for increased production efficiency, conservation measures, and other regional policy objectives.

3. This option would not require new legislation.

C. Bonneville Full Service Without Additional Bonneville Resources—Option No. 3.

1. *Summary.*—Upon expiration of Bonneville's existing contracts with DSIs, Bonneville would execute new DSI power sales contracts with provisions similar to those in existing contracts.

2. *Significant consequences.*—a. The policy Bonneville adopts for allocating power after existing contracts terminate will determine the impact of this option on preference customers. If Bonneville adopts an allocation policy under which all Bonneville power in excess of the amounts sold to DSIs is available to Bonneville's existing preference customers, then existing preference customers would receive allocations equivalent to what they expect to receive under existing contracts in 1984. After 1983, existing preference customers would be required to serve their load growth from new resources, thereby increasing their total wholesale power costs above the level which would result under options 1 and 2 (Sections A and B) above.

b. Any number of rate options would be available to Bonneville. Bonneville rates to DSIs could be designed to recover a greater proportion of Bonneville's revenue requirements than under existing rates. DSIs could, however, still receive rates sufficiently low to enable them to continue Pacific Northwest operations.

c. The region would continue to receive the benefit of (1) reserves provided by Bonneville's ability to restrict delivery of power to DSIs, (2) assured regional market for surplus energy, and (3) accomplishment of conservation and other regional policy objectives.

3. The "preference clause" would have to be amended to give some priority to DSIs, existing and new preference customers voluntarily desist from exercising their full claim on Federal power. Additional authority would be required to enable Bonneville to execute new, long term power sales contracts with DSIs when Bonneville had received competing applications from preference customers.

D. Bonneville Full Service With Increase In Bonneville Power Supply—Option No. 4.

1. *Summary.*—With a substantial increase in power supply, Bonneville would serve the requirements of preference customers and, would be able to execute new contracts with DSIs providing service similar to that in existing DSI power sales contracts.

2. *Significant consequences.*—Bonneville's ability to serve existing and new preference customers would not be adversely affected by continuing its service to DSIs. Wholesale power costs of both existing and new preference customers and DSIs would depend on the rate design which allocated Bonneville costs among existing preference customers, new preference customers, and DSIs. Bonneville rates for DSIs would continue to recognize the value of the reserves DSIs provide. DSIs would be able to continue Pacific Northwest operations, and make capital improvements which would increase the efficiency of their operations and reduce their power requirements.

3. This alternative would require additional authority for Bonneville to acquire new generating resource capability sufficient to meet the requirements of all preference customers and to serve Bonneville's DSI loads.

DSI CUSTOMERS

| | Megawatts[1] | Percent of BPA total DSI megawatts |
|---|---|---|
| I. Within BPA preference customers' service areas: | | |
| Alcoa-Vancouver | 238.5 | 7.2 |
| Alcoa-Wenatchee | 213.1 | 6.4 |
| Kaiser-Tacoma | 152.0 | 4.6 |
| Martin-Marietta-The Dalles | 168.0 | 5.1 |
| Martin-Marietta-Goldendale | 210.9 | 6.4 |
| Reynolds-Longview | 414.0 | 12.5 |
| Carborundum-Vancouver | 29.7 | .9 |
| Subtotal | 1,426.2 | 43.1 |
| II. Adjacent to BPA preference customers' service areas: | | |
| Anaconda-Columbia Falls | 337.8 | 10.2 |
| Kaiser-Spokane | 449.6 | 13.6 |
| Kaiser-Trentwood | 62.1 | 1.9 |
| Stauffer-Silver Bow | 61.3 | 1.8 |
| Georgia Pacific-Bellingham | 20.3 | .6 |
| Oremet-Albany | 3.4 | .1 |
| Intalco-Ferndale | 422.4 | 12.8 |
| Subtotal | 1,356.9 | 41.0 |
| III. Could not readily be served by BPA preference customers: | | |
| Crown Zellerbach-Port Townsend | 13.2 | .4 |
| Hanna Nickel-Riddle | 114.0 | 3.4 |
| Pacific Carbide | 9.0 | .3 |
| Pennwalt | 45.7 | 1.4 |
| Reynolds-Troutdale | 217.6 | 8.2 |
| Union Carbide | 20.3 | .6 |
| Alcoa-Addy | 53.2 | 1.6 |
| Subtotal | 527.0 | 15.9 |
| Total | 3,310.1 | 100.0 |

[1] "Industrial Firm" as of Mar. 29, 1978.

## Topic 6—Regional Participation

### I. Principle Factors

The region's utilities, through the Pacific Northwest Utilities Conference Committee (PNUCC), have welcomed participation by the states and public in regional planning. All of these options must be viewed as working in conjunction with the PNUCC programs.

A. There has been a marked increase by the public, by state and local government officials, and by consumer, environmental, and conservation interest groups in the general awareness of regional electric power issues and problems, and in a desire to participate in determining future Pacific Northwest electric power planning, supply, and conservation policy.

B. More specifically, the public, consumer interest and environmental groups, Bonneville customers, and state and local government officials have expressed a desire to be informed of and to participate in Bonneville's analysis and development of new revised power marketing policies.

C. At the present time, state and local government participation in electric power planning in the Pacific Northwest is limited to regulation of investor-owned utilities by state utility regulatory commissions and by state boards which approve new powerplant sites. State utility commission regulations are limited to the approval of retail power rates and the factors which justify such rates. Approval of new powerplant sites occurs after a utility has determined both needs for new generating resources, the appropriate type of generation, and the most desirable site. Present state participation in utility electric power policy decisions is focused on approval, disapproval, or modification of utility proposals, although in the Northwest at least one state (Oregon) has undertaken independently to identify problems, alternative solutions, and the optimum strategy for future electric power planning. As yet, there is no consequential cooperative or joint planning undertaken by state or local governments with utilities.

D. Future electric power decisions involve substantial commitments of Pacific Northwest natural and economic resources. Failure to construct adequate generating resources and transmission facilities in a timely fashion to serve future electric power requirements could have a substantial adverse effect on the economy, employment opportunities, lifestyle, standard of living, and well being of the Pacific Northwest. Premature development of power facilities also carries with it social penalties although not as severe as those associated with power shortages. Because of these social and economic penalties and the substantial commitments of natural and economic resources involved in electric power policy issues, particularly with respect to commitments to build new powerplants, and because of the central importance of an adequate power supply to the Pacific Northwest, it is desirable that decisions regarding major electric power policies and new powerplants have broad public support. Because of the controversial nature of some power planning issues, public support will not, nor is it necessary desirable that it should, be unanimous. But state and local elected officials consumer and environmental interest groups, and the general public should be given opportunities to be appropriately involved from the inception of a proposal and at each decisive stage of its evaluation in the decisionmaking process.

E. Again, more specifically, Bonneville marketing policies have a substantial impact on the Pacific Northwest because Bonneville sells approximately 50 percent of the power consumed in the region and provides approximately 80 percent of the region's high voltage transmission. Future Bonneville policies regarding the marketing of power from Federal hydroelectric projects and non-Federal net-billed projects, its plans for transmission system improvements to move power from new powerplants to load centers, its plans for wheeling, providing regional reserves, providing peaking capacity for power exchanges and other services, and its participation in future regional power programs should provide appropriate opportunity for the public, state and local government officials, and interest groups to comment and influence decisionmaking deliberations.

II. OPTIONS

A. Minimum Regional Participation—Option No. 1.

1. *Summary.*—a. Bonneville would abandon formal processes that provide opportunity for the public, state and local government officials, interest groups, and Bonneville customers to participate in development of new, major power marketing and construction policies.

b. Bonneville customers would be informed of Bonneville's intention to develop major new policies and afforded an opportunity to assist Bonneville in the analysis of the problem, identification of alternative solutions, and comment on Bonneville's proposed policy decisions.

c. Bonneville would not attempt to inform systematically the public, the states, or interest groups of such intentions, plans, or decisions except as minimally required by EIS and similar processes. Bonneville's policy of full public disclosure of all significant decisions would continue, and comments and recommendations received from the public, state agencies, and interest groups would be accepted and acknowledged. But beyond what is minimally required by law, Bonneville would not facilitate regional or public participation in its development of new policies.

2. *Significant consequences.*—a. The public, state and local government agencies, and interest groups would be less likely to become aware of evolving major policy issues until Bonneville and Pacific Northwest utilities progressed to the point of recommending a proposal or program requiring authorization or some other action by a federal, state, or local government regulatory body, a governor, legislature, or the Congress. Bonneville and the region's utilities would be in the position of proposing programs and facilities; the state regulatory agencies would be in the position of disposing of those proposals coming within their purview; and the public and interest groups could comment to state and federal regulatory and legislative bodies on Bonneville and utility proposals.

b. At the time proposals for power programs or facilities became "officially" known to the public, state and local officials, and interested groups, Bonneville and utilities would have already made substantial commitments of resources and a concomitant commitment to adopt the proposal if at all possible. Other parties would be in a position of either accepting it or opposing it but not participating in its development.

c. In view of the strong current interest in regional and public participation and citizen involvement in power planning decisionmaking, any significant retreat from present participation opportunities would be met with public criticism, the likelihood for regional consensus in implementation of power policies would be reduced, and prospects for timely implementation of policies to assure an adequate regional power supply might be imperiled.

3. This option would require abandonment and termination of Bonneville's existing procedures from public participation in marketing policy formulation.

B. Formal Procedure for Public Participation—Option No. 2.

1. *Summary.*—a. Bonneville would continue a systematic procedure for public participation in formulation of major power marketing and construction policies. This procedure would provide for: (1) public notice that a policy on a specific subject would be developed; (2) an opportunity for recommendation and suggestions on the policy; (3) notice of a policy proposal; (4) an opportunity for comment on the policy proposal and inquiry regarding the basis for the proposal; and (5) notice of the final, adopted policy.

b. This procedure would be supplemented with announcements, workships, mailings, press releases, public meetings, hearings and other mechanisms, as appropriate, to ensure public participation opportunities, to educate the public on the issues, to answer questions, to facilitate dissemination of information, and to make a record of proceedings.

2. *Significant consequences.*—a. Interested parties, whether Bonneville customers, the public, state and local government agencies, interest groups, or individuals, would be provided with an adequate and timely opportunity to be informed of Bonneville policy issues, the resolution of which could have significant impact in the region and on Bonneville's methods or arrangements for power marketing or construction of new facilities.

b. Through this procedure, interested parties would have the opportunity to alert Bonneville to data and information of which Bonneville was unaware and to influence Bonneville policy consideration by providing additional data, information, and analyses of problems. State and local officials responsible for energy matters, economic development, protection of natural resources, land use, and related subjects would be afforded opportunity to cooperatively influence decisions impacting their responsibilities.

c. Participation by regional interests—public and private, group and individual, regional, state, and local, business and labor, urban and rural—would be ensured by allowing all views to be heard and carefully considered at each decisive stage in the decisionmaking process.

3. No additional authority would be required.

C. Advisory Board—Option No. 3.

1. *Summary.*—An Advisory Board would be established to represent the region in Bonneville planning. The board would be comprised of one appointee each by the Governors of Washington, Oregon, Idaho, and Montana, and one appointee from each Congressional District by the District's Representative. The board would advise the Administrator on major Bonneville planning, but the Administrator would retain responsibility for establishing and implementing policy. The board would communicate with Congress at its own discretion. Variations on the size, composition, and appointment authorities for such an advisory board are almost limitless.

 

2. *Significant consequences.*—Effective regional participation in Bonneville decisionmaking would be further enhanced if this option were adopted in conjunction with Option No. 2. The region, through a representative advisory board, would participate directly in Bonneville policy planning. Adequate geographic and interest group representation of state and local concerns in the Bonneville decisionmaking process and better understanding of Bonneville policy on the state and local level would be facilitated. Continuity of membership would enhance knowledgeability of regional power policy issues. Modest size would facilitate participation.

3. No additional authority would be required.

D. Regional Power Planning Commission—Option No. 4.

1. *Summary.*—a. This option and variations thereof are based on proposals developed by the Governor of Oregon, the City of Seattle, and others. A regional power planning and policy commission would be established to oversee all utility planning, including Bonneville. The commission would have the following functions: (a) development and/or approval of regional load forecasts; (b) development and/or approval of a regional conservation program implemented through Bonneville; (c) examination of alternative generation options and approval of project plans; (d) approval of generic siting of new generating facilities; and (e) approval for transmission and marketing policies of Bonneville.

b. The commission could be comprised of state and federal representatives with the precise number of state representatives to be determined by population. One variant would be that recommended in the Seattle plan of Washington 3, Oregon 2, Idaho 1, Montana 1, and 2 Presidential appointments. Another variant would be that recommended by the Governor of Oregon: 7 members—2 each nominated by Governors of Oregon and Washington, 1 each nominated by Governors of Idaho and Montana, and the Chairman appointed by the U.S. Secretary of Energy; gubernatorial appointments to be confirmed by Congress.

2. *Significant consequences.*—The states through the policy commission would be directly involved in the determination of major regional power policies including Bonneville policies. Regional consensus, and subsequently support, for regional and Bonneville power programs might be facilitated. The decisionmaking process could be lengthened, however, and tied up procedurally in that the commission would have to reach some sort of acceptable consensus before programs could be enacted. Policy determination would be separated from plan implementation.

3. Additional legislative authority would be required.

E. Alternative Regional Participation Mechanisms—Option No. 5.

1. *Summary.*—a. Public opinion polls, different advisory boards (consumers, utilities, environmentalists, business and industry, public officials), town meetings, workshops, "hotline" toll-free telephone calls, and "jury system" techniques are all alternative ways to elicit and facilitate regional participation in power planning decisionmaking.

b. None of these alternatives are exclusive; all can be used to complement one another or the preceding options above.

2. *Significant consequences.*—a. Opportunities for experimentation and innovation in facilitating regional participation in power planning decisions would be increased.

b. The difficulty of securing adequate and representative participation of the public and the problem of inappropriate and unfair denomination of public participation proceedings by aggressive enthusiasts from either side of polarized and controversial issues could be resolved. A "jury system", for example, would have representative panels selected at random from the public as large as juries in criminal and civil proceedings are selected, paid for their time, provided with impartial instruction in the issues, and asked to render judgments, binding or advisory, on alternative energy proposals.

3. Some additional legislative authority might be required depending on the alternative selected.

## Topic 7—Load Forecasting

All of the options identified in this paper are possible within existing Bonneville authority. The extent of Bonneville's influence on regional electric power decisions will vary directly with Bonneville's authority in the areas of power acquisition, conservation, rates, and allocations. All of these factors, in turn, are influenced by load forecasts which are the basis for individual and collective utility planning, most particularly with respect to generation planning.

## I. PRINCIPAL FACTORS

A. Frequently the geographic area encompassed by a load forecast does not conform to the area for which generation/conservation is developed and operated.

B. Current forecasting responsibility is not always commensurate with the responsibility for meeting actual loads.

C. Though the need for generation is determined at present on a regional basis by aggregating individual utility forecasts, the probabilities of full consideration of such regional factors as diversity of loads and reserves are not always accomplished.

D. Project sponsors and states responsible for siting often disagree on forecasts causing lengthy and expensive plant delays and increase the probability of incurring regional shortages.

E. Decisions on economic, social, and public policies established by state and local government entities are frequently not an integral part of utilities' forecasting.

F. Forecasting assumptions (e.g., end use data, national economic policies, regional industrial and demographic growth projections) are not consistent for all utilities in the region. Bonneville, in cooperation and conjunction with its customers, the Pacific Northwest Utility Conference Committee (PNUCC), and the states, has embarked on a program to develop a more uniform set of basic data through not necessarily assumptions.

G. There is little public review of load forecasting, methodology, assumptions, and data, although both Bonneville and the PNUCC are moving in the direction of greater public input.

H. The impacts of developing regional resources on the basis of individual load forecasts, whether state, local government, or utility are, in the event of shortages, translated to the entire region, not just to the institution with an erroneous forecast.

I. The PNUCC and Bonneville are collectively taking many positive steps toward developing a regionally based load forecast acceptable to the states and local governments for the purposes of developing new resources and conservation programs.

## II. OPTIONS

A. Basic Service Activity—Current Program—Option No. 1.

1. *Summary.*—Bonneville provides load forecasting support services for its customers and the region as requested. Currently, this includes preparation of load forecasts for smaller utilities without adequate staff or not wishing to prepare their own, reviewing all Bonneville customer forecasts, forecasting direct service industrial loads, and storing and maintaining the data bases and load forecasting models prepared for the PNUCC and the Northwest Energy Policy Project (NEPP). Each utility forecast prepared by Bonneville is approved by the utility. Bonneville reviews utility forecasts for the purpose of commenting. Bonneville sums these individual forecasts to provide an overall forecast of its own loads.

2. *Significant consequences.*—a. In the past, regional load forecasts based on trend projections modified by economic analysis and judgment and aggregated to a regional level have been very accurate, but conditions are changing swiftly. Load forecasting responsibility continues to remain with the individual utility which must make its own economic decisions. However, development of generation and bulk transmission is rarely accomplished on a single utility basis.

b. There is no consistent set of data requirements. Assumptions and methodologies vary significantly among the utility systems. Regional forecasts are the sum of the parts even when the parts have different premises and foundations.

c. Individual forecasts are not independently verifiable for consistency with the regional forecast. In the past, overall regional accuracy has been assisted by compensating errors which tend to offset one another.

d. State and utility forecasts are often quite different, and there is frequently no means to reconcile the differences.

e. Bonneville planning is based on the aggregate of these diverse and often inconsistent forecasts.

B. Expanded Service Activity—Option No. 2.

1. *Summary.*—Bonneville would provide the services under the preceding option plus store and maintain a jointly developed data base of end use and assumption data for the region and the states. This would be based on a statistical survey of the region. Data for individual utility planning areas, except for those utilities who request Bonneville assistance in forecasting their loads, would not be stored

and maintained by Bonneville. A coordinating function would be established for communication among states, utilities, local governments, and the general public on load forecasting data, principles, and methodology. Use of common assumptions, data and methods for the various components, however, would be voluntary.

2. *Significant consequences.*—a. There would be greater opportunities for common assumptions and methodology in forecasting. This may increase the likelihood of forecast accuracy, although common assumptions and methodology could also lead to inferior forecasts.

b. Increased participation in the development of common assumptions and methodology would offer a greater chance for broad based input and acceptance.

c. Participation remains voluntary. Regional forecasts based on a more statistically sophisticated method should improve forecasting accuracy. Bonneville load/resource/conservation planning would continue to be based on the sum of utility forecasts.

d. Though this may produce an accurate regional forecast, plant justification would presumably be sought on a utility-by-utility basis.

e. A tool would be provided by which to evaluate regional conservation efforts.

f. Utility consistency with the regional forecast would be more readily verifiable by determining the assumptions and methodology used.

C. Bonneville Forecast—Option No. 3.

1. *Summary.*—Bonneville would continue to provide the services specified under the preceding option. In addition, Bonneville would establish and maintain a comprehensive end use data base for all Bonneville customers but not for the total region. Bonneville would research, develop, and maintain load forecasting models and techniques. Bonneville would prepare, in cooperation with the PNUCC and with full involvement of public, state, local government, and utilities, a load forecast for the Bonneville customer share of the regional generation load forecast and use such forecasts in all Bonneville planning. Bonneville customer load forecasts would be validated for Bonneville use in support of proposed conservation programs or research acquisition.

2. *Significant consequences.*—a. This would establish a comprehensive data base available for all users within the region. There would be greater assurance of common data, assumptions, methodology, and refinements in techniques. Broad-based involvement in regional forecasts would be facilitated. The forecast would be "macro" forecasts rather than the sum of individual system forecasts. Individual entities would continue to establish their local forecasts.

b. This option, however, would not cover the entire region, only the loads of Bonneville customers. It may not cover a portion of region that is proposing a new resource, and it may not cover main growth areas of the region. This may make it difficult for states or others to interact when the area covered may include only a portion or none of their jurisdiction.

c. Bonneville customer forecasts would be readily verified for consistency with the regional forecast.

D. Regional Forecast—Option No. 4.

1. *Summary.*—Same as the preceding option except that it would include the entire region and it would be comprehensive. This option would be desirable if Bonneville had general, broad authority for conservation and resource acquisition. It would be attractive for technical reasons as well. Load forecasts would be validated for Bonneville use in support of proposed conservation programs or resource acquistion.

2. *Significant consequences.*—a. Same as the preceding option, but there would be greater benefits since forecasts would encompass the entire region and all jurisdictional areas. All regional participants would also be included in resource development. It would generally be more usable and complete for all entities in the region.

b. The cost of the forecasting service would be borne by Bonneville ratepayers only. The ability of Bonneville to influence regional decisions would be increased with such load forecasting capabilities even if Bonneville did not have broader operational authorities.

c. Utility forecasts would be readily verified for consistency with the regional forecast.

### Topic 8—Transmission System

#### I. Principal Factors

A. Bonneville provides approximately 80 percent of the Pacific Northwest bulk power transmission capacity. In addition, Bonneville operates the major share of

the northern portion of the Pacific Northwest-Pacific Southwest intertie to California and interconnects with B. C. Hydro and West Kootenay Power & Light in Canada and with other adjacent regions.

B. Transmission lines and substations must be planned several years ahead of required energization dates. The initial step in the identification of proposed new facilities is an accurate estimate of future peakloads and energy requirements. Planning for a regional transmission grid requires knowledge of future generating resource locations. Although construction time is usually must shorter for transmission facilities than for generation, optimum planning requires coordination of probably generation and load location 15 to 20 years in advance of construction.

C. Reliability is a major concern in planning future power system additions. To assure this reliability, more generation, transmission, and distribution facilities than are necessary to meet normal, instantaneous and annual energy demand are constructed. Differing reliability standards among other owners of transmission facilities, in adjoining regions and among distributors, impede coordinated transmission system planning.

D. Bonneville and its customers investigate transmission system alternatives on a "one utility concept" that assumes that a single regional entity is transmitting and distributing electric power from sources of generation to consumers. The one-utility concept results in the most economical and best engineering plan of service, the lowest combined annual cost for ratepayers, maximum utilization of existing plant facilities, minimum environmental impacts, and orderly long-range development of a system. However, occasionally transmission lines are planned by utilities constructing new generating resources exclusively for their own loads or for specific purposes related only to their own system and facilities, and without regard to future expansion of the existing main grid, thereby restricting the options available for future regional transmission planning.

E. Interregional transmission lines can improve on the efficient use of national resources. Interties conserve national resources by providing opportunities for capacity and energy transfers back and forth, resource pooling, and in the Pacific Northwest displacing fossil fuel generation with surplus hydro generation that might otherwise be wasted because of the lack of sufficient storage.

II. OPTIONS

A. Reduced Role in Transmission Planning and Construction—Option No. 1.

1. *Summary.*—Bonneville would have decreased responsibility for the planning and construction of customer service facilities and transmission system additions and would shift increased responsibility for these facilities onto Pacific Northwest utilities. The utilities would provide all facilities from main grid substations. Bonneville would plan and construct only those transmission system additions needed to market energy from Federal hydroelectric projects and net-billed thermal projects. Bonneville would provide no transmission system improvements to wheel power from non-Federal generating projects to utility load centers.

2. *Significant consequences.*—This option could effectively damage the one-utility planning concept. The overall cost of delivering power from new generating facilities would be increased for all utilities. In additon, reduced BPA participation could have a considerable impact on the physical environment, depending on several factors. In a populated area served by several utilities, each of which is a Bonneville customer, each customer would be required to construct transmission facilities from its load center to Bonneville facilities or arrange wth each other for joint use in order to provide for delivery of Federal System power. In addition, such utilities would individually be required to construct, or arrange with each other for joint use, facilities to provide for delivery of power from new, non-Federal generating resources. It can be expected that in certain instances the resulting proliferation of transmission facilities would cost significantly more and have substantially greater environmental impact than if Bonneville were to construct transmission facilities on an integrated or one-utility basis. Construction of new generating resources nearer to load centers would be encouraged because of the high cost for construction of transmission facilities which utilities would have to bear if there were no improvement to, and thus reduced utilization of, the existing Federal System grid. In addition, fragmented planning, construction, and operation of transmission facilites would lead to reduced reliability.

3. No additional legislative authority would be required.

B. Cooperative Role in Transmission Planning and Construction—Option No. 2.

1. *Summary.*—Bonneville and its customers would mutually agree to investigate alternative transmission facilities on a "one utility concept." The responsibilities of Bonneville and each customer for construction of new facilities would be determined after a plan of service is selected. Bonneville would offer to provide the transmission lines from Federal and non-Federal generating projects to, and substation facilities at or near, load centers within utilities' service areas. Service would be provided at the point of delivery to each utility, if justified, after studying alternative plans of service. Each alternative transmission facility would be evaluated from a standpoint of cost and benefit to Bonneville and the customer, engineering comparability between alternatives, and environmental impact of the additional facilities. Ownership of facilities would be determined after the plan of service was selected and it was determined whether a utility or Bonneville would construct the required transmission system or substation facilities. If Bonneville constructed the facilities, the cost of the facilities would be included in Bonneville's total system costs and would, thereby, be included in determining uniform rates applicable throughout the Bonneville service area.

2. *Significant consequences.*—The facilities needed for the delivery of Federal and non-Federal power would be constructed at the least economic cost to the ratepayers of the region. If Bonneville constructed the facilities, inclusion of the cost of new transmission facilities in Bonneville rates would enable Bonneville to continue to extend the benefits of an integrated transmission system throughout the Pacific Northwest. Regardless of whether Bonneville or utilities constructed specific facilities, duplication of unnecessary facilities would be avoided. By avoiding duplication of facilities and planning new facilities in a manner which considered the overall environmental impact of alternative transmission service plans, adverse impact on the environment could be mitigated. Transmission planning would also consider regional power requirements and major new generating resources to serve regional needs. Dependence upon transmission facilities to deliver power from specific generating resources to specific loads would be minimized. This is essentially the way in which Bonneville and the region's utilities plan, construct, and operate regional transmission facilities.

3. No additional legislative authority would be required.

C. Increased Bonneville Responsibility—Option No. 3.

1. *Summary.*—Bonneville responsibility for construction of new transmission and substation facilities would be increased. Bonneville would provide all substation facilities required to deliver power at distribution voltages to Pacific Northwest utilities and to Bonneville's direct-service industrial customers. In addition, Bonneville would continually study the region's transmission system requirements, proposals for new generating resource locations, and regional power requirements, including geographic areas where substantial future load growth was identified. Prior to the announcement of powerplant locations, Bonneville would evaluate both generation and transmission location alternatives and recommend to the entity constructing generating resources the site or sites which were most compatable with the region's existing and planned transmission system. Bonneville would construct all extra-high voltage and ultra high voltage transmission facilities between Federal and non-Federal generating resources and utility load centers.

2. *Significant consequences.*—Significant consequences would be substantially similar to those as in preceding option. However, the one utility concept would be more fully realized with Bonneville having sole responsibility to plan and construct new transmission system and substation facilities. Bonneville's assumption of responsibility to provide adequate transmission capacity to serve Pacific Northwest needs might better assure that transmission capacity would be available when required. All additions to the regional transmission system over a long period would be planned by Bonneville to result in the least total additional cost and the minimum practicable adverse environmental impact. The cost of all new transmission system additions in the region would be included in Bonneville's total system cost. Bonneville determines its transmission rates by computing average transmission system costs. The cost of additions to the transmission system would be averaged with the substantially lower cost of the existing transmission system. This would reinforce the arrangement that serves as an economic disincentive to utilities considering construction of their own, narrower-purpose transmission facilities.

3. Additional legislative authority would be required to implement this option.

D. Bonneville Determination Of Regional Transmission System—Option No. 4.

1. *Summary.*—Bonneville, in addition to assuming the responsibility for extra- and ultra-high voltage transmission facilities as in the preceding option, would determine all future Pacific Northwest transmission system additions necessary to provide for the reliable delivery of power from generating resources to load centers throughout the Pacific Northwest. In addition, Bonneville would have the sole responsibility and authority to plan, construct, operate, and maintain new interregional transmission interties.

2. *Significant consequences.*—The significant economic and environmental consequences would be similar to those described for the preceding option. However, Bonneville would effectively serve as a regulator of Pacific Northwest utilities' plans for expansion of service and arrangements for delivery of power to their own distribution systems. In addition to filling the role of a Pacific Northwest transmission system regulator, Bonneville would have substantial influence on new generating resource sites and would be able to assure that new generating resource sites were selected to provide minimum environmental and economic impact to the region's ratepayers from the transmission system. This authority for Bonneville would eliminate the pluralistic development of Pacific Northwest electric power resources.

3. Additional authority for Bonneville would be required to implement this option.

## Topic 9—Financing

### I. PRINCIPAL FACTORS

A. Bonneville's transmission system construction program is financed directly from Bonneville revenues or by the proceeds from bonds sold to the U.S. Treasury and repaid by Bonneville revenues.

B. The generating projects constructed by the Corps of Engineers and the Bureau of Reclamation are financed by Federal appropriations. Bonneville, through its revenues from the sale of power, recovers the principal and interest costs of such facilities assigned to power.

C. Net-billed thermal projects constructed by some of Bonneville's preference customers are financed by the sale of tax-exempt revenue bonds which are secured by Bonneville's obligation under net-billing agreements to pay all project costs associated with the capability acquired by Bonneville from revenues.

D. Other generating projects sponsored by various public and private Pacific Northwest utilities are secured by the revenues and assets of the individual sponsoring utility and backed by the economic soundness of the individual utilities.

E. The revenue generating capability of the Federal System and its ability to spread costs across a large rate base ("rate leverage") create a favorable backing for financing new generating projects. The "Aaa" bond rating for the net-billed project bonds is evidence of the high quality of this security.

F. Most public and private regional utilities have less attractive bond ratings which range from "Aa" to "Baa" because of the pressure of increasing power-plant capital cost and relatively low ratios of equity ownership to debt.

G. Uncertainty regarding future development of the region's power system, the allocation of low cost Federal System resources, and the responsibility for planning and building new generating resources adversely affect financial assessments of securities issued by regional public and private utilities to finance future powerplants.

H. The inability to spread the economic and power supply risks associated with development of regional resources to all regional consumers increases the liabilities undertaken by any single utility or group of utilities. This increase in liabilities adversely affects financing.

### II. OPTIONS

A. No Bonneville participation—Option No. 1.

1. *Summary.*—a. Bonneville would not provide any contractual or direct assistance to public or private utilities to improve the quality of security sold by utilities to finance powerplant construction. Publicly owned utilities would continue to fund powerplant construction through the issuance of tax exempt bonds.

Cooperatively owned utilities could, to the extent their participation did not jeopardize issuance of tax exempt bonds under IRS regulations, purchase participants' share of projects funded through the issuance of tax exempt bonds by public project owners. In addition, cooperatively owned utilities could borrow funds at low federally based interest rates from the Federal Financing Bank of the U.S. Treasury.

b. Investor-owned utilities would continue to fund project ownership through a combination of equity financing and debt financing. Equity financing would be achieved through retained earnings and issuance of common or preferred stock. Debt financing would be achieved through issuance of bonds and notes. The income from these bonds and notes would be subject to taxation.

c. Bonneville support of new powerplant construction would be limited to activities and programs consistent with Bonneville's construction and operation of the region's integrated transmission system. Bonneville would not attempt to enhance financing for new powerplants.

d. In order to demonstrate a broader financial base, various individual utilities could create resource "pools." These pools would assure the automatic sale of surpluses to deficit member utilities and provide for common marketing of surplus power or purchases of power to meet deficiencies vis-a-vis nonmember utilities. As a result, securities marketed to finance pooled resources would demonstrate some regional economic base and presumably support lower interest rates.

2. *Significant consequences.*—a. Publicly and cooperatively owned utilities would continue to enjoy comparatively low interest rates as a result of their ability to fund construction through the issuance of tax exempt bonds or federally based borrowing. However, as the ratio of publicly owned utilities' equity ownership, in their power system and new powerplants, to their total debt diminished, the quality of the security of the financing would also diminish. In addition, as power costs increase, their "rate leverage" would also be reduced. The extent of any Bonneville reduction in the allocation of low-cost power, described in the option paper on Allocations, would further reduce the attractiveness of bonds sold to fund new powerplants.

b. As a result of the requirement to fund portions of new powerplant construction cost by equity financing, and as a result of higher interest rates for taxable corporate securities, investor-owned utilities would continue to have substantially higher borrowing costs than publicly owned utilities.

c. Utilities, either publicly or privately owned, having substantial amounts of low-cost hydro power in their rate base, either through allocation of Bonneville power or from their own hydro resources, would have a greater amount of "rate leverage". These utilities without long-term commitments of hydro resource capability in their rate bases would find financing more difficult or available only at higher rates.

B. Limited Bonneville Participation—Option No. 2

1. *Summary.*—a. As in the proceeding option, individual public and private utilities and joint operating agencies would retain responsibility for construction of new powerplants and issuance of bonds or other securities to finance that construction.

b. Bonneville would offer powerplant owners and individual utilities which have purchased a share of powerplant capability a wide range of services to assist in the most economic and efficient planning, including: construction oversight, integration of powerplant capability with existing resources, and marketing of surplus powerplant capability. Bonneville would also contract to provide assistance in forecasting future power requirements. Individual utilities would be responsible for acquiring the resource capability which load forecasts indicated was necessary to meet future power loads. During the construction of a new joint operating agency powerplant for a large number of individual utility participants, Bonneville would provide construction oversight for the utility participants at a lower cost than could be achieved by individual monitoring and reviewing construction progress. Upon completion of the powerplant, Bonneville would provide transmission, load factoring, and scheduling services to those utilities possessing shares of powerplant output. Provision of these services would enable utilities to integrate new powerplant capability with their individual system requirements at a minimum expense. In addition, during periods when powerplant capability was surplus to individual utility requirements,

 

Bonneville, on behalf of all participating utilities, would assist in marketing or reassigning surplus capability. This arrangement would tend to assure an individual utility an equal opportunity to market its surplus in competition with those utilities already familiar with marketing surpluses.

c. Publicly and cooperatively owned utilities acquiring firm energy could request that Bonneville administer a cooperative pooling of the capability they were acquiring from new powerplants with their allocation of comparatively low-cost Bonneville power. The individual utility, in order to meet its system requirements, would use the blended Bonneville power and new generating resource power at an average cost.

Similar arrangements might be included to assure a fair division of available power in the event of shortages.

2. *Significant consequences.*—a. Under a "single utility" concept, this arrangement would maximize use by Bonneville preference customers of the existing Pacific Northwest Federal System hydroelectric projects and transmission facilities and use new generating resource capability in the most efficient manner. The actual cost of financing new generating resource capability should, as a result, be below the cost to individual utilities because the benefits of a regional pool of preference agencies would be blended with Bonneville's marketing and operating capability and enhance the feasibility of new projects.

b. The arrangements under this option for the sale of surplus capability would benefit individual participating utilities. The participating utilities would be provided an orderly, available market which would not force them to absorb the full cost of ther unsalable generating resource capability. Arrangements for blending new resource capability with a publicly or cooperatively owned utility's allocation of comparatively low-cost Bonneville power would provide further assurance to potential powerplant construction investors, since an individual utilities' surplus power from new generating resources would not adversely affect that utilities' ability to meet its total obligations (including payment of the debt service included in project annual cost).

c. As described in the two preceding subsections, this option enhances the efficiency, marketability of output, and viability of operation of individual new generating resources and hence makes the underlying securities more attractive to investors. This option would not, however, change basic financing arrangements which individual publicly and coperatively owned utilities and investor-owned utiilties would normally adopt. Investor-owned uitlities would continue to finance new generating project construction through the expansion of equity and debt at capital costs and interest rates substantially exceeding those of publicly and cooperatively owned utilities. The tax-exempt status of bonds sold by publicly owned utilities and the special financial status of cogeneration is largely responsible for the favorable investment position. Consequently, a further increase in the difference between wholesale and retail power rates of utilities and publicly and cooperatively owned utilities will result.

d. This option, while utilizing the ability of the Federal System to integrate and manage generating resource output more efficiently, fails to utilize the $5.8 billion investment base in Federal System hydroelectric projects and the Bonneville transmission system. More importantly, it fails to directly utilize the revenue generating capability and rate leverage of the Federal transmission system and hydroelectric projects resulting from their advantageous position with respect to costs.

3. No additional legislation is required.

C. Bonneville Purchase/Sponsor Issue Bonds—Option No. 3

1. *Summary.*—a. Bonneville would enter into firm agreements to satisfy its customers' load requirements and to purchase all or a portion of the capability of a necessary new generating resource. The financing agreements would also obligate Bonneville to pay the financing agreements would also obligate Bonneville to pay the project's annual costs from its power sale revenues. These would include the cost of repaying principal and interest on bonds sold to finance construction, whether or not the project was completed, operable, or operating. Bonneville would have the obligation to plan and identify new resource capability required to meet its obligations to supply firm power to customers. In addition, Bonneville would integrate new generating resource capability acquired with its other resources and would schedule the combined output with optimum efficiency. Costs to Bonneville and associated risks would be spread over its large rate base and affect utilities throughout the region.

b. Publicly owned utilities would continue to finance new powerplant construction by issuing bonds whose interest is exempt from the Federal tax on income. Because Bonneville's status in the exempt financing is unclear, additional authority making Bonneville an exempt body for tax purposes would assure the tax exempt status on bonds sold by public agencies to finance construction of new generating resources whose capability Bonneville had acquired.

c. Investor-owned utilities would continue to issue debt to fund new powerplant construction. However, it may be possible that investor-owned utilities could eliminate the current requirement that a substantial portion of new generation be funded by equity capital, because Bonneville would acquire new powerplant capability thereby providing security for the debt. To obtain non-equity financing, the requirements of the Utility Holding Company Act would also need modifications to allow regional IOU's to form a resource conservation and operation entity. If investor-owned utilities were able to avoid equity financing, their effective cost for new generating resources would be reduced to a cost approaching Bonneville's current cost of capital.

d. Bonneville's obligation to pay the project owner the annual cost for Bonneville's share of acquired project capability would constitute an important element of security for the payment of the principal and interest of bonds sold to finance construction. Bonneville's obligation to pay annual cost would, in turn, be secured by revenues derived from the sale of power and services. As with TVA bonds, claims on Bonneville's revenues for service of this debt could be placed ahead of repayment of principal and interest to the U.S. Treasury for the Federal Columbia River Power System.

2. *Significant consequences.*—a. The effective interest rate for financing new generating resource construction for public bodies and IOUs would be lower than in preceding options because of the excellent quality of the security of bonds sold pursuant to this option. The equity of the Federal System, the rate leverage available from low Federal rates, the low costs for existing services and previously constructed hydroelectric projects, and the substantial revenue generating capability of the Federal System would provide substantially superior security for the potential investors than could be afforded by individual utilities alone. This fact is reflected in the "Aaa" bond rating held by net-billed project bonds.

b. Although they should be able to utilize full debt financing for new generating resources rather than depending upon equity financing for a portion of project capital cost, investor-owned utilities would, nevertheless, continue to have higher interest rates than those enjoyed by tax exempt bonds issued by public agencies. It is possible that investment for credits generated by IOU's would offset much of the differences in interest costs enjoyed by public entities.

c. Through Bonneville rates, the risk involved in an individual powerplant's feasibility would be pooled by a large number of utilities and ratepayers throughout the Pacific Northwest. Potential investors would not inappropriately focus their concern on the impacts of an inoperable plant or plants that operate below design expectations on individual utility systems. The cost of risk pooling would be spread over all of the direct beneficiaries, the region's power consumers and thus would not constitute a subsidy.

3. Additional authority would be required for Bonneville to purchase new generating resource capability and to assure the retention of tax exempt status of public agency bonds sold to finance the construction of public agency powerplants.

D. Bonneville Purchase Or Construct/Bonneville Finance—Option No. 4.

1. *Summary.*—a. As in the preceding option, Bonneville would contract to supply the loads of utilities and other entities and acquire new generating resource capability constructed by other entities. Alternatively, Bonneville could be given authority to purchase or construct its own generating facilities.

b. Project construction cost would be funded by Bonneville through one or a combination of the following arrangements:

(1) Similar to the Tennessee Valley Authority, Bonneville would have authority to sell its own bonds to the general public. Like TVA bonds, interest earned on such bonds could either be subject to the Federal tax on income, or could be tax exempt. Bonneville bonds would not be "full faith and credit" obligations of the United States, thus, principal and interest would be paid solely from Bonneville revenues. If Bonneville owned the generating resources, funds received from a sale of bonds could be applied directly to construction costs.

Bonneville purchase of project capability owned by another entity would require that such funds be loaned by Bonneville to the constructing and owning entity. Bonneville's revenues would be pledged to assure repayment of the debt.

(2) Bonneville could sell bonds to the Treasury Department in a manner similar to that currently authorized under the Transmission Act to finance transmission facilities. The interest rate on bonds sold to the Treasury Department would equal the average yield of outstanding marketable United States obligations at the time of borrowing plus an additional amount to provide a rate comparable to prevailing market rates for similar bonds. Since interest on U.S. obligations is not tax exempt, they generally bear a higher interest rate than tax exempt obligations. Bonneville would lend the proceeds of the Treasury bond sales to the entity that elected to own the generating resource. Bonneville's obligation to purchase and pay for project output from its revenues would assure repayment of the loan.

2. *Significant consequences.*—a. Financing through issuance of Bonneville bonds to the general public or to the Treasury Department would help assure an adequate supply of funds for new generating project construction at reasonable interest rates. Actual interest costs for bonds sold to the general public would depend upon whether or not the interest on bonds is subject to the Federal tax on income. If such bonds were tax exempt, the cost to the region's utilities of this financing alternative would be comparable to those associated with the preceding option. Issuance of Bonneville bonds which were not tax exempt would result in higher interest rates and higher effective power costs from Bonneville. However, even these non-tax exempt interest rates would be significantly less than current investor-owned utility financing costs since the entire financing could be backed by Bonneville's equity base, rate leverage, and revenue generating capability. Interest rates for non-tax exempt Bonneville bonds would more closely approximate investor-owned bonds issued under the preceding option when Bonneville acquires the investor-owned utility project capability.

3. Additional authority would be required either for Bonneville to issue its own bonds to the general public or for Bonneville to sell bonds to the Treasury Department to finance new project construction. Further authority would also be required to provide tax exempt status for the interest on Bonneville bonds sold to finance requirements of public agencies.

### Topic 10—Factors and Options Affecting Rate Design

*Note.*—Bonneville is currently developing revised wholesale power rates which will be effective December 1979. Proposed wholesale power rates will be ready for public review in August 1978. This option paper is not a substitute for the analysis of rate alternatives now underway nor will it circumvent the public involvement program Bonneville has initiated for developing revised wholesale power rates. The purpose of this option paper is to identify some of the principal rate options which must be considered along with options on other issues including power allocation, power acquisition, load forecasting, and conservation.

#### I. PRINCIPAL FACTORS

A. There are significant electric power cost differences between (1) Bonneville's direct-service industrial customers, (2) customers of publicly owned and cooperatively owned utilities, and (3) customers of investor-owned utilities.

B. Although historical rate design has been based largely on the cost of service, marginal cost pricing or other price objectives are receiving increasing consideration.

C. There is increasing concern that electric power rate design should be based on the achievement of social objectives such as conservation of electric power or rate relief to certain categories of ratepayers, such as rural and domestic ratepayers or low income ratepayers.

D. Because the cost of new generation resources is substantially greater than the average cost of existing resources, there is significant concern about the best method to recover these costs.

#### II. OPTIONS

All options considered, excepting Option No. 7, would retain an overall requirement that Bonneville's rates produce revenues which recover Bonneville total costs.

A. Average Cost Rates—Option No. 1.

1. *Summary.*—Bonneville wholesale power rates would be based on Bonneville's average saytem cost for power and transmission services except for some deviations similar to the existing transformation charge and seasonal variation.

2. *Significant consequences.*—The design of Bonneville rates would not be significantly different than rates currently in use. To the extent that there is price elasticity of demand from ultimate consumers, quantity demanded would be greater, and more generating resources and supporting transmission facilities would be required (assuming no other program adjustments) than if Bonneville rates were designed on some basis other than average cost and resulted in higher retail rates. However, other measures in the area of conservation or unconventional or renewable resources could eliminate or substantially reduce any increased demand caused by average system rates (see option topics 3 and 4).

B. Conservation Rates Without Overall Increase In Total Bonneville Revenue—Option No. 2.

1. *Summary.*—Bonneville wholesale power rates would be designed to meet the principal objective of reducing some of the demand for power and, therefore, some of the need for additional generating resources and transmission facilities. To achieve this objective, different rates could be established for different classes of Bonneville customers based upon the elasticity of demand in such class or end use. An alternative would be to design rates in tiers or blocks reflecting different costs for increases in demand. Another alternative would be for Bonneville to establish conservation goals and then assign different rates among utilities based on whether or not each utility meets the goals. This last alternative could be based on either voluntary or mandatory conservation programs by the utilities.

2. *Significant consequences.*—a. The exact effect of conservation rates is not known until the class of load and the rate has been identified. The effect upon various Bonneville utility customers would also be unknown until the target conservation loads are identified.

b. Conservation rates could reduce the need for additional generating resources and transmission facilities in addition to conservation programs which increase the efficient use of energy (see option topic No. 3).

c. Conservation rates may not provide the proper price indicator for wholesale power rates if utilities' overall cost of power is unchanged.

d. Bonneville would take greater interest in its customers retail rate design as it effects conservation.

3. This option, to be effective, may require additional authority for Bonneville.

C. Rates Based On Social Objectives—Option No. 3.

1. *Summary.*—Bonneville rates would be designed to achieve social objectives such as low rates for low income ratepayers, baseline rates, special rates for rural and domestic consumers, to stimulate increased industrial or commercial activity, or to achieve still other social objectives. Many alternatives are conceivable and may be readily combined with other rate objectives.

2. *Significant consequences.*—a. Depending upon the specific objectives to be achieved, there could be significant effects on consumption patterns among various classes of consumers, the need for additional resources, and the pressure for creation of new preference customers.

b. To make the rates effective to the benefiting classes, the utilities reselling Bonneville power would have to adopt rate schedules passing any benefits obtained to the targeted customers. Bonneville's review of customers' rates and policies would also be significantly increased.

3. Bonneville could, depending upon the social objective selected, require additional authority to implement this option.

D. Retail Rates—Option No. 4.

1. *Summary.*—Bonneville would prescribe its customers' retail rate design to achieve a specified objective, such as conservation or baseline rates.

2. *Significant consequences.*—Detailed respecification of retail rates by Bonneville prescription would be required to ensure that specific conservation or social objectives would be met. Bonneville's increased involvement in retail rate procedures would add a significant new layer of regulation to rate adoption procedures.

3. Additional authority might be required for Bonneville to prescribe its customers' retail rate design.

E. Multi-Tier Rates—Option No. 5.

1. *Summary.*—Bonneville would adopt different cost allocations to support rates based upon class of customers, type of load, or any of several combinations.

Three bills have been introduced (S. 2080, H.R. 9020, and H.R. 5862) which would require that costs of existing Bonneville resources be allocated to specific utilities or to specific loads. (See discussion in Option Topic No. 1.) Or in the alternative, Bonneville could be required to allocate a certain portion of its resources and their costs through rates to a selected group of utilities by geographic location, size, or demographic mix.

2. *Significant consequences.*—As discussed in options 2 and 3, the exact consequences of a multi-tiered rate allocation requires greater specificity of principals. The consequences which are determinable are: greater monitoring and regulation of utility resale rates and policies by Bonneville would be required; and costs of various regional consumer groups could shift significantly. Most proposals reviewed would tend to narrow the disparity in the wholesale rates applicable to IOU and Bonneville preference customer residential consumers. These proposals would also increase the rates applicable to Bonneville DSIs. Increased commercial and industrial rates for new or expanded regional commercial loads could also be required.

3. No additional authority would be required for Bonneville to purchase additional resources as specified in this option.

F. Domestic and Rural Rates—Option No. 6.

1. *Summary.*—Rates would be established to principally benefit domestic and rural consumers as suggested by the Bonneville Project Act. Such rates could cover all utility classes (e.g., preference customers and investor-owned utilities) provided that Bonneville had sufficient resources to market to non-preference utilities. The rates could also be segregated between preference and non-preference utilities and further between new and old utility customer or loads with or among the basic preference/non-preference classes. The rate levels could be set with arbitrary differences based on other policy objectives or on a cost basis by segregating resources. For example, rates would be determined by first grouping resources into categories based on common cost characteristics and designating each resource category as salable to a specific customer category. The lowest-cost resource group could be designated for sale to domestic and rural customers of public bodies and cooperatives; power from high-unit-cost hydro facilities would be designated for sale to domestic and rural customers of investor-owned utilities; and the remaining highest-cost thermal resources would be designated to meet other loads in the Pacific Northwest including the loads of Bonneville's direct-service industrial customers.

2. *Significant consequences.*—a. Depending on the breadth of Bonneville's sales to non-preference utilities and the rate differences, if any, between utility classes, the pressure for formation of new public bodies and cooperatives may be effectively eliminated.

b. Cost impacts of new and higher cost resources would be borne by the region's commercial and industrial consumers. This may adversely effect the region's ability to attract new commercial and industrial concerns or even expansion of existing facilities.

c. Bonneville could require a pass through of the benefits to domestic and rural consumers as a requisite of the sale. However, even absent such a requirement, it would be clear to local boards and PUC's governing retail rates that the benefits were intended for the domestic and rural cousumers. Thus, pressure would be exerted for retail rates to follow the same pattern.

3. No additional legislation would be required for Bonneville to establish these rates. Their effectiveness, however, may depend on whether Bonneville requires sufficient resources to market to non-preference utilities.

G. Marginal-Cost Rates—Option No. 7.

1. *Summary.*—Bonneville wholesale power rates would be designed using marginal-cost pricing. Rates would principally reflect replacement costs or the costs of new incremental resources added to the regional power system. Bonneville may take an active interest in its customer retail rates to assure that marginal-cost pricing is applied at the retail level in order to be most effective. This is the only rate option considered that would recover more than Bonneville's revenue requirements.

2. *Significant consequences.*—a. The wholesale rate difference between Bonneville customers and utilities that are not Bonneville customers would be reversed. Since marginal-cost pricing is not based on average historical imbedded costs of hydro resources which are very low, but rather on the much higher costs of new thermal resources, utilities which are not Bonneville customers could continue to average in some lower cost resources.

b. Bonneville may have difficulty marketing all of its resources under such pricing schemes since some utilities perceive that a purchase from Bonneville carries burdens other than price.

c. To the extent that there is elasticity of demand, the requirements for future generating resource capability would be reduced because marginal cost rates are generally higher than other types of rates.

d. Marginal cost pricing covering Bonneville's customers may place pressure on non-Bonneville customer utilities to adopt similar provisions through local PUCs.

e. Bonneville would have considerably greater revenues to distribute. Such redistribution of wealth from the region would require extensive regional and national input. This revenue collection or "taxing" aspect of Bonneville would represent a significant and controversial change in Bonneville's charter.

3. Additional authority would be required to allow Bonneville to recover significantly more revenue than needed to pay FCRPS costs and repay the Federal investment in the FCRPS.

## TOPIC 11—OVERSIGHT (GENERATION, CONSTRUCTION, AND OPERATION)

### I. PRINCIPAL FACTORS

A. Bonneville currently acquires the capability of the Hanford generating project and has acquired through net-billing agreements the entire capability of Washington Public Power Supply System's (WPPSS) Nuclear Projects Nos. 1 and 2, the WPPSS's 70 percent ownership share of Nuclear Project No. 3, and the City of Eugene, Oregon's 30 percent share of the Trojan Project. The Trojan Project and the Hanford Project are in operation. WPPSS Nuclear Projects Nos. 1, 2, and 3 are under construction. Bonneville has agreed, under the terms of the net-billing agreements, to pay annual costs for each project whether or not the project is actually producing power at design capacity and regardless of whether the project has been completed.

B. Bonneville, as the purchaser of a project's capability, has a responsibility to Congress, to its customers, and to their ratepayers to assure that the project is constructed and operated in a sound, businesslike manner at the lowest overall cost to the ultimate consumer consistent with project objectives including safety, reliability, and environmental standards.

### II. OPTIONS

A. Limited Approval—Option No. 1.

1. *Summary.*—a. Bonneville would have authority to approve or disapprove major contracts and services, equipment contracts, and construction change orders. The project owners would be responsible for preparation and evaluation of bids without consultation with Bonneville. After having made a preliminary selection, the project owner would require Bonneville's approval.

b. Upon completion of annual budgets for construction, operation, and administrative and general expenses, the project owner would submit such budgets to Bonneville for approval or disapproval. If Bonneville disapproved items in the proposed budgets, the project owner and Bonneville would deliberate a mutually satisfactory resolution of the differences.

c. The project owner wouldl be entirely responsible for overseeing and directing the project management, construction, and operation subject only to Bonneville scheduling. Bonneville could make suggestions for changes or improvements in project management, construction, and operation, but the project owner would not be obligated to observe or comply with those suggestions.

2. *Significant consequences.*—a. The process of Bonneville approval or disapproval of project budgets and major contract actions would occur after the project owner has already made its decision and, therefore, would place Bonneville in the position of "second guessing" the project owner. Bonneville disapproval at this late stage in the contracting or budget process would be disruptive to project construction or operation.

b. Bonneville would be dependent upon the project owner to assure that the project would be constructed and operated in the most efficient manner consistent with good utility practice and sound business principles. To the extent that the project owner was not fulfilling this responsibility, Bonneville would not have

means of assuring a change in the project owner's conduct short of disapproval of budgets and major purchase and change order contracts.

3. No additional legislative authority could be regional.

B. Active Oversight/Limited Approval—Option No. 2.

1. *Summary.*—a. Bonneville, in addition to the role described in Option No. 1, would assign sufficient staff to continuously monitor all major facets of project construction, design, contracting, operation, and the project owner's major personnel and other policies. Through intensive observation, Bonneville would identify at an early point project owner actions which were inconsistent with construction or operation of the project in a sound, businesslike manner to result in the lowest practicable overall cost to Bonneville's consumers. Bonneville's recommendations for changes in practices of the project owner, architect, engineer, or contractor would be integrated into the construction or operation of the project in a timely fashion.

b. The project owner would continue to be entirely responsible for directing the project management, construction, and operation. Although Bonneville's continuous and intensive oversight would enable Bonneville to make early suggestions for changes or improvements, the project owner, nevertheless, would not be obligated to observe or comply with those suggestions.

2. Significant consequences.—a. Bonneville recommendations and suggestions for improvements or revisions before the project owner was committed to a course of action would provide minimum disruption in contracting operation, construction, and budget processes and would, thereby, provide a benefit to efficient project construction or operation.

b. Bonneville would continue to be dependent upon the project owner to assure that the project was constructed and operated in the most efficient manner consistent with good utility practice and sound business principles. To the extent that the project owner failed to fulfill his responsibility and was unwilling to accept or incorporate Bonneville's suggestions for recommendations, Bonneville would have no means of assuring a change in the project owner's conduct short of disapproval of budgets and major purchase and change order contracts.

3. No additional legislative authority would be required.

C. Customers Committee—Option No. 3.

1. Summary.—a Because the impact of the cost of construction and operation of projects whose output Bonneville has acquired falls largely upon Bonneville's wholesale power customers and their ratepayers, Bonneville would involve major wholesale power customers in the oversight process. Bonneville would continue to exercise approval or disapproval of budgets and major purchase and change order contracts but would generally act in accord with the recommendations of the committee.

b. Bonneville would so oversee major project owner policies, construction activities, and operations and submit its recommendations for any revisions or improvements directly to the project owner. If Bonneville sought the project owner's concurrence in or implementation of a suggested change in construction or operating practices, and if the project owner disagreed or failed to comply with the recommendation, the matter would be submitted by Bonneville to a committee composed of major Bonneville wholesale power customers. The committee, upon receipt of information from both Bonneville and the project owner regarding the matter in dispute, would either adopt, modify and adopt, or reject Bonneville's recommendation. Action of the committee would be binding upon the project owner, and the project owner would be compelled to implement committee recommendations.

c. Bonneville would contract with its customers for the oversight of project owner policy, construction activities, and operations. If a matter required arbitration, Bonneville would submit the findings of its customer committee to the project owner for action, submit the findings to an arbitrator, or adopt independent findings for submission to the project owner.

d. The committee would meet regularly to receive information regarding the status of project construction and operation and the project owner's management practices.

2. *Significant consequences.*—a. This option would directly involve the entities that ultimately are responsible for payment of all project costs. Their direct pecuniary interest in efficient, economical, and sound project construction and operation should assure a high level of interest and responsibility and result in effective action to assure that the project is constructed in a timely and economical manner.

b. Bonneville could continue to be responsible for investigating and analyzing the project owner's construction and operating practices. The committees' activity as arbitrator or its contracted oversight responsibility would remove Bonneville from a focal point of disagreement with the project owner and would provide assurance that Bonneville's suggestions were only to secure the most efficient construction and operating practices.

c. Many of Bonneville's large wholesale power customers may be closely associated with the project owner in other capacities. Some of the customers may directly purchase capability of other projects being constructed by the project owner. Other customers may be members of the project owner's governing board. This relationship may result in inconsistent interests on the part of Bonneville customers who participate in a customer oversight committee. The size of such a committee might make it cumbersome.

d. The option does not fundamentally change the relationship between Bonneville and the project owner as described in the previous option and, therefore, is subject to the deficiencies of that option. Short of seeking the customer committee's concurrence in a Bonneville suggestion, Bonneville has no method to enforce its interests with the project owner for the most efficient, timely, and economical construction and operation of those projects whose capability Bonneville acquires.

3. No additional legislative authority would be required.

D. Increased Bonneville Oversight and Approval Activity—Option No. 4.

1. *Summary.*—Bonneville could approve any one of several project related activities such as major personnel actions, organizational changes, and construction, contract, and operating policies of project owners. Bonneville would submit its analysis and recommendations regarding revisions or changes in any of these areas to the project owner, as provided in Option No. 1. In addition, Bonneville could have limited authority to issue directives or advisories to the project owner regarding personnel actions, organizational changes, and construction, contract and operating policies. Bonneville authority would be limited to areas directly affecting the construction and operation of the projects.

2. *Significant consequences.*—a. Project owners would be required to be responsive to Bonneville's criticisms and suggestions for changes in personnel, organization, and policy. This option would provide Bonneville with a level of response from the owner commensurate with Bonneville's responsibility and obligation to Congress. Bonneville's customers, with ratepayers to assure that the project owner is doing an adequate job. In addition, when Bonneville issued directives or advisories, many ambiguities regarding the appropriateness of Bonneville to comment on project construction and operation would be eliminated.

b. This option would require a substantial Bonneville oversight staff to enable Bonneville to effectively analyze owner management practices and make useful recommendations.

3. No additional legislation authority would be required.

E. Participation In Project Construction and Operation—Option No. 5.

1. *Summary.*—In addition to exercising the authority described in the preceding option, Bonneville would be authorized to place its personnel in positions of responsibility within the project owner's construction and operating management team. Bonneville personnel would assume, as Bonneville deemed necessary, management positions which directly affected project construction and operation and contract management practices.

2. *Significant consequences.*—Bonneville would directly assume responsibility for project construction and operation if Bonneville was dissatisfied with the project owner's progress or management of construction and operation. This option would provide Bonneville with a direct response to its obligations to Congress, its customers, and the ratepayers.

3. Additional legislative authority would be required.

---

BONNEVILLE POWER ADMINISTRATION,
*Portland, Oreg., June 2, 1978.*

***To All BPA Preference Customers:***

GENTLEMEN: Termination of our current power sales contracts in the period between 1981 and 1994 has resulted in the need to develop a new policy to allocate energy, and has created considerable regional interest. During our recent customer meetings we received numerous questions and comments about the

type of energy allocation many of you feel BPA should adopt. In addition, discussions about possible new Federal legislation affecting Bonneville have focused on how power should be allocated among various customers classes.

Many of you are concerned about the allocation your utility may receive under new contracts. We understand your concern, and we are aware that uncertainty about future allocations of BPA energy is making it very difficult for many utilities to forecast with confidence the new resources they will need to meet their own loads. We, too, would prefer to have the allocation policy resolved. Nevertheless, we cannot adopt a new allocation policy until we analyze, with your assistance, many alternative policies, select a proposal, and proceed with our public involvement process in development and adoption of a final allocation policy in 1980.

Development of a new BPA allocation policy is a very complex task because of the wide range of economic, social, and utility issues which must be studied. The difficulty of the effort is compounded by the legal issues involved in allocating a shortage of BPA power among competing applications. Although the law requires that BPA "give preference and priority to public bodies and cooperatives" and does provide limited policy directives in disposing of available energy, BPA has significant discretion in establishing other elements of its allocation policy.

We have prepared the enclosed discussion paper to explain both our concerns about allocating energy and the scope, complexity, and consequences of the problem facing BPA and the Pacific Northwest. We hope that this paper will provide a better understanding of our concerns and the issues we face in allocations, and also serve as a basis for greater communication toward the development of an allocation policy which will be satisfactory and create the resource planning certainty our region needs.

We do want your views. If our analysis is wrong, let us know. We need your help, your ideas, your arguments, and your support.

Sincerely,

STERLING MUNRO, *Administrator.*

Enclosure:

## ALLOCATION OF BONNEVILLE POWER RESOURCES DISCUSSION PAPER

### I. INTRODUCTION

Bonneville's future decision on allocation of its power resources are extremely important to the region's electric utilities, Bonneville's direct service industrial customers, the region's states, municipalities, and many others. In recognition of this, Bonneville recently instituted a formal proceeding for broad participation in its decision regarding allocation of its power resources when existing power sales contracts begin to expire in the early 1980's. This discussion paper does not in any way attempt to indicate the conclusions of that process, but rather discusses *some* of the developing issues that must be considered in the process.

Allocation of the limited supply of relatively low-cost Federal power has also proven to be one of the more controversial issues in the current debate over new regional power legislation. Although the most critical concern is how the Northwest should meet its future energy needs—through conservation, renewable resources, or conventional generation if necessary—the first issue that must be addressed is how the Northwest should divide up the energy resources that exist today. It is appropriate, therefore, to explore some of the many issues confronting Bonneville regarding allocations; to help set the stage for developing an appropriate, effective, and lasting policy decision.

Bonneville has some, although limited, policy directives set forth in the Bonneville Project Act of 1937 to govern its disposition of resources. The principle paramount to all others is the preference clause. Although there is some disagreement, it provides that public bodies' and cooperatives' right to Bonneville's power resources is always superior to that of investor owned utilities and private corporations. This applies to all power Bonneville has available, both hydro and nonhydro. Additionally, Bonneville must recognize and deal appropriately with the policy directives of widespread use, anti-monopolization and domestic and rural. These directives, the principle of the preference clause and the recognition of past commitments, reasonable expectations, and future rights must all be integrated in developing an allocation policy. There are many possibilities, each consistent with the preference clause, and for any given alternative there are literally scores

of details that have to be worked out. All deal with the various policy directives in some measure, each attempting to take into account the many legitimate, varied, and well considered concerns of all parties involved. Allocation is exceedingly complex, not just exceedingly controversial. Simple allocation schemes make powerful debating points but have little usefulness. Bonneville cannot allocate on the basis of rhetoric or simplistic assumptions, even if the public debate sometimes degenerates into those terms. Bonneville has a statute to administer, a power system to manage, and a limited supply of something that is in great demand. Bonneville must be responsive to all and cannot be arbitrary in this decision. In discussing the observations and problems herein, Bonneville intends to provide a basis for better understanding and greater communication that ultimately will result in a fair and lasting decision.

By way of perhaps well known background information Bonneville is obligated by the provisions of preference customers' power sales contracts, to meet the loads and load growth requirements, with certain limitations of its existing preference customers until July 1, 1983. Regardless of contractual obligations, however, Bonneville is faced with serious power shortages with recurrence of critical or nearly critical water conditions in any of the next ten or more years. With good fortune, and with a quick start on effective regional conservation programs, the region's load in 1983 may be less than presently forecast. This would reduce Bonneville's forecasted deficits and possibly provide a margin of safety against poor water conditions in the mid-1980's, but it won't solve the allocation problem. Bonneville has limited resources, yet demand for its power by preference customers is nevertheless continuing to increase. Demand will exceed supply by ever-growing amounts in the years ahead, therefore, the problem of allocating a shortage will inexorably occur.

Yet, many people seem to believe that an allocation of Bonneville power under the existing statute would necessarily provide existing preference customers with enough low-cost power to meet their total needs for many, many years. This allocation depends upon three assumptions: first, that expiration of Bonneville's direct-service industrial contracts in the 1980's will release Bonneville from any obligation to serve direct-service industrial customers, either directly or through a preference customer, and free up a vast amount of preference power in the region for meeting Bonneville's existing preference customers' loads; second, that no new preference customers will be formed to compete for this power; and third, that prospective preference customers, such as Oregon's "Domestic and Rural Power Authority", can never qualify for preference treatment. Thus, all Bonneville power would ultimately be allocated to the preference customers that exist today.

If the underlying assumptions stated above were valid and preference customer loads never exceeded the Bonneville supply, then Bonneville could simply apply the statute mechanically to allocation matters and concentrate its major efforts in other areas. Current circumstances, however, at least raise serious doubts about the validity of the assumptions. Things just aren't that simple. The allocation issue Bonneville faces is not the competing demands of preference customers versus nonpreference customers, for which the statute provides a clear solution. Instead, it is the problem of how to allocate a shortage of Bonneville power among the preference customer class. There is not a solution to this problem written clearly in the Bonneville Project Act.

## II. OBLIGATIONS TO EXISTING PREFERENCE CUSTOMERS

The preference customers and potential preference customers staking claims to Bonneville's power will be many and varied. Some existing preference customers have contracts that expire in 1983, many soon thereafter. Bonneville's obligation to meet existing preference customer load growth requirements ends in 1983, and obligations to those whose contracts expire are undefined. Those fortunate enough to have late contract termination dates are then limited to a fixed allocation and will have no commitment to have their post-1983 load growth needs met. The exception, of course, is the smaller preference customers with loads of less than 25 average megawatts; they have a legal right to receive their load growth needs from Bonneville until they reach 25 average megawatts or until their contracts expire. In addition to existing preference customers, however, Bonneville has received applications or inquiries for power from many prospective preference customers; some are established public bodies and cooperatives whose preference status is clear, and some are in the process of being formed.

How should Bonneville sort out the competing claims of these various applicants if a sorting-out process is necessary? Obviously the first call on Bonneville's resources would be those preference customer loads that Bonneville is obligated to meet under contracts that have not expired.

Next Bonneville would have to look at the preference customer loads that Bonneville is not contractually obligated to serve. These include the loads and load growth of existing preference customers after their current contracts expire, the loads and load growth of newly-formed public bodies and cooperatives and currently unserved utilities that qualify for preference treatment, and the post-1983 load growth of preference customers whose current contracts have not expired remain subject to the Notices of Insufficiency.

The Bonneville Project Act does not tell Bonneville how to allocate power among these non-obligated loads if it is impossible to serve all of them with new 20-year requirements contracts. Many troubling questions therefore arise. Should a preference customer whose current contract expires in 1984 be offered a new 20-year requirements contract if the same offer cannot be made later to a preference customer whose current contract expires in 1990 or 1994? Should contracts contain load growth limitations or withdrawal provisions, in which they would not be requirements contracts? Do some types of utilities need or deserve requirements contracts more than others? Should public agencies who possess their own generating resources be treated differently from those who do not? The City of Seattle, among others, has suggested that allocation should take conservation into account; should a conserving utility be rewarded for its conservation efforts, and if so, how? Or is it enough to avoid penalizing the conserving utility? Is load growth a fair measure of conservation effort, or should Bonneville make detailed analyses of the conservation programs and conservation opportunities of each preference customer?

Even without the issue of applications from newly formed public bodies and cooperatives, the uncertainties of allocation are formidable. Yet, it is impossible to discuss allocation without also discussing this complicating issue.

### III. ALLOCATIONS TO NEWLY FORMED PUBLIC BODIES AND COOPERATIVES

The Bonneville Project Act declares that it is the policy of Congress, as expressed in that Act, that the Administrator give the people a reasonable opportunity and time to form and to qualify for an allocation of BPA power. Historically, that has permitted or enabled the formation and operation of many now existing preference customers. Allocation of Federal power, if necessary to assist prospective preference customers, is also implicit in the Act's 20-year limit on all power sales contracts. Because similar statutes governing the Bureau of Reclamation (now WAPA) and the Tennessee Valley Authority do not contain any 20-year limit on power sales contracts, it's fair to say that the Bonneville Act is uniquely solicitous of the rights of prospective preference customers.

Nothwithstanding, very few qualified preference customers have been formed in the past two decades. In the 1950's and early 1960's, the power cost advantages a new preference customer might have obtained were very small. FDR's "yardstick" concept was founded during a period when basic resource costs were not appreciably different. The yardstick was a comparative measure of the quality of service, the responsiveness to the consumers and would be consumers in a particular service territory, and not generally based on resource cost differences. Beginning in the early 1970's, and in the years since, growing differences in the cost of power between Bonneville's preference customers and private utilities have made preference status more attractive. The advantages of Bonneville's low cost resources are great when compared to alternatives faced by the region's consumers in some of the private utility service areas. But during the same period, the people who might form such utilities have been well aware that Bonneville had no power available to sell them and this discouraged the formation of new public bodies and cooperatives.

One of the disincentives to the formation of new public bodies and cooperatives has been state laws governing formation of new publicly or cooperatively owned utilities and the compensation to investor-owned utilities for system acquisition. Formation of new public bodies or cooperatives has been particularly difficult in Oregon, Idaho, and Montana. Compensation by the new-formed utility for the fair market value of facilities plus "severance" has made the availability of low-cost power from Bonneville insufficient to give them lower rates. In recent years,

therefore, there has been little financial incentive to undertake the effort necessary to become an entity entitled to preference under the Bonneville Project Act.

However, circumstances are now changing. Bonneville is receiving applications for power from some existing and new public bodies and cooperatives not now preference customers. Bonneville will have to act on these applications during the allocation process. In setting allocations, what should Bonneville's attitude be toward assisting the formation of new preference customers? Should Bonneville keep some power in reserve, or subject to withdrawal, in favor of newly formed public bodies and cooperatives at the expense of those already in existence? Bonneville's decision will affect more than just the few potential customers that have expressed an interest to Bonneville: it will set a policy for all future prospective preference customers. If Bonneville's decision is that new preference applicants will receive a low cost power supply along with existing preference customers, it is reasonable to expect that the state laws that have impeded formation of new preference customers in the past would be changed swiftly. The Northwest states whose citizens believe they currently receive few benefits from the Federal Columbia River Power System already have indicated that they are anxious to receive what they preceive to be their "fair share."

What if Bonneville were to deny new preference applicants equality of treatment with existing preference customers? Could not a new preference applicant argue that it faces the same future power supply problems and opportunities as an existing preference customer when its contract has expired?

If Bonneville prefers its existing preference customers to any new preference customers, might not the preference clause operate in practice to prevent any future change in the distribution of Bonneville power in the region? Wouldn't it be a little disingenuous to tell the public that they cannot share in the benefits of the Bonneville system unless they form a new public body or cooperative, and then to tell them that new public bodies and cooperatives cannot qualify for equal treatment either? The region now is divided into public power and private power areas, as a matter of choice, and subject to a change of status in either direction at local option. Should this option be blocked in a practical sense by Bonneville's allocation policy? Would not denying new public bodies and cooperatives reasonable access to Federal power permanently Balkanize the region into enclaves of the "haves" and the "have nots"?

### IV. ALLOCATIONS TO DOMESTIC AND RURAL POWER AUTHORITIES

It is easier to make a generalization than a specific application in most cases. Oregon's new "Domestic and Rural Power Authority", or DRPA is a case in point. DRPA's credentials may not be as clear as those of other potential preference customers. Nevertheless, DRPA has applied for an allocation of Federal power as a preference agency.

Many argue that DRPA is a "sham" or a "phony". There are arguments on the other side as well, of course, and they must all be considered carefully in the allocation process. DRPA represents the concerted, and considered, action of the Governor of Oregon and the Oregon Legislature. Enactment of DRPA by Oregon was a serious step by the popularly-elected and politically accountable representatives of a Northwest state. Bonneville has not yet had to face the issue of DRPA's qualifications as a preference body. However, DRPA must receive serious attention from Bonneville when that issue is faced.

What is important now is that legal challenges can reasonably be expected regardless of the decision Bonneville makes on DRPA. Unfortunately, the allocation policy Bonneville adopts cannot become final or certain until this challenge has concluded. This could be the greatest uncertainty posed by the allocation process. Until the legal issues are resolved, no customer of Bonneville will have a reliable indication of its utimate allocation of Bonneville power. Effective power planning in the region by any utility relying on Bonneville's power will be difficult or impossible during this period.

It has been suggested that Bonneville could avoid a lawsuit, or at least a lawsuit that Oregon might win, simply by declaring that DRPA is entitled to preference under the Bonneville Project Act, and then denying DRPA an allocation of power. This suggstion is based on the *Santa Clara* decision, which appears to hold that a preference customer has no legal entitlement to an allocation of Federal power, at least so long as all available power is sold to other preference

customers. The basic theory of this suggestion is, therefore, that Bonneville's denial of preference status to DRPA might be subject to judicial review, but that Bonneville's failure to allocate DRPA any power may not.

The foregoing suggestion is referenced solely by way of illustration of the broad range of comments which have been made. Bonneville will, in fact, consider applications for power on their merits, and will exercise its discretion in the allocation of power to such applicants in accordance with the allocation criteria which is now being developed.

Some of the investor-owned utilities, in their suggestions for a new Bonneville allocation policy, claim that certain policy directives and Congressional statements they have taken from the Bonneville Project Act support their argument that Bonneville has incorrectly interpreted the statute in the past. These investor-owned utilities state that the Bonneville Project Act directs Bonneville to encourage the widespread use of Federal power, market power to avoid "the monopolization thereof by limited groups," and to ensure that the benefits of the Federal power are enjoyed by the general public, and particularly domestic and rural consumers. These directives, they argue, are inconsistent with the provision that Bonneville must give preference and priority to public bodies and cooperatives. These investor-owned utilities say that BPA must resolve the inconsistency by an exercise of existing administrative discretion and allocate power to investor-owned utilities pursuant to the directive that Federal power benefits go to the general public, and particularly domestic and rural consumers. They note that a high percentage of the Bonneville power now sold to existing preference customers is ultimately used by commercial and industrial enterprises, and in some cases existing preference customers' commercial and industrial loads approach or exceed one-half of their total load. These investor-owned utilities are raising basic issues regarding the intent of Congress, and in developing a new allocation policy Bonneville cannot disregard these arguments.

## V. ALLOCATING POWER FROM THE DIRECT-SERVICE INDUSTRY CONTRACTS.

Assuming DRPA does not qualify for an allocation, that the number of new preference customers is small, and that the investor-owned utilities' claims are not sustained, the existing preference customers will still face uncertainties when the direct-service industry (DSI) contracts begin to expire in the mid-1980's. When Intalco's contract expires in 1984, for example, some 300 megawatts of BPA power will become available immediately. Bonneville will sell the power to preference customers before offering any for sale to nonpreference customers. But 300 megawatts of new preference customer demand is not going to be created instantly in December of 1984. So where will the power go?

An important element in resolving this question is the fact that most of the DSI load is located in or adjacent to the service areas of existing preference customers. Testimony before the Senate Energy Committee's regional hearings on S. 2080 indicated that the proportion of DSI load is 85 percent, but the precise figure is unimportant in this discussion. A table showing proximity of the industries to preference customer and investor-owned utility systems and the size of the industries' loads is attached.

When an aluminum plant's Bonneville contract expires, the plant isn't just going to close down or leave the region. It will undoubtedly apply for service from its local utility. If that utility is a preference customer, it, in turn, will apply to Bonneville for additional power to serve this additional load. If that application is granted, would not this mean that Bonneville will be using the power released by the expiration of the DSI contract to serve the utility that serves that same DSI?

If so, three problems arise: how to provide power system reserves, how to regulate the rates charged by the former DSI, and how to deal with issues of power availability or "withdrawability".

At present the DSIs are a regional resource because Bonneville can interrupt a portion of their power as needed to provide energy and capacity reserves. If the DSIs become customers of existing preference agencies, or if they form the nucleus of a new preference agency, they will undoubtedly try to receive firm power. Bonneville, on the other hand, will not have enough firm power available, because the amount of firm power released by expiration of a DSI contract is considerably less than the total power the DSI presently consumes. In addition, Bonneville

would want to continue to use the DSI loads to provide reserves, if only because it's needed and no other industrial loads in the region are really suited to quick interruptions. It's likely, then, that, given the assumptions previously stated, Bonneville would have to allocate a mixture of firm and nonfirm power to the preference customer serving the former DSI, and insist on rights for Bonneville to interrupt the non-firm load for the benefit of all its preference customers.

Would not adding a large industrial plant to any utility's load obviously present the possibility of a financial bonanza for that utility, assuming that Bonneville allocates the power needed to serve the load? Could not a utility use its industrial rates, and could not it even raise them substantially, to roll back rates for its other customers? That could even lead to new preference customers being formed with a large industrial plant as their nucleus, even though Bonneville would probably insist on continued use of the industrial plants to provide needed reserves.

What would Bonneville's statutory requirement and responsibility be to prevent discriminatory rates at the retail level? It may be that Bonneville would be forced to oversee preference customers' retail rates more closely, certainly as regards the former DSI. This could be a cumbersome, acrimonious process, and less efficient than keeping the DSIs as customers of Bonneville. But it could be made to work.

Carrying the foregoing example even further, Bonneville would have to consider the withdrawal of the additional power allocated because of the DSI load. The reason for allocating the power initially to the preference customer was simply that the former DSI represented a new load on the preference customer's system at a time when other preference customer loads did not require the power. There was no competing application. But as other preference customer loads increase, or as applications for service were received from new preference customers, or as new preference customer loads increase, there would be an absolute shortage of Bonneville power among the preference class.

Some have suggested Bonneville could allocate power to cover a former DSI's load on a 20-year nonwithdrawable basis to the preference customer serving it. This would mean, however, that no load growth or other preference customers, not even residential load growth, could be met with Bonneville power. The other preference customers would have to meet their load growth needs entirely with incremental cost power, while the preference customer serving the former DSI could continually raise its industrial rates to insulate its ratepayers from this upward cost pressure—in essence withdrawing low cost power from its DSI to meet its other load growth.

If, on the other hand, Bonneville were to withdraw the power used by the preference customer to serve the former DSI, and use it to meet the load growth needs of other preference customers, regardless of the nature of that load growth, then new inequities would be created. For example, a preference customer adding a new pulp mill would receive low-cost Bonneville power to serve that load, while the preference customer serving a former DSI would be required to replace the withdrawn power at incremental cost to serve its pre-existing industrial load that the entire region now relies upon for reserves.

The critical questions therefore become: for what type of load growth would Bonneville reasonably withdraw power allocated to a preference customer to serve a former DSI load? Should Bonneville withdraw only a preference customer's allocation used to serve an existing DSI load, or should it also withdraw Federal power being used to serve any "new" or even existing industrial load?

### VI. END USE ALLOCATION

One alternative BPA must consider is to withdraw power from preference customers to serve the domestic and rural loads, and domestic and rural load growth, of other preference customers. The power withdrawn would be power otherwise used to serve preference customers' commercial and/or industrial loads. Bonneville must consider this possibility because the total requirements of Bonneville's preference customers would exceed its total supply of available power, and Bonneville can expect that at some time it will have insufficient power to serve all competing applications of preference customers. Under those circumstances, individual preference customers must make up the deficit with incremental cost power, and some decision must be made as to the type of load growth that will bear that cost. Will it be all load growth, commercial and industrial load growth, or domestic and rural load growth?

Preference customer contracts requiring reallocation based on domestic and rural loads would almost certainly include withdrawal provisions. New 20-year requirements contracts could not reasonably be executed. Withdrawal provisions probably should distinguish, however, between different categories of load or growth. That would insure that any withdrawal would be made for a higher priority purpose on a fair and predictable basis.

In addition, allocations based on domestic and rural loads may have rate implications as well as supply implications. If Bonneville withdraws some of a utility's power supply because Bonneville had an absolute shortage, then by definition Bonneville would not have any other power available to sell that utility to compensate for that withdrawal. If, on the other hand, Bonneville's supply of power was sufficient to meet total needs, the allocation process described above might affect only rates and with a far less serious impact. Low-cost power would be withdrawn for the same purposes, and under the same conditions, but Bonneville could supply a preference customer with the higher-cost power it would need to take its place. This may or may not provide a reason for Federal legislation giving Bonneville the right to acquire additional power. It is important to note, however, that the rate implications and hard policy choices cannot be avoided by granting Bonneville the right to purchase power. Even if new power sources are created and made available to Bonneville, the supply of *low-cost* Bonneville power cannot be expanded, and it's the shortage of low-cost power to meet the needs of all preference customers that forces Bonneville to consider allocations based on domestic and rural loads.

## VII. SUMMARY

Bonneville has no choice, under law, but to embark upon development of allocation policies. Whether legislation will be enacted which will provide guidelines for this allocation is uncertain. Even if legislation is enacted, however, preference customers' likely expect that the legislated allocation would leave them with an allocation no less than they would receive under the existing statute.

Although many alternatives have been described in this statement, there are many more alternatives and specifics that have not been covered. The objective has been to give a general picture of some of the issues which must be faced in the allocation process if there is no new legislation.

To summarize: Bonneville will be faced with a shortage of power to allocate among its preference customers. This shortage will be greater if new preference customers are served, if DRPA is found to qualify for preference treatment, and if new demands are received for service to new municipal or governmental loads throughout the Northwest.

Expiration of the DSI contracts will not eliminate the problem. If new preference customers or DRPA receive an allocation, existing preference customers will benefit little from expiration of the DSI contracts. There may even be some detrimental effect, depending on what arrangements BPA can make to supply reserves in another form. If the class of preference customers does not expand, the DSIs would likely become retail customers of existing preference customers, at least for the most part, and, at least initially, Bonneville could determine that it would have little choice but to allocate any available power to those preference customers who then serve the former DSIs. Unless Bonneville makes that allocation subject to withdrawal, however, no low-cost Bonneville power will be available to meet preference customers' other load growth.

If Bonneville does make preference customers' allocations subject to withdrawal, Bonneville must decide what type of load or load growth justifies a withdrawal. In other words, Bonneville would have to decide what portion of preference customers' loads will be met with low-cost power, and what portion with incremental cost power obtained by the preference customers from sources other than Bonneville.

The prospect of new 20-year requirements contracts is doubtful. Preference customers' allocations cannot be unlimited (full requirements) and simultaneously subject to withdrawal. Therefore, allocation is likely to result not in fixed allocations, but in allocations that are rolling in time and subject to adjustment. Also, preference customers' ultimate allocations are likely to be uncertain for a number of years because of possible litigation over all or some part of the allocation issue.

DSI CUSTOMERS

| | Megawatts[1] | Percent of BPA total DSI megawatts |
|---|---|---|
| I. Within BPA preference customers' service areas: | | |
| Alcoa-Vancouver | 238.5 | 7.2 |
| Alcoa-Wenatchee | 213.1 | 6.4 |
| Kaiser-Tacoma | 152.0 | 4.6 |
| Martin-Marietta-The Dalles | 168.0 | 5.1 |
| Martin-Marietta-Goldendale | 210.9 | 6.4 |
| Reynolds-Longview | 414.0 | 12.5 |
| Carborundum-Vancouver | 28.1 | .9 |
| Subtotal | 1,424.6 | 43.1 |
| II. Adjacent to BPA preference customers' service areas: | | |
| Anaconda-Columbia Falls | 337.8 | 10.2 |
| Kaiser-Spokane | 449.6 | 13.6 |
| Kaiser-Trentwood | 62.1 | 1.9 |
| Stauffer-Silver Bow | 61.3 | 1.8 |
| Georgia Pacific-Bellingham | 20.3 | .6 |
| Oremet-Albany | 3.4 | .1 |
| Intalco-Ferndale | 422.4 | 12.8 |
| Subtotal | 1,356.9 | 41.0 |
| II. Could not readily be served by BPA preference customers: | | |
| Crown Zellerbach-Port Townsend | 13.2 | .4 |
| Hanna Nickel-Riddle | 114.0 | 3.4 |
| Pacific Carbide | 9.0 | .3 |
| Pennwalt | 45.7 | 1.4 |
| Reynolds-Troutdale | 271.6 | 8.2 |
| Union Carbide | 20.3 | .6 |
| Alcoa-Addy | 53.2 | 1.6 |
| Subtotal | 527.0 | 15.9 |
| Total | 3,308.0 | 100.0 |

[1] "Industrial Firm" as of Mar. 29, 1978.

U.S. DEPARTMENT OF THE INTERIOR,
BONNEVILLE POWER ADMINISTRATION,
*Portland, Oreg., June 24, 1976.*

HON. DOUGLAS S. MAHONEY,
*Albion, Idaho 83311.*

Subject: Contract No. 14-03-38576 (Power Sales Contract)—"Notice of Insufficiency."

DEAR MAYOR MAHONEY: The Bonneville Power Administration has the obligation under the Power Sales Contract to meet the City's power requirements, subject to limitations included in such contract, unless, pursuant to Section 22 of the General Contract Provisions attached to such contract, Bonneville determines that Bonneville's resources will not be adequate to meet its estimated loads, subject to specific notice requirements.

Bonneville has completed an analysis of the resources it estimates will be available for disposition and its requirements and commitments to supply firm energy in the year July 1, 1983, to June 30, 1984. As a result of this analysis, Bonneville has determined that the firm energy resources available to it will be insufficient in that year to supply in full the City's firm energy requirements, the firm energy requirements of other preference customers, and Bonneville's obligations to deliver firm energy to its other customers.

Therefore, in accordance with the provisions of the Power Sales Contract, I hereby give notice, effective at 2400 hours on June 30, 1976, that in the year beginning July 1, 1983, and in each year thereafter during the term of the Power Sales Contract, Bonneville's obligation to supply firm energy to the City will be limited to an allocation, the amount of which will be computed according to the terms of Section 22 of the General Contract Provisions.

Bonneville has provided the City and its other customers with a preliminary forecast dated April 6, 1976, of the City's allocation based upon then available information. Bonneville will furnish the City with a new forecast when data is available regarding the City's 1975–1976 net system firm energy load. From time to time as additional data becomes available, Bonneville will furnish the City with revised forecasts of its allocation and a final notice of allocation in accordance with such Section 22.

If you have any questions concerning this letter, the disposition of power after the date of insufficiency, or your allocation, please contact your Bonnville Area or District Office.

Sincerely yours,

DONALD PAUL HODEL,
*Administrator.*

TABLE 1.—WEST GROUP AREA LOADS AND RESOURCES

[Critical hydro conditions, average energy megawatts]

| | 1978–79 | 1979–80 | 1980–81 | 1981–82 | 1982–83 | 1983–84 | 1984–85 | 1985–86 | 1986–87 | 1987–88 | 1988–89 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Loads: | | | | | | | | | | | |
| Area energy load | 16, 071 | 16, 867 | 17, 757 | 18, 715 | 19, 505 | 20, 219 | 20, 972 | 21, 751 | 22, 550 | 23, 393 | 24, 271 |
| Exports | 650 | 629 | 647 | 496 | 339 | 203 | 205 | 207 | 209 | 201 | 174 |
| Total energy requirements | 16, 721 | 17, 496 | 18, 404 | 19, 211 | 19, 844 | 20, 422 | 21, 177 | 21, 958 | 22, 759 | 23, 594 | 24, 445 |
| Resources: | | | | | | | | | | | |
| Existing | 14, 570 | 14, 553 | 14, 517 | 14, 511 | 14, 503 | 13, 982 | 13, 966 | 13, 943 | 13, 941 | 13, 925 | 13, 919 |
| Imports | 1, 394 | 1, 580 | 1, 608 | 1, 567 | 1, 501 | 1, 477 | 1, 378 | 1, 318 | 1, 162 | 890 | 683 |
| New hydro: | | | | | | | | | | | |
| Grand Coulee 3d powerplant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chief Joseph addition | 0 | 31 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 |
| Rock Island addition | 110 | 123 | 123 | 123 | 123 | 123 | 123 | 123 | 123 | 123 | 123 |
| Lower Monumental | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Coulee pump generator | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| High Ross | 0 | 0 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 35 | 36 |
| Bonneville 2d powerplant | 0 | 0 | 10 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 |
| Libby additions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Libby reregulating | 0 | 0 | 0 | 0 | 0 | 11 | 29 | 29 | 29 | 29 | 29 |
| Cougar additions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Strube | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 3 |
| Total new hydro | 110 | 154 | 233 | 279 | 279 | 290 | 308 | 310 | 311 | 311 | 311 |
| New thermal: | | | | | | | | | | | |
| WNP No. 2 | 0 | 0 | 110 | 687 | 825 | 825 | 825 | 825 | 825 | 825 | 825 |
| Colstrip No. 3 | 0 | 0 | 0 | 74 | 313 | 368 | 368 | 368 | 368 | 368 | 368 |
| Boardman Coal | 0 | 0 | 191 | 334 | 358 | 358 | 358 | 358 | 358 | 358 | 358 |
| Colstrip No. 4 | 0 | 0 | 0 | 0 | 122 | 325 | 368 | 368 | 368 | 368 | 368 |
| WNP No. 1 | 0 | 0 | 0 | 0 | 63 | 765 | 933 | 938 | 938 | 938 | 938 |
| Skagit No. 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 773 | 966 | 966 | 966 |
| WNP No. 3 | 0 | 0 | 0 | 0 | 0 | 62 | 760 | 930 | 930 | 930 | 930 |
| WNP No. 4 | 0 | 0 | 0 | 0 | 0 | 0 | 437 | 860 | 938 | 938 | 938 |
| WNP No. 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 434 | 853 | 930 | 930 |
| Pebble Springs No. 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 189 | 803 | 945 | 945 |
| Skagit No. 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 773 | 966 |
| Pebble Springs No. 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 189 |
| Total new thermal | 0 | 0 | 301 | 1, 095 | 1, 681 | 2, 703 | 4, 054 | 6, 043 | 7, 347 | 8, 339 | 8, 721 |
| Gross resources | 16, 074 | 16, 287 | 16, 659 | 17, 452 | 17, 964 | 18, 452 | 19, 706 | 21, 614 | 22, 761 | 23, 465 | 23, 634 |
| Reserves | 413 | 389 | 394 | 439 | 395 | 403 | 426 | 435 | 452 | 469 | 481 |
| Net resources | 15, 661 | 15, 898 | 16, 265 | 17, 013 | 17, 569 | 18, 049 | 19, 280 | 21, 179 | 22, 309 | 22, 996 | 23, 153 |
| Surplus or (deficit) | (1, 060) | (1, 598) | (2, 139) | (2, 198) | (2, 275) | (2, 373) | (1, 897) | (779) | (450) | (598) | (1, 292) |
| Surplus or (deficit) percent of load | (6. 4) | (9. 1) | (11. 6) | (11. 4) | (11. 5) | (11. 6) | (9. 0) | (3. 5) | (2. 0) | (2. 5) | (5. 3) |

42-850 O - 79 - 10

TABLE 2.—WEST GROUP AREA LOADS AND RESOURCES

[Critical hydro conditions, average energy megawatts]

| | 1978–79 | 1979–80 | 1980–81 | 1981–82 | 1982–83 | 1983–84 | 1984–85 | 1985–86 | 1986–87 | 1987–88 | 1988–89 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Present schedule: | | | | | | | | | | | |
| Total energy load | 16,721 | 17,496 | 18,404 | 19,211 | 19,844 | 20,422 | 21,177 | 21,958 | 22,759 | 23,594 | 24,445 |
| Energy resources | 15,661 | 15,898 | 16,265 | 17,013 | 17,569 | 18,049 | 19,280 | 21,179 | 22,309 | 22,996 | 23,153 |
| Resource surplus or (deficit) | (1,060) | (1,598) | (2,139) | (2,198) | (2,275) | (2,373) | (1,897) | (779) | (450) | (598) | (1,292) |
| Present schedule—Thermal plants delayed 1 yr:[1] | | | | | | | | | | | |
| Total energy load | 16,721 | 17,496 | 18,404 | 19,211 | 19,844 | 20,422 | 21,177 | 21,958 | 22,759 | 23,594 | 24,445 |
| Energy resources | 15,661 | 15,898 | 15,964 | 16,219 | 16,983 | 17,027 | 17,929 | 19,190 | ?1,005 | 22,004 | 23,252 |
| Resource surplus or (deficit) | (1,060) | (1,598) | (2,440) | (2,992) | (2,861) | (3,395) | (3,248) | (2,768) | (1,754) | (1,590) | (1,193) |
| Present schedule—Thermal plants delayed 2 yr:[1] | | | | | | | | | | | |
| Total energy load | 16,721 | 17,496 | 18,404 | 19,211 | 19,844 | 20,422 | 21,177 | 21,958 | 22,759 | 23,594 | 24,445 |
| Energy resources | 15,661 | 15,898 | 15,964 | 15,918 | 16,189 | 16,441 | 16,907 | 17,839 | 19,016 | 20,700 | 22,260 |
| Resource surplus or (deficit) | (1,060) | (1,598) | (2,440) | (3,293) | (3,655) | (3,981) | (4,270) | (4,119) | (3,743) | (2,894) | (2,185) |

[1] Except those plants scheduled for completion prior to the 1980 water year.

Note: Load-resource data based on PNUCC Blue Book tables dated Mar. 15, 1978.

Mr. DINGELL. The committee thanks you.

Our next witness is Monte Canfield, Director, Energy and Minerals Division, General Accounting Office. It is a source of genuine pleasure for me to welcome you back, Mr. Canfield.

**STATEMENT OF MONTE E. CANFIELD, JR.**

Mr. CANFIELD. Thank you, Mr. Chairman. Before I begin a summary of my statement, I would like to make a personal statement.

As you probably know, at the end of this month I will be, after 15 years of public service, moving out of this arena into a different one. I want to say simply that it has been a great pleasure to work with this committee, with the staff and with you personally. I am going to miss it, but I think the people who are at GAO will carry on the same tradition.

Mr. DINGELL. You should know that this committee has enormous respect for the agency which you have served so well and so long. We have a particularly high regard for you because of your assistance to the committee, the ability with which you approach your tasks and the rare dedication to public interests which you have demonstrated. The records of this committee clearly drip with the extraordinary efforts and assistance you have afforded us and we are most appreciative. We regret your departure but we express our good wishes to you in whatever undertaking you might commence in the future.

Mr. CANFIELD. Thank you, Mr. Chairman. I will proceed with my statement.

Let me move away from the initial description of the large report, which we consider a major report, which we issued on August 10 of this year entitled "Region at the Crossroads—The Pacific Northwest Searches for New Sources of Electric Energy."

I will not read the issues that we discussed in the report. They are essentially the issues which ultimately have to be addressed in this legislation. I will say something as to the conclusion of that report. The report has been available to the staff and to yourself for a number of days now and our staff is available to go into any detailed questions on the report.

We point out in the report that the region needs improved leadership in electric power planning and policymaking and we come down in favor of the BPA providing that kind of leadership. We also state: Representative citizen involvement in power planning and policymaking is prerequisite to development of an acceptable electricity management program. Increased opportunities to participate in power planning must be provided to State and local governments, environmentalists, utility customers and other interested citizens. We state that it must be a front-end opportunity to review situations which are proposed after the fact.

We also state, however, that more information is needed before the Federal Government makes any firm commitments to guarantee the financing of new thermal powerplants in the near future. It is really unclear how much energy will actually be needed to meet future load growth. It is possible that the construction of new powerplants could

be postponed for many years if the utilities would turn increased attention to conservation and energy efficiency.

The potential of conservation, combined with numerous uncertainties present in the regional load forecasts, argues against a premature Federal commitment to participate in new generating plants.

Our analysis showed that, if a moderate forecast proved more realistic than the forecasts of regional utilities and moderate conservation incentives were adopted, the thermal generating plants already approved for construction would be sufficient to meet regional demand growth through 1995. Assuming a 10- to 15-year leadtime for developing thermal plants, this would enable regional policymakers to defer decisions on additional plants until the 1980–85 time period. It also has not been demonstrated that regional utilities cannot secure the capital needed for new generating plants without Federal assistance.

Conservation and renewable energy technologies deserve thorough consideration as alternatives to thermal powerplants. These alternative energy sources can be added in smaller increments, require less capital and shorter construction schedules and generally entail fewer serious environmental risks than nuclear and coal-fired plants.

Conservation, because it reduces energy waste and frees existing generation for use elsewhere, is recognized as the least expensive source of electricity. In addition, the region may be able to capitalize on its extensive renewable energy potentials more quickly than many power planners predict.

Bonneville should continue to market Federal hydropower to preference customers in accordance with existing legislation. It would be inequitable to abruptly discontinue deliveries of Federal power to preference customers who have become so dependent on this supply source.

However, the pricing of Federal power at true replacement cost would result in greater consumer awareness and greater potential for voluntary conservation. Gradually increasing the rates for Federal hydropower would help accomplish this objective.

Let me turn specifically to how our report relates to the legislation. The objectives of H.R. 13931 to recharter the Bonneville Power Administration to emphasize conservation of energy resources, to develop renewable resources, and to provide public participation in the development of power programs are most encouraging and are goals recommended in our report. We fully endorse these objectives but feel the proposed legislation needs to be clarified to assure the objectives are met.

First, clarification is needed in the conservation and renewable resources provisions. The bill provides that the Administration implement feasible and cost-effective conservation and renewable resource programs. However, it does not provide adequate guidance in determining what is feasible and cost-effective.

The bill is also silent on the extent of the conservation and renewable resource efforts and on the size and nature of the investment needed to implement and carry out such efforts. We recommend the legislation specifically point out that "cost-effective comparisons" means cost comparison at the margin and should include environmental and social costs when practical.

In my statement, we provide specific language which we believe will do that. I will pass over the specific language.

We also believe that the Administrator should also promote conservation by using his wholesale ratemaking authority to encourage retail rates which would provide incentives to discourage waste of energy.

This legislation is in line with our conclusion that more public involvement is needed in regional power planning and policymaking. Section 4 authorizes the Bonneville Administrator to obtain regional input by establishing two regional advisory councils and to prepare a regional power planning and conservation program in consultation with these two councils and the Governors of the States of Idaho, Montana, Oregon, and Washington.

Our concern, however, is that the legislation does not give the councils specific responsibilities other than consultation. In performing such important duties as preparing the regional load and resource forecasts and developing the region's conservation programs, the Bonneville Administrator is required only to consult with the Governors and advisory councils. The Administrator would appear to have little or no accountability to the public or elected representatives.

We recommend that, for this very important responsibility, the advisory committees be given specific planning and review functions. These should include:

One: Reviewing the regional forecasts.

Two: Insuring that the regional forecasts deal with benefits from conservation.

Three: Active and meaningful participation in the formulation of conservation programs.

Four: Providing input into decisions to build new thermal generating facilities as opposed to investment in renewable resources.

To provide a more meaningful role, an advisory council should have explicitly defined duties as well as independent staff or study capabilities. In addition the Administrator should, within 60 days, provide written comments to the councils and to the people of the Northwest on his reasons for accepting or rejecting the councils' advice.

The Administrator should also be required to periodically update the regional power planning and conservation program and report to the Congress and the people of the Pacific Northwest on the status of programs to conserve electrical energy, develop renewable energy resources, and balance electricity supply and demand.

The two councils created would be the Bonneville Utilities' Council, comprised of utility and industry representatives, and the Bonneville Consumers' Council, comprised of representatives appointed by the Northwest Governors. The legislation does not provide reasons for having two advisory councils.

We believe that one council, representing a diverse regional makeup, similar to the regional power planning board recommended in our report, would be more appropriate. One council would likely provide a greater opportunity to centrally focus ideas and information on key issues. A single council would appear more appropriate to meet the planning and review responsibilities discussed above.

If two councils are set up, however, we believe there is a small glitch in the bill as now written since it allows the Governors to appoint elected officials to the consumers' council; since PUD commissioners are available, they would be available for qualified appointment. To avoid that, we recommend that legislation be amended to preclude appointment of utility officials to a consumers' council.

We are concerned with the provisions that appear to authorize Bonneville to construct conventional generating resources or, through purchase agreements, underwrite conventional powerplants constructed by utilities. Our analysis showed there would be no immediate need for additional thermal powerplants in the Northwest beyond those presently under construction or licensed if moderate conservation incentives were adopted and a moderate demand forecast occurred.

The uncertainties associated with load forecasts, together with the potential of untapped conservation and renewable energy potentials, argue against hurried decisions to build additional thermal generating capacity. Therefore we do not see any need for Bonneville to construct thermal powerplants nor, until more information is available, the need to make firm commitments in the near future to help finance conventional thermal powerplants.

Even if it were to become clear, given more information, that load growth would be so high as to require additional thermal generation, we do not feel that the Federal Government should construct thermal powerplants. It has been GAO's position that the Federal Government not take over functions that the private sector could or has been performing unless it has been demonstrated that the private sector cannot perform the function.

We have seen no demonstration that Northwest utilities cannot construct or secure the capital need for new powerplants without Federal assistance. We do favor, however, authorizing Bonneville to construct or fund the construction of facilities which would research, develop, and demonstrate energy conservation and new renewable technologies.

If, however, the Congress should grant Bonneville the authority to underwrite thermal powerplants, then, we feel, section 6(g) should be amended. This section requires Bonneville to submit any power purchase intentions to the Senate Energy and Natural Resources Committee and the House Interior and Insular Affairs Committee for review and execute no contracts until 90 days after submission to the committees.

We believe committing the Federal Government to underwriting a major acquisition such as a thermal powerplant should require more approval than a 90-day nonaction by the Congress. We believe that the public interest is best served when congressional control over activities is exercised through annual reviews and affirmative action on planned programs and financing requirements.

To maintain congressional control of financing of thermal powerplants by means other than through the appropriations process, Bonneville should submit financing proposals for review by the Congress at the same time it submits an annual budget.

The legislation addresses the regional rate disparity problem and preference customer issue by (1) extending the benefits of Federal

hydropower to include residential customers or privately owned utilities and (2) marketing power to existing preference customers and new residential customers at an average cost of a pool of power from Federal entities, preference customers and nonpreferenced entities.

This appears to be a precedent in that investor-owned utilities have never been assured access to the benefits of Federal hydropower. Bonneville preference customers would be yielding a portion of their total entitlement to the Federal base resource in exchange for a pooling arrangement among themselves, Bonneville, and nonpreference entities.

Our report addresses these issues by keeping the preference customer clause as is but gradually increasing the price of Federal power to accomplish regional rate parity. This portion of our report has been misinterpreted and taken out of context. Our analysis showed the Northwest will face higher power costs if increased demand is met by thermal powerplants rather than by conservation and renewable resource programs.

Thus the questions to be answered are: How can rate disparities be decreased and power needs be met with minimum capital and environmental costs? Our answer was to gradually increase the price of Federal power until it reaches parity with the average price of producing power in the Northwest.

This would eliminate the regional rate disparities and the regional infighting for Federal power. It would also provide a fund of money which could be used to carry out the conservation and renewable resource programs for the entire region. The end result would have the consumers paying about the same rates they would pay if increased power demands were met totally by thermal power.

Some of the suggestions have already been touched, one has not. It is item No. 4 in the attachment, which simply says that the legislation will not solve rate inequities in the nonresidential sectors. As pointed out in our report, several publicly owned utilities use Bonneville preference power wholly or largely to serve industrial users, and it has been argued by some that such industrial customers are receiving an unfair competitive advantage. The legislation simply does not resolve this conflict.

I won't go any further with my prepared statement. We will be happy to answer questions. I do have members of the staff here who will be available to answer any technical questions you may have on my statement. Thank you, Mr. Chairman.

[Testimony resumes on p. 139.]

[Mr. Canfield's prepared statement and attachment follows:]

STATEMENT OF
MONTE CANFIELD, JR.
DIRECTOR, ENERGY AND MINERALS DIVISION
BEFORE THE
SUBCOMMITTEE ON ENERGY AND POWER
OF THE
COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE
HOUSE OF REPRESENTATIVES

Mr. Chairman:

We appreciate your invitation to discuss our recent report 1/ on the Pacific Northwest electric energy picture and how the results of our work align with the purposes of H.R. 13931, the Pacific Northwest Electric Power Planning and Conservation Act. My statement will discuss the issues and conclusions addressed in our study and relate those to the provisions in the proposed legislation.

Our report looked at the major issues facing Bonneville Power Administration and power planners in the Pacific Northwest. These issues are:

--What supply options does the Pacific Northwest, a region that has primarily depended on hydropower for meeting its electrical demand, have for meeting its future power needs?

--How much electrical demand can be met through conservation?

--Who is responsible for regionwide electricity management and how can regionwide input be provided into the decisionmaking processes?

--How can the Federal power be marketed to discourage waste and to decrease regional rate disparities?

--Should the Federal Government underwrite or guarantee the financing of thermal powerplants?

--What role should Bonneville play in resolving these issues?

In reviewing these issues we concluded:

--The Pacific Northwest region needs improved leadership in electric power planning and policymaking. No regional entity is responsible for spearheading the development of a coordinated electricity management

1/ "Region at the Crossroads--The Pacific Northwest Searches for New Sources of Electric Energy," EMD-78-76, August 10, 1978.

program for the region.

--Representative citizen involvement in power planning and policymaking is prerequisite to development of an acceptable electricity management program. Increased opportunities to participate in power planning must be provided to State and local governments, environmentalists, utility customers, and other interested citizens. Further, the opportunities for participation must be front-end opportunities involving the development of plans.

--More information is needed before the Federal Governme t makes any firm commitments to guarantee the financing of new thermal power plants in the near future. It is unclear how much energy will actually be needed to meet future load growth. It is possible that the construction of new powerplants could be postponed for many years if the utilities turned increased attention to conservation and energy efficiency. The potential of conservation, combined with the numerous uncertainties present in regional load forecasts, argues against a premature Federal commitment to participate in new generating plants. Our analysis showed that if a moderate forecast proved more realistic than the forecasts of regional utilities and moderate conservation incentives were adopted, the thermal generating plants already approved for construction would be sufficient to meet regional demand growth through 1995. Assuming a 10- to 15-year leadtime for developing thermal plants, this would enable regional policymakers to defer decisions on additional plants until the 1980-85 time period. It also has not been demonstrated that regional utilities cannot secure the capital needed for

--Conservation and renewable energy technologies deserve thorough consideration as alternatives to thermal powerplants. These alternative energy sources can be added in smaller increments, require less capital and shorter construction schedules, and generally entail fewer serious environmental

risks than nuclear and coal-fired plants. Conservation, because it reduces energy waste and frees existing generation for use elsewhere, is recognized as the least expensive source of electricity. In addition, the region may be able to capitalize on its extensive renewable energy potentials more quickly than many power planners predict.

--Bonneville should continue to market Federal hydropower to preference customers in accordance with existing legislation. It would be inequitable to abruptly discontinue deliveries of Federal power to preference customers who have become so dependent on this supply source. However, the pricing of Federal power at true replacement cost would result in greater consumer awareness and greater potential for voluntary conservation. Gradually increasing the rates for Federal hydropower would help accomplish this objective.

RELATION OF CONCLUSIONS TO PROPOSED LEGISLATION

The objectives of H.R. 13931 to recharter the Bonneville Power Administration to emphasize conservation of energy resources, development of renewable resources, and provide public participation in the development of power programs are most encouraging and are goals recommended in our report. We fully endorse these objectives, but feel the proposed legislation needs to be clarified to assure the objectives are met.

First, clarification is needed in the conservation and renewable resources provisions. The bill provides that the Administration implement "feasible and cost effective" conservation and renewable resource programs. However, it does not provide adequate guidance in determining what is feasible and cost effective. The bill is also silent on the extent of the conservation and renewable efforts and on the size and nature of the investment needed to implement and carryout such efforts. We recommend the legislation specifically point out that "cost effective" comparisons means cost comparison at the margin and should include environmental and social costs when practical. We would recommend the following definition:

"Cost-effectiveness should be determined by comparing, on a life cycle basis, the unmelded cost of generating, transmitting, and distributing electricity from new thermal supply sources with the cost of energy conservation and/or renewable resource alternatives. Environmental and social effects should be included when they can be identified. To the extent practical, these effects should also be quantified."

The Administrator should also promote conservation by using his wholesale rate-making authority to encourage retail rates which would provide incentives to discourage waste of energy.

The legislation is in-line with our conclusion that more public involvement is needed in regional power planning and policymaking. Section 4 authorizes the Bonneville Administrator to obtain regional input by establishing two regional Advisory Councils and to prepare a regional power planning and conservation program in consultation with these two Councils and the Governors of the States of Idaho, Montana, Oregon, and Washington. Our concern, however, is that the legislation does not give the Councils' specific responsibilities other than consultation. In performing such important duties as preparing the regional load and resource forecasts and developing the regions conservation programs, the Bonneville Administrator is only required to consult with the Governors and Advisory Councils. The Administrator would appear to have little or no accountability to the public or elected representatives. We recommend that for this very important responsibility, the Advisory Committees be given specific planning and review functions. These should include:

1. Reviewing the regional forecasts.
2. Ensuring that the regional forecasts deal with benefits from conservation.
3. Active and meaningful participation in the formulation of conservation programs.
4. Providing input into decisions to build new thermal generating facilities as opposed to investment in renewable resources.

To provide a more meaningful role, an Advisory Council should have explicitly defined duties as well as independent staff or

study capabilities. In addition, the Administrator should, within 60 days, provide written comments to the Councils' and to the people of the Northwest on his reasons for accepting or rejecting the Councils' advice. The Administrator should also be required to periodically update the regional power planning and conservation program and report to the Congress and the people of the Pacific Northwest on the status of programs to conserve electrical energy, develop renewable energy resources, and balance electricity supply and demand.

The two Councils' created would be the Bonneville Utilities' Council, comprised of utility and industry representatives, and the Bonneville Consumers' Council, comprised of representatives appointed by the Northwest Governors. The legislation does not provide reasons for having two Advisory Councils. We believe that one council representing a diverse regional makeup, similar to the Regional Power Planning Board recommended in our report, would be more appropriate. One council would likely provide a greater opportunity to centrally focus ideas and information on key issues. A single council would appear more appropriate to meet the planning and review responsibilities discussed above.

Another concern regarding the Advisory Councils' as proposed is their potential makeup. It appears the Consumers' Council would provide a non-utility advisory role to the Administrator but in effect could end-up with Public Utility District (PUD) Commissioners as members. The Governors appointees to this Council are to include elected officials. Since PUD Commissioners are local elected officials, they would presumably be available and qualified for such appointments. Therefore, utility officials could be appointed to the Consumers Council. To avoid this, we recommend the legislation be amended to preclude the appointment of utility officials to the Consumer's Council.

We are concerned with the provisions that appear to authorize Bonneville to construct conventional generating resources or, through purchase agreements, underwrite conventional powerplants constructed by utilities. Our analysis showed there would be no immediate need for additional thermal powerplants in the Northwest

beyond those presently under construction or licensed if moderate conservation incentives were adopted and a moderate demand forecast occurred. The uncertainties associated with load forecasts, together with the potential of untapped conservation and renewable energy potentials, argue against hurried decisions to build additional thermal generating capacity. Therefore, we do not see see any need for Bonneville constructing thermal powerplants nor, until more information is available, the need for making firm commitments in the near future to help finance conventional thermal powerplants. Even if it were to become clear, given more information, that load growth would be so high as to require additional thermal generation, we do not feel the Federal Government should construct thermal powerplants. It has been GAO's postion that the Federal Government not take over functions that the private sector could or has been performing unless it has been demonstrated that the private sector cannot perform the function. We have seen no demonstration that Northwest utilities cannot construct or secure the capital needed for new powerplants without Federal assistance. We do favor, however, authorizing Bonneville to construct, or fund the construction, of facilities which would research, develop, and demonstrate energy conservation and new renewable technologies.

If, however, the Congress should grant Bonneville the authority to underwrite thermal powerplants, then we feel section 6(g) should be amended. This section requires Bonneville to submit any power purchase intentions to the Senate Energy and Natural Resources Committee and House Interior and Insular Affairs Committee for review and execute no contracts until 90 days after submission to the Committees. We believe commiting the Federal Government to underwriting a major acquisition such as a thermal powerplant should require more approval than a 90-day non-action by the Congress. We believe that the public interest is best served when congressional control over activities is exercised through annual reviews and affirmative action on planned programs and financing requirements. To maintain congressional control financing of thermal powerplants by means other than through the appropriations process, Bonneville should submit financing proposals for review by the Congress at the same time it submits an annual budget.

The legislation addresses the regional rate disparity problem and preference customer issue by: (1) extending the benefits of Federal hydropower to include residential customers of privately-owned utilities and (2) marketing power to existing preference customers and new residential customers at an average cost of a pool of power from Federal entities, preference customers and non-preference entities. This appears to be a precedent in that investor-owned utilities have never been assured access to the benefits of Federal hydropower. Bonneville preference customers would be yielding a portion of their total entitlement to the Federal base resource in exchange for a pooling arrangement among themselves, Bonneville, and non-preference entities.

Our report addresses these issues by keeping the preference customer clause as is, but gradually increasing the price of Federal power to accomplish regional rate parity. This portion of our report has been misinterpreted and taken out of context. Our analysis showed the Northwest will face higher power costs if increased demand is met by thermal powerplants rather than by conservation and renewable resource programs. Thus, the questions to be answered are: how can rate disparities be decreased and power needs be met with minimum capital and environmental costs? Our answer was to graudally increase the price of Federal power until it reaches parity with the average price of producing power in the Northwest. This would eliminate the regional rate disparities and the regional infighting for Federal power. It would also provide a fund of money which could be used to carry out the conservation and renewable resource programs for the entire region. The end result would have the consumers paying about the same rates they would pay if increased power demands were met totally by thermal power.

That concludes my prepared statement. More suggested changes to H.R. 13931 are attached. We would be pleased to answer any questions.

**OTHER GAO COMMENTS ON H.R. 13931**

1. The legislation gives authority to the Bonneville Administrator for various functions which could require huge sums of money. We think the legislation should make clear that the Administrator will be acting under the direction of the Secretary of Energy. One way to accomplish this would b~ to add a sentence to Section 9(b) to provide:

   "The authority and duties of the Administrator referred to herein are subject to the supervision and direction of the Secretary of Energy."

2. Section 8(b) does not appear to set a limit as to how much debt BPA can have outstanding at any one time through its bonding authority. GAO believes that an aggregate bonding limit, such as is used in the Tennessee Valley Authority bonding authority, should be placed on Bonneville in order to provide greater fiscal control.

3. Section 7(b) authorizes the Administrator to set rates appropriate to a specific sector (residential) but Bonneville only markets at the wholesale level. It provides no guidelines toward how Bonneville can assure the Federal power rates are passed on at the retail level. This should be specified in the legislation.

4. The legislation will not solve rate inequities in the non-residential sectors. As pointed out in our report, several publicly owned utilities use Bonneville preference power wholly or largely to serve industrial users. It has been argued by some that such industrial consumers are receiving an unfair competitive advantage. The legislation does not appear to resolve this conflict.

5. Since load forecasting is so important to power planning and presently an inexact science, it would appear a range of forecasts (high, middle, low) should be developed by the Administrator so that various supply and demand options can be evaluated over a range of eventualities.

Mr. DINGELL. The committee thanks you for a very helpful statement.

Gentlemen, before the Chair recognizes his colleagues or members of the staff for the purpose of asking questions, the Chair observes there have been a number of interesting comments that may be of concern amongst the panel members. For that reason, if we could start, I think, with the gentleman on your left and my right for purposes of such comments as you might wish to make in the light of the other panel members' discussions.

Mr. McISAAC. Chairman Dingell, I have no particular comment. I would defer to Administrator Munro if he has any reactions to the GAO report.

Mr. MUNRO. I did not make note of every statement that Mr. Canfield made. I must say my own reaction to the GAO report, Mr. Chairman, was very largely favorable. I thought they made an excellent analysis of the situation in the Northwest. I thought they made some excellent recommendations.

Particularly attractive are the recommendations having to do with emphasis on conservation and renewable-based generation. The Northwest has in the past—let me say at a point in relatively recent history—been a totally renewable-based area because our hydro system was the resource of the region.

I am attracted to the notion of our endeavoring to pursue those goals and objectives to the extent that we can possibly implement them, basing our requirements on conservation and renewable-based resources.

Mr. DINGELL. Mr. Bardin.

Mr. BARDIN. Mr. Chairman, on the limited issue of the residential utility rate design, I am troubled by the suggestion in Mr. Canfield's testimony that we progressively price Federal hydro power in a way that places the residential customer closer to the concept of paying replacement cost, particularly in the context which suggested there may be no role for the Federal Government in pursuing the output of new thermal plants.

In that case the base costs that the Federal system is incurring are not replacement costs at all but the replacement costs of some other utility, investor-owned sector, municipally owned sector rather would be the historical cost, and it is just another principle of utility ratemaking and a principle which has prevailed in the management of these Federal resources for which we say we charge the overall cost, realize it is overall revenue, but we don't try to charge Federal power or interior power generally to the universe of customers to achieve revenues which are higher than cost, including a just and reasonable return.

Moreover, in the practical circumstances that we confront in the Pacific Northwest, where we have a vast hydro resource, and when you combine the Federal hydroelectric resource, which is about half of the power, with the non-Federal, municipal- and investor-owned, you get 90 percent or more at the moment, you have such a low cost in that sector that the most practical way to achieve the economic benefit, the efficiency benefit, that the signal is not to rely exclusively on price but

to combine the incentive, loans or otherwise, pushing out conservation, including the retrofitting of existing homes with insulation and other conservation techniques by means that go beyond the pricing means.

Indeed one of the most recent and exciting developments in this country is by a utility out in that region, which happens to the an investor-owned utility, which will be making zero interest loans which have now been approved by the Oregon Commissioner—to make zero interest loans to its residential customers on a cost-effective basis to mine the potential of conservation to the benefit of all customers.

It seems to me that the bill opens the door to having Bonneville be an active participant, hopefully through the existing investor-owned utility rather than independently owned, to achieve that kind of dramatic breakthrough on the conservation front.

Mr. DINGELL. Thank you, Mr. Bardin. Mr. Canfield.

Mr. CANFIELD. I think there is no single issue in our report that is more controversial than the question of surcharge and why it is used in the pricing mechanism to develop an incentive for conservation. I will simply say that the report essentially stands on its own. It explains in great detail as to what the use of the surcharge would be.

The surcharge would be a very gradually implemented one between now and the year 2000. All of the money accumulated through the surcharge would be plowed back into conservation and the kinds of activities that Mr. Bardin suggests. If the private sector can come up with the kind of capital required to encourage that kind of conservation and renewable resource activity as fast as some people think they can, perhaps a surcharge will not be needed.

I want to make it quite clear that we are talking about a surcharge that will be applied over a 20-year period and one which will be plowed back into the region for precisely the kinds of conservation and renewable resource activities, and to those same customers that we are talking about here.

So it is a controversial issue and reasonable men can differ on it. That is about all I want to say about it. The surcharge would be plowed back to the very customer against whom the surcharge will be applied.

I know, having spent a number of years in this town trying to promote energy conservation and on past reputation have been thrown out of a number of meetings suggesting that it was necessary to do energy conservation some years ago, that the pricing mechanism is one way to influence it and, if there are other ways that are more attractive to other people, they are entitled to utilize them. That is about all I want to say.

Mr. DINGELL. Thank you. The Chair will recognize his colleagues in order of appearance. The Chair expresses thanks to the gentleman from New York, Mr. Ottinger, and his good friend from Tennessee, Mr. Gore, for being with us. The Chair recognizes the gentleman from New York, Mr. Ottinger.

Mr. OTTINGER. Thank you, Mr. Chairman. I have grave problems with this legislation. I suppose my first question really is, on some of those problems, why we are being asked to rush this through at the end of the session without giving adequate consideration to some things which are clearly precedent-setting and will have grave consequences for the entire country.

My difficulty with it goes to opening up the Treasury to the financing of plants for the investor-owned utilities out in the Northwest, allowing them to make use of the tax-exempt status, the Federal Government and the State and local utilities exemptions from antitrust laws, exemptions from the Public Utility Holding Company Act.

It seems to me that those are very important precedents that have very grave consequences. To allow that kind of advantage to the Northwest—which at the present time has the lowest utility prices in the entire country and, on that basis, already is at a great competitive advantage in relation to other areas in the country—without extending those advantages to the rest of the country seems to me to be something that is totally unsupportable.

I understand that the theory of doing this is to solve the problem of disparities within the grade structures of the various utilities in the Northwest. It is something that I feel I could not countenance.

Then I am concerned in terms of the precedent-setting nature of this arrangement, that the Bonneville Power Administration could construct any type of generating resources the Administrator determines necessary to assure reliability while there is a study to be made of conservation. Certain conservation measures are given lip service as being in preference. There are no controls over the exercise of authority to go ahead and build plants while the various studies are made and no limitations on the funding for this kind of resource.

I am concerned that public participation is not adequately mandated. For instance, in section 5(a), "The Administrator shall offer to sell power to each public Northwest utility." That is a mandate to sell, not a discretionary power. There is no provision for public participation in that.

Also, with respect to the conservation provisions, section 6(b), "In the event that the Administrator determines conservation will be insufficient," there is no public participation in that determination.

So I think this bill raises grave problems of policy and equity for the rest of the country. I don't see any reason why we should try to rush this through without giving it adequate consideration and, having had a determination made with respect to even some of the provisions that are put in here for conservation that offer very interesting possibilities, whether those should not be applied to the country as a whole.

Now whoever wants to comment on that is welcome. Why should we rush this through and why should we give preference in terms of Federal financing and of having I O U's participate in public power in this instance and not in the rest of the country? Those are the principal questions that I raise.

Mr. McIsaac. Mr. Ottinger, as a native son of New York State as well, perhaps it is appropriate for me to try to respond, at least in part, to some of your observations. As we have indicated in our testimony today—and in the other forums where we have testified on the bill—the Administration is taking a point of view which would be in concert with yours, as best I can determine it from your comments, with regard to some of the authorities given to the Bonneville Power Administrator under the Act.

42-650 O - 79 - 11

For example, we agree there would be a lump sum limit on spending authority. We agree there should not be power for the Bonneville Administrator to determine what is tax exempt and what is not. We would intend that the Bonneville Power Administrator not be given the authority to construct any new generating plants, either hydro, thermal or any other form, including new or renewable resources.

We feel there are plenty of mechanisms to construct utility plants, power generating facilities, short of having direct financing and construction authority in the Bonneville Power Administration.

With regard to the need for speed on this legislation, I would like to defer to my colleague, Administrator Munro, who has at his fingertips a full knowledge of some of the circumstances that we face in the Pacific Northwest. Before I do so I would like to clarify the role of the Bonneville Power Administration as a Federal entity. The Bonneville Power Administration, in effect, does not spend the taxpayers' money. The Bonneville Power Administrator, under this legislation as we would propose it be amended, is operating, in effect, a cost pass-through kind of agency. He would arrange for the cost of services being delivered to the Bonneville Power Administration to be passed through to the customers of the Bonneville Power Administration.

Mr. OTTINGER. Does the Administrator not have authority to borrow from the Treasury?

Mr. McISAAC. He does today, yes, sir. Whether or not he could continue to have such authority to borrow directly from the Treasury under this act would remain to be seen. If he did have that authority it would be at rates, as we have suggested, comparable to the kind of interest rates the triple-A-rated utility companies would have to pay on the private market.

Mr. OTTINGER. There is a provision in here, I take it, where borrowing is not to exceed $1,250 million plus the principal amount of any bonds outstanding which shall have been issued to finance or assist in financing, et cetera. Are you going to extend that to my customers?

Mr. MUNRO. Congressman Ottinger, 4 years ago the Congress made the Bonneville Power Administration a self-financing entity. All of our expenditures are paid either as a result of our revenues, or capital investment involves some borrowings from the Treasury, sale of revenue bonds to the Treasury, but at interest rates established by the Treasury comparable to utility bond interest rates in the general marketplace.

Mr. OTTINGER. Are you prepared to take over the Consolidated Edison Co. in New York? If you are, we have a deal.

Mr. MUNRO. I hesitate to suggest to you, Mr. Ottinger, what you already know; a predecessor of mine, Mr. Charles F. Luce, now is the chief executive officer of the Consolidated Edison Co.

Mr. OTTINGER. He has changed radically.

Mr. MUNRO. I am not prepared to follow in his footsteps, however.

Mr. OTTINGER. Doesn't this legislation, Federal assistance of various kinds, accelerate the competitive advantage which the Northwest already enjoys vis-a-vis the entire rest of the country?

Mr. MUNRO. Congressman Ottinger, you might examine this legislation from the standpoint of the impact on industrial commercial

rates, for example. The effect of this legislation would be to raise those rates very, very substantially. That is in the area of about 75 percent of the load in the Northwest now. The residential load in the Northwest is about 25 percent.

Mr. OTTINGER. Wouldn't I be very happy to see my industrial and commercial customers in the New York metropolitan area have the increased prices—low as they are—that you anticipate under this legislation?

Mr. MUNRO. Yes; I think you probably would, Congressman Ottinger. You might even be happy to move, if you could, the Columbia River System into your backyard. That is the major reason for the differences, I would say, in the cost of electric power generation.

Mr. OTTINGER. You want us to give them Federal borrowing power on top of that.

Mr. MUNRO. The legislation does not propose that borrowings from the Treasury be utilized in connection with the construction of new generating capacity. It does propose that the borrowings from the Treasury be used to finance cost-effective conservation measures, for example.

However, the construction of new generating capacity under the legislation would be financed in the private market. The Bonneville Power Administration would be authorized to enter into a purchase contract for the output of those plants or the capability of those plants.

Mr. OTTINGER. That is the equivalent of financing a plant.

Mr. DINGELL. Isn't that entry by Bonneville Power for purposes of purchasing power on a long-term basis?

Mr. MUNRO. Yes, sir.

Mr. DINGELL. Isn't that purchase to include all costs which would be occasioned by the generation of that power?

Mr. MUNRO. Absolutely.

Mr. DINGELL. Isn't that, then, to include capital costs, construction costs, borrowing costs, administrative costs and all other costs that would be occasioned in the generation of power?

Mr. MUNRO. It would be an obligation to repay all the costs of operation of the plant, Mr. Chairman.

Mr. DINGELL. How does that differ, then, from a guarantee contract where one would guarantee simply to repay both the principal and interest?

Mr. MUNRO. It would differ substantially.

Mr. DINGELL. In either instance, the Federal Government assures that the interest and the principal will be repaid, does it not?

Mr. MUNRO. Mr. Chairman, the requirement is that rates be charged to BPA customers to pay for all those costs. That is a requirement of current law. We are not permitted to do anything else.

Mr. DINGELL. The Federal Government has guaranteed to purchase all of the power which would be under the contract for the life of the facility. Have they not guaranteed, then, in your own words, to assure payment of both principal and interest as borrowers?

Mr. MUNRO. If the Bonneville Power Administration would for some reason fail to recover the costs through our rates, that would be the case. However, since under current law we are required to

recover the costs through our rates, I cannot conceive of such a possibility.

Mr. DINGELL. That is a very good answer but it is the wrong question. To repeat my question, aren't you essentially guaranteeing that you will pay back both principal and interest through the purchase contract which you execute?

Mr. MUNRO. Mr. Chairman, the full faith and credit of the United States is not behind that obligation.

Mr. DINGELL. Whose basic credit is behind the obligation?

Mr. MUNRO. The ratepayers of the region.

Mr. DINGELL. And is the contract signed by Bonneville Power?

Mr. MUNRO. I believe it would be fair to say——

Mr. DINGELL. Wait. Is there a contract of Bonneville Power to purchase that power?

Mr. MUNRO. Yes, sir. I think it is fair to say if we fail to carry out the Congress directive to recover the costs through our rate structure, through our revenues, that then I would assume the Government of the United States would stand behind that obligation. I assume the Congress would first insist that we perform on the obligation that you have imposed on us, and that is to recover through revenue.

Mr. DINGELL. You are taking a lengthy dance to arrive at the final point I want you to arrive at. I have here before me an advertisement which appeared some while back—I am not sure just when—in a newspaper in Washington State. It says:

[The advertisement follows:]

We own and offer subject to prior sale or change in price, the following

# $1,000,000
# Washington
# Public Power Supply System
# Nuclear Project No. 1
## Revenue Bonds

DATED: 4/1/78 MOODY'S RATING: Aaa DUE: July 1, as shown below.

# Federal
# Tax-Exempt Yield
# 6.00%

Minimum Purchase
**$5,000**

| Coupon | Maturity | Approximate Price |
|---|---|---|
| 5.875% | *7/1/2017 | 98.10 |

| Approx. Taxable Equivalent Yield 50% Bracket | Approx. Taxable Equivalent Yield 70% Bracket |
|---|---|
| 12.00% | 20.00% |

*Callable 4/1/88 @ 103
**Discount bonds subject to capital gains tax.

The United States of America, Department of the Interior, acting by and through the Bonneville Power Administrator ("Bonneville"), has purchased the entire capability of the Project. Bonneville is obligated to pay the total annual costs of the Project, including debt service on the Bonds, whether or not the Project is completed, operable or operating and notwithstanding the suspension, reduction or curtailment of the Project output. Additional information available upon request.

In Seattle, call
**583-4260**

Call the following numbers toll free from:
Washington (Outside Seattle): 800-552-0612
Oregon, Idaho and Montana: 800-426-0210

SEATTLE-FIRST NATIONAL BANK

BEST COPY AVAILABLE

Mr. DINGELL. They say that they are handling the underwriting on $1 million of Washington Public Power Supply System Nuclear Project No. 1 revenue bonds; these are tax-exempt and are guaranteed in toto by the Federal Government.

I have several questions. One, what was your authority for your signing a contract of guarantee here? What was the statutory authority?

Mr. MUNRO. Mr. Chairman, that is a transaction under the net billing arrangements approved by Congress.

Mr. DINGELL. Approved by Congress?

Mr. MUNRO. Yes.

Mr. DINGELL. Can you cite the statutory authority therefor?

Mr. MUNRO. I can get it for you.

Mr. DINGELL. Can you cite it today?

Mr. MUNRO. No.

Mr. DINGELL. If you run around guaranteeing $1 million in bonds it strikes me you ought to have at your fingertips the authority so to do.

Mr. MUNRO. It would be legislative history that would be required.

Mr. DINGELL. No statute? I am always impressed with legislative history but I think there has to be legislative authority under which to act. Can you cite any legislative pronouncement by the Congress?

Mr. MUNRO. It is in the Appropriation Acts of 1970 and 1971.

Mr. DINGELL. I would appreciate if you would cite us specific statutory language authorizing you to do this. Now, is this any different from that which you would do under the legislation before us?

Mr. MUNRO. No, sir. Under the legislation before us it would be different in this sense——

Mr. DINGELL. It would be?

Mr. MUNRO. The net billing arrangement is a three-way transaction. Under the proposed legislation it would be a direct purchase by the Bonneville Power Administration. That is what would be authorized.

Mr. DINGELL. Is that a distinction of great moment?

Mr. MUNRO. The end result is the same, Mr. Chairman, from the point of your question, yes.

Mr. DINGELL. It strikes me that the Washington Public Power Supply System and the Seattle First National Bank are of the view that you are doing two things: (*a*) issuing tax-exempt bonds and (*b*) guaranteeing them. Are they incorrect or am I incorrect?

Mr. MUNRO. I don't believe they said that. The Washington Public Power Supply System is issuing the tax-exempt bonds. The Bonneville Power Administration is involved in the net purchase, not in the issuance of bonds.

Mr. DINGELL. Except that they indicate these are guaranteed.

Mr. MUNRO. Does it say "guarantee" there, Mr. Chairman?

Mr. DINGELL. No.

Mr. MUNRO. It says we are purchasing the output.

Mr. DINGELL. It says: The United States of America, Department of the Interior, has purchased the entire capability of the project. Bonneville is obligated to pay the entire total cost of the project. If Bonneville is obligated, do they guarantee or not? I am not sure what the difference is when you are obligated and when you guarantee.

Mr. MUNRO. Mr. Chairman, this is not a general obligation bond; it is a revenue bond. Therefore it is repaid under those circumstances.

Mr. DINGELL. It strikes me you and the Seattle First National Bank have a little difference here.

Mr. MUNRO. I don't believe so.

Mr. DINGELL. They say you are obligated.

Mr. MUNRO. We are obligated to make the purchase, yes. We are obligated to pay the costs associated with the operation of that plant.

Mr. DINGELL. You pay it through the borrower but you pay it nonetheless?

Mr. MUNRO. Yes, sir.

Mr. DINGELL. Regardless of whether the project is completed or not?

Mr. MUNRO. Yes, sir.

Mr. DINGELL. Can you, for curiosity's sake, tell me what steps you took to assure that the project is going to be completed or it is going to produce power?

Mr. MUNRO. Mr. Chairman, we have staff associated with oversight in connection with those projects. We concern ourselves with every transaction that they engage in.

Mr. DINGELL. What assurances will you have that the project will be completed and that it will deliver enough power to pay itself off?

Mr. MUNRO. We have the right to reject their budgets, Mr. Chairman.

Mr. DIGELL. What steps did you take prior to these events to assure that this was going to transpire——

Mr. MUNRO. We have contracts with them.

Mr. DINGELL [continuing]. And that there was going to be power generated in the fashion prescribed in the prospectus and applications for the guarantee submitted to you?

Mr. MUNRO. We have a contract which will require them to construct in accordance with sound utility principles, that is, prudent utility practice, Mr. Chairman.

Mr. DINGELL. Sound utility principles are not necessarily good engineering principles. What assurance did you have there?

Mr. MUNRO. It is the sound utility practice that is the standard in the industry, Mr. Chairman.

Mr. DINGELL. I can show you splendid facilities that lie idle, nuclear plants that have not generated a nickel's worth of power. I will be delighted to show some of them to you.

I would like you to submit some specific statement as to the safeguards which you apply in this instance which will assure that the Federal Government will be held safe, that the ratepayers will get what they are paying for and that the Federal Government does not wind up holding the sack on this matter.

Mr. MUNRO. Yes, sir; we will be delighted to provide copies of our contracts.

Mr. DINGELL. I would like to have not just contracts but also some editorial comments that would comfort me on this matter to indicate that you good folks are not just bouncing around like confetti.

[The contracts that were furnished may be found in the subcommittee files.]

Mr. OTTINGER. Mr. Chairman, as I understand it, these tax-exempt guaranteed bonds are going to be issued under this legislation for the

benefit of investor-owned utilities. They are going to get to participate in this.

Mr. MUNRO. That is not my understanding of what is proposed in the legislation. The administration has already testified, Congressman Ottinger, with regard to tax-exempt status. Reading the bill itself I see the requirement that the tax-exempt relationship involve the need for serving public bodies, not investor-owned utilities.

Mr. OTTINGER. All the power is going to be pooled. You are going to keep low the residential costs to residential users in the Northwest; they are going to get an advantage.

Mr. MUNRO. There are no labels on the electrons, of course, to differentiate one from the other. But the intent of the legislation, as I understand it, is that there would not be an obligation involving tax-exempt status that went beyond the requirement to serve the needs of the tax-exempt bodies, the public utility districts, municipal bodies, rural electric co-ops that would be involved.

Mr. OTTINGER. Do the rest of the panelists agree with that? It seems to me patently obvious the customers of the investor-owned utilities are going to get the advantage of price averaging here.

Mr. BARDIN. Mr. Ottinger, on the point about pooling in the case of the residential customers, if you look at the universe of the three classes of customers to whom Bonneville can now deliver, you have the public, the consumer-owner utilities; they enjoy the preference under this bill; you have investor-owned utilities who have been notified and are suffering curtailment of what they can take; you have customers who are suffering direct curtailment of what they can take.

There was a period in the past when Bonneville had an abundance of power available to supply all of these people. You are entering a period in the future of great uncertainty but clearly diimnished availability in relationship to growing demand. Now, what they are going to do over a period of years, as I understand it, is reduce the enjoyment of the pool of low cost hydropower by the direct industrial customers so that the residential load of the investor-owned utilities can continue to enjoy as long as possible that benefit, which is going to be enjoyed beyond the range of the consumer-owned systems in any event.

Mr. OTTINGER. That means that the investor-owned utility customers are going to get some of the advantages of Federal financing.

Mr. BARDIN. They now get it. They will continue to get it. It will be taken away more rapidly from these direct industrial customers, particularly aluminum companies, in order to retain such benefits as long as possible for residential customers in investor-owned systems as well as, of course, the residential customers of the consumer-owned systems, who, under the preference clause, have the first call.

Mr. OTTINGER. Mr. Canfield, how do you view this?

Mr. CANFIELD. I am almost as confused as the bill is. It is a difficult bill to read. If you go to section 6(c) it says: "If resources in addition to such resources are needed, then the Administrator shall require additional electric power resources, giving priority," et cetera, but he can acquire power resources.

Now you go back to section 3(j). " 'Resources' means electric power facilities that produce electric power"—I guess that means a power plant—"planned electric power capability of generating facilities,

 

whether operating or operable, electric power conserved," et cetera.

Then if you flip back to section 13(a), "The Administrator is authorized to issue and sell * * * bonds"—I guess revenue bonds—under certain kinds of conditions and through the Treasury, et cetera.

Now, as I read that, there is no conclusion on the question of whether or not you can buy these resources from investor-owned utilities. I would assume, as I read the legislation as it now stands, you could buy the resources from investor-owned utilities through the bonding process. If I am wrong, I will be happy to stand corrected, because I have to read three parts of the bill to get there.

Mr. MUNRO. This has to be read in connection with the Bonneville Power Act and Transmission Act, which are not amended in that respect by this proposed legislation, Mr. Canfield. We currently, of course, purchase power from investor-owned utilities. We would continue to do so.

I think what the legislation is proposing is authority to purchase from new plants built by investor-owned utilities or public agencies.

Mr. CANFIELD. Does not section 8, where it refers to section 11(b) of Public Law 93-454, amend the 1974 act? And down on lines 24 and 25 it says: "* * * to implement the Administrator's authority pursuant to the Pacific Northwest Electric Power Planning and Conservation Act," which, I believe, is the title of this bill. I guess we can look it up.

Mr. OTTINGER. Well, we are running out of time. You know, we have a public power authority in New York. We have a Federally licensed facility up on the Niagara River, and customers of Con Ed are trying to get some of that very cheap power. I wonder if we can get some of this very cheap financing, too.

I guess we have so many problems wrapped up here that I think to pass this at this point, Mr. Chairman, would be a tremendous mistake. I think we ought to hear from other parts of the country and see what parts of this could be applied nationally and, if any should be applied at all, make sure that the conservation measures that are put in are mandatory and not discretionary, and see that the public has a chance to participate at every stage. We should take a much closer look at this before we proceed.

Mr. DINGELL. We are going to try to process this legislation as fast as we can. We do have some difficulty in understanding and appreciating all the subtleties and trying to figure out what it does and how, and how it comports with the broad public policy in regard to electric utilities and that sort of thing.

The Chair has said on a number of occasions that I do recognize there is great need for legislation of this kind, and the Chair is concerned that we legislate prudently and well.

Gentlemen, the Chair apologizes to all of you. It will be necessary for us to go over and vote. We will return as punctually as we possibly can, which will be in 10 or 15 minutes. The committee will stand in recess.

[Brief recess.]

Mr. DINGELL. The subcommittee will be in order. Mr. Potter.

Mr. POTTER. Section 6 indicates you start with conservation measures and you go to renewable resource measures. If those two do not work,

then you go on to the next and presumably less desirable resource measures such as acquisition of thermal generation.

How long is it going to take you to put together the kind of information about what conservation measures are feasible and cost effective, as required under section 6(a)?

Mr. MUNRO. We think we could make a determination very fast that some measures would be immediately effective. Mr. Potter, including retrofit of existing housing and other structures for weatherization. The formulation of a regional plan in the consultative process that is described in the bill, we think, will take a longer period of time.

Mr. POTTER. About 2 years?

Mr. MUNRO. About 2 years, we indicated, roughly speaking, in our answer to the written questions. Therefore we hope that we would not be prohibited from going forward immediately with some cost-effective conservation measures while the regional plan is devised.

However, we have also suggested that we think the consultative provisions of section 6(g) of the bill should be applied not only to the acquisitions that might occur in the thermal area but also with regard to any acquisitions of resources, including acquisition of resources for conservation purposes on a long-range conservation program.

Therefore the regional plan would be devised through the full public involvement process, involvement of personal consultation of the Governors and the regional councils that are proposed to be established in the bill.

Mr. POTTER. Do you have any idea of the magnitude of conservation resources you are likely to be able to turn up in short order, as you indicate?

Mr. MUNRO. We made an estimate that if we were to retrofit every cost-effective residence in the region—for example, weatherization retrofit—that we would be able to achieve a saving of the equivalent of half of a large thermal plant, say 500 megawatts, by that kind of investment—and we believe that would be a more cost-effective investment than the investment in the generating capacity.

Mr. DINGELL. I concur fully in your judgment. I happen to think that the idea of an areawide plan is probably a good thing, but can you tell me what conservation measure, Mr. Munro, other than insulation would you look into before you go to construction of new facilities or buying power?

Mr. MUNRO. Mr. Chairman, in regard to residential applications, in addition to insulation and retrofit. I think we would have to look at temperature-setback devices, appliance-efficiency devices, water-heater controls, that type of installation, as possibly cost-effective investment as a means of saving more than by investment in alternative generating capacity.

Mr. DINGELL. Now I have two questions. One is, first of all: Could you submit to us a more carefully thought-out list? I am catching you here standing on one foot and I think you need more time.

Mr. MUNRO. Yes, I could supply a longer list of things that we think would have to be looked at.

[Testimony resumes on p. 154.]

[The following material was received for the record:]

## CONSERVATION MEASURES OF BONNEVILLE POWER ADMINISTRATION

*Request.* A. List of conservation measures BPA would consider under the authority of section 6(a) of H.R. 13931 and estimates of the costs of those measures, and other mechanisms BPA would use to achieve conservation. (Pollock)

Answer. The following discussion, in providing the information requested, presents a preliminary perspective of how BPA would approach the energy conservation responsibilities of H.R. 13931. The spirit as well as the letter of this legislation mandates effective participation in major decisions by the region's ratepayers, the states, local communities, utilities, environmental and other interest groups, and the public at large.

In formulating conservation programs, we would want and need the full benefit of this public input, which would undoubtedly improve and refine these preliminary thoughts on implementing conservation provisions of H.R. 13931.

### MEASURES

We would consider all conservation measures which have a potential to reduce electric power demands in the region. A variety of measures have been suggested in regional work done to date by others and we would examine these ideas carefully. This earlier work includes:

a. A 1977 Skidmore, Owings, and Merrill (SOM) report commissioned by BPA.

b. The 1978 energy conservation report of the Northwest Energy Policy Project commissioned by the Governors of the four Northwest states.

c. The "Alternative Scenario" proposed by the National Resources Defense Council (NRDC) in 1977 for inclusion in the draft "Role EIS".

d. The August 10, 1975 report by the General Accounting Office addressing electric energy options for the Northwest.

A preliminary list of specific measures we would consider is attached.

### EVALUATION AND PROGRAM DEVELOPMENT

Preliminary analysis of conservation measures would be conducted to determine their engineering feasibility, technical potential and economic costs. The engineering feasibility studies would examine the technical features of the resources and identify potential problems of each. Research on the technical potential would estimate the total electric energy savings if the measure is implemented throughout the region. The next step in the evaluation process would be to assess costs.

The preliminary analysis would identify the potentially attractive energy conservation technologies. Programs by which the Administrator will finance or encourage the implementation of these technologies would then be developed. The programs would be subjected to economic and environmental analysis to determine their costs and benefits and determine their impact on the ultimate consumers of electricity, utilities, Bonneville Power Administration and other public bodies and economic markets. In addition the economic/environmental analysis, major new conservation programs would be examined from other standpoints, including timeliness, reliability, compatibility with other programs and operations, customer and utility acceptability, and complexity of implementation and management.

After consideration of these and possibly other criteria, programs which are found to be feasible and cost-effective would be proposed for implementation.

### COSTS

Proposed conservation programs would be included in the regional power planning program required under provisions of HR 13931. The costs of these programs will be determined as part of the evaluation process described above. It is, therefore, difficult to estimate these costs now not knowing precisely what programs would be proposed. Nevertheless, there are certain investments in conservation that are appropriate for budgeting purposes even though more detailed studies have not yet been done.

Specifically, a regional insulation program for residences served by BPA utility customers is expected to be feasible and cost-effective. Further, enough is known about the costs of such a program to estimate expenditures of $275 million over the five-year period FY 80 through 84.

In addition, many recent studies have estimated that there are as many or more opportunities for cost-effective conservation in the commercial, industrial, and agricultural sectors as there are in the residential. About 55% of our regional electric power consumption occurs in these other sectors, thus, we anticipate substantial expenditures and energy conservation accomplishments. Specific commercial, industrial, and agricultural programs have not been developed. However, programs would probably include, for example, efforts to improve efficiency of heating, ventilation, air conditioning, lighting and appliances similar to those contemplated for residences.

It is difficult to estimate the cost of commercial, industrial, and agricultural measures to be undertaken as well as residential measures other than weatherization. Some recent studies have estimated that by 1985 as much as two billion dollars could be invested in cost-effective conservation measures in the region. We are not prepared to support such estimates without much further study, but do believe it prudent to budget substantial sums for programs to be undertaken in FY 82, 83, and 84. Our estimate of $550 million for other conservation programs (in addition to residential insulation) is tentative but should give us a sufficient base of funding to make substantial conservation progress.

MECHANISMS

BPA would use a range of mechanisms to achieve conservation, including information programs and incentives to encourage others to adopt conservation measures, as well as programs to increase the energy efficiency of its own facilities and activities.

Information programs would be designed to result in conservation by making energy consumers and other decisionmakers aware of the benefits to them and to society of the adoption of conservation measures. Information programs can be direct or indirect, depending upon whether they are designed to inform those who could actually adopt conservation measures, or those who could take some intermediate action which in turn would result in the adoption of conservation measures. Conservation information programs include formal conservation education, in which information is "packaged" for ease of understanding and assimilation and presented to specific audiences in a structured manner.

BPA would probably develop and implement relatively aggressive information programs such programs may be the only appropriate way for BPA to influence the adoption of some conservation measures. These programs could include acting as a clearinghouse for conservation information, actively seeking, collecting, and analyzing information developed by others; developing significant conservation infomation directly through internal studies, various pilot programs, and R&D contracts; developing effective means for distributing conservation information to BPA customers, ultimate consumers, and other decisionmakers; and supporting the conservation information programs of other public agencies and other groups. Means of distributing conservation information could include some or all of the following: TV and radio spots; films, newspaper articles, columns, and ads; workshops and conferences; briefings and technical assistance to state and local governments, businesses, and interest groups; and public service programs such as infrared flyovers, ground-level follow-ups, etc. BPA also intends to consider the development of conservation curricula and educational materials and the active support of others' conservation education programs.

Incentives would be designed to result in conservation by providing economic encouragement for adoption of conservation measures. BPA would develop and implement strong incentives for conservation, designing its incentive programs to reward the adoption of beneficial intermediate actions or conservation measures, but to minimize penalties on consumers who have made decisions in the past based on lack of reliable information and on groups which are least able to bear hardships imposed by severe penalties. We would evaluate the use of wholesale power rates, review of BPA customers retail rates, allocation of federal power, conservation provisions in contracts with customers and vendors, and financial assistance for adoption of conservation measures. Forms of financial assistance, including some investments under provisions of HR 13931, to be evaluated would include loans, grants, purchase-lease, deferred payment, and other programs aimed at BPA's customers as well as directly at ultimate consumers.

We would not be likely to propose mandatory programs requiring conservation measures to be adopted by ultimate consumers. In general, these types of pro-

grams are more appropriate for state and local government and in some cases Congressional adoption (e.g., building codes and appliance efficiency standards).

BPA could, however, require as part of its power allocation process or in its power sales contracts that its customers take certain conservation actions. We might also devise a plan where our customers are credited in their power purchase transactions for progress toward a standard of efficient electricity use. This would provide an incentive for adoption of conservation programs by our customers as well as state and local government.

In addition to these mechanisms, BPA will continue to conduct engineering and economic studies to identify ways of reducing regional power system losses, particularly transmission losses. Our existing facilities, includng BPA buldings and vehicles, will be operated in the most energy efficient manner, and our new facilities will be designed to reflect cost-effective conservation technology.

Decisions on which specific mechanisms BPA would actually use to achieve conservation would be the product of many considerations; applicable statutes and regulations, the public involvement processes which are a fundamental ingredient of H.R. 13931, and findings regarding feasibility and cost-effectiveness.

### Preliminary List of Conservation Measures BPA Would Consider

#### 1. RESIDENTIAL—END USE

Thermostat temperature set-ups and set-backs.
Insulation/weatherization retrofit.
New thermal construction practices.
Increased appliance efficiency.
District heating.
Increased lighting efficiency.
Solar water heating.
Solar space heating systems.
Wind generation.
Renewable fuel space heating.
Geothermal space and water heating.
Reduced hot water use and temperature.

#### 2. COMMERCIAL—END USE

Thermostat temperature set-ups and set-backs.
Reduced lighting levels.
Improved HVAC systems and controls.
Insulation/weatherization retrofit.
New thermal construction practices.
Solar space heating and cooling systems.
Solar water heating.
Total energy system applications.
Heat pump.
Reduced hot water use and temperature.
Wind energy systems.
Waste heat recovery.

#### 3. INDUSTRIAL

Cogeneration.
Recycling.
Low-cost "housekeeping."
Waste heat utilization.
New process technology.
Solar and geothermal space/process heating.
Matching motors to loads.
Power factor correction.
Increased lighting efficiency.

#### 4. IMPROVED TRANSMISSION SYSTEM OPERATIONS

Higher voltage.
Reconductoring.
Added series compensation.
Inter/intraregional diversity capacity exchange.
Energy storage sytems.

 

5. IRRIGATION

Pump efficiency testing.
More efficient irrigation methods.
Solar or wind irrigation pumps.

Mr. DINGELL. Could you indicate to us the mechanism which you would use to bring about the kind of conservation—in other words, under this bill—and I don't read it into the bill—do you have statutory authority to enforce that kind of practice or do you need it?

Mr. MUNRO. We believe this bill would give us the authority to make the investment in conservation, Mr. Chairman.

Mr. DINGELL. What I am trying to figure out is: If you talk about insulating a man's house, how would you make him insulate it if he doesn't want to? If you talk about a more efficient water heater or temperature-turndown devices or thermostats, or if you are talking about appliance efficiency, how will you achieve that in a free society without some kind of statutory authority or rule-making to finance it?

Mr. MUNRO. We think it is intrinsically attractive to that person you are talking about, the home owner or occupier, if he or she does not have to pay for it, if it is on an interest-free loan basis even. The extra comfort, the extra value, that is associated with that investment, we think, will gain the cooperation of people.

Now, this is already a process that is going into effect in the Northwest under the auspices of investor-owned utilities. Our public body customers, Mr. Chairman, are prohibited from doing that because of provisions in the State constitutions that prohibit lending the credit of the State. We believe that, under the authority such as is contained in this bill, we could help them implement programs of that nature.

Mr. DINGELL. Let me deal very frankly with you. You remember, when we had the conservation section of the President's program before this committee, there were great differences which resolved around the fact that one person would be compelled to insulate another person's home or pay for the efficiency of a water heater or something of that kind. The chairman of this committee and many of my colleagues felt that a rate-basing mechanism was incorrect. Would you do it through the rate-basing mechanism?

Mr. MUNRO. I don't rule out the use of the price mechanism at all, of using our rates as a way of helping encourage our utility customers to apply at the retail level ratemaking that will make the proper signals to consumers.

What I am talking about here with regard to conservation investment, however, is an investment that we would make on behalf of all the consumers of the region just as an investment would be made in generating capacity. The alternative investment here would be made in the conservation measures themselves and they would be paid for, in effect, by all of the consumers.

Mr. DINGELL. Then you are talking about including this in the rate base, are you not?

Mr. MUNRO. Yes.

Mr. McISAAC. The circumstances here, Mr. Chairman, are that if Bonneville were to have, as we have suggested, a statutory limit of some form on the borrowing capacity and authority to make investments in conservation programs as opposed to investment in generating facilities, which the administration does not want Bonneville to

 

make, then the interest cost presumably at triple-A bond rates which would be incurred in servicing the debt for conservation investments would be spread over the rate base. You are absolutely right.

The rationale for spreading such interest cost over the rate base, which would include spreading that interest cost to those who might not participate directly in the program, is that it is the alternative to building new thermal generating facilities. Coal-fired plants at 36 to 40 mils per kilowatt hour or nuclear at some equivalent cost range would cause a larger increase in the rate base than this investment in conservation.

Mr. MUNRO. I am sorry; I missed the import of your question. We don't have a rate base in the sense of investor-owned utilities having a rate base as a starting point for measuring return on investment. I missed the fact that that is what you were driving at. Bonneville's own rate structure, I assume, would be built into the rate structure and paid for by the consumers.

Mr. DINGELL. It would?

Mr. MUNRO. Yes, sir.

Mr. DINGELL. Then you solicit authority for something which the Congress has expressly said you could not do under the energy proposal of the President which said that these things cannot be rate based.

Mr. MUNRO. Mr. Chairman, I don't believe the legislation that you refer to has been approved by the Congress. I am not intimately familiar with the current status of it but I have an understanding, not specific, that there have been some proposed adjustments in regard to this legislation as it stands in conference. Previously there was the grandfathering in of programs already in existence.

Mr. DINGELL. We have a grandfather clause which we reluctantly agreed to. You see, that is our problem here. Let us say you insulate your house and I don't. Under the way you are talking about I can come in and get a free loan and you are compelled to pay the cost or a goodly portion of the cost of my insulation of my home.

Mr. MUNRO. That is correct.

Mr. DINGELL. I have some difficulty justifying that.

Mr. BARDIN. May I address that, Mr. Chairman.

Mr. DINGELL. Surely.

Mr. BARDIN. Since the hearings on the National Energy Act before this committee in this very region the commissioner of public utilities in the State of Oregon has reviewed after public hearing a proposal to engage in that kind of program presented to him by the Pacific Power & Light Co. The fact pattern analysis I think is highly relevant to the question you raise.

Mr. DINGELL. If I am in error I want to know about it.

Mr. BARDIN. The Pacific Power & Light Co. reported to the commissioner that they had literally thousands of situations in their service area in Oregon where they could save money for the other customers on the system by putting forward credit, in this case an interest-free loan, until the house was sold, whether that would be 2 months later or 20 years later, to retrofit, to insulate houses, thousands of houses in their service area. By doing that they were going to save enough electricity to be able to defer the construction of the

next thermal generating plant to the benefit of all the remaining customers.

Now if you have a program like that here in the Pacific Northwest, and I must say you have analogous situations elsewhere, but if you have that kind of program it may answer the concerns that you have raised while meeting the needs in this region. The needs are particularly acute in the Pacific Northwest or in any area where the price of residential power is very low. So that there is a disparity between the benefit that the homeowner realizes, selfishly and immediately by conserving, by retrofitting with insulation, and the benefit that the region realizes, the total conglomerate utility investment realizes, by deferring that much higher cost of thermal investment.

Another way of putting it is that our residential rate does not and frankly cannot, with or without this bill, reflect the cost of a new thermal powerplant. Under basic utility ratemaking principles the residential rate will be lower, based on the average cost will be lower than the cost of the new thermal plant. So that you achieve the balance of what you are trying to do if you will allow the utility to go forward and put forward capital for retrofitting. That could be an investor-owned utility as in the Oregon Commissioner's case. What is proposed in this bill is to allow the Federal umbrella for the power system to be the financial vehicle which solves the constitutional problem for the municipally-owned utilities as well as have a source of finance for the investor-owned utility.

I suggest going a step further and building into the program, in addition to the carrot of financing for the homeowner, the actual stick of appropriate discipline through a surcharge of some similar mechanism by which the Bonneville Power Administration in its wholesale contracts, using contract power, not police power but contract power, would press the purchasing utilities to participate and to impress upon their customers the need to participate in this kind of program as well as the inducement of participating in this kind of programing.

Mr. McIsaac. Further to Mr. Bardin's comment, if I may, you asked at the outset of the question and answer period whether or not we had any observations in regard to each others' testimony. Mr. Canfield earlier had said that one of the principal methods of making an inducement to achieve conservation is to bring utility rates for marginal needs for power up to the marginal cost of the production of such power. I might say, being the official responsible for the operation of the Federal Power Marketing Administration, that I know of no way that comes readily to mind to determine what is an appropriate judgment of the marginal cost of electric power short of building the facilities to produce such power, incurring the costs and then determining what those costs will be as you spread them around.

An appropriate conservation program to me is one such as we are trying to map out here where we have certain carrots, we spread the costs of those carrots across the entire, you say, rate base—Mr. Munro referred to it has rate structure—then you have certain sticks, penalties of some form which can be imposed through the rate structure mechanism for nonparticipation or nonperformance in conservation measures. It seems to me that this legislation permits an approach of that type to be worked out in an area of the country that does, as in some

other areas of the country, benefit from extraordinarily low electric power rates.

Mr. DINGELL. Gentlemen, the Chair is going to yield back to counsel.

Mr. POTTER. I want to pursue this a little further not so much in the line of what kind of authority you should have but what is going to happen, at what point, assuming that the regional load goes in the order of, I think you projected 3.4 percent. When are you going to need your first increment of power beyond that which is already under construction?

Mr. MUNRO. That is the current load forecast of the utilities, Mr. Potter. If that forecast turns out to be accurate, then the current schedule of construction for new generating capacity would not be adequate to meet that great a load growth. I do believe that the application of the kind of conservation measures that would be possible under this legislation would reduce that load growth rate. I can't tell you how much. I think it requires the application of these measures and the monitoring of the results in order to really determine what we can get out of conservation measures.

Mr. POTTER. Sterling, let me say the problem I have is this.

Assuming that this bill passes, or something like it passes, say either this year or early next year, I am concerned that you, vested with all the majesty and power that this bill will create, are going to be the target of a lot of people coming up to you and saying, "We are going to build a plant and we are going to do it now," you have authority to require conservation measures and that is nice, you have authority to require construction of measures to use renewable resources and that is nice, but that is some time down the road. We are going to have to make a decision right now. I am looking for some help from you about the nature of the speed with which these nonthermal resources can be deployed and the ease with which you are going to be able to fend off the people who are going to be after you to buy into their particular project.

Mr. MUNRO. Let me say that under the terms of this bill, since I have indicated that it would take us at least 2 years in order to develop a regional plan that is mandated by the proposed bill, we could certainly obviously make no commitment with regard to the purchase of new resources in that 2-year period. This is because in the existing legislation it requires that the regional plan be completed before one could make any commitments in that regard.

Mr. POTTER. So you have a 2-year breathing time?

Mr. MUNRO. We are suggesting also that it not only be those kinds of commitments that are meeting the test of public involvement and consultation and the regional plan but all of the commitments that might be made by the Bonneville Power Administration and that the regional plan itself must be devised and presented to the Congress. I have also suggested my own concern and dissatisfaction with the provisions in the bill for congressional review because a provision that only requires that you be advised and that it lay on the table for 90 days is hardly a procedure, and that is all that is in this bill. I suspect the Congress may very well wish to have more specific review procedure than that.

Mr. CANFIELD. Mr. Potter, let me make a technical point because I don't think it is all that technical when you realize the implications

42-650—79——12

 

of it. Again you have to keep flipping back and forth. The Administrator shall conserve power by measures that he determines are feasible and cost effective. That is in section 6(A). Then you look at section 3(C), it says:

Conservation measure or a renewable waste heat or cogeneration resource application is "cost effective" if it results in costs to the Administrator greater than the cost of the least cost feasible alternative resource * * * that the Administrator determines is or can be available for acquisition.

We have already noted that resource includes the acquisition of thermal powerplants. We have suggested language here in my statement; it says, "We recommend that legislation specifically point out the cost effective comparisons," meaning cost comparisons at the margin, "And should include environmental and social costs where practical." We have specific language, "Cost effectiveness should be determined by comparing on a life-cycle basis the unmelded cost of generating, transmitting and distributing electricity from new thermal supply sources with the cost of energy conservation and, or renewable resource alternatives.

Environmental and social effects should be included when they can be quantified. What is important about that is that if you read section 3(C) and I am not disagreeing with Mr. Munro in what he is saying, I am saying what this legislation says, if you read it here, the "least cost feasible alternative resource" to him may well be a powerplant that comes on line that is either built by, and again he says he is not agreeing with that part of the legislation, BPA or is guaranteed through the financing authority that we talked about earlier. That is then melded into the overall cost of the Bonneville system which would be considerably less costly than any conservation opportunity that you might be able to find. That is something that you ought to be very specific about.

Mr. McIsaac. I think the administration and Mr. Munro would agree with Mr. Canfield's observation and the language he suggests.

Mr. Canfield. The language is poor because it states that you can buy another powerplant and plow it into the cheap base and that will be the least cost alternative. Conservation and renewable sources are not going to stand a chance in hell.

Mr. Dingell. As I gather, Mr. McIsaac, the administration is agreeing with the suggestion made by Mr. Canfield?

Mr. McIsaac. It is on this matter of what constitutes cost effective base comparison with conservation measures, yes, sir. We have not explored this language specifically in the administration.

Mr. Munro. Mr. Canfield is pointing out what should be accomplished here. If the language that he is suggesting accomplishes that we certainly endorse the thrust of that language. We should be making these comparisons using marginal cost principles as a basis of comparison. We should be using life of plant as comparison. We should be using, for example, differences between conservation and generating capacity in this respect. Conservation normally would not require any distribution system, therefore we should take into account what costs would be associated with an alternative generating plant in delivering that electricity to the market.

Mr. Dingell. I think those are helpful suggestions.

Mr. McIsaac. Mr. Chairman, I believe you were out of the room when I was reading my statement. One of the positions that the administration has taken is that we should get a clarification of this language. I believe Mr. Canfield's clarification is appropriate.

Mr. Dingell. I thank you for that. That is very helpful to the committee. As you know, we are anxious to be helpful on this bill but I have a number of things that concern me about it.

I observe here in the questions that were directed by me to the Bonneville Power Administration on September 8, 1978, the question was as follows: "2(C). We note that the provision of sections 5 and 6 except for 6(C) in the Senate bill do not appear to require the carry-out in accordance with such a problem"—this referring to a program that would be put in place by the administration.

Should not the bill provide that the authorities in these sections be utilized only in accordance with such program, particularly in the case of all of the provisions of section 6 of the bill?

Answer, such a requirement would be inconsistent with those purposes of the bill which require immediate implementation. For example, the bill sets a deadline of July 1, 1979, the exchange provides rate relief for residential and small farmloads of investor-owned utilities. In addition BPA should not be required to defer action on conservation or renewable source supplies pending resolving of a regional power plan and conservation program.

That is at variance with what you said in response to a question by Mr. Potter. Will you tell me which of those two I should believe.

Mr. Munro. I don't think it is inconsistent. I should like to clear up the inconsistency if there is one. I believe we should go ahead with conservation immediately because that is the cheapest resource that is available and one should not have to make a finding to that effect through the 2-year process.

The other measure that is involved here is merely a bookkeeping exchange, not the creation of any new electrical resource, and the intent of the bill obviously is that bookkeeping exchange and the benefits from a rate standpoint are to occur at a date certain in the bill, July 1, and therefore the suggestion would be inconsistent with the legislation.

Mr. Dingell. Will you be able to meet that July 1 deadline?

Mr. Munro. It all depends on when the legislation is enacted, Mr. Chairman. I assume it was drafted in the context of enactment during this Congress. Therefore, under those circumstances the deadline could be met.

Mr. Dingell. Doesn't the plan require that you look not only to conservation but the best conservation program that you can come forward with and doesn't this require that the plan should look at that too?

Mr. Munro. I believe that is looking to the provision for new capacity.

Mr. Dingell. One element of that is the question of rate, is it not? Doesn't rates that fairly represent costs send a signal to the purchaser of electricity power?

Mr. Munro. Certainly.

Mr. Dingell. If you are going to redo your rate structure how will you be sure if you do it in haste without consideration of other matters that you have not afforded a signal, which may or may not be correct, to the ratemakers, industrial, residential, farms, and so forth, which

may not fully represent the judgments that you will ascertain are necessary in regard to the plan which you will be shortly thereafter bringing forward?

Mr. MUNRO. Mr. Chairman, we are presently giving a signal to our customers, in the form of a rate increase to be effective in December 1979. We have currently involved in our public involvement program a tentative proposal for the implementation of an increase the result of which must be to increase our revenues by an average of 92 percent. That signal will be going out regardless. That is an obligation we have in order to meet all of our costs.

Mr. DINGELL. You are not going to increase your costs 92 percent as of that date.

Mr. MUNRO. That is in contemplation of all of the cost impacts of what we are doing, Mr. Chairman, yes. That increase in revenues is required in order to meet our obligations.

Mr. DINGELL. You mean to say that on December 1 you are going to send out to all categories of ratepayers a 92-percent increase or you are going to increase?

Mr. MUNRO. That is the average. It is December 1979, Mr. Chairman, not this year, the deadline for completing that revenue increase.

Mr. DINGELL. The Chair will yield to Mr. Finnegan.

Mr. FINNEGAN. To follow up on the point the chairman was raising and the relation to the question of conservation and the way it was used in the bill, two terms are used, one is the term "conservation" as defined on page 3, "means any appropriate improvements in the power system or investment which increases the efficiency production or use." Then you talk in the net subsection in terms of "conservation meaures." "The conservation measure" term is used in section 6(A) of the bill.

What is not clear though is when you talk about a conservation program and plan it apparently is only a conservation program plan regarding the power system or investment which increases the efficiency of energy production and use and does not look at all conservation measures as part of that plan to see what should be done and be considered by you prior prior to using your other authorities in section 6. Will you comment on that?

Mr. MUNRO. Is there an ambiguity in that regard, Mr. Finnegan? I hope you would clear it up.

Mr. FINNEGAN. You intend that the program and plan cover everything as far as conservation?

Mr. MUNRO. Yes, sir.

Mr. FINNEGAN. That leads me to the next question. If that is true should not that program and plan be in place or be developed before you go to utilizing these other authorities that get you beyond conservation into exchanges, into purchases of power, into the acquisition of resources some of which resources are renewable resources and so forth?

Mr. MUNRO. We have suggested it should with regard to new resources, yes. The exchange does not involve a new resource.

Mr. FINNEGAN. What about the purchasing authority?

Mr. MUNRO. Yes; with this exception. I don't think we should be required to wait with regard to conservation investment, possibly even

renewable resource based investment. I think we should attempt to get some action underway with regard to those priorities.

Mr. FINNEGAN. All of those are aimed at providing greater capacity, more reliability and more power?

Mr. MUNRO. That is correct.

Mr. FINNEGAN. The questions come about, should you do that until you get all the conservation, total program or plan developed to see what is the best steps to take? Otherwise it sounds like you are going ahead of that in a hodgepodge circumstance and I think that is what the chairman is talking about.

Mr. MUNRO. Only with the exception of conservation. I agree with you, with the exception of conservation. I think we should implement conservation immediately. We will not have devised every means of doing so but we should get started.

Mr. FINNEGAN. You mentioned insulation and thermostats. A lot of those things, except insulation, you really have no control over, on the TV very little control.

Mr. MUNRO. We would have control in the sense of investing in it. We are not advertising asking people to do this.

Mr. FINNEGAN. Investing in insulation but other measures you listed such as thermostats, covering water heaters and so forth, those are things that you really don't have much control over. You can tell people it is a good idea to do it.

Mr. MUNRO. We conceivably could, I suppose, if that were a cost-effective investment, we could actually install what you are talking about.

Mr. BARDIN. As I recall the decision of the Oregon Commissioner, it specifically covered the insulating blanket around water heaters, for example. That is a time-proven, cost-effective means in every region of the country including the Pacific Northwest for insulation results. I would hope that that would be an area in which Bonneville could plunge in immediately with online adjustments during the 2-year planning period. You are talking about a diffuse program where thousands of people throughout the region have to accept changes in their home and the implementation has to be done in thousands of separate cases.

In order to make that kind of program we ought to be starting right away.

Mr. FINNEGAN. You are suggesting Bonneville go ahead and do this, using the authorities that they have under this bill as amended under existing law plus this bill which includes the use of the bonding authority and they can use the revenues from bonds to go out and pay for people's insulation and pay for the covering of their water heaters and whatever, which then gets you back to the Treasury picking up the tab for these people. That is the point the chairman was getting at. It is almost the same thing as rate basing.

Mr. BARDIN. I don't think I fully answered Chairman Dingell's point on that. At least the way the Oregon Commissioners have approved the Pacific Power and Light plan after public hearings out there, the utility is not ultimately paying that consumer's cost of insulation. It is a loan program, not a grant program. Now I would be prepared to argue for a grant program in some factual circumstances where the generality of customers are deriving net benefits.

Mr. FINNEGAN. It is a loan program.

Mr. BARDIN. The Oregon program is a loan program. It takes care of the homeowner's program of front-end money. It gives life cycle costing annualized and that loan must be repaid at the time the house is sold. In effect it is an extra lien against the home, Mr. Chairman, and if it would be useful we would be happy to supply the committee with copies, detailed copies, of the plan and of the Oregon Commissioner's order.

Mr. DINGELL. That would be useful.

Mr. FINNEGAN. The loan program in the present bill, the way the bill is drafted—this is section 6(A) again which provides for financing residences for insulation—again there is no provision in the bill, if it is for loans, there is no provision for stating what the interest rate will be, the terms of the loan, or anything, of the things even comparable to what you are doing in Oregon.

Mr. MUNRO. The industry alone by definition would not have an interest rate attached to it.

Mr. FINNEGAN. But you can't decide that now, that is the point.

Mr. MUNRO. I don't believe that in borrowing from the Treasury at interest rates that are determined to be comparable to marketplace interest rates is the Federal Government picking up the tab as you indicated earlier?

Mr. FINNEGAN. You are going to use the revenues from those bonds, or you could.

Mr. MUNRO. These are revenue bonds and they would be repaid by our customers and be a part of, as the chairman indicated, our rate structure.

Mr. DINGELL. I have a real curiosity about this. Can you tell us how much of those bonds in terms of dollar amount will be issued and what will be the repayment schedule? Will they be callable prior to the maturity date and if so, under what conditions? What would be the interest rate on the bonds? What would be the protection of the taxpayers in the event there was a default on the bonds? What would be the protections that would be assessed in the event that the facilities which would be constructed, the generating facilities, were to, let us say, go sour and not produce power? That is a matter of great concern to me.

Mr. MUNRO. Mr. Chairman, in the context of the conservation investment we are talking about——

Mr. DINGELL. Let us talk conservation investments first and talk construction second because I am troubled by both. What is the amount of bonds you propose to issue to accomplish this end?

Mr. MUNRO. Our current limitation on the issuance of bonds is $1,250 million. That is in the existing law. This bill puts no ceiling on it. We have already testified we believe at a minimum you should follow the Budget Control Act procedures in establishing ceilings on the bonding authority.

Mr. DINGELL. That is not in the legislation.

Mr. MUNRO. Not in the legislation, no, sir.

Mr. DINGELL. It strikes me it would be good policy to have such a limitation.

Mr. MUNRO. Yes, sir.

Mr. DINGELL. Can any of you gentlemen down there guide us as to what that limitation should be as regards first the conservation provision and second, the construction provision?

Mr. MUNRO. Mr. Chairman, I would have to go through the budget process before making any commitments as I interpret the legislation of this kind and therefore we would at that point provide an estimate of what we propose to do in conservation, for example. If that required an increase in the ceiling we would have to request an increase in the ceiling, therefore, the Congress would act on it at that time.

Mr. DINGELL. Can you give us any appreciation of what that is at this time or whether you have made any scrutiny of it?

Mr. MUNRO. We could give you some estimates based on the study we made of the insulation program proposal, the weatherization program.

Mr. DINGELL. Would you do that?

Mr. MUNRO. Yes, sir.

[The information requested was not available to the subcommittee at the time of printing:]

Mr. DINGELL. You see, I have some real problems with authorizing broad borrowing programs without an idea how much it is going to carry us through. We have if I recall correctly $160 billion worth of Government guarantees outstanding at this particular minute and there are folks running around here trying to get additional Federal guarantees; $160 billion is about one-third of the national debt.

Mr. MUNRO. Mr. Chairman, I see no guarantee in this as I have indicated before. It is not in the same category I think as you are referring to.

Mr. DINGELL. Let me come around to that particular point because that is a matter of some concern to me. You and the Treasury seem to have a different view. Treasury says the major concern with sections 6(A) and 9 is that they will result in Federal guarantees of tax debt obligations issued by State and local government.

Mr. MUNRO. That is with respect to the other kind of financing, Mr. Chairman under which facilities would be constructed by other entities, not the Bonneville Power Administration. This does not refer to our Treasury borrowings. I think if there is any ambiguity in the bill, as Mr. Canfield suggested, indicating it intends to authorize us to make investments in the construction of generating facilities, that should be eliminated. If there is any indication that we would be authorized to borrow from the Treasury in order to do so, that should definitely be cleared up.

Mr. DINGELL. It is a matter of concern to me. Let me read on here.

> Section 6(B) would authorize Bonneville Power Administration, BPA, to contract to purchase electric power resources from non-Federal entities which would include State and local governments. Private holders of State and local bonds issued to construct electric power facilities could be guaranteed that the Federal Government will provide funds to pay off the bonds.

Now, is that correct or not?

Mr. McISAAC. Mr. Chairman, the administration testified that we would like to have section 6(D) struck from the bill.

Mr. DINGELL. That is 6(D) as in dog.

Mr. McIsaac. Yes; that covers construction and operation of generating facilities of any type. I think the issue you are talking about is solely that of what is the requirement on the Federal Government under purchase power contracts.

Mr. Dingell. Remember, the Treasury here is complaining about 6(B) in their comments. Now you have said that 6(D) be stricken but they are protesting 6(B). They also talk about 6(F) and 8 and 9(E), which I would like to address at the appropriate point. But your response to their distress appears to be to strike the section other than that about which they complain.

Mr. McIsaac. 6(B), as I understand, authorizes the Administrator to acquire additional resources, that is, the capability to produce power, or power itself to meet the obligations of the Bonneville Power Administration to serve its customers.

Mr. Dingell. Let me read the definition of resources here so that we know where we are going. It is in there and it is on page 4 of the bill at the bottom of the page. It says:

> (j) "resources" means electric power facilities that produce power, planned electric power capability of generating facilities, whether operating or operable, electric power conserved, and measures to conserve electric power.

Mr. Munro. The one area of the bill where the Bonneville Power Administration should have authority to acquire and own electric power generating capability is in the limited area of small applications. The specific example was given of a combustion turbine generator for the purposes of assuring transmission system reliability. In other words, we have an island which is served by underwater cable. The cables have a tendency to get entangled with the anchors of vessels. When it comes time to provide additional service to that island we believe it might very well be more efficient to do it with the installation of generating capacity of small capacity and nature on the island itself. In other words, the administration asks that everything in this legislation that authorized Bonneville to actually acquire and own power generating facilities be eliminated.

Mr. Dingell. I applaud your intention. I have some curiosity whether your intentions and the language of the bill are the same. When we refer to resources it says:

> * * * electric power facilities that produce electric power, planned electric power capable of generating facilities, whether operating or operable, electric power conserved, and measures to conserve electric power.

That goes back to the guarantee provision or the other provisions to which I have been alluding in section 6.

Mr. Munro. Therefore you may wish to put in that section with regard to the acquisition of any facilities that produce electricity, it could be defined to show the limitation, I believe, Mr. Chairman.

Mr. Dingell. Am I unfair in gathering from this the impression that this affords you rather more sweeping authorities than those which you have been setting forth in your testimony?

Mr. Munro. Yes, sir.

We set forth in our testimony the fact we believe the bill should be amended in order to meet these limitations.

Mr. Dingell. My comments are not hostile. I am trying to figure out what this does so that we can work together and get you a bill so

that I don't get my tail feathers scorched when I go to the floor. Under this language could Bonneville buy nuclear powerplants?

Mr. MUNRO. No, sir.

Mr. DINGELL. Why would you say no?

Mr. MUNRO. If you limit it as we have requested, Mr. Chairman——

Mr. DINGELL. I am speaking of the language of the bill.

Mr. MUNRO. We are not interested in having an authority to acquire nuclear plants.

Mr. MCISAAC. The language of the bill would give Bonneville Power Administration the capacity to construct and operate nuclear plants.

Mr. DINGELL. It would also give you power to buy plants that are already in being and not generating, or plants that are in being and are generating.

Mr. MCISAAC. Yes, sir, but we oppose that. We don't believe Bonneville Power Administration knew it would be given authority to operate a plant.

Mr. DINGELL. Then I suggest you are suggesting amendment of this language.

Mr. MUNRO. Certainly. That is specifically in our testimony, Mr. Chairman.

Mr. DINGELL. Let me go on here because the Treasury has some other concerns here that I am troubled about. They indicate and they say:

> Thus, private holders of State and local bonds issued to construct electric power facilities will be guaranteed that the Federal Government will provide funds to pay off the bonds.

Are they correct or incorrect in that apprehension? That is in their testimony at page 1, the last three lines.

Mr. MCISAAC. Mr. Chairman, the Department of Energy agrees with the administration position taken by the Treasury that we should not have dual authority. We should not have two guarantees.

Mr. DINGELL. Gentlemen, I want to say that if my comments appear to be hostile and critical, they are not. I would like to get counsel here to go through the fashion in which this could work by reading the existing law together with amendments which will be proposed here. At this time I yield to Mr. Finnegan.

Mr. FINNEGAN. Mr. Munro, I think if you will look to page 15 of the bill, section 8(A), it amends Public Law 93-454 by adding a new paragraph 12. The particular section amends section 11(B). Section 11(A) of that act, which of course is the Federal Columbia River Transmission System Act which you are familiar with, establishes the Bonneville Power Administration Fund. That fund shall consist of, one, all receipts, collections and recovery by the Administrator in cash from all sources including trust funds; two, all proceeds derived from the sale of bonds by the Administrator; three, any appropriations made by the Congress for the fund; and four, the following funds which are hereby transferred. There is a list of them. It then states in subsection "B" that the Administrator may make expenditures from the fund which shall have been included in the annual budget submitted to Congress without further appropriation and without further fiscal year limitations that may be included in the Appropriation Act for any purpose necessary or appropriate to

carry out the duties imposed on the Administrator pursuant to law including, but not limited to, and there are 11 items and this 12th item would be added.

I think the point the chairman is making is that from this language plus additional language already in the statute and the authority to purchase as he described a few minutes ago there is no question that there would be in effect a guarantee of the purchase through the contract process using the Bonneville authority to do it. That is the point he is making. Are you suggesting, based on your other suggestion here, that really the provision of section 8(A) ought not to be in the bill?

Mr. MUNRO. No, Mr. Finnegan. I think whatever limitations you put should be reflected in 8(A).

Mr. FINNEGAN. Why do you need 8(A)?

Mr. MUNRO. The listings under 8(A) are apparently listings of those existing laws that are amended specifically by this legislation.

Mr. FINNEGAN. 8(A) is an amendment to section 11(B) of the Transmission Act. As I just stated the Transmission Act says you can "use the funds for any purpose necessary or appropriate to carry out the duties imposed on the Administrator pursuant to law, including but not limited to."

All this means is now you get a shopping list. The first is "construction, acquisition, and replacement of the transmission system, including facilities and structures appurtenant thereto, and additions, improvements, and betterments thereto."

Next is "Operation, maintenance, repair and relocation, to the extent such relocation is not provided for under subsection (1) above, of the transmission system; third is "electrical research, development, experimentation, test, and investigation related to construction, operation, and maintenance of transmission systems and facilities. Fourth is "Marketing of electric power." Five is "transmission over facilities of others and rental, lease, or lease-purchase of facilities."

Sixth is "Purchase of electric power (including the entitlement of electric plant capability) (i) on a short-term basis to meet temporary deficiencies in electric power which the Administrator is obligated by contract to supply, or (ii) if such purchase has been heretofore authorized or is made with funds expressly appropriated for such purchase by the Congress, or (iii) if to be paid for with funds provided by other entities for such purpose under a trust or agency arrangement."

Seven is "defraying emergency expenses or insuring continuous operation."

Eight is "paying the interest on, premiums, discounts, and expenses, if any, in connection with the issuance of, and principal of all bonds issued under section 13(a) of this act, including provisions for and maintenance of reserve and other funds established in connection therewith."

Nine is "making such payments to the credit of the reclamation fund or other funds as are required by or pursuant to law to be made into such funds in connection with reclamation projects in the Pacific Northwest: *Provided*, That this clause shall not be construed as permitting the use of revenues for repayment of costs allocated to irriga-

tion at any project except as otherwise expressly as authorized by law."

Ten is "making payments to the credit of miscellaneous receipts of the Treasury for all unpaid costs required by or pursuant to law to be charged to and returned to the general fund of the Treasury for the repayment of the Federal investment in the Federal Columbia River Power System from electric power marketed by the Administrator."

Eleven is "acquiring such goods and services, and paying dues and membership fees in such professional, utility, industry, and other societies, associations, and institutes, together with expenses related to such memberships, including but not limited to the acquisitions and payments set forth in the general provisions of the annual appropriations act for the Department of the Interior, as the Administrator determines to be necessary or appropriate in carrying out the purposes of this act."

What does 12 add to that list that is not already covered in the present law? What does 12 give you?

Mr. MUNRO. What you are referring to says those are not necessarily limitations.

Mr. FINNEGAN. That is correct.

Mr. MUNRO. I believe we are only going to be permitted under section 8(A) to make such payments carrying out the purposes of this act as you specifically authorize us to do in this act. We are asking that you specifically prohibit us, if that is your desire, not to engage in purchases for the construction or acquisition of a generating facility, for example, except for the limited purpose that we mention.

Mr. FINNEGAN. What do you mean by the word "payments"?

Mr. DINGELL. If counsel will permit, if I read here the language referred to say, "making such payments as shall be required to carry out the purpose of the Pacific Northwest Electric Power Planning and Conservation Act."

Mr. Finnegan has read from that language. One is construction, acquisition, replacement of transmission systems.

Mr. MUNRO. That is in the existing law you are reading from.

Mr. DINGELL. Operation, maintenance, repair and relocation and so forth of the above transmission system. Three is electrical research, development, experimentation, test and investigations," and so forth. Four is marketing of electrical power. Five is transmission of facilities rental, lease or lease-purchase of facilities. Now lease-purchase of facility is pretty broad. As I understand, lease-purchase facilities could be generation facilities, transmission facilities. It could be damn near anything.

Mr. DINGELL. That is the current law. Six is "purchase of electric power (including the entitlement of electric plant capability) on a short-term basis to meet temporary deficiencies," and so forth. If such purchase has been heretofore authorized or is made with funds expressly appropriated for such purchase by the Congress, or (three) if to be paid for with funds provided by other entities for such purpose under a trust or agency arrangement. Seven is "defraying emergency expenses or insuring continuous operation." Nine is "making such payments to the credit of the reclamation fund or other funds as are required by or pursuant to law to be made into such funds in connection

 

with reclamation projects in the Pacific Northwest: *Provided*, That this clause shall not be construed as permitting the use of revenues for repayment of costs allocated to irrigation at any project except as otherwise expressly authorized by law."

Ten is "making payments to the credit of miscellaneous receipts of the Treasury for all unpaid costs required by or pursuant to law to be charged to and returned to the general fund of the Treasury for the repayment of the Federal investment in the Federal Columbia River Power System from electric power marketed by the Administrator."

Eleven is "acquiring such goods and services, and paying dues and membership fees in such professional, utility, industry, and other societies, associations, and institutes, together with expenses related to such memberships . . . in carrying out the purposes of this act."

I am curious after I read the language that you have here why would you need 12 to follow 11?

Mr. McIsaac. Mr. Chairman, I don't believe that the 11 purposes enumerated in the original Columbia River System Transmission Act covers the situation where you would wish to make investments through whatever means, grants, loans, out of Bonneville funds for conservation purposes. It certainly wouldn't cover it for such purposes as we have already discussed implicit in the bill as drafted before you, the purchase of power generation facilities which we oppose and which we hope will be amended.

Mr. Dingell. You are suggesting section 8(A) be amended, is that right?

Mr. McIsaac. Sir, I think you need section 8(A) to give the Administrator the authority to spend money from the Bonneville fund for conservation purposes. What I am proposing be amended is the enumeration in this draft legislation of the purposes for which the Bonneville Administrator can spend that money and limit it to conservation.

Mr. Dingell. The language that I read here appears to be a little broader but let me yield back to Mr. Finnegan.

Mr. Finnegan. Mr. McIsaac, I point out to you as I read in the beginning of this that the present statute, present law, says the Administrator may make expenditures from the fund "for any purpose necessary or appropriate to carry out the duties imposed upon the Administrator pursuant to law," now including these items. If this bill passes and it tells him to do conservation it is a duty for which he has a responsibility and he has the authority to carry it out.

Mr. Dingell. In fairness to the reporter, you have to say yes or no.

Mr. McIsaac. I see what you are driving at. I think that is an appropriate legal interpretation although I am not a lawyer.

Mr. Dingell. It is the desire of the committee to understand the purpose of the legislation. The purpose of the legislation as I read it is "To assist the electrical consumers of the Pacific Northwest through use of the Federal Columbia River power system to achieve cost-effective energy conservation, to encourage the development of renewable energy resources, to establish a representative regional power planning process, to assure the region of an efficient and adequate power supply, and for other purposes."

So under 12 here he can do anything necessary to accomplish that, including buying facilities. You say that is not necessary but the lan-

guage is sufficiently clear that I am curious whether or not you are not vesting him with that authority, particularly in light of the fact that you are expanding his responsibilities as read earlier?

Mr. McIsaac. Vesting him with the authority to purchase generating facilities?

Mr. Dingell. I read it that way.

Mr. McIsaac. We suggest, sir, an amendment to prohibit him from doing so.

Mr. Dingell. We would ask for drafting service on that point.

Mr. McIsaac. I cannot hear you.

Mr. Dingell. As a matter of Christian charity, we would request drafting assistance on that point to narrow that sweep.

Mr. McIsaac. We will be happy to provide such assistance.

Mr. Dingell. Now, Treasury complains about 6(f). They say it "would authorize BPA to enter into agreements with such entities 'to fund or secure debt incurred in the investigation and initial development of such resources.'" Do you agree with Treasury's comments on 6(f)?

Mr. McIsaac. Yes, I do.

Mr. Dingell. Do you think that 6(f) is good or are you in agreement with Treasury that it ought to be modified or changed or stricken? Where are we on that one?

Mr. McIsaac. Sir, I do not recall the precise nature of the Treasury position, but I assure you we agree with it. We checked it carefully before they made that statement.

Mr. Dingell. The Treasury does set out the administration's position.

Mr. McIsaac. Yes.

Mr. Dingell. Mr. Munro, I guess, agrees with that?

Mr. McIsaac. Yes.

Mr. Dingell. Let me read 6(f):

> The aministrator is authorized to enter agreements with sponsors of resources which may be proposed for acquisition by the administrator to fund or secure debt incurred in the investigation and initial development of such resources.

Now, he can do two things: He can fund or secure debt incurred in investigation, in its initial development of such resources. What does that mean? Does that mean under the investigation he can do all the things necessary to further plans for acquisition of or leasing and so forth of the facilities and then initial development can include what, purchase of land, construction of a dam, installation of generation facilities? What would be the bound of authority he would have under that?

Mr. Munro. I would determine this as defining the preconstruction cost.

Mr. Dingell. Would that include land acquisition?

Mr. Munro. It might.

Mr. Dingell. Architect fees?

Mr. Munro. Yes.

Mr. Dingell. Engineering cost?

Mr. Munro. Yes.

Mr. Dingell. Acquisition of generators and so forth?

Mr. MUNRO. No. I think that would be in the construction process.

Mr. DINGELL. So he could fund or secure the debt related to everything before the construction cost under this.

Mr. MUNRO. Yes, as part of the cost of this facility.

Mr. DINGELL. Would you gentlemen submit us some language that would be helpful to us in supporting the administration position? I suggest that should be done in concert with the Treasury Department so that we can have the administration's viewpoint together as opposed to referring the difference between you good folks downtown.

Section 8 has been discussed by you and Mr. Finnegan.

Section 9(e), the Treasury says as follows:

> Section 9(e) would confer on the BPA administrator authority to exempt from federal income taxes the interest on obligations issued by state or local governments to finance construction of facilities for production of electrical power for purchase by BPA. Thus, the federal guarantees provided under Sections 6 and 8 could be extended to tax exempt debt.

Is that true or false?

Mr. MCISAAC. This should be amended, according to the Treasury testimony, to clear up that ambiguity, Mr. Chairman.

Mr. DINGELL. Gentlemen, will you get together with the Treasury Department and submit language to correct that please?

Mr. MCISAAC. Yes.

Mr. DINGELL. Mr. Finnegan advises me that the Treasury wants to drop 9(e) in its entirety. I think probably there would be some difficulty here if that would be done. The Chair is concerned now about language here which appears under section 9 and it is in 9(c).

It reads as follows: "Bonneville Consumers Council and Bonneville Utilities Council shall not be subject to the provisions of the Federal Advisory Committee Act." Can you tell me why they would not be subject to the National Advisory Committee Act?

Mr. MUNRO. Presumably, Mr. Chairman, the sponsors of the legislation wanted to exempt these bodies from the kind of requirements involving Federal officials that are in the Advisory Committee Act. Meetings can be adjourned by the Federal representative. The meeting must be chaired by the Federal representative or at least the Federal representative must be present.

Mr. DINGELL. The meetings will be open?

Mr. MUNRO. I would say the administration's position is very strongly in favor of requiring open conduct of the meetings and those kinds of provisions are in the Advisory Committee. I see no reason for exempting these councils from those provisions.

Mr. DINGELL. How about antitrust exemption?

Mr. MUNRO. Yes; we have testified they should not be exempt from antitrust provisions.

Mr. DINGELL. Let me read the following: "Any action by a member of such council related to an action of such council shall not be deemed to be a violation of the Federal or State antitrust laws." I gather that the administration is not in favor of this language.

Mr. MCISAAC. That is right.

Mr. DINGELL. I yield to Mr. Finnegan.

Mr. FINNEGAN. Can you give us any ideas as to why the participants in the council would want that provision of exemption from the antitrust laws?

Mr. MUNRO. I do not see why there should be such an exemption. They are not involved in making any decisions having to do with resources. If Canfield's recommendations were adopted you might have to look at the question at issue as to whether they could function without an exemption from the antitrust provisions.

As we read the bill as it stands now, I just do not see where they would be involved in any need for such an exemption. If there is a reason for such a provision, it is up to the members of these councils to explain and justify the need.

Mr. FINNEGAN. To the extent that there results from this bill some degree of pooling of power or a significant amount of pooling of power, to what extent would the utilities want to have a role in the say of how that is all done and could it be possible that they anticipate that the utilities council that is established by this bill would be the mechanism for doing that?

And if they get into that situation, they would then require some sort of antitrust exemption because their recommendation, for example, for acquiring new facilities or entering into a purchasing contract or any of those things could be very important and could have an anticompetitive impact on some utility or somebody wanting to get into the business.

Mr. MUNRO. I cannot find anything in the bill that gives them authority to make decisions in that regard.

Mr. FINNEGAN. Not make decisions but participating in making recommendations to you as Bonneville administrator.

Mr. MUNRO. They are specifically authorized to do so under the bill, yes, make recommendations.

Mr. DINGELL. Does not the relative language at page 11, at least part of it, say "prior to the execution of any contract for acquisition of major resources pursuant to section (c) of this section, the administrator shall have reviewed the proposed action with the Governors, Bonneville Consumers Council, and the Bonneville Utilities Council, pursuant to section 4; and he shall submit any comments or recommendations received from the Governors and the councils along with the proposed contracts and evidence," and so forth and so on, "to the Senate Energy and Natural Resources Committee and to the House Interior Committee for review."

Now, the Bonneville Consumers Council will be whom?

Mr. MUNRO. Under the terms of this legislation they are representatives appointed by the Governors, Mr. Chairman.

Mr. DINGELL. No Federal appointees?

Mr. MUNRO. No, sir.

Mr. DINGELL. Now, the Bonneville Utilities Council will be whom?

Mr. MUNRO. They would be representatives of the utilities, public and private, and direct service industry.

Mr. DINGELL. So, an antitrust exemption for a council of utilities here might be extremely unwise, particularly if you couple it was an exemption from the Federal Advisory Committee's legislation; is that right?

Mr. MUNRO. I see no justification for it, Mr. Chairman, unless you adopt some other amendatory language that would give them some decisionmaking power; then there would be a different situation.

Mr. FINNEGAN. I think that the concern here—I am not suggesting we want antitrust but I want to get to the point that they do have recommended authority on contracts which this bill does give them. One of those contracts that you may suggest to purchase or to get into is the contract with somebody who wants to get into the utility business.

They may say, "No; you should not do it." Then they have competition problems, anticompetition problems. The fact that they are not making a decision is not really relevant. The fact that they can as a group get together and make recommendations is just as relevant.

Mr. MUNRO. I certainly defer to your legal advice on that subject. I cannot testify as to that.

Mr. FINNEGAN. I suggest that the chairman would want to hear from the general counsel of Bonneville on this matter as well as the Justice Department on this matter, so that we get the viewpoints on this issue rather than quickly wave it away and say we have concerns about it but let us know what it is all about first. What is the effect on this utility council if it is eliminated?

Mr. DINGELL. The chair is going to yield to Mr. Athy.

Mr. ATHY. Mr. Munro, what is your view of the recommendation made by Mr. Bardin for building mandatory conservation standards in the bill?

Mr. MUNRO. I do not recall building in, Mr. Athy.

Mr. ATHY. Mr. Bardin suggested amending——

Mr. MUNRO. He indicated we certainly ought to look at what opportunities may exist for utilizing rate mechanisms to achieve the objectives.

Mr. ATHY. I thought that was a separate point.

Mr. MUNRO. I certainly agreed with that. I have now looked at his testimony in tht regard, with regard to his testimony will quote it. "The administrator of the Bonneville administration should be specifically authorized to require, as a condition of wholesale contracts, that distribution utilities institute comprehensive programs in cooperation with State and local efforts."

Mr. ATHY. Are you in support of that view?

Mr. MUNRO. Yes. I believe, and particularly recognizing the cautions from this committee and others for public involvement, that the imposition of such a process should itself be in the public involvement program and consultation processes that are directed by the bill, not just a mandate of the Bonneville Power Administration.

Mr. ATHY. Let me ask Mr. Canfield to compare price mechanisms to mandatory standards.

Mr. CANFIELD. May I have the question?

Mr. ATHY. You make an evaluation in general comparing price mechanisms as opposed to mandatory conservation methods and in particular, what recommendation would you make with regard to the problem in that area?

Mr. CANFIELD. It is very obvious to me that mandatory mechanisms are quicker and more effective and they are almost never passed. So, the price mechanism as a fallback position, it seems to me, is worth having.

Mr. ATHY. Mr. Munro, is my reading of the bill correct that resources that are under construction before being acquired by Bonneville, must go through that three-step process?

Mr. MUNRO. Yes; any acquisition of new resources would have to go through the process.

Mr. ATHY. Projects No. 4 and No. 5 would have to go through that three-step process?

Mr. MUNRO. Yes.

Mr. ATHY. You think that is desirable?

Mr. MUNRO. Yes.

Mr. ATHY. Would you agree that on the siting provisions under 6(c) you ought to first go to the State and get approval of the State before you go through that process? Some of the Governors and commissioners feel being at the end of that process cuts into their prerogatives at the time the decision is rendered at that level.

Mr. MUNRO. Yes. I have indicated that process of consultation should be applied to all these steps, not just to "C." Mr. Athy. We have recommended that in our testimony and in the answers to the written questions from the committee.

Mr. ATHY. Would you support the idea that the Governors ought to be able to actually approve on a majority basis?

Mr. MUNRO. I believe it is the position of the administration, Mr. Athy, that decisions of the Federal agency ought to be under the control of the Federal Government and not another governmental entity.

Mr. MCISAAC. We believe, of course, that Governors should be sensitivity consulted in the way in which Mr. Munro has testified.

Mr. ATHY. Let me ask you: Is there anything that can be done about the situation where a public utility is selling utility is selling almost all its power to industrial customers? Is there anywhere in the confines of this bill where something can be done about that type of a situation?

Mr. MUNRO. This bill does not change the definitions of the Bonneville Act or any other Federal act having to do with the eligibility. Who is a preference customer, Mr. Athy? The Congress can of course do that if it desires to do so.

Mr. ATHY. The direct service industries are making some noise about the floor included in the section 7 rate provisions, saying it is going to produce revenues in excess of what is necessary. I assume that those revenues are intended to finance conservation measures.

But is that floor necessary?

Mr. MUNRO. I would say that it probably would produce revenues more than would be required to carry out the other purposes of the bill. I think it is a matter for determination by the Congress as to whether that is necessary.

Mr. ATHY. The direct service industries seem to be complaining that the way the rate structure is established if their load drops significantly because of interruption or business fall off their unit costs increase dramatically. They feel they should be able to spread those costs over the years. Do you agree with that recommendation?

Mr. MUNRO. No, sir.

Mr. ATHY. Is there room in the Pacific Northwest for the development of low-head hydro?

Mr. MUNRO. Yes.

42-630—79——13

Mr. ATHY. Should this be specifically included in the bill.

Mr. MUNRO. The Corps of Engineers has done a number of studies of low-head hydro opportunities, Mr. Athy. This bill, I think, is consistent with the development of low-head hydro and in fact, I see it as encouraging the development of low-head hydro and the acquisition by Bonneville of low-head hydro resource because they are renewable resources.

Mr. McISAAC. On the other hand, the administration's position is that the act should be drafted so that Bonneville would be prohibited from acquiring for construction or operating purposes any generating facilities, including hydroelectric generating facilities. At the moment, Bonneville purchases the power from federally operated hydroelectric generating facilities in the Pacific Northwest. I believe most of them are operated by the Corps of Engineers.

Bonneville is undertaking, I believe, the purchase of the power output of some new generating facilities which are going to be built by the city of Idaho Falls using tax bonding authority, low-head hydrogenerating facilities, using new ball turbine technology. Bonneville will be purchasing that power, as I recall. This act would encourage Bonneville to look for these kinds of applications.

Mr. MUNRO. That purchase is under existing authority for 5 years or less contract, however.

Mr. ATHY. Do you think that the emphasis of this legislation, the discussion in the GAO study talking about self-sufficiency in this region, is in conflict with objectives of the national energy legislation which seems to encourage much broader regional interties to lessen disadvantages which certain areas suffer?

Mr. BARDIN. We always built our power in this country from the small local plant outward, starting from Thomas Edison's 12th Street station serving a very, a very small downtown city block area in Manhattan. This Pacific Northwest region in fact led the way a decade ago in developing a very strong interregional intertie to the south, with California and Nevada and the other States there.

So, that unless there is some specific provision in the language in this bill that you would like me to study with you, I know of no thrust or development in the immediate past, present or future which ought to inhibit local evolution and progression that we have seen actually underway for a good many years for very strong interregional development as the scale of operation justified.

Mr. ATHY. I have no further questions, Mr. Chairman.

Mr. DINGELL. I return here to this Bonneville Consumers Council and Bonneville Utilities Council. What will be the function of each of those bodies?

Mr. MUNRO. The bill gives them an authority—I should not call it authority—it sets them up for the purpose of advising the administrator in the development of the regional plan and program and in the review of specific proposed acquisitions, Mr. Chairman.

I assume it is devised for the purpose of both utility expression of view on those subjects and other than the utility expression of view in the region onthose subjects.

Mr. DINGELL. That is the language which appears at page 11, line 1 and the following subparagraph?

Mr. MUNRO. Yes.

Mr. DINGELL. Does that authority give them the authority to convene themselves and discuss things like pooling arrangements?

Mr. MUNRO. The language of the bill establishing those councils mandates to the Bonneville Power Administrator the responsibility for devising the rules under which they would function, Mr. Chairman.

Mr. DINGELL. They would then be able to come together and advise the Bonneville Power Administrator as to the fashion in which he should function. That will also include the function as regards pooling arrangements, et cetera, and it would also leave them the authority to convene themselves to discuss pooling arrangements, as between themselves, would it not?

Mr. MUNRO. The language of 6(g) spells out specifically the matters on which we are to consult with them, I believe.

Mr. DINGELL. Maybe we had better proceed here by exclusion. Can you tell me that this language does not authorize them to engage in discussions among themselves as regards pooling and allocations of power?

Mr. MUNRO. I see no prohibition here on their discussing among themselves anything.

Mr. DINGELL. No prohibition?

Mr. MUNRO. I see no prohibition in the bill on any discussion of any subject.

Mr. DINGELL. Then sitting comfortably back under the antitrust exceptions in 9(c), without the mandates of the Federal Advisory Committee Act, they can do almost anything they want in those?

Mr. MCISAAC. Yes.

Mr. DINGELL. I think we have agreed it should come out. We should get it out in some haste. Can you give me an answer to that, gentlemen?

Mr. MUNRO. I see no justification for the exemption, Mr. Chairman, from the antitrust.

Mr. DINGELL. Gentlemen, I would like to turn your attention now to page 19 of the bill, line 14. It says as follows: "(f) no provision of chapter 2(c) of title 15 of the United States Code shall apply to or be deemed to include any 'person' or 'company' as defined in 15 U.S.(c) 79(b)(a) and (2)."

Can you tell me what is 2(c) of title 15 of the United States Code? Is that public utilities' holding company act?

Mr. MUNRO. Yes.

Mr. DINGELL. Can you tell me why that would not apply to these good folks?

Mr. MUNRO. No, Mr. Chairman. We have recommended. the administration has, that this exception not be granted either. The Justice Department, I believe, has reported to you on that subject.

Mr. DINGELL. Let us try to understand why it is here because there may be a good reason that escapes both the administration and the chairman of the subcommittee. Can you tell me what this exception from the public utilities holding company—first of all, to whom would the exception from the public utilities holding company apply? The first question is: Whom? Then, we will get around to "what" next.

Mr. MUNRO. Those are subject to the holding company act. They are investor-owned utilities, Mr. Chairman.

Mr. DINGELL. It would apply to any investigator-owned utility company.

Mr. McIsaac. Mr. Chairman, in my testimony earlier, the Public Utility Holding Company Act was adopted to address specific abuses in the ownership of private utilities. My faint recollection of economic history is that a man named Samuel Insull—I hope I am not maligning anyone by the name of Samuel Insull—but I believe he acquired a string of electric utility companies and pyramided these companies. There was a subsequent collapse with abuses of ratemaking authority and the like.

I think the Electric Utility Holding Company Act was passed to address such abuses in ownership of a series of companies essentially owned by one person. I am not sure of the specific language of the act, but I believe, and it is the administration's position, that there is no reason why exemption of this act's protection is necessary to accomplish the goals of the bill. We cannot defend the language that is contained in the bill.

Mr. Dingell. This one does trouble me because I have seen periodic raids on this subject which have from time to time greatly troubled me. The Chair yields to Mr. Finnegan.

Mr. Finnegan. May I ask a question, again going back to the councils? One is the consumers council and the utility council. We discussed the utilities council. The consumer council consists of elected local officials and other persons who will be appointed from the general public with a view to diversity of background. Isn't it true that the consumers council, when you talk about elected officials, could include persons who are commissioners of PUD and so forth so they could be some utility special interest types from that standpoint?

Mr. Munro. This bill would not prohibit that. The appointment of mayors or city council members who may be the bodies who are in fact responsible for the operation of municipalities also would not be prohibited from membership. I myself see no reason to exclude that discretion on the part of the governors in making these choices.

Mr. Finnegan. The situation is that the utilities could be members of both types of councils.

Mr. Munro. They could be.

Mr. Finnegan. But the consumer could not be a member of the second council.

Mr. Munro. That is correct, the way this is structured.

Mr. Finnegan. If you are going to have a council, would it not be better to have a council that is balanced with one council that has all of the representations that would provide you a broad range of views rather than two councils that would provide their own special interest type of advice?

Mr. Munro. I would see no objection on our part to restructuring to that purpose.

Mr. Dingell. You are advocating having one council so that you get one representative view from industry?

Mr. Munro. If you wanted to have one council, certainly it would be appropriate, Mr. Chairman.

Mr. Dingell. Mr. Canfield, do you want to give us a comment?

Mr. Canfield. I am trying to leave the government gracefully.

Mr. Dingell. I see no reason why you cannot answer the question and leave gracefully.

 

Mr. CANFIELD. We recommended in our report and in my testimony that there be a single council. We think that would much better serve the public interest that that council be composed of the whole spectrum of interests that are involved and we certainly would support that they not be exempt from the two acts, the Antitrust and the Federal Advisory Committee Act.

So, we have strongly recommended that. We will provide legislative language to the committee if you are interested.

Mr. DINGELL. I think that would be of value to the committee.

Is there any reason why we could not have a majority of these folks be representative of consumers as opposed to industrial representatives? This is supposed to be a consumer-oriented bill.

Mr. MUNRO. I certainly do not have any objection.

Mr. MCISAAC. Mr. Chairman, I might point out the distribution of power usage in the Pacific Northwest, 75 percent of the power generated is consumed by industry and only 25 percent by the householder whom we typically think of as being consumers. There are two classes of consumers.

Mr. DINGELL. That is a very good point. How do we address that?

Mr. MCISAAC. One way that it was addressed in the legislation—and I do not want to come down on one side or the other of this council issue; I think Mr. Munro has unique knowledge about that and we can operate with councils in a variety of ways—but the way that it has been addressed is that the direct service industrial customers were going to meet with the utilities council.

The reason is that the direct service industrial companies do provide the interruptable load in the Pacific Northwest. You understand that in periods of very dry weather, such as we experienced last year, and the preceding year in the Pacific Northwest, the Columbia River system falls below that point where we can reasonably, continuously generate sufficient power. The people whose service is interrupted tend to be the large direct service industries, primarily the aluminium industry.

Indeed last year a considerable portion of the aluminum industry in the Pacific Northwest was shut down for a certain portion of time. The aluminum industry by giving up their power under contract did, in effect, provide for the residential consumer.

The drafters of legislation classified the direct service industrial customers as being part of the utilities council and then we had the separate consumers council where it would be hoped that the homeowners, those interested in conservation, would be most heavily represented.

Mr. DINGELL. I understand what you are saying, Mr. McIsaac. But you arouse my curiosity. Is that the rationale for having two separate councils really?

Mr. MCISAAC. I am not sure what the rationale was. I just point that out as a phenomenon that I noticed when I read the bill.

Mr. DINGELL. I gather from your testimony that your support of the bill is somewhat tempered, that you have trouble about certain portions thereof.

Mr. Munro. can give a comment on the rationale for perhaps two councils or what would be the function of the different councils? I find these troublesome.

Mr. MUNRO. Mr. Chairman, the rationale may be that one council is related to the generation and distribution end of the producer-consumer relationship, and the other council is on the consumer end of the relationship. I see no problem; in fact it might be an advantage, if they were arguing, communicating, whatever they do, together rather than separately.

I do not think they would necessarily be inhibited by joint sessions. I do not think that there is any essential, intrinsic merit either way.

Mr. DINGELL. I observe no mandate either as to what these councils shall do or when they shall be called together. They appear to be able to go as they please and come as they please and not be troubled with the consequences of their recommendations.

Should we not lay down some rules for them under which they would function and some rules in regard to who should convene them and so forth, who should be appointed to be chairman, et cetera?

Mr. MUNRO. Yes. If the Congress does not do that in the legislation, this bill as drafted would require the Bonneville administrator to do that, Mr. Chairman.

Mr. DINGELL. I observe that the Advisory Committee Act would generally deal with that. I observe that the administrator would be empowered by the legislation to establish terms and conditions of service for members of the commission, to fill vacancies on the council in the absence of appointment by the Governor or failure of the utility to select persons.

I do not gather that they would have any power over their function. If I am in error, and I hope I am, I will be delighted to have you correct me.

Mr. MUNRO. Power over their function, Mr. Chairman?

Mr. DINGELL. Yes.

Mr. MUNRO. I am required to consult with them. That is the only power I have over their function.

Mr. DINGELL. But you have no say as to where they meet, when they meet, under what conditions, what they will discuss when the doors are closed.

Mr. MUNRO. Presumably in devising the rules and regulations for their operation, as required here, there would have to be some frequency of meeting and some obligation for me to meet with them.

Mr. DINGELL. I do not see any place in the bill where you have the authority set forth that you are saying you would have. If I am in error, I stand ready to be corrected.

Mr. MUNRO. It says, "The administrator shall establish," Mr. Chairman. That is the opening line.

Mr. DINGELL. What does he establish?

Mr. MUNRO. The administrator shall establish the council.

Mr. DINGELL. Sir?

Mr. MUNRO. "Establish a Bonneville Consumer's Council and a Bonneville Utilities Council."

Mr. DINGELL. It says you shall establish the councils. Once you have established them, then what say do you have over their affairs?

Mr. MUNRO. As I read the legislation, they are not to be dominated by the administrator in the sense that the administrator will direct what their views will be, Mr. Chairman, no.

So, I would not have any power of that kind over their affairs as I interpret the proposal.

Mr. DINGELL. Who would deal with the rules and their procedures, the openness of their meetings, the travel expenses, the times of meeting, the terms of their recommendations to you?

Mr. MUNRO. The legislation says the administrator shall establish them. The administrator would have to do that.

Mr. DINGELL. Where do you read that?

Mr. MUNRO. I read it in line 4 of page 5.

Mr. DINGELL. It says: "The administrator shall establish a Bonneville Consumers' Council and a Bonneville Utilities Council." You establish them. That is sort of like God, on the seventh day he rested. You have done that; you then proceed to rest. What further do you do there?

Mr. MUNRO. That is left to the determination of the administrator, I assume.

Mr. DINGELL. Is it? Where?

Mr. MUNRO. That is my interpretation of what it means.

Mr. DINGELL. I have a great deal of faith but where is it here?

Mr. CAUFIELD. Excuse me, Mr. Chairman. On page 6, line 4, "conditions of service."

Mr. MUNRO. If I could refer to the administrative section of the bill on page 18 in section 9(a).

Mr. DINGELL. Where in there?

Mr. MUNRO. I interpret that as general authority to do many things, Mr. Chairman.

Mr. DINGELL. Where does it lay out the authority of the two councils?

Mr. MUNRO. It does not say so specifically there. But taking that section in connection with the other section "to establish," I believe that would be the authority on which to set up the specifics.

Mr. DINGELL. It says "contracts, agreements and arrangements."

Mr. MUNRO. Yes.

Mr. DINGELL. That would be contracts, arrangements and arrangements for those good things, but those would be matters like travel plans, travel expenses, compensation, per diem. But where would it go to the powers of this panel to arrive at its own procedural judgment and establish procedure to hire staff, et cetera?

Mr. MUNRO. It does not.

Mr. BARDIN. It occurs to me that the language could be clarified by the Congress that if it were to be enacted as it now stands, the administrator in establishing a council would presumably prescribe by order or what in effect would be bylaws or the ground rules.

Mr. DINGELL. Where is the authority in the bill to do that?

Mr. BARDIN. I believe the verb, "shall establish" could be so read just as the Constitution of the United States.

Mr. DINGELL. I am familiar with the words "shall establish." That means he shall do something. It means he shall set up the council. Where does it say he would have the authority to then prescribe the rules and regulations, times of meeting, quorum, the number of folks who would serve, the compensation, the per diem and the establishment of their rules and procedures?

I think that is something you folks down there had better take a look at because we need your help on it. While I think we need somebody setting authority, I am not sure if you find yourself in court with counsel on the other side that you can make the case before the judge that you did have authority to do these things.

Gentlemen, we have asked hard questions. I wish to reiterate to each of you my respect for you and my appreciation to you for being here and my regrets if we have in any fashion displeased you with any of the questions.

But we are dealing with legislation that is of vast importance to the area. I am sure that my colleagues from that part of the country would not take kindly if I were to shirk my responsibility to protect them from the public and private utilities in the area.

With those comments, gentlemen, I thank each of you for your assistance to the committee. The committee stands adjourned until the call of the Chair.

[Whereupon, at 6:35 p.m., the committee was adjourned subject to the call of the Chair.]